# EXHIBIT G

09/12/2024

Mr. Good,

Enclosed is a copy of my franchise agreement and a couple pieces of correspondence that I could find going through my email on ownership changes at Cartridge World/CWNA.

Outside of what I have provided, I do not have any information regarding CWNA assets nor do they hold any interest in any of my assets. I am required to send them monthly royalties as outlined in the enclosed franchise agreement. They have not provided any equipment and I lease my own retail space from a local developer.

Please feel free to reach out to me at 309-762-2465 with any follow up questions you may have. I spoke briefly with my attorney and he advised that sending you the enclosed information should suffice and that I hopefully won't need to appear in court on the 26th. If you anticipate me having to appear, my attorney is in Florida and won't be able to make the 26th so I would need to reschedule the appearance.

I'm happy to assist with anything further you may require.


Best,

Karrie Powers

## CERTIFICATE OF ATTORNEY

I, Ross M. Good, an attorney, certify under penalties as provided by law pursuant to 735 ILCS 5/1-109 that the following information is true:

1.    On September 14, 2021, the United States District Court for the Northern District of Ohio entered a judgment in civil action no. 1:16-cv-00226 in favor of Whiteamire Clinic P.A., Inc. and against Cartridge World North America, LLC in the amount of $4,293,000 plus post-judgment interest which continues to accrue, the entirety of which remains unsatisfied.

Dated: August 19, 2024

/s/ Ross M. Good
_____
Ross M. Good, Esq.
The Good Law Group
800 E. Northwest Hwy, Suite 814
Palatine, IL 60074
ross@thegoodlawgroup.com
direct: (847) 600-9576


_____
Clerk
United States District Court
Northern District of Illinois

THOMAS G. BRUTON, CLERK



_____
(By) DEPUTY CLERK

August 20, 2024
_____
DATE

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Whiteamire Clinic P.A., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 1:24-cv-06753 |
| | ) | |
| Cartridge World North America, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**THIRD PARTY CITATION TO DISCOVER ASSETS**

To: IN THE INK, LLC

3924 38TH STREET, MOLINE, IL 61265

On February 1, 2016, Whiteamire Clinic P.A., Inc ("Plaintiff" or "Judgment Creditor") filed a lawsuit against Cartridge World North America, LLC ("Defendant" or "Judgment Debtor"). On September 14, 2021, the U.S. District Court for the Northern District of Ohio entered judgment against Defendant and in favor of Plaintiff in the amount of $4,293,000, plus post-judgment interest accrued pursuant to 28 U.S.C. § 1961, which continues to accrue (the "Judgment"). The Judgment remains entirely unsatisfied. This Judgment was entered by the Court pursuant to the Illinois Uniform Country Money Judgments Recognition Act (735 Ill. Comp. Stat. 5/12-661, et seq.).

Pursuant to 735 ILCS 5/2-1402 and Illinois Supreme Court Rule 277, made applicable hereto by Federal Rule of Civil Procedure 69(a)(l), YOU ARE COMMANDED to appear at

> 219 South Dearborn Street
> Chicago, IL 60604
> Courtroom 1419 on
> September 26, 2024 at 9:30 a.m.

on the date and time identified in the NOTICE OF THIRD-PARTY CITATION TO DISCOVER ASSETS to be examined under oath to discover assets or income not exempt from the enforcement of the Judgment.

**YOUR FAILURE TO COMPLY WITH THIS CITATION MAY CAUSE YOU TO BE ARRESTED AND BROUGHT BEFORE THE COURT TO ANSWER TO A CHARGE OF CONTEMPT OF COURT, WHICH MAY BE PUNISHABLE BY IMPRISONMENT IN THE COUNTY JAIL.**

**YOU ARE COMMANDED** to produce at the examination all books, papers or records in your possession or control showing any accounts, property, assets or income of the Judgment Debtor, including, without limitation:

1. All personal or business checking, savings, brokerage, money market or other accounts, in which the Judgment Debtor has, or has had, an interest;

2. Any indebtedness due or to become due the Judgment Debtor from any third person or entity, including but not limited to accounts receivable, and also including promissory notes and other loan documents and a list identifying the names and addresses of and amounts owned by each person or entity who is so indebted;

3. Income of any kind or nature to which the Judgment Debtor is entitled, including but not limited to salaries, rental income, dividends, royalties, wages, draws or distributions and contract retainages

4. Any interest owned by the Judgment Debtor in any real property (land and the buildings affixed thereto), or in which the Judgment Debtor has any interest;

5. Any deposit of money in the name of the Judgment Debtor or in which the Judgment Debtor has any interest;

6. Any stocks, bonds, debentures, options, promissory notes, partnerships, memberships, other obligations or "securities" as defined in the Illinois statutes owned by the Judgment Debtor or in which the Judgment Debtor has any interest, or owned in the name of another for the Judgment Debtor's benefit, including but not limited to originals and copies of stock certificates, confirmation advices, correspondence, statements or other records of dealings with stock brokerage agents, or similar agents, and bond coupons;

7. Any interest held by the Judgment Debtor in a corporation, partnership, limited partnership or limited liability company;

8. The Judgment Debtor's ownership of or interest in personal property and information related to the value thereof, the present location thereof, and the insurance thereon, including but not limited to bills of lading, warehouse receipts, negotiable or non-negotiable orders for delivery of goods, documents of title to titled vehicles such as automobiles, and records of ownership of any other vehicles such as boats, airplanes, office equipment and furniture of all types, including all documents reflecting any encumbrances on the titles to the foregoing, such as liens, and records of payments of loans with respect thereto, cash promissory notes, accounts receivable, contracts, claims of any type, lawsuits, jewelry, gold, coin collections, and precious metals;

9. The Judgment Debtor's interest in any insurance policies, either as the insured or as a beneficiary thereunder, and the Judgment Debtor's interest in any annuities, or similar forms of contracts, either as an insured or as a beneficiary thereunder;

10. The Judgment Debtor's ownership of the beneficial interest, or any portion of the beneficial interest, under any land trust, whether in the Judgment Debtor's name or in the name of another held for the Judgment Debtor's benefit;

11. The interest of the Judgment Debtor as a beneficiary under any trust, or as a grantor or trustee under any trust;

12. The Judgment Debtor's interest in IN THE INK, LLC, and any pledges or encumbrances on the same; and

13.     A schedule of any payments due or to become due from IN THE INK, LLC to the Judgment Debtor, including but not limited to, salaries, reimbursements, or rent payable to the Judgment Debtor.

**YOU ARE ADDITIONALLY COMMANDED** to produce at the examination all books, papers or records in your possession or control that refer to or evidence the sale, transfer, or disposition of property, both personal and real, tangible and intangible, by the Judgment Debtor to any person or entity at any time between September 14, 2021 and the present.

Documents produced prior to the examination may be delivered to:

Ross M. Good, Esq.
The Good Law Group
800 E. Northwest Hwy, Suite 814
Palatine, IL 60074
Phone/Fax: (847) 600-9576
ross@thegoodlawgroup.com

Pursuant to 735 ILCS 5/2-1402(f)(1), YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment therefrom, a deduction order or garnishment, belonging to the Judgment Debtor or to which he or she may be entitled or which may thereafter be acquired by or become due to him or her, and from paying over or otherwise disposing of any moneys not so exempt which are due or to become due to the Judgment Debtor, until the further order of the court or the termination of the proceeding, whichever occurs first. You are not required to withhold the payment of any money beyond double the amount of the judgment.

To: Cartridge World Franchisees & Territory Masters

Date: November 2, 2021

Subject: CW USA Re-organization

Dear Valued Franchisees & Territory Masters,

In December 2019, Blackford Capital acquired Cartridge World USA (formally Cartridge World NA) from Cartridge World Global and combined it with International Toner Corporation to form Imaging Supplies Consolidation II ("ISC II") with the strategy to grow in the imaging supplies market. As part of the continued growth, in October 2021 International Toner Corporation (ISC II) acquired essentially all the assets of Supplies Wholesalers ("SW"), a division of Reno Nevada based Online Tech Stores.

Although Supplies Wholesalers remains an un-authorized supplier to Cartridge World USA, we have begun the process for testing and qualifying specific products which may adhere to the CW USA approved vendor guidelines. To be clear, we are emphatic you continue to procure products from only the Cartridge World USA approved vendors. We are very early in the process and will keep you informed as this evolves.

As a result of this acquisition and reorganization Tony Bazan has been named the CEO of ISC II and I (Rob Leonard-Blackford Operating Partner) have been named the CW USA CEO replacing Mark Pinner and reporting directly to Tony Bazan. As part of the reorganization, we will continue to re-evaluate and determine what resources are required to grow the network and support the Cartridge World Franchisees to ensure our mutual success by growing the business. I will work closely with the network to mutually establish goals and strategic objectives that benefit all the constituents.

A strategic component of the SW acquisition and integration plan includes increasing the depth and breadth of distribution. The three additional distribution centers coming on-line to service CW USA in 2022 which are: 1. Lewisberry, Pennsylvania; 2. Sparks, Nevada; and 3. Memphis, Tennessee. Once the integration is complete, this will result in "Same Day, Pull, Pack and Ship" for all our Cartridge World Brand Toner and Ink products, as well as our entire TAA compliant product line from each of these locations, in addition to the current ITC distribution center in Buffalo Grove Ill.

Cartridge World USA continues to represent one the most unique business models in our industry. As a result of the COVID pandemic and resulting changes in the overall business landscape, the Small Office, Home Office, and SMB Channels are continuing to grow.

Rest assured, there is no one better positioned to take advantage of this dynamic market shift than our own CW USA network, which is why we invested in this business in 2019. All the initiatives we develop jointly moving

forward are designed to insure each of you are well positioned to carve out your fair share of this market and compete effectively in these channels. We are looking forward to supporting your continued success and will work our level best to provide the products, services and support you deserve!"

Please do not hesitate to contact myself or any member of the Cartridge World USA team if you have additional questions.

Sincerely,

Rob Leonard
CEO
Cartridge World USA
Email: rleonard@blackfordcapital.com



**Operating Partner**

Eric George
Finance Manager CW USA
Email: egeorge@cartridgeworldusa.com
(815) 321-4404

Tina Ricchio
Franchise Support/Operations Manager CW USA
Email: tricchio@cartridgeworldusa.com
(815) 321-4406



Cartridge World USA Franchisees & Masters,

First off, thank you for your continued partnership and support of an iconic brand and leader in the ink and toner printer cartridge business. We understand as a franchise owner you probably have many questions pertaining to the recent transactions of Cartridge World USA.

Carolina Wholesale Group acquired the license to operate the CW franchise in the USA from Blackford Capital. Carolina Wholesale Group owns both Arlington Industries and ITC so is very familiar with product needs for the Cartridge World franchisee. We are in the early stages of learning about the franchise business and with the input of the Masters and Franchisees, will put together a plan to best support the group.

We have partnered with Robert Maynard and Michael Mabry from Won Life Brands. Robert and Michael will be joining the team to better support you and grow the brand. Combined, Robert and Michael have over 50 years of franchise experience ranging from being franchisees to founding, growing, and leading franchise brands. To put it simply, they are franchise business people.

As we continue to acclimate to your business, we will be reaching out to you via a questionnaire to better understand what your needs are as a Cartridge World franchisee. We are actively seeking to hire a dedicated President to run Cartridge World on a day-to-day basis who can work with you, the franchisee, and the Arlington and ITC management team. In the meantime, both Tina Ricchio and Eric George remain fully engaged to support you and they are working closely with the Carolina Wholesale Group team to insure a smooth transition.

Sincerely,

*Larry Huneycutt*

President, Carolina Wholesale Group



**Cartridge World**

UNIFORM FRANCHISE OFFERING CIRCULAR
FOR USE IN THE STATE OF MINNESOTA

SUBFRANCHISOR:

WILDWOOD FRANCHISING, INC.
A California Corporation
5743 A Horton Street
Emeryville, CA 94608
(510) 594-9900

The Franchisee will operate a retail store in the business of refilling printer inkjet cartridges, remanufacturing laser cartridges and selling toners, hardware, software and related printer consumables.

The initial franchise fee is $28,000. Under current policy, which may change, a second franchise will have an initial franchise fee of $20,000, a third franchise is $17,000 and a fourth and subsequent franchise is $15,000. The initial franchise fee is due at the time you execute your Franchise Agreement. The estimated initial investment required ranges from $76,800 to $124,800.

<u>Risk Factors:</u>

THE FRANCHISE AGREEMENT PERMITS THE FRANCHISEE TO ARBITRATE OR LITIGATE WITH US ONLY IN CALIFORNIA. OUT OF STATE OR AREA ARBITRATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST MORE TO ARBITRATE WITH US IN THE LOCATION WE SELECT THAN IN YOUR HOME STATE.

THE FRANCHISE AGREEMENT STATES THAT CALIFORNIA LAW GOVERNS THIS AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

YOUR FAILURE TO ACHIEVE CERTAIN PERFORMANCE STANDARDS MAY RESULT IN TERMINATION OF YOUR FRANCHISE AGREEMENT

THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Information about comparisons of franchisors is available. Call the state administrators listed in Exhibit C or your public library for sources of information.

Registration of this franchise by a state does not mean that the state recommends it or has verified the information in this offering circular. If you learn that anything in the offering circular is untrue, contact the Federal Trade Commission and the state authority listed in Exhibit C.

Effective Date: January 28, 2004

INFORMATION FOR PROSPECTIVE FRANCHISEES
REQUIRED BY THE FEDERAL TRADE COMMISSION

TO PROTECT YOU, WE'VE REQUIRED YOUR FRANCHISOR TO GIVE YOU THIS INFORMATION.
<u>WE HAVEN'T CHECKED IT AND DON'T KNOW IF IT'S CORRECT</u>. IT SHOULD HELP YOU MAKE UP
YOUR MIND. STUDY IT CAREFULLY. WHILE IT INCLUDES SOME INFORMATION ABOUT YOUR
CONTRACT, DON'T RELY ON IT ALONE TO UNDERSTAND YOUR CONTRACT. READ ALL OF YOUR
CONTRACT CAREFULLY. BUYING A FRANCHISE IS A COMPLICATED INVESTMENT. TAKE YOUR
TIME TO DECIDE. IF POSSIBLE, SHOW YOUR CONTRACT AND THIS INFORMATION TO AN
ADVISOR, LIKE A LAWYER OR AN ACCOUNTANT. IF YOU FIND ANYTHING YOU THINK MAY BE
WRONG OR ANYTHING IMPORTANT THAT'S BEEN LEFT OUT, YOU SHOULD LET US KNOW
ABOUT IT. IT MAY BE AGAINST THE LAW.

THERE MAY ALSO BE LAWS ON FRANCHISING IN YOUR STATE. ASK YOUR STATE AGENCIES
ABOUT THEM.

FEDERAL TRADE COMMISSION
Washington, D.C. 20580

Date of Issuance: January 28, 2004

## LIST OF FORMER CARTRIDGE WORLD FRANCHISEES

David Colantonio
35 Floribunda Avenue
Glenmore Park, New South Wales 2745
Australia
02 4721 4001
(Blacktown outlet – transferred)

Scott Hall
66 Hitchen Road
Pokeno 1872
New Zealand
1800 266 899
(Albany outlet – transferred)

Holden Hill Unit Trust — Trustee, Jack Pete
6/560 Main North East Rd.
Holden Hill, South Australia 5088
Australia
61 8 8367 9444
(Holden Hill outlet – terminated)

Jennet Meg Holland
698 Ruthven Street
Toowoomba, Queensland 4350
Australia
(Toowoomba outlet – terminated)

Michael and Toni Mullins
3 Park Terrace
Magill, South Australia 5072
Australia
08 8332 5248
(Melrose Park outlet – reacquired)

David Parkinson
Unit 1/3C, Hornbeam Park Oval
Hornbeam Park, Harrogate
Yorkshire, England
0011 44 1423 878 520
(Harrogate outlet – transferred)

Sandra Roubos
3 Jellicor Street
Broadview, South Australia 5083
Australia
08 8981 1288
(Darwin outlet – transferred)

David Thor
43 Collins Street
Narrabeen, New South Wales 2101

Australia
02 9982 6700
(Dee Why outlet transferred)

Vicki Swanson
2 Whitbread Grove
Skye, South Australia
Australia
phone unlisted
(Netley outlet – transferred)

Peter John Wright
Shop 3/158 Gordon Street
Port Macquarie, New South Wales 2444
Australia
61 2 6584 9253
(Port Macquarie outlet – closed)

This document is NOT an offer of a franchise. <u>Cartridge World North America LLC does not award Cartridge World Unit Franchise Agreements in the United States.</u> Cartridge World Master Franchisees will market and award Unit Franchises.

This document is intended to be a 'model' Unit Uniform Franchise Offering Circular ("UFOC"). It has been filed as '<u>advertising</u>' with the State of California and is to be delivered to Cartridge World Master Franchises and candidates for Master Franchises for **information purposes only.** The Cartridge World North America LLC Master Franchise Agreement UFOC includes as an exhibit the current form of Cartridge World Unit Franchise Agreement. This model Unit UFOC is based upon this current form Franchise Agreement.

IT IS THE MASTER FRANCHISEE'S SOLE RESPONSIBILITY TO ENSURE THAT ALL FRANCHISE REGISTRATION, DISCLOSURE AND OTHER LEGAL OBLIGATIONS ARE COMPLIED WITH IN CONNECTION WITH THE OFFER AND AWARD OF UNIT FRANCHISES IN THEIR TERRITORY. THIS MODEL UNIT UFOC IS NOT TO BE DELIVERED BY YOU TO ANY PERSONS/ENTITIES, AND YOU ARE EXPRESSLY PRECLUDED FROM DOING SO. YOU ARE AUTHORIZED TO USE THIS DOCUMENT FOR YOUR INFORMATION ONLY AND SOLELY IN CONNECTION WITH YOUR DEVELOPMENT OF UNIT FRANCHISE UFOC DOCUMENTS FOR YOUR TERRITORY.

TABLE OF CONTENTS

| ITEM | | PAGE |
|------|---|------|
| 1. | THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES | 1 |
| 2. | BUSINESS EXPERIENCE | 4 |
| 3. | LITIGATION | 5 |
| 4. | BANKRUPTCY | 6 |
| 5. | INITIAL FRANCHISE FEE | 7 |
| 6. | OTHER FEES | 9 |
| 7. | INITIAL INVESTMENT | 14 |
| 8. | RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES | 17 |
| 9. | FRANCHISEE'S OBLIGATIONS | 19 |
| 10. | FINANCING | 20 |
| 11. | FRANCHISOR'S OBLIGATIONS | 20 |
| 12. | TERRITORY | 28 |
| 13. | TRADEMARKS | 32 |
| 14. | PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION | 34 |
| 15. | OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS | 35 |
| 16. | RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL | 35 |
| 17. | RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION | 35 |
| 18. | PUBLIC FIGURES | 41 |
| 19. | EARNINGS CLAIMS | 41 |
| 20. | LIST OF OUTLETS | 42 |
| 21. | FINANCIAL STATEMENTS | 46 |
| 22. | CONTRACTS | 46 |
| 23. | RECEIPT | 46 |

MINNESOTA ADDENDUM TO OFFERING CIRCULAR

**Exhibits**

A.    Franchise Agreement and All Exhibits, including Minnesota Addendum

B.    Financial Statements

C.    State Administrators and Agents For Service of Process

D.    List Of Current And Former Franchisees, Master Franchisees, And Pilot Operations

E.    Operations Manual Table of Contents

F.    Statement Of Prospective Franchisee

G.    Receipt

This document is NOT an offer of a franchise.  <u>Cartridge World North America LLC does not award Cartridge World Unit Franchise Agreements in the United States</u>.  Cartridge World Master Franchisees will market and award Unit Franchises.

This document is intended to be a 'model' Unit Uniform Franchise Offering Circular ("UFOC").  It has been filed as '<u>advertising</u>' with the State of California and is to be delivered to Cartridge World Master Franchises and candidates for Master Franchises for **information purposes only**.  The Cartridge World North America LLC Master Franchise Agreement UFOC includes as an exhibit the current form of Cartridge World Unit Franchise Agreement.  This model Unit UFOC is based upon this current form Franchise Agreement.

IT IS THE MASTER FRANCHISEE'S SOLE RESPONSIBILITY TO ENSURE THAT ALL FRANCHISE REGISTRATION, DISCLOSURE AND OTHER LEGAL OBLIGATIONS ARE COMPLIED WITH IN CONNECTION WITH THE OFFER AND AWARD OF UNIT FRANCHISES IN THEIR TERRITORY.  THIS MODEL UNIT UFOC IS NOT TO BE DELIVERED BY YOU TO ANY PERSONS/ENTITIES, AND YOU ARE EXPRESSLY PRECLUDED FROM DOING SO.  YOU ARE AUTHORIZED TO USE THIS DOCUMENT FOR YOUR INFORMATION ONLY AND SOLELY IN CONNECTION WITH YOUR DEVELOPMENT OF UNIT FRANCHISE UFOC DOCUMENTS FOR YOUR TERRITORY.

1. **THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES**

**The Franchisor, Business Form, Names, Address**

To simplify the language in this Offering Circular, "Wildwood", "we" or "us" means and "our" refers to Wildwood Franchising, Inc. (the Franchisor). "You," or "your" means or refers to the person who buys the Unit Franchise. If a business entity buys the Unit Franchise, "you" includes the Unit Franchisee's owners.

Wildwood was incorporated in the state of California, on December 11, 2002 and is offering Cartridge World ® franchises and began offering franchises in California in March 2003. We will start offering franchises in this state as of the effective date of this Offering Circular. Our principal place of business is 5743 A Horton St., Emeryville, California. We are a Master Franchisee of Cartridge World North America, LLC, offering, selling and servicing Cartridge World Franchise Businesses as an independent contractor in a specified area. We offer, and award, to qualified applicants, a franchise to operate one Cartridge World Unit Franchise Business (referred to as the "Unit Franchise" in this Offering Circular) at a specified retail location approved by us using the "Cartridge World" name and design. Please see Exhibit A for a copy of the current form of Cartridge World Unit Franchise Agreement. Capitalized terms that are not defined in this Offering Circular have the meanings that are included in the Unit Franchise Agreement (Article 1.2). Under an agreement with CWNA dated March 11, 2003 and that expires on March 11, 2018, Wildwood has the right to grant Cartridge World franchises in Northern California and Minnesota.

**Master Franchisor Information**

CWNA is the Master Franchisor of the Cartridge World System in the United States. CWNA was formed as a limited liability company in the State of Nevada in June, 2002, and began offering Cartridge World Master Franchises in late 2002. Its principal place of business is 5743 A Horton St., Emeryville, California 94608. CWNA has no company owned Cartridge World businesses, although it has the right to operate them. CWNA's primary business is the offer and sale of Cartridge World Master Franchise Businesses and it does not own franchises in any other line of business.

CWNA's affiliate, Cartridge World Pty Ltd. (CW International), has licensed to CWNA the rights to grant master franchises in the United States using the Cartridge World Marks and System. CW International's head office is located at 39 Charles St., Norwood, South Australia 5067. The Cartridge World concept was founded in Adelaide, Australia. Bryan Stokes, the Secretary and co-founder of CW International, started a business called Australian Laser Charge in 1988, refilling printer inkjet cartridges, remanufacturing laser cartridges, selling toners and related printer consumables. In 1991, the company changed its name to Australian Cartridge Co. and started offering franchises in 1997. The current business system was co-founded in 1999, by Mr. Stokes and franchising consultant Paul Wheeler, and the name was changed to Cartridge World Pty. Ltd. The company began franchising outside of Australia in 2000. CW International has been operating businesses of the type described in the Offering Circular since 1999.

CW International will be assisting us with training and advice. As of December 31, 2002 CW International had 14 Master Franchises operating in Australia, New Zealand, England, Scotland, Ireland, Singapore, Poland, Germany, Malaysia, Canada and Switzerland, and the Cartridge World system included 241 Unit Franchises throughout the world. Currently there is one company owned Cartridge World® retail Store in Melrose Park, Adelaide, South Australia.

CWNA also has an Affiliate, Cartridge World Supplies ("CWS"), which is a wholly owned subsidiary of CW International and is headquartered at CW International's principal location in South Australia. CWS was formed in South Australia in May, 2001, and sells ink, compatible cartridges and related consumables to franchisees in Australia and New Zealand. We anticipate that CWS or a related company may supply similar products to CWNA for sale to Unit Franchisees in the United States.

Cartridge World, Inc.("CW Inc."),another Affiliate, was incorporated in the state of Nevada in May, 2002, and is the managing member of CWNA. CW Inc. is headquartered in CWNA's Emeryville, CA office. CW Inc. does not offer franchises, in any line of business.

When this document refers to "related companies", it means CW International, CWNA, CW Inc., CWS and their respective affiliates.

### Our Business Activities and the Franchises to be Offered in this State

CW International has developed methods of marketing and operating retail stores in the business of refilling printer inkjet cartridges, remanufacturing laser cartridges and selling toners, hardware, software and related printer consumables (the "System"). Traditional Cartridge World stores ("Stores") are retail stores operating in stand-alone buildings or in strip-shopping centers which provide products and services related to refilling of printer (and other) cartridges, including refilling of inkjet cartridges; remanufacturing of laser cartridges; sales of toner, computer hardware (including printers) and software, and ancillary products and services using the System.

The Cartridge World System is characterized by certain trademarks and logos, operating systems, training and marketing concepts, the Manual, distinctive color schemes and uniforms, systems, methods, procedures, specialized products and confidential information. Through our Master Franchisor, CWNA, we have been granted the right to offer, award and service Cartridge World Unit Franchises in California, New York and Minnesota.

This Offering Circular describes the Cartridge World Unit Franchises we offer in this state. All amounts described in this document are in U.S. Dollars. If we grant you a Cartridge World Unit Franchise, you will have a contractual relationship only with us. Although they perform certain services under the Unit Franchise Agreement on our behalf, neither CWNA nor CW International will have any obligations to you, and you may look only to us for performance under the Franchise Agreement. We have the right, in our absolute discretion, to decide at any time whether or not to award a Cartridge World® Unit Franchise to you.

Our primary business is the offer and sale of franchises for traditional Cartridge World Unit Stores (the type offered here). We have no operating franchised units as of the date of this Offering Circular, and this Offering Circular describes our initial franchise offering in this state . We do not offer franchises in any other line of business, but we have the right to do so. If we establish a company-owned unit in this state, the Master Franchise Agreement with CWNA requires us to operate it under the then current unit franchise agreement being offered by us under our then current Offering Circular. The agreement would be between us and an affiliate of ours, as the unit franchisee. We do not currently operate businesses of the type being franchised and have not done so in the past. We have no predecessors or affiliates that are required to be disclosed in this Offering Circular.

Our agent in this state authorized to receive service of process is identified in Exhibit C.

There are no industry specific laws or regulations that apply to Unit Franchise businesses. However, there are laws that apply to businesses in general and you are responsible for complying with them in the operation of your Cartridge World Business, including local, state and federal business, retail sales, zoning and similar regulations and licensing requirements, and any applicable environment related laws and/or regulations. You should consult with your attorney and local, state and federal government agencies before buying your Cartridge World Unit Franchise or any business to determine all legal requirements that you must comply with to consider their effects on you and cost of compliance. It is your sole responsibility, on an ongoing basis, to investigate and satisfy all local, state and federal laws, since they vary from place to place and can change over time.

We believe that the market for cartridge remanufacturing and refilling services and for printer consumables is developed, and continues to develop and evolve. The technology of the products/services can change rapidly and materially. For this reason, it is especially difficult to foresee how this industry will need to evolve to keep pace with changes in product, methods of distribution, technical needs, consumer interest and demand, and other marketplace forces that can significantly impact the viability of the industry and those people and companies associated with it, including the franchise offered with this Offering Circular. The primary market for Cartridge World services are individual consumers and businesses looking for a convenient, efficient and economic way of meeting their demands for varied printer consumables. If we award you a Unit Franchise, you will compete with other businesses offering services similar to those offered by a Cartridge World Business, including original equipment manufacturers, small local businesses, larger industrial operations with production line type refill services and internet based providers. You may find that the demand in this market is somewhat slower during common vacation periods.

We (and/or other master franchisees) may currently offer Cartridge World® Unit Franchises in other states on economic and/or other terms that differ from those offered under this Offering Circular. Also, there may be instances where we have varied, or will vary, the terms on which we offer franchises to suit the circumstances of a particular transaction. We strongly urge you to carefully review all documents, as well as this Offering Circular, with independent advisors who can provide legal, business and/or economic guidance, such as a lawyer and/or accountant.

You should also understand the following business realities: A franchised Cartridge World Business involves business risks. We don't have the ability to reliably make any promises, estimates, representations, guarantees or other assurances concerning your potential success as a Cartridge World Franchisee. We do not guarantee your success or any level of sales volume, profits (if any) or otherwise. Any volume, profit and possible success are primarily dependent on your sales ability and efforts as an independent business operator, as well as your proper use of the Cartridge World System. The Cartridge World concept is new and, for the most part, untested in the United States, and rapid technology developments may have negative impacts on your business. Further, we do not have experience as a Cartridge World Franchisor.

For all of these reasons, the purchase of a Cartridge World (or any other) franchise is a speculative investment. Significant investment beyond that outlined in this Offering Circular may be required to succeed, and there are no guarantees of success. We will not secure any pre-existing or future accounts, leads, or other sources of business for your use in the operation of your Cartridge World Business.

2.    <u>BUSINESS EXPERIENCE</u>

**Franchisor: Wildwood Franchising, Inc.**

**President and CEO – Burt Yarkin**

Burt Yarkin has been Wildwood's President and CEO since our formation in December 2002. In January 2003 Mr. Yarkin became CEO of CWNA. From April 1998 until joining CWNA, Mr. Yarkin was the Director of Franchise Development for Gymboree Corporation. In this position he was responsible for all U.S. and International franchising and marketing, real estate and legal aspects with regards to franchising. His primary focus was the expansion of Gymboree's educational programs. Prior to working for Gymboree, Mr. Yarkin was the Manager of Franchise Development for 1-800-Flowers from 1997 till 1998. Prior to holding that position, Mr. Yarkin was the Regional Director for Speedmatic Stores from 1993 till 1997. Mr. Yarkin is also the CEO of CWNA.

**Franchise Broker -- Steven M. Vollmer**

Steven M. Vollmer has represented Wildwood in franchise sales activities in the State of Minnesota since December 2003. He is currently a self employed, independent consultant. He was President and CEO of Air-Serv, LLC from 1985 until March 2003.

**Franchise Broker -- Gerard Kubisiak**

Gerard Kubisiak has represented Wildwood in franchise sales activities in the State of Minnesota since December 2003. He is currently a self employed, independent consultant. He was Vice President of Sales for Worldchain, Inc. from November 2002 until March 2003. From June 1998 until November 2003, Mr. Kubisiak was Vice President of Sales for i2 Technologies.

**Franchise Broker -- Dale R. Johnson**

Dale Johnson has represented Wildwood in franchise sales activities since January 2004. He has been CEO of D. Richards & Associates, an affiliate of The Entrepreneur Source, since October 1991.

**Franchise Broker -- Susan Moreau**

Susan Moreau has represented Wildwood in franchise sales activities since January 2004. She has been affiliated with The Entrepreneur Source since 2002. From July 2000 until July 2002 she operated Moreau Business Consulting, an Internet business consulting business. From December 1999 until July 2000, she was a Sales Manager for NCR- Systemedia Group. From 1982 until then, she was Director of Customer Service for Check Technology Corporation.

**Franchise Broker -- Carolyn Marie Herfurth**

Carolyn Herfurth has represented Wildwood in franchise sales activities since January 2004. She has been affiliated with The Entrepreneur Source since 2002. From 2000 until 2002 she worked in business development for Oracle Corporation. From 1999 until 2000 she worked in business development for DBI, Inc and she held a similar position with Rand Worldwide from 1997 until 1999.

**CWNA:**

### President – Paul Leslie Wheeler

Paul Leslie Wheeler has been CWNA's President since its formation in June 2002. He served as CEO of CWNA from June 2002 to January 2003. He has served as Director of CWNA's affiliate, CW International, since March, 1999, and is responsible for franchise marketing, legal documentation, and administrative services. From 1994 until joining the CW International, Mr. Wheeler owned a franchise consulting firm, Complete Franchising Pty Ltd, headquartered in Adelaide, Australia, which assists small businesses in expansion plans through franchise concepts. He acted as a consultant to Australian Cartridge Co. Pty. Ltd., starting in 1996. Mr. Wheeler is a Director of CW International, and Director and President of Cartridge World, Inc.

### CEO — Burt Yarkin

Mr. Yarkin became CWNA's CEO on January 2, 2003, and in this capacity will continue franchise development activities and oversee various other management functions. His employment history is noted above. Mr. Yarkin is the owner and President of Wildwood which he will also manage while he serves as CEO of CWNA.

### Secretary – Bryan Maxwell Stokes

Bryan Maxwell Stokes became CWNA's Secretary in June 2002. Mr. Stokes is (with Paul Wheeler) co-founder of CWNA's affiliate and has served as Director since 1999, first in Adelaide and now Norwood, South Australia. He is responsible for marketing, infrastructure, and research and development for CW International, and is in charge of training for CWNA's Master Franchisees. Prior to joining Cartridge World Pty Ltd, he owned and operated (from 1994 to 1999) the Australian Cartridge Co., a business substantially similar to CW International's, and located in Adelaide, Australia. Mr. Stokes is a Director of CW International, and Director and Secretary of Cartridge World, Inc.

### Treasurer and CFO – Michael John Fuller

Michael John Fuller became Chief Financial Officer upon CWNA's formation. He acted as a consultant to CW International in Adelaide and later Norwood, South Australia from 1997 until joining CWNA. Prior to that, he was Director of Home Mortgage Services Pty. Ltd. in Adelaide, South Australia. Mr. Fuller has relocated to Australia, where he has assumed management responsibility for field support to be provided to CW International Master Franchises throughout the world, as well as CWNA Master Franchises located in the United States.

### Director of Franchise Operations — Robert Livengood

Robert Livengood became CWNA's Director of Franchise Operations in February 2003. From 2001 to 2002, he owned a Wetzels Pretzels franchise in San Jose, California. From 1997 to 2001, he was Assistant General Manager of Great Mall in Milpitas, California. From 1985 to 1997, he owned 7-Eleven franchises in Milpitas and San Jose, California.

### 3.     LITIGATION

As to Wildwood (the Franchisor), no litigation is required to be disclosed in this Offering Circular.

As to CWNA,

Jack Pete as trustee of the Australian Cartridge Company – Holden Hill Unit Trust v. Australian Cartridge Company Pty Ltd (ACN 008 291 914) and Cartridge World Pty Ltd (ACN 086 234 826) and John Henry Nominees Pty Ltd (ACN 007975 902) , Action No. 99 of 2002, District Court of South Australia, Adelaide, South Australia (Jan. 23, 2002). A complaint was filed against Cartridge World Pty Ltd (CWNA's predecessor) and the other named defendants by the trustee of a Cartridge World franchisee previously operating in Holden Hill, South Australia. The plaintiff alleged that the defendants committed various misrepresentations and misused the advertising fund. The complaint sought various forms of relief, including among them a declaration that the trustee of the franchisee validly terminated the franchise agreement and is not bound by the covenants against competition it contained, an accounting of an advertising fund, and an award of damages in excess of $115,000 for breach of contract and violations of various Australian statutes, including the Trade Practices Act and the Fair Trading Act. The defendants filed a counterclaim, alleging various breaches of the franchise agreement, including $4,000 for non payment of obligations owed (unpaid royalties and advertising), and seeking other relief. In December 2002, the court found in favor of the defendants on their counterclaim and ordered the plaintiff to pay the defendant's costs in both the action and the counterclaim. The court also struck out the plaintiff's complaint.

Cartridge World Pty Ltd (ACN 086 234 826) (formerly Australian Cartridge Company Pty Ltd (ACN 008 291 914) and John Henry Nominees Pty Ltd (ACN 007975 902) v. Latull Pty Ltd (ACN 008 030 000), Christopher John Biggs and Norma Geraldine Biggs, Action No. 1480 of 2001, District Court of South Australia, Adelaide, South Australia (Sept. 27, 2001). CWNA's predecessor filed suit against a Cartridge World Franchisee in Norwood, South Australia, for non payment of royalties owed. The franchisee filed a counterclaim against the plaintiff, also naming as defendants Messrs. Wheeler and Stokes and John Henry Nominees Pty Ltd. The franchisee alleges that it had an oral agreement with CW International to pay a reduced royalty fee. The franchisee asserts in its counterclaim that misrepresentations and breaches of warranty were committed by various defendants in connection with franchisee's purchase of the Norwood store operations and in the award of the franchise agreement. The counterclaim seeks varying forms of relief from different defendants, including among them an order voiding the Business Purchase Agreement under which the franchisee acquired the franchised business, an accounting of an advertising fund, and an award of damages in an unspecified amount for breach of contract and warranty and violations of various Australian statutes, including the Trade Practices Act, the Fair Trading Act, the Franchising Code of Conduct, the Land and Business Act and the Misrepresentations Act. CWNA's predecessor is actively defending this counterclaim.

Other than these two actions, no litigation is required to be disclosed in this Offering Circular. Neither CWNA, Wildwood Inc. nor any person identified in Item 2 above:

Potential Action:

Adelaide, South Australia (March 20 and 24, 2003). While no judicial action is pending as of the Date of this Offering Circular, Paul Wheeler and Bryan Stokes each were charged on the above described dates with 11 counts of fraudulent conversion and fraudulent misappropriation by the Adelaide police. Cartridge World Pty Ltd has reason to believe that the counts are related to a corresponding number of payments made to the applicable advertising fund; however, as of the date of this Offering Circular, a formal declaration of the charges has not been filed, nor have specific statutory violations been alleged or particulars provided with respect to the 11 counts. The defendants have been released pending a scheduled appearance before the Adelaide Magistrates' Court on May 2, 2003. Under

Australian law, being charged with an offense does not necessarily mean that a prosecution will follow. If the charges are not dismissed, the defendants intend to vigorously defend against them.

Neither we, nor CWNA, nor any person listed in Item 2 of the UFOC is subject to any currently effective order of any national securities association or national securities exchange, as defined in the Securities Exchange Act of 1934, 15 U.S.C.A. 78a et seq., or suspending or expelling such persons from membership in such association or exchange.

## 4.   BANKRUPTCY

On March 4, 1991 an order was entered by the Federal Court of Australia, South Australian District Registry, General Division, Bankruptcy District of South Australia, declaring Bryan Maxwell Stokes bankrupt (Administration No. SA331/91/6). The order resulted from his inability to pay a judgment obtained by a vendor while recovering from serious injuries sustained during a criminal assault. The bankruptcy was discharged in 1994.

Other than the proceeding described above, no person previously identified in Item 1 or 2 of this Offering Circular has been involved as a debtor in proceedings under the U.S. Bankruptcy Code required to be disclosed in this Item.

## 5.   INITIAL FRANCHISE FEE

On signing the Unit Franchise Agreement, you must pay the an Initial Franchise Fee for a Unit Franchise, in cash or with a certified check, in the amount of $28,000 which includes a fee for training in the amount of $8,000. This fee is placed in an impound account until your franchise opens for business, at which time it is remitted to Wildwood. This fee is uniform for franchisees operating in Minnesota, but higher or lower fees may be charged in other states. We pay a portion of the Initial Franchise Fee to CWNA. Initial Franchise Fees usually are used for operating expenses and are a part of our general operating fund.

Both the Training Fee and the Franchise Fee are non-refundable except in the following instances:

1.     If we decide that you have not successfully completed the initial training (See Item 11 of this Offering Circular), then we may choose to cancel the Franchise Agreement and return to you the lesser of: 1) 1/2 of the initial franchise fee paid to us; or 2) the initial franchise fee, less any training-related costs, commissions and/or any other expenses paid by us and/or a related company. If we make that choice, then you must return all Manuals, sign a general release of claims and other documents we reasonably require.

If the location for your traditional Cartridge World Store has not been identified by the date of you sign your Unit Franchise Agreement, Exhibit 2.2 to your Agreement will note this fact and state that you and we will specify the Territory in a signed writing. If we cannot later mutually agree on a Territory, then we may choose to cancel all of our obligations under the Unit Franchise Agreement and return the Initial Franchise Fee, less any training-related costs, commissions and/or any other expenses paid by us and/or a related company. If we make that choice, then you must return all Manuals, sign a general release of claims and other documents we reasonably require.

Under our current policy we may award multiple franchises (in our discretion and to qualified candidates) for a reduced Initial Franchise Fee: the Initial Franchise Fee currently charged for a second franchise is $20,000, a third franchise is $17,000 and a fourth and subsequent franchise is $15,000. This policy is subject to change, and the price that you will pay for any second or multiple franchises will be determined by the price in effect when that franchise is awarded. These reduced initial franchise fees do not include any training or other fees that may apply (and which we may require you to pay) at the time that the franchise is awarded. All fees are subject to change in, and other fees may be imposed under, future forms of agreement.

The initial franchise fee covers the initial training program for you, and includes coach airfare (to and from Australia) and accommodations (during the scheduled training period) for 1 person (travel and accommodations for more than one person must be paid by you.) You are responsible for all other costs associated with attendance at initial training, such as wages, meals, incidentals and living expenses. We can choose to eliminate or shorten training for persons previously trained or with comparable experience.

The Initial Franchise Fee and/or the training fee may not be the same for all franchisees, depending on factors such as (but not only) prior relationship, number of franchises awarded, the applicable master franchisee and other factors.

You are required to purchase an opening package for your Unit Franchise Business from CWNA or an approved supplier, including equipment and an opening inventory for your Store (see Item 7). The cost of the opening package is estimated to range from $37,000 to $45,000. You may (but are not currently required to) purchase furnishings, fixtures, signage, and materials and professional assistance for your grand opening advertising program from CWNA. We may require new franchisees to purchase these additional items from CWNA in the future.

You will pay the applicable amount at the time of the signing of the Unit Franchise Agreement. Refer to Item 7 of this Offering Circular for additional information regarding costs associated with your opening of your Franchise Business.

The rest of this page is intentionally left blank.

## 6. OTHER FEES

| NAME OF FEE[1] | AMOUNT | DUE DATE | REMARKS |
|---|---|---|---|
| Royalty | The greater of (a) **6%** of monthly Gross Profit on computer hardware and/or software, <u>plus</u> **6%** of Gross Volume[2],[3] on all other goods and services or (b) a minimum royalty of **$500.00** per month.[3] | By the 10th day of each month for the preceding month. We can specify other payment periods. | "Gross Profit" is "Gross Volume"[2] less costs of goods sold. Payments begin when store starts operating, or six months after agreement signed, whichever happens first. Subject to inflation adjustment. [4] |
| Marketing Fund Contributions | The greater of (a) up to 4% of Gross Profit on computer hardware and/or software, <u>plus</u> up to 4% of Gross Volume[2] on all other goods and services or (b) a minimum royalty of $250 per month.[3] | Same as royalties. | Item 11 of this Offering Circular describes the Marketing Fund. Contributions are set by and payable to CWNA, which manages the Fund. CWNA may delegate contribution collection and other activities to Master Franchisees and/or other companies Subject to inflation adjustment.[4] |
| Local Marketing Activities | $400 per month[5] | Payable to suppliers as incurred. | Subject to inflation adjustment.[4] |
| Franchisee Marketing Groups ("FMG") | As established by a FMG (**no FMG is in effect now**) | As incurred. | If established, you must join in any local, regional, national FMG and make any required contributions |
| Interest on Late Payments | Interest is highest legal rate for open business credit, not to exceed 1.5% per month. | Payable on demand. | Interest on all amounts owed us. Subject to inflation adjustment.[4] |

| Name of Fee[1] | Amount | Due Date | Remarks |
|---|---|---|---|
| Late Fees; Costs of Collection | $200 | Payable as incurred for late/missed payment/funds transfer and/or report due | Applied within legal limits.<br><br>Subject to inflation adjustment. [4] |
| Successor Unit Franchise Fee | **10%** of the then Initial Franchise Fee (inclusive of any training fees), subject to **$5,000** minimum | At the time we award the successor franchise. | Subject to inflation adjustment. [4]<br><br>Payable if you meet conditions for successor franchise (See Item 17of this Circular and Section 15 of the Franchise Agreement).<br><br>Non refundable unless successor is denied. |
| Convention Support Fee[6] | Established based on the event | As instructed prior to event. | You must attend the annual convention unless excused by us. Subject to inflation adjustment.[4] |
| Transfer Fee | $10,000, plus then current training costs | On notification of proposed transfer of 50% or more interest | Subject to inflation adjustment.[4] |
| Management Fees[7] | <u>Only if you get notice of default from us and we appoint manager;</u> $500 per day management fee, plus expenses | Deducted from funds of your Business | Daily management fee subject to inflation adjustment. [4]<br><br>Compensation, other costs, travel and living expenses of appointed manager payable by you. |
| Internet/Intranet Service Fee[8] | Up to $100 per month | Payable in advance, on a monthly or annual basis (or whatever other basis we select.) | Payable by credit card or auto draft as we select; maximum fee subject to inflation adjustment. [4] |

| NAME OF FEE[1] | AMOUNT | DUE DATE | REMARKS |
|---|---|---|---|
| Training Costs[9] | Costs determined by training attended/staff participation | Before training or as incurred. | Payable if you re-enroll in initial training, attend other training programs or if you enroll additional employees in training programs. You are responsible for all training fees, travel, living, incidental and other expenses of attendance. |
| Audit/inspection Charges[10] | Amount of understatement of revenues, with interest and late charges, plus costs of audit, if applicable | Within ten days after receipt of the audit report or as incurred | Audit costs payable if reports not provided or understatement exceeds 2%. |
| Grant of Security Interest | You grant us a security interest in assets and proceeds of Unit Franchise Business[11] | Granted with Unit Franchise Agreement | You must complete financing statements/documents within 10 days of receipt from us. |

(1)     All fees are imposed, collected by and payable to us, unless CWNA elects to receive direct payment. All fees are non-refundable, unless otherwise noted. You must participate in our electronic funds transfer program, which authorizes us to utilize a pre-authorized bank draft system, as well as the then current electronic reporting system. We are authorized by you to debit your account for minimum payments due under the Franchise Agreement if payment is not received when due. We can apply any payments owed by you to any debt of yours that we choose (except for Marketing Fund payments), set off any amounts owed to you against any amount owed by you to us/specified third parties and retain amounts received on your account for debts owed. (Section 9.5 of the Unit Franchise Agreement) We may elect to waive and/or credit, reduce or defer payment of any and all fees and charges of any kind in connection with the franchise on a case by case basis as we consider appropriate and as permitted by law.

(2)     "Gross Volume" includes all charges and/or revenues that are, or could be, received or earned by you (and/or any Affiliate):

A)     by, at or in connection with your CARTRIDGE WORLD Store;

B)     relating to the kinds of goods or services available now or in the future through a CARTRIDGE WORLD Store and/or distributed in association with the Marks or the CARTRIDGE WORLD System;

C)     relating to the operation of any Similar Business (as defined in the Franchise Agreement);

D)     with respect to, any tenants and/or subtenants of yours on the Premises (including rent and other lease payments); and/or

E)     with respect to any co-branding activities.

All sales and/or billings, whether collected or not, will be included in Gross Volume, with no deduction for credit card or other charges. Gross Volume does not include sales tax, value added and similar taxes

collected and paid when due to the appropriate taxing authority or actual customer refunds, adjustments and credits.

(3)    We currently have a policy that allows new franchisees a reduced royalty in the first six months of their operations.  The percentage payable on Gross Volume/Profit in the first calendar month of operations (full or partial) is 1%; 2% on the Gross Volume/Profit in the second month; 3% on the third month, 4% on the 4th month, 5% on the 5th month, and 6% thereafter.  The minimum monthly contribution requirement is effective as to royalties/marketing fund contributions owed on the 6th month of operations and thereafter.  You must meet all financial obligations to us during any closure of your Cartridge World store unless we agree otherwise in writing. (See Section 10.8 of the Franchise Agreement).

(4)    Amounts subject to inflation adjustment may be adjusted each year, at our option, in proportion to the changes in the Consumer Price Index (U.S. Average, all items) maintained by the U.S. Department of Labor (or any successor index) as compared to the previous year.  We will notify you of any percentage adjustment each year.

(5)    You must submit proof of local marketing expenditures at the times and in the form that we select.

(6)    At least one management level person must attend for each store.  You are responsible for all costs of attendance, including travel, lodging, meals and incidentals.

(7)    If we deliver a notice of default to you which you fail to cure within required period, in addition to our other rights and remedies, we have the right to appoint a manager to operate your Franchise Business until you have cured all defaults.  We will keep all funds from the operation of the Franchise Business during the period of management by us in a separate fund and all expenses of the Franchise Business, including compensation, other costs and travel and living expenses of our appointed manager, will be charged to and paid out of the fund.  You are responsible for any fund deficiency.  We also can choose to manage your business in the event of your death or disability and pay ourselves a reasonable amount for doing so.

(8)    All, if any, use of the Internet, World Wide Web or other electronic media by you in connection with your CARTRIDGE WORLD Store will be as specified by us.  Among other things, such use may be required to be through us/any Related Company, using a designated Internet/Intranet Service Provider (which can be us or an Affiliate), and all pages accessed through a designated site and/or meet specifications.  We plan to implement an internet/intranet system to enhance communications by and among us and Franchisees and to permit the efficient/economic delivery of a variety of information.  You must participate in any intranet/internet activities and maintain the necessary hardware, software, High-Speed Internet Service (Cable, DSL) (based on availability) or dial-up modem and other items as required by us to enable you to do so on an ongoing basis at your expense.

(9)    The training fee included in the initial franchise fee covers certain expenses associated with your attendance at initial training as described in Item 5 of this Offering Circular.  You and your manager must attend additional/refresher courses that we may require.  We may charge a fee for additional optional or mandatory training programs, and you are responsible for all travel, living, incidental and other expenses associated with attendance at any such programs.  We select the location for training.  All mandatory meetings/training (after the initial training) will be in North America.

(10)   Generally, our audits of your franchise business are at our expense.  However, if you fail to provide the necessary records of if understatements of the Gross Sales Volume are more than 2% for any period, then you must pay us the additional royalty payments and other amounts shown from the understatements and we may require you to reimburse us for all costs related to the audit.  If an audit reveals an intentional understatement of Gross Sales Volume/Profit for any period in any amount, or an understatement (whether intentional or not) of Gross Sales Volume/Profit for any period greater than 5%, we may terminate the Agreement (plus other remedies).

(11)   The security interest granted by you is prior to all other security interests in the collateral except for (a) bona fide purchase money security interests and (b) the security interest granted to a third party in connection with your original financing, if any.  We will make reasonable efforts to accommodate reasonable lender's requirements, including the possible subordination of our interests.  If an event occurs that allows us to terminate the Unit Franchise Agreement, or any other agreement between you and us, or if we are not assured that all of your (and/or any affiliates') obligations will be met, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your traditional Cartridge World Store is located, including the right to possession of the collateral.

Items 7, 8, 9, 12 and 17 of this Offering Circular also provide information about costs that you may incur in connection with your Unit Franchise Business.

The rest of this page is intentionally left blank.

## 7. INITIAL INVESTMENT- Single Store; Certain Estimated Costs (3 months only)

| Description [1] | Estimated Amount | Method of Payment | When Due | To Whom Payable |
|---|---|---|---|---|
| Franchise Fee [2] | $28,000 (includes training fee) | Lump Sum, in cash or certified check | On Signing Franchise Agreement | Us |
| Equipment, freight inclusive [3] | $15,000 to $19,000 | Lump Sum, in cash or certified check | With Franchise Agreement | CWNA or Approved Suppliers |
| Opening Inventory [3] | $9,000 to $11,000 | Lump Sum, in cash or certified check | With Franchise Agreement | CWNA or Approved Suppliers |
| Computer Hardware and Software [3,4] | $0 - $2,000 | Check/cash | With Franchise Agreement | Suppliers and Vendors |
| Signs [3,5] | $2,000 to $4,000 | Lump Sum, in cash or certified check | With Franchise Agreement | CWNA or Approved Suppliers |
| Business licenses, utility deposits or other pre-paid expenses | $300 - $800 | As Required | As Required | Applicable Agency/Government authority/suppliers |
| Grand Opening Advertising [6] | $5000 | As Arranged | As Arranged | Us or Local Suppliers |
| Insurance [7] | $1,000 to $5,000 | As Arranged | As Incurred | Insurance Company |
| Training [8] | $500 – $4,000 | As incurred | Prior to Opening | Suppliers |
| Furnishings and Fixtures [3] | $5,000 to $10,000 | Check/cash | On invoice | CWNA and/or Suppliers |
| Real Estate [9] | $3,000 to $5,000 | As arranged | Prior to Opening | Lessor/Contractors |
| Construction and Remodeling [10] | $0 to $10,000 | Lump Sum, in cash or certified check | Prior to Opening | Suppliers |
| Miscellaneous Funds [11] | $1,000 to $5,000 | As Agreed | As Incurred | Vendors, Suppliers |
| Additional Funds - 3 months [12] | $7,000 to $16,000 | As Incurred | As Incurred | Employees, Vendors, Utilities |
| TOTAL [13] | $76,800 to $124,800 | | | |

(1)    The initial investment table shows certain expenditures required to develop a single Unit Franchise Business.   Note that these amounts may vary widely.   Amounts payable to us are nonrefundable unless otherwise noted.  Amounts payable to suppliers/vendors are refunded according to

arrangements you make with the vendor, if any. We are beginning to franchise with this Offering Circular. These figures are estimates of the range of your initial costs in the first 3 months of operation only, and are based in part on the experience of CW International in Australia and other countries outside of the United States. These amounts may vary significantly from country to country, and market to market.

(2) The Franchise Fee for an additional franchise may be less (See Item 5 of this Offering Circular).

(3) As described in Items 5 and 8, and Section 10.2 of the Unit Franchise Agreement, you must purchase certain equipment, signs, uniforms, a POS System, stationary and your initial inventory. All of these items must be obtained through approved suppliers, which may include CWNA. Credit card transaction processing equipment meeting our specifications also is required. These specifications/requirements are subject to change by us. Additionally, modifications to the Cartridge World System and practices at times may require additional and as yet undetermined expenditures, such as a residue filtering system currently under development by us that we anticipate will be implemented in Cartridge World Stores. You are responsible for costs of compliance.

(4) If you do not already have one, you must purchase a personal computer with Microsoft Office software. Hardware/software specifications/requirements are subject to change/elimination by us. You are responsible for costs of compliance. (See Item 11 of this Offering Circular).

(5) You must purchase signage for your Franchise Business location that meets our specifications and is approved by us.

(6) You must spend at least $5,000 on a grand opening marketing program.

(7) You must maintain in force policies of insurance issued by carriers we have approved covering various risks. We may specify the types and amounts of coverage required under these policies and require different and/or additional kinds of insurance at any time. Each insurance policy must name us, our affiliates and the Related Companies (as defined in the Unit Franchise Agreement) as additional named insureds, must contain a waiver of all subrogation rights against us, our affiliates, the Franchisor-Related Persons/Entities and any successors and assigns, and must provide for 30 days' prior written notice to us of any material modifications, cancellation, or expiration of the policies.

Our current insurance requirements are:

| Type of Insurance | Limits and Other Details |
|---|---|
| Commercial General Liability | $1,000,000 General Aggregate |
| | $1,000,000 Products Aggregate |
| | $1,000,000 Each Occurrence |
| | $1,000,000 Personal Injury/Advertising Injury |
| | $1,000 Medical Payments |
| Business Interruption Insurance | Must provide continued payment of amounts due (or to become due) us, any applicable Related Company and/or any affiliate under the Franchise Agreement. |

| | |
|---|---|
| All Risk Property and Casualty | Must cover the replacement value of the store and all associated items (e.g., inventory, signs, equipment, etc.) |
| Worker's Compensation | Statutory<br>$1,000,000 Employer's Liability |

(8)    The low end of the range for training expenses represents our estimate of the lowest amount you would spend on meals and incidentals during training. The high end of the range in the table represents our estimate of the cost to send an additional person to training. The initial franchise fee covers the initial training program for you and includes airfare and accommodations for one person only. This fee does not include training, travel and accommodations charges for more than one person or any other costs associated with attendance at initial training, such as meals, incidentals and living expenses. The amount you expend will depend on several factors, including your number of attendees, the distance you must travel, and the type of accommodations you choose, among others.

(9)    You are required to locate in a retail site that is a free standing building or retail store within a strip shopping complex that is visible and accessible to the general public. If you do not own adequate shop space, then you must lease the space for your Franchise Business. The typical traditional Cartridge World Store has 600 to 700 square feet. Rental or purchase expenses will vary significantly since real estate and rental values vary greatly from market to market and due to factors such as the condition, location and size of the space; demand; and general economic conditions. We cannot accurately estimate any rental or real estate acquisition costs. You should investigate these costs in your area. The estimate provided does not factor in any special deposits or other costs of acquisition.

(10)    You are required to comply with the traditional Cartridge World store design standards and specifications that we give to you. You are responsible for employing a licensed contractor, as well as such architectural, engineering and other professional services as you may require to comply with our specifications and local requirements. Any change from plans has to be submitted to us for approval. We make no representations regarding the costs to you of development and buildout and cannot accurately estimate these and related costs due to wide variation among markets in labor, construction, professional services, materials, permitting and other associated costs. You should research all of these costs locally.

(11)    Miscellaneous Opening Costs includes security deposits, utility costs, cost associated with obtaining business licenses and permits.

(12)    Additional Funds is an estimate of certain funds needed to cover your business (not personal) expenses during the first 3 months of operation of your business. You will need capital to support on-going costs of your business, such as payroll, utilities, taxes, loan payments and other expenses, to the extent that revenues do not cover business costs. New businesses (franchised or not) often have larger expenses than revenues. This is only an estimate, and we can't guarantee that the amounts specified will be adequate. You may need additional funds during the first 3 months of initial operation or afterwards. We do not furnish or authorize our salespersons or any other persons or entities to furnish estimates as to the capital or other reserve funds necessary to reach "break-even" or any other financial position, nor should you rely on any such estimates. The 3 month period from beginning business covers the time by which most Franchisees are fully in operation but does not necessarily mean that you will have reached "break-even", "positive cash flow", or any other financial position. In addition, the estimates presented relate only to costs associated with the franchised business, reflect minimal employee wages and do not cover any personal, "living," unrelated business or other expenses you may

have, such as royalty payments, Marketing Fund contributions, debt service on any loans, state sales, and/or use taxes on goods and services, and a variety of other amounts not described above. Although we make no estimates or representations regarding financial performance of a Cartridge World Store, we recommend that, in addition to the additional funds shown, you have sufficient personal savings and/or income so that you will be self-sufficient and need not draw funds from your franchised Cartridge World Store for at least 3 months after start-up.

(13)   Total Estimated Initial Investment  All of the figures are estimates of certain initial start up expenses. The chart is not all inclusive as noted in footnote 11, above, and we cannot guarantee you will not have additional expenses in starting your Cartridge World business.  Your costs will vary depending on such factors as: how much you follow the Systems and procedures; your management, technical and marketing skill, experience and general business ability; the size and location of your facility; whether the facility must be adapted or refurbished and other conversion costs, local and general economic conditions; the local market for Cartridge World products; levels of competition; prevailing wage rates and the sales levels reached by you during the initial period.  The estimate does not include any finance charge, interest or debt service obligation.

Miscellaneous costs to begin operations and other financial requirements may be more or less than the figures specified above, as a function of the size of business (number of staff, anticipated volume of business, etc.) and number of units that you intend to operate, the area in which you intend to operate and other factors, as mentioned above.  Many of these factors are primarily under your control in your independent operation of the business.  We have made no provision for capital or other reserve funds necessary for you to reach "break-even" or any other financial position nor do any of these estimates include any finance charges, interest or debt service obligations.  You should not assume that revenues from your customers will necessarily cover your initial (or other) expenses.  You should review these figures carefully with a business advisor (such as an accountant) before making any decision to purchase the franchise.  In preparing the figures in this chart, we relied on CW International's 5 years of industry experience. While we have given you these estimates in U.S. dollars, they are based on experience acquired principally in Australia and New Zealand.  Experiences in the U.S. markets may vary significantly.  These figures are estimates, and we cannot guarantee that you will not have additional expenses.

Since costs can vary with each Franchisee, we strongly recommend that you (1) obtain, before you buy a franchise or make any commitments, independent estimates from third-party vendors and your accountant of the costs that would be needed to establish and operate a Cartridge World® Franchise, (2) discuss with current Cartridge World® Franchisees their economic experiences (including initial costs) in opening and operating a Cartridge World® Franchise (although their experiences will be based on a non U.S. market and may vary significantly from your own) and (3) carefully evaluate the adequacy of your total financial reserves.

## 8.   RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

We have identified various suppliers of Designated Equipment, Products and/or Services that your Unit Franchise Business must use or provide and which meet Cartridge World standards and requirements, in each case as we/CWNA consider appropriate.  You must purchase, use and offer the types, brands and quality of our Designated Equipment, Products and Services.  If we so require, you must use only suppliers that we designate for your traditional Cartridge World Store.  Designated suppliers may include, and may be limited to, us, CWNA, CW International, and/or affiliated companies.

We and/or any of these related companies may receive revenues from items that you are required to buy from us or from designated suppliers. (See Section 10.2 of the Unit Franchise Agreement).

CWNA is a designated supplier for inks, compatible cartridges and related printer consumables to help ensure that such products are of a uniform, high quality and are uniformly available in all Traditional Cartridge World Stores. The predictability of high quality products, product performance and similar factors are of key importance to our target consumers, to building a positive image and reputation for the Cartridge World Brand and Franchise system, and to individual Store and System growth. We will periodically issue specifications and standards for products to our franchisees in the manuals or otherwise in writing. In the last fiscal year, CWNA did not receive any revenue from the sale of these products to US franchisees as no franchisees were in operation in the US.

We may delete, substitute, modify or add to the Products/Services/suppliers, and may select a supplier on the basis of whatever requirements we find appropriate. Requirements may relate to frequency of delivery, product life and quality; standards of service; as well as payments, contributions or other consideration being paid to us, CWNA or our/their Affiliates, or other criteria.

You must notify us in writing if you want to purchase, use or offer any items that we have not previously approved, or if you propose to use any supplier who we have not previously approved for the proposed item. You will need to submit to us the information, specifications, and samples we request and pre-pay reasonable charges connected with our review and evaluation of any proposal. We'll notify you within a reasonable time whether or not you're authorized to purchase or use the proposed items or to deal with the proposed supplier. We may condition and/or revoke our approval of particular items or suppliers as we choose. You must immediately stop selling or using any unapproved items/suppliers. You agree in the Unit Franchise Agreement not to make claims against us, CWNA or other related companies regarding suppliers. Any claims must be made only against the supplier in question and require our consent.

You must purchase your opening inventory, certain equipment and signs from CWNA or designated suppliers. During the fiscal year ending December 31, 2003 CWNA anticipates receiving revenues from the sale of opening inventory, equipment, signs and other materials to our Unit Franchisees. CWNA had no such sales in the prior fiscal year.

We estimate that your purchase of products, supplies, or services from suppliers that we have approved or that comply with our specifications will represent approximately 20% to 40% of your costs to establish the Store, and approximately 15% to 20% of your costs in the ongoing operation of the Store. However, Unit Franchises are only beginning to be established in the United States, and we have no actual data on which to base these estimates.

We and/or CWNA, CWS, or CW International currently negotiate purchase arrangements with approved suppliers of certain equipment and supplies for the benefit of our franchisees, (but are not obligated to do so). **Currently, neither Wildwood nor CWNA receive revenues from other suppliers because of transactions with our franchisees and with us, although we could receive them in future.**

We don't provide material benefits (such as the award of a successor or additional franchise) on the use of designated or approved sources. However, failure to use approved items/suppliers might be a default under the Franchise Agreement and, in general, any Franchisee in default would not be awarded a successor or additional franchise and might be subject to termination. If we issue a notice of default,

we, CWNA and each of our respective affiliates may choose to discontinue selling and/or providing any goods and/or services to you until you have cured all defaults or require you to pay C.O.D. (i.e., cash on delivery) by certified check.

It is our policy (though we can change it) for you to guarantee all refilled cartridges. When a customer has a problem with a refilled cartridge, you must repair it or give the customer a refund for the amount of ink or toner used. If our product causes damage to a printer, and the customer provides a written, detailed report from a technician supporting the customer's claim, then you must pay the cost of repairs.

### Purchasing or Distribution Cooperatives

There currently are no formal purchasing or distribution cooperatives in the United States. If one is formed, we can require that you make your purchases through a Cartridge World cooperative. (See Section 10.3 of the Franchise Agreement).

## 9. FRANCHISEE'S OBLIGATIONS

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE UNIT FRANCHISE AND OTHER AGREEMENTS. IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR.

| | OBLIGATION | SECTION IN UNIT AGREEMENT/OTHER DOCUMENTS | ITEM IN OFFERING CIRCULAR |
|---|---|---|---|
| a. | Site selection and acquisition/lease | 3.1, 3.2 | 7, 11 |
| b. | Pre-opening purchases/leases | 3.3-3.5, 3.7 | 5, 7, 8,11 |
| c. | Site development and other pre-opening requirements | Art. 3 | 5, 7, 8, 11 |
| d. | Initial and ongoing training | 3.6, Art. 5 | 5, 6, 7 ,11 |
| e. | Opening | 3.1, 3.6 | 6, 7 ,8,11 |
| f. | Fees | Art. 5, 9.1- 9.7, 10.8, 11.1- 11.4,14.3, 15.3, 16.9, 19.8 | 5, 6, 7,11,17 |
| g. | Compliance with standards and policies/Operations Manual | 1.1, 3.3 - 3.5, 4, 5.3, 10.1 – 10.4, 10.6, 16.1, 16.2 | 8,11,12,16,17 |
| h. | Trademarks and proprietary information | 2.1, 5.3, 6.1 – 6.4, 8.1, 17.2 - 17.4, 19.7 | 13, 14 ,17 |
| i. | Restrictions on products/services offered | 2.1, 10.2 | 8, 12, 16 ,17 |
| j. | Warranty and customer service requirements | 10.9, 16.1 | 17 |
| k. | Territorial development and sales quotas | 16.5 | 12 ,17 |
| l. | On-going product/service purchases | 4, 5.1, 10.2 | 7, 8,11 |
| m. | Maintenance, appearance and remodeling requirements | Sections 1.5, 3.3, 10.1, 10.2, 14, 15 and17.2 of Franchise Agreement | Item 11 and 17 |
| n. | Insurance | 10.6 | 6, 7 |

| OBLIGATION | SECTION IN UNIT AGREEMENT/OTHER DOCUMENTS | ITEM IN OFFERING CIRCULAR |
|---|---|---|
| o.   Advertising | Art. 6, 11; 3.7, 7.1 | 6, 7,11 |
| p.   Indemnification | 7.4 | 9 |
| q.   Owner's participation/ management/staffing | 10.5 | 15 |
| r.   Records/Reports | 12.1, 12.3, 10.5, 4, 16.2, 17.2, 17.3 | 6,11,17 |
| s.   Inspections/Audits | Art. 13; 16.1 | 6, 12, 17 |
| t.   Transfers/ Cartridge World Right of First Refusal and Right to Repurchase | Art. 4 | 6, 17 |
| u.   Successor Term | 15 | 6, 17 |
| v.   Post-Termination obligations | Art. 8 and 17 | 17 |
| w.   Non-Competition covenants | Art. 8 and 17.4 | 17 |
| x.   Dispute resolution | Art. 19 and 21 | 17 |
| y.   Franchisor Management/Franchise-default | 16.9 | 6,17 |
| z. Our Right to Repurchase Franchise Assets | 14.8 | 17 |
| AA.   Security Interests | 18 | 6 |

10.   **FINANCING**

Neither we nor CWNA offers direct or indirect financing.  Neither we nor CWNA guarantee your note, lease or obligation.

11.   **FRANCHISOR'S OBLIGATIONS**

Except as listed below, we need not provide any assistance to you.

**Our Pre-Opening Obligations to Cartridge World® Unit Franchisees**

A.       We'll provide you with training. (Unit Franchise Agreement, Section 5.1)

B.       We'll provide you with information about the equipment, products, signs and other goods that you must use to open and operate your traditional Cartridge World Store, and about their respective approved/designated suppliers. (Unit Franchise Agreement, Sections 3.5 and 10.2)

C.       We'll furnish you with standards, specifications and other requirements ("Design Standards") for the design, décor, layout, furniture, and other items required for your traditional Cartridge World store. (Unit Franchise Agreement, Section 3.3)

D.       We will consider sites proposed by you, and any applicable leases, and grant, condition or withhold our approval of them as appropriate. (Unit Franchise Agreement, Sections 3.1 and 3.2)

**Our Obligations During the Operation of Your Cartridge World® Unit Franchise**

A.    We will loan you a copy of the Manuals. (Unit Franchise Agreement, Section 5.3) A copy of the Table of Contents of our Manuals is attached as Exhibit E.

B.    We'll furnish guidance to you about (1) specifications, standards and operating procedures used by traditional Cartridge World Stores, including any modifications; (2) purchasing approved equipment, fixtures, signs, inventory, operating materials and supplies; (3) developing and implementing local marketing programs; (4) administrative, bookkeeping, accounting, inventory control and general operating and management procedures; and (5) establishing and conducting employee training programs at your traditional Cartridge World Store.  This guidance can be furnished in the Manuals, bulletins, written reports and recommendations, other written materials, refresher training programs and/or telephone/Internet/intranet consultations or consultations at our offices or at your traditional Cartridge World Store, whichever method we choose. You must comply with this instruction. (Unit Franchise Agreement, Section 5.2)

C.    We'll license you to use the Cartridge World Marks and System expressly as authorized by, and subject to the terms of, the Unit Franchise Agreement. (Unit Franchise Agreement, Sections 1.1, 2.1, 6.1 and 6.2)

D.    We'll give you advice and guidance about your grand opening marketing program for you to follow. (Unit Franchise Agreement, Section 3.7)

E.    We will disclose to you Intellectual Property and Confidential Information (as defined in the Unit Franchise Agreement) for the operation of your Unit Franchise. (Unit Franchise Agreement, Section 8.1)

F.    Our representatives will meet with you and your director of operations/manager from time to time as we consider appropriate to discuss and review the overall performance of your traditional Cartridge World Store and other matters.  You will attend the meeting at your expense. (Unit Franchise Agreement, Sections 5.2 and 13.1)

**Computer Hardware and Software**

At your expense, you must purchase, use, maintain and update computer, electronic cash register and other systems (including point of sale, back-office and other systems) and software programs which meet our specifications as they evolve over time and which, in some cases, may only be available through us and/or approved vendors.  Currently, you may purchase all software and hardware from the vendor of your choice, but we reserve the right to require you to deal only with vendors approved by us, which may be limited to us and/or our affiliates. You must update and otherwise change your computer hardware and software systems as we request, at your expense.  You must pay all amounts charged by any supplier or licensor of the systems and programs used by you (which may include us and/or any affiliates), including charges for use, maintenance, support and/or updates. (Unit Franchise Agreement, Section 4)

There are no contractual limitations on the frequency and cost of upgrades and/or updates to the systems or programs.  You must comply with each of our then-current Terms of Use and Privacy Policies (and all other requirements) regarding all computer and other systems, including Internet use. (Unit Franchise Agreement, Sections 4 and 11.3)

You must establish and maintain at your own expense a bookkeeping, accounting, record-keeping and records retention system conforming to requirements set by us. We can (and expect to) require that each transaction related to your traditional Cartridge World Store will be processed on a computer system (including hardware and software) specified by, and fully accessible to, us. You'll participate in our then-current electronic reporting system covering sales and other items, with direct interconnection to (and full, on-line access by) our computer hardware and software systems. (Unit Franchise Agreement, Section 12.1)

We reserve the right to have full access to all electronic cash register, computer and other systems and the information and data they contain, and to retrieve, analyze, download and use the software and all data they contain (as well as any other information reported to us) at any time and as we choose. Although we currently do not do so, we may charge a reasonable fee for the license, modification, maintenance or support of proprietary software that we may license to you, and other goods and services that we or any affiliates furnish to you related to the cash register, computer and other systems. (Unit Franchise Agreement, Section 12.1)

We plan to implement an internet/intranet system to enhance communications by and among us and Franchisees and to permit the efficient/economic delivery of a variety of information, such as Manuals, System bulletins, marketing materials, financial data, reporting information, technical instructions, etc. You will participate in any such intranet/internet activities and maintain the necessary hardware, software, High-Speed Internet Service (Cable, DSL) (based on availability) or dial-up modem and other items to enable you to do so on an ongoing basis at your expense. (Unit Franchise Agreement, Section 11.3)

Presently, we require each Cartridge World® Unit Franchisee to have a PC or laptop with the following minimum standards:

Windows 98
733 MHz processor
Modem speed of 56K
64 MB Memory
Internet Access
CD-ROM Drive
Microsoft Office and Excel software

Cartridge World® Unit Franchisees will use the computer for general administration of the business, including maintenance of customer records, billings and communication with other franchisees, Master Franchisees (Regions), and us. You must also use Microsoft Office software, which is the proprietary property of Microsoft. Microsoft's principal business address and telephone number are One Microsoft Way, Redmond, WA 98052-6399, (425) 882-8080. Microsoft does not have any contractual obligation to provide ongoing maintenance, repairs, upgrades or updates.

Currently, you also must use an electronic cash register and credit card transaction processing equipment, which you may be able to obtain through your banking relationship. You will use this equipment for retail transactions, stock control and financial information management. We reserve the right to issue specifications or designate specific suppliers, which may include us, for any electronic cash register or POS system you use. You may be required to modify your systems in the future to meet these specifications.

### Advertising

**National Marketing Fund**  (Unit Franchise Agreement, Section 11.1)

CWNA plans to establish an advertising, publicity and marketing fund (the "National Marketing Fund" or "Marketing Fund") for advertising, advertising-related, marketing and/or public relations programs, services and/or materials as we deem necessary or appropriate to promote Cartridge World® Stores and the Brand.  CWNA anticipates that a separate Fund will be established in the United States. You'll contribute to the Marketing Fund for the country in which your Store is located as described in Item 6. You understand that some Cartridge World® Unit Franchisees may have different Marketing Fund and/or other obligations than you.

CWNA may, on a temporary or permanent basis, delegate management of all or part of the Marketing Fund to us and/or other Master Franchisees and/or CWNA's Related Companies, including but not limited to contribution collection activities.  To the extent they do so, all delegated obligations will be ours alone.

Since operations of the Marketing Fund are just beginning (or will begin in the near term) no information is available on percentages spent on various activities in the United States (as applicable). The Marketing Fund may place advertising in any media.  We anticipate the coverage initially will be local and regional in scope, although we have the right to do national advertising.  We or our affiliates (if any) may prepare advertising, and we may employ outside advertising agencies.  If all monies in the Marketing Fund are not spent in the fiscal year the funds are carried over for use in the next fiscal year.

Contributions to the Marketing Fund made by any supplier or other third party, whether or not made with respect to purchases by you, will not count toward your required contributions to the Marketing Fund or any cooperative.  We'll require all traditional Cartridge World Stores owned by us to make contributions to the Marketing Fund as if they were subject to our then-current form of Franchise Agreement.

CWNA has sole discretion over <u>all</u> matters relating to the Marketing Fund, operational, marketing or any other matter (consistent with the Franchise Agreement).  The Marketing Fund may be used for (among other things) product development; signage; creation, production and distribution of marketing, advertising, public relations and other materials in any medium, including the internet; administration expenses; brand/image campaigns; media; national, regional and other marketing programs; activities to promote current and/or future CARTRIDGE WORLD Stores and the Brand; agency and consulting services; research, any expenses approved by us and associated with FAC or other franchisee advisory groups.  A brief statement regarding the availability of CARTRIDGE WORLD franchises may be included in advertising and other items produced using the Marketing Fund. However, no funds will be spent by the Marketing Fund primarily for franchisee solicitations.

CWNA, we and/or any Related Companies can provide goods, services, materials, etc. (including administrative services and/or "in-house advertising agency" services) and be compensated and/or reimbursed for the same by the Marketing Fund, provided the compensation is reasonable in amount. CWNA can arrange for goods, services, materials, etc. (including administrative services) to be provided by independent persons/companies and all related costs, fees, etc. will be paid by the Marketing Fund. While CWNA is not required to do so, if an FAC has been formed and any matters are submitted by

CWNA for approval to the FAC and approval is granted by a majority of the members, the approval will be binding on you.

You must participate in all marketing programs instituted by the Marketing Fund or us but will retain full freedom to set your own prices. However, maximum prices above which you will not provide any goods or services may be specified so long as this direction does not violate any applicable law. You may be denied access to programs and/or materials if you are in default in any obligations to the Marketing Fund and/or otherwise in default under the Franchise Agreement. You must honor all coupons, price reduction and other promotions/programs we require. The Marketing Fund may furnish you with marketing, advertising and promotional materials, but you may be required to pay the cost of producing them plus shipping and handling. The Marketing Fund may be used to pay the costs of advertising, marketing and/or public relations programs, services and/or materials with respect to any co-branding, dual franchising or other programs.

CWNA will account for the Marketing Fund separately from other funds. All taxes of any kind, whether incurred by us, CWNA, any related company or other entity in connection with the Marketing Fund, are payable by the Marketing Fund. CWNA will prepare financial statements for the Marketing Fund annually, which will be furnished to you upon written request. Such statements may be audited and any related accounting/auditing costs will be paid by the Marketing Fund. Funds in the Marketing Fund must be expended, prior to termination of the Marketing Fund, only for the purposes authorized by the relevant Franchise Agreement(s.) No profit, gain or other benefit will directly accrue to CWNA from the Marketing Fund. All interest earned on monies contributed to, or held in, the Marketing Fund will be remitted to the Marketing Fund and will be subject to the restrictions of the relevant Franchise Agreement(s).

Financial management of the Marketing Fund will be CWNA 's sole responsibility. CWNA may in:

1) compensate itself, us and/or any Franchisor Related Person/Entity for salaries, administrative costs, overhead and other expenses incurred in Marketing Fund related programs/activities, including but not limited to production, research, insurance, and collection expenses, as well as any legal expense related to the activities and purposes of the Marketing Fund (consistent with the provisions of this Agreement);

2) charge the Marketing Fund for attorney's fees and other costs related in any way to claims against us and/or any of the Franchisor-Related Persons/Entities regarding the Marketing Fund However, CWNA is required to reimburse the Marketing Fund for any attorneys' fees and/or costs paid by the Marketing Fund in connection with any action in which CWNA is finally found to have acted unlawfully or guilty of wrongdoing;

3) spend in any fiscal year an amount greater or less than the aggregate contributions to the Marketing Fund in that year, and the Marketing Fund may borrow from CWNA or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus;

4) revise marketing and other programs, and/or make expenditures from the Marketing Fund, to take account of cultural and other differences;

5) defer, waive and/or compromise claims for current/future contributions to, and/or claims against or with respect to, the Marketing Fund and fund the same with the Marketing Fund;

6) in our discretion, take legal or other action against any franchisee in default of their obligations to the Marketing Fund;

7) merge the Marketing Fund with any marketing fund otherwise established for CARTRIDGE WORLD Stores for use consistent with your franchise agreement.

8)     maintain Marketing Fund assets in one or more accounts designated as "trust accounts" for purposes of protecting assets from claims of third-party creditors, (but such action will not create any "trust," "fiduciary relationship" or similar special arrangement);

9)     incorporate the Marketing Fund or operate it through an entity separate from CWNA, which is subject to all rights and duties of CWNA relating to the Marketing Fund;

10)     take such other actions in connection with the Fund as CWNA considers to be appropriate and consistent with the franchise agreement.

Neither we nor CWNA have any obligation to ensure that expenditures by the Marketing Fund are or will be proportionate or equivalent to contributions to the Marketing Fund by CARTRIDGE WORLD Stores operating in any geographic area, or that any CARTRIDGE WORLD Store will benefit directly, indirectly or in proportion to its contribution to the Marketing Fund; except that contributions from Traditional Cartridge World Stores in the United States will be used in the United States. Neither we nor CWNA have any obligation to require other CARTRIDGE WORLD Stores to contribute to the Marketing Fund or engage in local marketing, and CWNA may decide to allow a franchisee to make direct advertising expenditures in place of contributions to the Marketing Fund.

Neither CWNA nor we will be liable for any act or omission in connection with the Marketing Fund that is consistent with the Franchise Agreement. None of the relationships with you in connection with the Marketing Fund will be in the nature of a "trust," "fiduciary" or similar special arrangement.

**Your Local Store Marketing Activities** (Unit Franchise Agreement Section 11.3)

As noted in Items 6 and 7, you must spend at least $400 each calendar month for local advertising and promotion. Appropriate local advertising expenditures may include classified telephone directory listings and advertising. The value of discounts, coupon redemptions and/or products or services given without charge are not considered to meet your local advertising obligation.

Your advertising has to be in good taste and conform to ethical and legal standards. We may require that samples of all advertising and promotional materials for any media, including the Internet, be submitted to us for our review and approval prior to use. You may not use any materials or programs disapproved by us/any Related Company at any time. We can require that a brief statement regarding the availability of CARTRIDGE WORLD franchises be included in advertising used by you and/or that brochures regarding purchase of CARTRIDGE WORLD franchises be displayed in your CARTRIDGE WORLD Store.

All, if any, use of the Internet, World Wide Web or other electronic media by you in connection with your CARTRIDGE WORLD Store must follow our instructions. (See Item 6 of this Offering Circular for additional information on internet programs/usage).

### Site Selection

You are responsible for selecting the proposed site for your traditional Cartridge World Store Location. Your site selection is subject to our acceptance, which we will not unreasonably withhold if the site meets our standards. If the site for your traditional Cartridge World Store has not been identified and purchased (or leased) by you and accepted by us by the time you and we sign the Unit Franchise Agreement, then you have to find a suitable site within 6 months. You should not make any commitments with respect to any location, nor should you operate a Cartridge World Store, unless we have accepted

the location. Site selection, development, and any related matters are your sole responsibility. (Unit Franchise Agreement, Section 3.1)

We consider a variety of factors in evaluating a proposed site. Some of the factors are site location, area demographics, makeup of other co-tenants, traffic density, shopping centers or malls, parking and ingress/egress. We have no contractual requirement to consent to the location you select for your Store within a specified period of time. If you are unable to locate a site acceptable to us, we may terminate the Franchise Agreement (Unit Franchise Agreement, Section 3.1). Our acceptance of a site is not a recommendation, approval or endorsement of it. If your site is leased, you must try to have certain provisions included in your lease specified by us. (Unit Franchise Agreement, Section 3.2; Collateral Assignment of Lease Ex. 3.2) You may not execute a lease, or any modification or amendment, without our prior written consent and must give us a copy of the signed lease within 5 days after it's signed.

While we may assist you with your efforts, you are solely responsible for all matters involved in selecting, obtaining and developing the site. We will furnish you with standards and requirements for your Unit Franchise location, including its design, décor, layout, equipment, signs and other items. (Unit Franchise Agreement, Section 3.3). You must at your expense prepare any surveys and plans and take whatever actions are necessary to comply with our plans and specifications, any lease requirements and any applicable authorities, ordinances and statutes. Any changes from any plans must be submitted to us for our consent. You must employ a licensed contractor reasonably acceptable to us. We <u>strongly</u> recommend that you have all matters related to site selection, securing and development reviewed by your own independent attorney, real estate broker, architect, contractors and other applicable professionals.

### Typical Length of Time to Open Your Business

Your Unit Franchise location must be open for business within 6 months from the date of the Unit Franchise Agreement. Each of the following must occur prior to your opening: (1) we notify you that all of your pre-opening obligations have been fulfilled; (2) pre-opening training of personnel has been completed; (3) all amounts due us (and/or any affiliate) have been paid; and (4) we've been furnished with copies of all insurance policies, leases/subleases and other required documents. You'll open your traditional Cartridge World Store for business immediately following our notice to you. (Unit Franchise Agreement, Sections 3.1 and 3.6).

The typical length of time between the signing of the franchise agreement and the opening of a franchised location in Australia is sixty days. The length of time in the United States may vary significantly from this estimate. Factors that may affect this length of time include scheduling and completion of training, staffing needs and availability, real estate/leasing markets, location development and selection, financing, permits and licensing requirements.

### Franchisee Groups

**Franchisee Advisory Council**: We, CWNA, or a related company may choose to form a Franchisee Advisory Council, or "FAC", to provide input on System related matters. When formed, an FAC would consist of Store owners, each of whom would be elected by Cartridge World Stores to represent the interests of a particular geographical area or region. We would have a non voting participant on the council. Any bylaws adopted by the group would require our consent. If we, CWNA or a related company, as applicable, submitted a matter to the FAC for an approval (even if not required to do so), an FAC approval would be binding on you. (Unit Franchise Agreement, Section 10.10).

**Franchisee Marketing Group:** We, CWNA or a related company may choose to form regional associations of Cartridge World Stores for co-operative marketing and other marketing related purposes ("FMG"). You would be required to join an FMG if it was formed to cover your location and to follow any bylaws or other rules, including any contributions the group might require. Any required contributions would be assessed on a per Store basis. Any bylaws adopted by the group would require our consent. If we, CWNA or a related company, as applicable, submitted a matter to the FMG for an approval (even if not required to do so), an FMG approval would be binding on you. (Unit Franchise Agreement, Section 11.4).

### Training

You must complete our 10-day training program to our satisfaction before operating your Cartridge World® Store. The program covers a two week period and will include classroom training at a time and location that we choose. Currently, the initial training program is held at CW International offices in Adelaide, South Australia. The training fee covers the training program tuition, airfare and accommodations for 1 person. Food, living and other expenses are your responsibility, and you must pay travel and accommodations for the second and subsequent persons. We may charge a reasonable fee for training of additional persons. If you have been previously trained we can choose to not provide training, or to provide a revised and/or shortened program. (Unit Franchise Agreement, Section 5.1) Additionally, we generally provide and may require you to participate in on-site training as we consider appropriate as you begin your Store operations.

You are responsible for having your managers trained, and we may require that they attend initial training at your expense. You and your manager must attend additional and/or refresher training programs, including national and regional conferences, conventions and meetings, and your employees may be required to attend mandatory training programs presented by us in your area. We may charge fees for optional training programs. You are responsible for all travel, living, incidental and other expenses for you and your staff attending any training programs.

We can decide that you have not successfully completed your initial training. If we do, we may terminate the Franchise Agreement and return a portion of your Initial Franchise Fee. You will have to return all Manuals and sign a General Release. Alternatively, we can require you to hire a substitute manager and arrange for him/her to complete the training program to our satisfaction. (Unit Franchise Agreement, Section 5.1)

We will provide at your request on-site consultations at your CARTRIDGE WORLD Store, based on notice, availability of personnel and your payment of reasonable travel, food, incidental and lodging expenses. No consulting fee will be charged. If we believe that your operations warrant it, we can require that a manager or other person designated by us be placed in your CARTRIDGE WORLD Store to supervise its day-to-day operations until operations meet System standards. (Unit Franchise Agreement, Section 5.2)

The principal CW International staff involved in initial training classes is as follows.

Robert Steer – Mr. Steer has been with CW International as its training manager since 1999 and has 30 years of experience in retail. He administers all classes during training.

John Robson – Mr. Robson has been with CW International as its Technical Manager since 2000. He has experience in technical writing/specifications, and as a technician in the communications and defense electronics industries. He worked in cartridge remanufacturing for 3 year prior to joining CW International. He will aid and occasionally substitute for Mr. Steer.

Bryan Stokes, one of the founders of CW International, has comprehensively trained both Mr. Steer and Mr. Robson in the technical aspects of our business.

Hans-Robert Van Amstel – Mr. Amstel has been with CW International since 2000 and is responsible for Information Technology and Website administration. He has extensive technical experience in the electronics and telecommunications industry and will train Franchisees with our communications software and Point of Sale software.

**Cartridge World® Unit Franchise Training Program**

| SUBJECT | TIME BEGUN | INSTRUCTIONAL MATERIAL | HOURS OF CLASSROOM TRAINING |
|---|---|---|---|
| Orientation<br>Inkjets[1] | Day 1 | Hands-on training; material support; our Operations and Training Manuals | 6 1/2 hours |
| Inkjets<br>Laser Cartridges[2] | Day 2 | Hands-on training; material support; our Operations and Training Manuals | 7 hours |
| Laser Cartridges | Days 3 through 6 | Hands-on training; material support; our Operations and Training Manuals | 28 hours |
| Inkjet Cartridges<br>Accounts Package<br>Inkjets | Day 7 | Hands-on training; material support; our Operations and Training Manuals | 7 hours |
| Laser Cartridges<br>Inkjet/Laser | Day 8 | Hands-on training; material support; our Operations and Training Manuals | 7 hours |
| Inkjet/Laser<br>Operations Manual[3]<br>Manuals[4]<br>Inkjet Cartridges | Day 9 | Hands-on training; material support; our Operations and Training Manuals | 7 hours |
| **Review** | Day 10 | Hands-on training; material support; our Operations and Training Manuals | 7 hours |

NOTES
1. Inkjet training includes how cartridges work, problems associated with them, refilling, testing and problem solving, ink structure, etc.
2. Laser Cartridge training includes how cartridges work, part identification, disassemble, reloading, replacing worn parts, re-assemble, testing, fault finding, plus demonstration(s).
3. Aspects of the Operations Manual presented, such as marketing, shop presentation, bookwork, stock control, and other matters.
4. Instructions on working with various parts books.

12.  **TERRITORY**

You are awarded a franchise to operate a single traditional Cartridge World Store at a location to be approved by us (See Item 11 of this Offering Circular and Section 2.1 of the Franchise Agreement).

You should refer to your Franchise Agreement and Exhibit 2.2 for a detailed explanation of your territory rights, if any, the limits and conditions on those rights and the rights reserved to us. The explanation of your Territory rights and our reserved rights in this Item 12 is meant to be a "plain English" summary of those rights and is not intended to modify or limit any of the provisions in the Franchise Agreement or Exhibit 2.2.

Note that the term "Brick and Mortar Distribution Opportunity" includes "Traditional Cartridge World Stores" as well as other types of physical retail facilities, such as kiosks. But a Traditional Cartridge World Store is limited to a full sized, conventional retail facility. It is important to understand these terms because your rights with respect to these two types of units are different.

Generally speaking, your territory rights are as follows:

(1) Except as explained in (7) below, you will receive a designated geographic area as your "Territory". It will be identified in Exhibit 2.2 in your Franchise Agreement along with an explanation of your rights in that Territory.

2) If you receive a Territory, we will not open or authorize anyone else to open another Traditional Cartridge World Store in your Territory during the first 24 months after the date of the Franchise Agreement (the "Start Up Period"). During the Start Up Period, we may open or authorize anyone else to open any other type of Brick and Mortar Distribution Opportunity inside your Territory subject to your right of first refusal to acquire a franchise to operate that Brick and Mortar Distribution Opportunity in your Territory.

(3) After the Start Up Period, we may open or authorize others to open any type of Brick and Mortar Distribution Opportunity, including Traditional Cartridge World Stores, in your Territory subject to your right of first refusal to acquire a franchise to open the Brick and Mortar Distribution Opportunity.

(4) We will give you notice if we plan to locate or authorize someone else to locate any type of Brick and Mortar Distribution Opportunity in your Territory.

You will have a 15-day opportunity to accept this franchise award on the same terms and conditions as the proposed candidate (or on our then standard terms, if the planned unit is to be owned by us). If you accept, then you will have to sign a General Release of claims and meet whatever conditions we apply to the particular opportunity. You should read Exhibit 2.2 for a complete description of all the terms and conditions to exercising this right of first refusal.

(5) You must be in Good Standing (as defined in Section 1.2 of the Franchise Agreement) to exercise your right of first refusal. If you are not in Good Standing we do not have to provide you with notice of the opportunity or our plans for another Cartridge World location in the Territory.

(6) The Start Up Period only applies during the initial term of your Franchise Agreement for your Store and not during any renewal term or the term of any successor franchise for that Store. If you become a franchise by acquiring an existing Store then there is no Start Up Period.

(7) You may be awarded a franchise for a location in another Traditional Cartridge World Store Franchisee's Territory, for example, if that franchisee declined to exercise the right of first refusal for the franchise. In that case, you would not have any Territory (apart from your store premises) or any of the rights described above. We may also decline to award a Territory for a franchise that is not for the operation of a Traditional CARTRIDGE WORLD Store, regardless of whether it is in another franchisee's Territory.

Any Cartridge World Store that is located in a physical retail facility open to the public is considered a Brick and Mortar Opportunity. However, a "Traditional CARTRIDGE WORLD Store" is limited to a full, standard size, "brick and mortar" retail facility located in a free-standing building or a shopping center accessible to the general public and using the Marks and CARTRIDGE WORLD® System. The term does not include non-traditional CARTRIDGE WORLD Stores such as limited square footage outlets like "express" units or kiosks; units housed within other retail facilities, such as a department store; Internet sites and/or direct mail operations. A point of distribution that does not involve the use of the CARTRIDGE WORLD name or System or that is not in a physical retail facility open to the public is not considered a Brick and Mortar Opportunity. Examples are mail or phone order operations, sales via the Internet, or the operation of a similar business under a different name, mark or system at a retail facility.

Except for your rights if applicable as described above with respect to Brick and Mortar Opportunities, we and Franchisor-Related Persons/Entities have the right to market and sell CARTRIDGE WORLD Brand (or any other brand) products and services (whether or not competitive) to customers located anywhere (including within the Territory) using any channel of distribution located anywhere.

**The following applies to <u>all</u> franchisees, whether they are awarded a geographic Territory, or their "Territory" is limited to the site for their Store Location.**

We and Franchisor-Related Persons/Entities have the right to market and sell CARTRIDGE WORLD Brand (or any other brand) products and services (whether or not competitive) to customers located anywhere using any channel of distribution located anywhere (unless expressly limited by the Franchise Agreement). We and they are expressly permitted for the full term of the Franchise Agreement, including the Start-Up Period, to:

1)      own and/or operate ourselves, and/or authorize others to own and/or operate:

a)      any kind of business in the Territory selling to customers located anywhere, whether or not using the CARTRIDGE WORLD Marks and System (subject to the prohibition during the Start Up Period as to Traditional Cartridge World Stores and subject to the right of first refusal) and

b)      any kind of business outside of the Territory selling to customers located anywhere, including without limitation, Traditional CARTRIDGE WORLD Stores, whether or not using the CARTRIDGE WORLD Marks and System;

2) develop or become associated with other concepts (including dual branding and/or other franchise systems), whether or not using the CARTRIDGE WORLD System and/or the Marks, and award franchises under such other concepts for locations anywhere and/or operate units/channels of distribution owned by us and/or any Affiliate/Related Company under such other concepts for locations anywhere, selling to customers located anywhere;

3) acquire, be acquired by, merge, affiliate with or engage in any transaction with other businesses (whether competitive or not), with units located anywhere and selling to customers located anywhere. Such transactions may include arrangements involving competing outlets and brand conversions (to or from the CARTRIDGE WORLD Marks and System). Such transactions are expressly permitted, and you agree to participate at your expense in any such conversion.

This Franchise applies only to the establishment and operation of a Traditional Cartridge World Store at a single site (for the offer/sale of approved Products and Services). All of the business of the CARTRIDGE WORLD Store must be conducted from the Premises, although you may choose to deliver some Products and Services at customer sites. The Franchise does not grant you any rights with respect to other and/or related businesses, products and/or services, in which we or any Franchisor Related Persons/Entities may be involved, now or in the future.

Our current policy is to allow you to accept orders from any customer located anywhere, but we can change this policy at any time as we choose. You are required to comply with any restrictions we specify as to the customers to whom you may offer or sell, including any Special Accounts. "Special Accounts" are classes of special customers (which may include national accounts, other large businesses, government agencies, and/or otherwise) that we designate from time-to-time in our Business Judgment. Note that we may restrict your use of the Internet, World Wide Web, other electronic means of marketing and/or mail order (and/or any other means of distribution). You will not market or sell through such venue(s) without our written permission. We also may require you to accept orders only from customers located in the Territory and/or of a particular classification, however we decide.

In any case where we have the right to terminate your rights under the Franchise Agreement, we may, as an alternative remedy, reduce, eliminate or otherwise modify your territorial and similar rights, including any rights-of-first-refusal. (Unit Franchise Agreement, Section 2.2 and Exhibit 2.2)

## Relocation

If your lease expires or terminates; if your Location is damaged, condemned or otherwise rendered unusable; or if, in your and our judgment, there is a change in the character of the location sufficiently detrimental to your business potential to warrant relocation, then you will relocate your traditional Cartridge World Store to a location acceptable to us. Any relocation will be at your sole expense, and you (and each affiliate of yours) will sign a General Release when we grant our consent. (Franchise Agreement, Section 3.8)

## Performance Standards

You and we have a shared interest in your CARTRIDGE WORLD Store not performing below CARTRIDGE WORLD System Standards, or failing to achieve a certain level of Gross Volume. Performance standards include both Cartridge World® System Standards and Gross Volume Requirements. (Franchise Agreement Section 16.5)

<u>Cartridge World® System Standards</u>

Your CARTRIDGE WORLD Store may be evaluated for compliance with CARTRIDGE WORLD System Standards using a variety of methods. Your Store will be assigned a System Standards Score in each major category and compared with the average scores in each category achieved by all CARTRIDGE WORLD Stores in the United States (including those owned and/or operated by us and/or our Affiliates), or another geographic area.

<u>Cartridge World® Financial Standards</u>

We may compare your Gross Volume with the then-current "Financial Standard". Any will be made on a 6 month basis. [For example, if the first comparison was on June 30, the next comparison would be on December 31, etc.] The Financial Standard will be determined as follows:

| Period Open (measured from the earlier of actual opening date or the date by which the Store is required to be open) | Financial Standards (adjusted every 6 mos.) |
|---|---|
| Less than One Year | 50% of PUA* |
| One Year or More, But Less Than Two Years | 65% of PUA* |
| Two Years or More | 75% of PUA* |

*"PUA" or "Per Unit Average" – The average Gross Volume for all CARTRIDGE WORLD Stores in the United States during the most recent 6 month period before the measuring date.

We have the right to make reasonable revisions to elements of the Financial or System Standards with 6 months written advance notice to you.

If your System Standards Score in a scored category is lower than the average System Standards Score; or if your Gross Volume for the applicable measurement period does not equal the then-current Financial Standard, then we may (but don't have to) implement a correction process as outlined in the Franchise Agreement. If we do so and if you do not correct your Store deficiencies, then we can terminate the agreement, although you may be able to transfer your Store subject to conditions (Section 16.5, Unit Franchise Agreement).

13. **TRADEMARKS**

The Principal Marks that will be used to identify your business are the words "Cartridge World" and the logo that consists of the words "Cartridge World" and a 7-pointed star as shown on the cover page of this Offering Circular. CW International obtained a federal registration of the Mark, "CARTRIDGE WORLD in Logo", on the Principal Register of the United States Patent and Trademark Office on October 8, 2002 (Registration No. 2631733). CW International obtained a federal registration of the words "Cartridge World" without the design, on the Principal Register of the United States Patent and Trademark

Office on May 20, 2003 (Registration No. 2717527). No affidavits or renewals have become due for these registrations.

CW International has granted CWNA, through a license agreement, the right to use and grant franchisees the right to use the "Cartridge World®" service mark. Termination or expiration of the license agreement will not affect your right to use the "Cartridge World®" service mark. This license agreement does not significantly limit CWNA's rights to use or license the trademark in a manner material to you. In addition, CWNA has granted us, through a master franchise agreement, the right to use the service mark in this state. Under the terms of our master franchise agreement with CWNA, if the master franchise is terminated, if CWNA's license with CW International is terminated, or if CWNA elects to withdraw from the market in your area, the Unit Franchise Agreement may be terminated.

There are no currently effective material determinations of the United States Patent and Trademark Office, the Trademark Trial and Appeal Board, the trademark administrator of any state or any court, nor are there any pending infringement, opposition or cancellation proceedings or material litigation, involving the Marks. There are no agreements currently in effect which significantly limit our rights to use or license the use of these trademarks, service marks, trade names, logotypes or other commercial symbols in any manner material to you. There are no infringing uses actually known to us that could materially affect your use of these trademarks, service marks, trade names, logotypes or other commercial symbols in the geographic area where we offer franchises.

Neither we, CWNA or the related companies are obligated under the Franchise Agreement to protect your right to use the Principal Trademarks or to defend or indemnify you if you are sued for infringement because of your use of the Principal Trademarks.

CWNA is currently investigating information received about unrelated companies operating under the name "Cartridge World" in California and New Jersey, which could have prior rights in a trade or service mark that includes the words, "Cartridge World". The nature and geographical scope of these companies' operations, as well as various websites, are uncertain to us as of the effective date of this Offering Circular. Therefore, we do not know the nature and scope of any prior rights that these companies may have with respect to the Marks. We will take whatever action we consider to be appropriate as relevant information is received.

CWNA is also conducting various searches throughout the country to determine if there are other locales in which the Cartridge World name and mark may be in use, and other uses may be discovered as a result of this process. You should understand that there is always a possibility that there might be one or more businesses unknown to us using a name or trademarks similar to ours and with superior rights to the name or trademarks. We strongly suggest that you research this possibility, using telephone directories, local filings and other means, before you pay any money, sign any binding documents or make any binding commitments. This is especially important because CWNA is just beginning to establish franchise operations in the United States, and we are just beginning to offer franchises in our franchise area. If you do not research other trademarks in this area, then you may be at risk.

You must notify us immediately of any apparent or actual infringement of, or challenge to your use of the Marks, or any claim by any person of any rights in the Marks. You will not communicate with anyone other than us or our counsel regarding any infringement, challenge or claim. We/CWNA/related companies have the right to take whatever action we consider appropriate and to control exclusively any litigation or other proceeding arising out of any infringement, challenge or claim (including the right to direct any settlement of the claims). You must sign any documents, give any assistance, and do any acts

that our attorneys believe are necessary or advisable to protect and maintain the interests we have in any litigation or administrative proceeding.

If it becomes advisable at any time in our sole judgment for you to modify or discontinue the use of any of the Marks, or for you to use one or more additional or substitute trademarks or service marks, you will immediately comply (at your expense) with our directions. We will not have any liability or obligation to you for modification, discontinuance or otherwise. We are not obligated under the Franchise Agreement to pay for the costs of your defense or to indemnify you in connection with any trademark proceeding or action.

**14.    PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION**

There are no patents that are material to the Franchise. We claim copyright protection in our Manuals, instruction materials, agreements, advertising, promotional materials, electronic and computerized media displays and other items created by our employees or acquired by assignment, although we have not registered these materials with the United States Registrar of Copyrights. We consider these materials proprietary and confidential, and you may use them only as provided in the Franchise Agreement.

There currently are no effective determinations of the Copyright Office (Library of Congress) or any court regarding any of the copyrighted materials. There are no agreements in effect which significantly limit our right to use or license the copyrighted materials. Finally, there are no infringing uses actually known to us that could materially affect your use of the copyrighted materials in any state. No agreement requires us to protect or defend any copyrights or you in connection with any copyrights.

In general, our proprietary information includes "Confidential Information" as defined in Article 8 of the Franchise Agreement, some of which is contained in our Manuals, and includes, among other things: (1) techniques, policies, procedures, information, systems, and knowledge regarding the development, marketing, operation and franchising of traditional Cartridge World Stores; (2) information regarding, and suppliers of, items used and/or offered in the Franchise Business; and (3) all information regarding customers, including any statistical and/or financial information and all lists; (4) methods of refilling printer cartridges; (5) our engineered jigs. We disclose to you Confidential Information needed for the operation of a the franchise, and you may learn additional Confidential Information during the term of your franchise. Between you and us, we have all rights to the Confidential Information. Your only interest in the Confidential Information is the right to use it under your Franchise Agreement.

You must agree that you will maintain the confidentiality of all the Confidential Information during and after the term of the Franchise Agreement and that you will not use any of the Confidential Information in any other business or in any manner we do not specifically authorize in writing. You also agree to fully and promptly disclose to us all ideas, techniques and other similar information relating to the franchise business that are conceived or developed by you and/or your employees. We will have an ongoing right to use, and to authorize others to use, such ideas, etc., without compensation or other obligation.

You are required to cause each of your employees, agents, principals and affiliates to execute and deliver to you an agreement containing substantially the same provisions as described in this Item 14 (in forms specified by us) and will deliver to us copies on request (Franchise Agreement, Section 8.1).

From and after the date of the Franchise Agreement, we own the relationship with all past,

current and future customers you service, as well as all customer lists and all transactional and other information relating to customers, including addresses and telephone numbers. We also own and control all domain names and URLs ("Uniform Resource Locator") relating to any CARTRIDGE WORLD Store. We can use the lists and information in any way we wish (Franchise Agreement, Section 8.1).

## 15. OBLIGATION TO PARTICIPATE IN THE ACTUAL OPERATION OF THE FRANCHISE BUSINESS

A person who has successfully completed all training required by us and who meets all of our other then-current standards must personally manage your Cartridge World Store on a full-time basis. We strongly recommend, but do not require, that you personally manage your traditional Cartridge World Store on an "on-premises" basis. Absentee ownership may expose you to a greater risk of failure than if you are personally involved, on a full time basis, in the on-site daily management of your traditional Cartridge World Store. You are required to keep us advised of the identities of the manager and other supervisors of your traditional Cartridge World Store. We have the right to deal with the manager and other supervisors regarding the day-to-day operations of, and reporting requirements for, your Cartridge World Store. You are solely responsible for hiring all of your employees and for their supervision, terms of employment, compensation and proper training. Your managers will not be required to have an equity interest in the Store; however, all of your employees will be required to sign a confidentiality agreement in a form acceptable to us.

If the Franchisee is not a natural person, all past, current and/or future obligations of the Franchisee must be personally guaranteed by one or more persons acceptable to us in our sole discretion (Refer to Exhibit 1 of the Franchise Agreement).

## 16. RESTRICTIONS ON WHAT THE FRANCHISE MAY SELL

You must operate your Cartridge World® Franchise Business in accordance with the traditional Cartridge World® Store System standards (including required products and services). We can change our policies, procedures, Manuals, suppliers, approved Products and services, and other System elements at any time. You may not use your Cartridge World® Unit Franchise Business for any purposes other than the operation of a Cartridge World® Unit Franchise Business and must purchase, use and offer each of and only the types, brands and/or quality of Products and Services we designate. You may not (without our prior written consent) operate your traditional Cartridge World® Store Unit Franchise Business from any location other than the approved site. Our current policy is to allow you to accept requests from prospects and orders from any customers located anywhere, but we can change this policy.

## 17. RENEWAL, TERMINATION, TRANSFER AND DISPUTE RESOLUTION

This table lists certain important provisions of the Unit Franchise and related agreements. You should read these provisions in the agreement attached to this offering circular. Note that not all provisions, nor all details of provisions, are listed in this table.

| PROVISION | SECTION IN FRANCHISE AGREEMENT | SUMMARY |
|---|---|---|
| a. Term of the franchise | 2.1 | 10 years from the date of the Franchise Agreement; if you acquire an existing Cartridge |

| PROVISION | SECTION IN FRANCHISE AGREEMENT | SUMMARY |
|---|---|---|
| | | World franchise, you sign a new franchise agreement for the balance of the term of the original franchise (unless we decide to offer full term on case by case basis.) |
| b. Renewal or extension of the term | 15.1 | Your rights terminate at end of term; however, you may be eligible for a successor franchise (which may differ materially from the current Franchise Agreement) for, at our option, the lesser of a single 10-year period or the balance of the lease term for the Store Premises, without any further term. |
| c. Requirements for you to renew or extend | 15.2 - 3 | Complied with all agreements; maintained possession of Premises acceptable to us for the term; notice of election to obtain successor franchise; satisfied all monetary obligations; cure deficiencies; Location brought into compliance with current standards; pay amounts due; sign new franchise agreement/related documents; meet current qualification and training requirements; execute a general release; pay renewal fee; relocate Location if required; location reviewed and approved by us. |
| d. Termination by you | None | Not Applicable |
| e. Termination by us without cause | | Your agreement may not be terminated without good cause. |
| f. Termination by us with cause | 3.1, 5.1, 13.3, 16 | We can terminate you if you commit any one of several listed violations |
| g. "Cause" defined-defaults which can be cured | 16.2 | 10-Day cure - Failure to: report accurately Gross Volume or pay any amounts due; submit accurate and timely reports; comply w/ Manuals; maintain insurance; correct dangerous conditions. |

| PROVISION | SECTION IN FRANCHISE AGREEMENT | SUMMARY |
|---|---|---|
| | | 30-Day cure – uncured default under any lease; fail to remain current with obligations to others for the Franchise Business; fail to comply with any other Franchise Agreement requirements, procedures, and standards. |
| h.  "Cause" defined-defaults which <u>cannot</u> be cured | 3.1, 5.1, 16.1, 16.3 - 16.5 | Failure to timely locate site, develop or open store or successfully complete training, abandon or fail to operate business for more than 7 days or transfer control without consent; misrepresentations by you; assignment for the benefits of creditors or inability to pay debts; bankruptcy; receiver appointed; conviction of a felony or misconduct affecting reputation; unauthorized transfer; unauthorized use of Confidential Information or Marks; violation of non-competition provisions; misrepresentations of amounts owed and other matters; 5 or more customer complaints in 12 months; 2 defaults in 12 months or 3 defaults in 24 months; cross defaults under other agreements; failure to meet Performance Standards; |

| PROVISION | SECTION IN FRANCHISE AGREEMENT | SUMMARY |
|---|---|---|
| i. Your obligations on termination/non-renewal | 17.1 - 17.4, 14.8 | Pay all amounts owed and to be owed; cease use of all Cartridge World name, trade dress, and marks; de-identify Premises; cancel fictitious name registrations, transfer phone numbers/URL's/directory listings; comply with covenants; furnish evidence of compliance with the above; return and stop using Manuals and confidential materials; continuing indemnification, confidentiality, dispute resolution and non compete obligations; if in default, sign general release for our waiver of rights; sell assets to us at fair market value and/or assign lease for Premises at our option. We can require you to pay future royalties. No equity on termination. If you continue to use the Marks after termination, you will owe us greater of Store profits or all fees normally payable. |
| j. Assignment of contract by us | 14.1 | Fully assignable by us; we can be sold; sell any assets; go public; engage in a private placement; merge, acquire or be merged/acquired with competitors or others; refinance; buyout or other transaction. On transfer we have no continuing obligations. |
| k. "Transfer" by you-definition | 14.2 | Includes transfer of any interest of any kind or nature |
| l. Our approval of transfer by you | 14.3 - 14.4 | Transfer subject to our consent and transfer of interest/assets of business must include franchise. You may have no more than 12 individuals with ownership of business or assets associated with the franchise without prior written consent. |

| PROVISION | SECTION IN FRANCHISE AGREEMENT | SUMMARY |
|---|---|---|
| m. Conditions for our approval of transfer | 14.3 - 14.4, 14.6 | You must be in compliance with Franchise Agreement, lease/sublease and any other agreements; transferee qualifies; transferee assumes all obligations; all amounts due paid in full; Business in compliance with then-current standards; all required reports and other documents in; transferee completes training; transferee obtains permits, licenses and insurance; you remain liable for franchised business without express release; consent of lessor; transferee signs new Agreement or is assigned transferor's agreement, at our option; payment of transfer fee; general release by all; amount financed subordinated to us and financing only with our consent; post term. non compete; compliance with laws; you comply with confidentiality, indemnification and dispute resolution provisions; we can withhold approval based on circumstances . <u>Additional conditions</u> for transfer to a wholly-owned entity. |
| n. Our right of first refusal to acquire your business | 14.7 | We have right subject to time frames: to match offer; to substitute cash for any proposed payment; to exclude non complying assets value and interests outside franchise; to customary representations, warranties and agreements on sale. |
| o. Our option to purchase your business | 14.8 | We can choose to purchase your business and/or franchise through and up to 120 days after agreement ended. Price formula and terms in agreement. |
| p. Your death or disability | 14.5 | Interest must be transferred to |

| PROVISION | SECTION IN FRANCHISE AGREEMENT | SUMMARY |
|---|---|---|
| | | approved third party within 6 months, subject to transfer conditions, and we may have right to manage the Location in interim. |
| q. Non-competition covenants during the term | 8.2 | No involvement in any similar business anywhere; special, additional remedies for breach |
| r. Non-competition covenants after the franchise is terminated or expires | 8.2 | No interest in similar business for 2 years in old Territory or other Stores marketing area. If non-competition restrictions are unenforceable or reduced, we may require you to pay a fee based on formula. |
| s. Modification of the agreement | 19.9 | Modifications must be in writing and signed by all parties. Operating Manual is subject to change by us and you must promptly comply. |
| t. Integration/merger clause | 19.9, 19.10, 21 | Only terms of written Franchise Agreement, exhibits, riders and Manuals are binding. Outside promises are not enforceable. |
| u. Dispute resolution by arbitration or mediation | 19 | Except for certain claims, all disputes resolved through mediation/arbitration at our then-current headquarters; waiver of punitive and other named damages no class actions; limits on periods in which to bring claims; notice of claims requirement; pay own attorney fees, except in limited instances; but all foregoing limitations of claims are subject to Minn. Stat. §80C.17, Subd. 5 |
| v. Choice of forum | 19.1 and 19.2 | Litigation in court encompassing our then-current headquarters excepts as stated in Minnesota Addendum |
| w. Choice of law | 19.15 | The law of California, except as stated in Minnesota Addendum. |

Various states, including but not limited to the following, have statutes which may supersede the Franchise Agreement in your relationship with the franchisor including areas of termination and renewal

of your franchise: ARKANSAS [Code Sections 4-72-201-4-72-210], CALIFORNIA [Bus. & Prof. Code Sections 20000-200043], CONNECTICUT [42-133e et seq.], DELAWARE [Code, Title 6, Chapter 25, Sections 2551-2556], HAWAII [Rev. Stat. 482E-6], ILLINOIS [815 ILCS 705/19 and 705/20], INDIANA [Code Sections 23-2-2.7 (1) - (7)], IOWA [Sections 523H.1-523H.17], MICHIGAN [19.854 (27)], MISSISSIPPI [Code Sections 75-24-51-75-24-63], MISSOURI [Stat. Sections 407.400-407.410] NEBRASKA [Re. Stat. Sections 87-401 - 87-410], NEW JERSEY [Rev Stat. Sections 56:10-1-56:10-12], SOUTH DAKOTA [Codified Laws Section 37-5A-51], VIRGINIA [Code Sections 13.1-557 through 13.1-574], WASHINGTON [Code Section 19.100.180], WISCONSIN [Stat. Section 135.03], DISTRICT OF COLUMBIA [Code Sections 29-1201-29-1208], PUERTO RICO [Annotated Laws Sections 278 - 278d], VIRGIN ISLANDS [Annotated Code Sections 130 - 139]. These and other states may have court decisions, which may supersede the Franchise Agreement in your relationship with the franchisor, including the areas of termination and renewal of your franchise.

The Franchise Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 et seq.)

You should note that the above summaries are, as a result of disclosure regulations, necessarily brief. You are strongly urged to read in full all provisions of the Franchise Agreement and other documents before signing any binding documents, paying any amounts or making any investments. You should be aware that regardless of any provisions of state law to the contrary and notwithstanding any statements in the Offering Circular required as a condition of registration or otherwise, we intend to fully enforce the provisions of the Franchise Agreement and other documents, including all venue, choice-of-laws and mediation/arbitration provisions, and to rely on federal preemption under the Federal Arbitration Act (9 U. S. C.§ 1 et seq.).

18.   **ARRANGEMENTS WITH PUBLIC FIGURES**

We do not use any public figure to promote our franchise.

19.   **EARNINGS CLAIMS**

We do not furnish or authorize our salespersons to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a traditional Cartridge World® Store . Actual results may vary from unit to unit and we cannot estimate the results of any particular franchise.

We have specifically instructed our salespersons, agents, employees, and officers (and all other personnel) that they are not permitted to make any claims or statements, written or oral, regarding prospects or chances of success, actual or potential sales, costs, earnings, income or profits of, or other financial matters.

We do not suggest or guarantee that you will succeed in the operation of a traditional Cartridge World Store Unit Franchise or reach any particular level of sales, profits, cash flows or otherwise. If you believe that any promises, representations or agreements are or have been, at any time, made to you that are not expressly described in the Franchise Agreement or this Offering Circular, you must provide a written statement regarding this next to your signature on the Franchise Agreement. If any information or representations that are not expressly described in the Franchise Agreement or this Offering Circular have been provided to you, they should not be relied on and they will not bind us. Please notify us in writing before you buy a franchise if any information or representations of that sort have been provided to you,

Before signing any binding documents or making any investment, you should make your own independent investigation regarding the possible purchase of a Franchise, including speaking with a significant number of current and past traditional Cartridge World® Unit Franchisees regarding their experiences and with independent advisors, such as your attorney and/or accountant. **You should also note that we are entering your market with the franchise offer described in this Offering Circular. The experiences of Cartridge World Store Unit Franchisees in Australia, New Zealand and any other country may vary significantly in many material ways from your own due to material differences franchise agreements, in markets, cultures, product/service demand, economic conditions and many other factors. See Item 20 and related exhibits regarding the names, addresses and phone numbers of current and past Cartridge World® Unit Franchisees.**

20.    <u>LIST OF OUTLETS</u>

As of the date of this Offering Circular, Wildwood had only sold one Cartridge World Store Unit Franchise, which is not yet open. No franchisees had an outlet terminated, canceled, transferred, not renewed or otherwise voluntarily or involuntarily ceased to do business under our franchise agreement, and no franchisee has failed to communicate with us within the ten weeks prior to the application date. As of the date of this Offering Circular, Wildwood did not own or operate any Cartridge World Stores. The table below shows our projected unit franchisees for this year.

*PROJECTED UNIT FRANCHISE OPENINGS THROUGH 12/31/03*

| | FRANCHISE AGREEMENTS SIGNED BUT LOCATION NOT OPEN | PROJECTED FRANCHISED NEW LOCATIONS IN THE NEXT FISCAL YEAR | PROJECTED COMPANY OWNED OPENINGS IN NEXT FISCAL YEAR |
|---|---|---|---|
| California | 1 | 3 | 4 |
| Minnesota | | 2 | 2 |
| New York | | 2 | 2 |
| TOTAL | 1 | 7 | 8 |

The above figures are estimates only. These numbers may change significantly depending upon a number of factors, including the timing of various state registrations and the success of franchise marketing efforts, among other.

**Related Company Information**

**CW International**

As of December 31, 2002, CW International had approximately 12 Master Franchisees, and 241 Unit Franchisees world wide, and 1 Company-Owned location operating in Australia. Refer to the charts below for additional information on these franchises. Contact information for CW International's Unit Franchises is included in Exhibit D to this offering

Additionally, CW International previously licensed the operation of one pilot store in San Diego, CA, which was in operation May, 2001 to February 2003. The licensee accepted CW International's offer to rescind the license. The former licensee may continue to operate a similar business but will not be

licensed to use the Cartridge World marks or name.  Refer to Exhibit D for information regarding the operator of this pilot location.

**CWNA**

As of May 31, 2003 CWNA has 7 Master Franchises, no Cartridge World Store Unit Franchisees and no company owned locations.  No Master Franchisees had an outlet terminated, canceled, transferred, not renewed or otherwise voluntarily or involuntarily ceased to do business under their franchise agreement, and no franchisee has failed to communicate with them within the ten weeks prior to the application date.  Contact information for CWNA's Master Franchisees is attached as Exhibit D to this Offering Circular.

**CWNA DATA:**

### PROJECTED OPENINGS BY UNIT FRANCHISEES
### DURING THE 12-MONTH PERIOD ENDING 12/31/03

| STATE OR COUNTRY | FRANCHISE AGREEMENTS SIGNED BUT LOCATION NOT OPEN | PROJECTED FRANCHISED NEW LOCATIONS IN THE NEXT FISCAL YEAR | PROJECTED CWNA OPENINGS IN NEXT FISCAL YEAR |
|---|---|---|---|
| Alabama | | | |
| Arizona | | 1 | |
| Arkansas | | | |
| California | | 4 | |
| Colorado | | | |
| Connecticut | | | |
| Delaware | | | |
| Florida | | 4 | |
| Georgia | | | |
| Hawaii | | | |
| Idaho | | | |
| Indiana | | | |
| Iowa | | | |
| Kansas | | | |
| Kentucky | | | |
| Louisiana | | | |
| Maine | | | |
| Massachusetts | | | |
| Michigan | | | |
| Minnesota | | 2 | |
| Mississippi | | | |
| Missouri | | | |
| Montana | | | |
| Nebraska | | | |
| Nevada | | | |

| STATE OR COUNTRY | FRANCHISE AGREEMENTS SIGNED BUT LOCATION NOT OPEN | PROJECTED FRANCHISED NEW LOCATIONS IN THE NEXT FISCAL YEAR | PROJECTED CWNA OPENINGS IN NEXT FISCAL YEAR |
|---|---|---|---|
| New Hampshire | | | |
| New Jersey | | | |
| New Mexico | | | |
| New York | | 2 | |
| North Carolina | | | |
| North Dakota | | | |
| Ohio | | | |
| Oklahoma | | | |
| Oregon | | | |
| Pennsylvania | | 2 | |
| Rhode Island | | | |
| South Carolina | | | |
| South Dakota | | | |
| Tennessee | | | |
| Texas | | 3 | |
| Utah | | | |
| Vermont | | | |
| Virginia | | 2 | |
| Washington | | | |
| West Virginia | | | |
| Wisconsin | | | |
| Wyoming | | | |
| TOTAL | | 20 | |

The above figures are estimates only. These numbers may change significantly depending upon a number of factors, including the timing of various state registrations and the success of franchise marketing efforts, among other. CWNA does not anticipate directly granting unit franchises.

CW International Data:

**FRANCHISED STORE STATUS SUMMARY**
**FOR YEARS ENDING JUNE 30, 2000/2001/2002**
**AND THE PERIOD ENDING DECEMBER 31, 2002**

| Country[1] | Transfers | Cancelled Or Terminated | Not Renewed | Reacquired By Franchisor | Left the System Other | Totals from Left Columns | Franchises Operating at Year End |
|---|---|---|---|---|---|---|---|
| Australia | 1/2/5/1 | 0/0/2/0 | 0/0/0/0 | 0/0/1/0 | 0/0/1/0 | 1/2/9/1 | 38/74/102/113 |
| New Zealand | 0/0/1/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/1/0 | 0/12/16/ 22 |
| Poland | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/1/5 |
| England | 0/0/1/1 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/1/1 | 0/4/24/79 |
| Scotland | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/6/12 |
| Ireland | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/1/ 4 |
| Singapore | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/2/2 |
| Germany | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/1 |
| Canada | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/1 |
| Malaysia | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/1 |
| Switzerland | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/0/0 | 0/0/1/1 |
| Totals | 1/2/7/2 | 0/0/2/0 | 0/0/0/0 | 0/0/1/0 | 0/0/1/0 | 1/2/11/2 | 38/90/153/241 |

(1)      CW International has granted master franchises for the countries listed, and the master franchisors in those countries franchise to the unit franchises.  No master franchises have been transferred, cancelled, not renewed, or left the system for the periods noted above.  One master franchise in Australia was reacquired in August 2000.  A list of CW International's current franchisees and master franchisees, as well as those franchisees that have ceased to do business under the franchise agreement from June 30, 2001 – December 31, 2002, is attached as Exhibit D. CW International has one company owned store in Melrose Park, South Australia.

CW International estimates that 30 unit franchises will be granted by master franchisees in Australia in the 12 months following June 30, 2002.  It estimates that it will grant 5 master franchises world wide in the same period.

21.  **FINANCIAL STATEMENTS**

Exhibit B contains the audited financial statement of Wildwood Franchising, Inc. for the period ended December 31, 2002, a compiled, unaudited financial statement of Wildwood Franchising, Inc. as of February 28, 2003, and audited financial statements for CWNA as of December 31, 2002.   Our fiscal year end is December 31.

22.  **CONTRACTS**

The Franchise Agreement (including as exhibits an Owners' Guaranty, a form of General Release, a Collateral Assignment of Lease, and a form of Employee Confidentiality Agreement) is attached to this Offering Circular as Exhibit A and the Statement of Prospective Franchisee is attached to this Offering Circular as Exhibit F.

23.  **RECEIPT**

Two copies of an acknowledgment of your receipt of this Offering Circular appear as Exhibit G.  Please sign and date one copy and return it to us.  Retain the other copy for your records.  You should also complete and return the Statement of Prospective Franchisee (Exhibit F) to us before you sign any Franchise Agreement or pay any sums.

**ADDENDUM TO**
**OFFERING CIRCULAR**
**AS REQUIRED BY THE STATE OF MINNESOTA**

With respect to franchises governed by Minnesota law, the following shall apply:

Item 17 of the Offering Circular is amended as follows: Franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3 and 4 which require, except in certain specified cases, that a franchisee be given 90 days notice of termination (with 60 days to cure) and 180 days notice for non-renewal of the Franchise Agreement.

Item 17 and the Cover Page of the Offering Circular is amended as follows: Section 19.15 of the Franchise Agreement concerning governing law of the agreement shall not in any way abrogate or reduce any rights of the franchisee as provided for in Minnesota Statutes, Chapter 80C.

Item 17 and the Cover Page of the Offering Circular is amended as follows: Section 19.2 of the Franchise Agreement concerning jurisdiction and venue for disputes shall not be applicable to the extent prohibited by Minn. Stat. Sec. 80C1 and Minn. Rule 2860.4400J.

Item 13 of the Offering Circular is amended as follows: Franchisor will comply with requirement imposed Minnesota Statutes section 80C.12, subdivisions 1(g) concerning protection of a franchisee's right to use the trademarks or indemnify franchisee in connection with claims regarding the use of the trademarks.

Item 17 of the Offering Circular is amended as follows: With respect to franchises governed by Minnesota law, any release franchisee is required to provide by the provisions of the Agreement or under Exhibit 1.2 attached to the Agreement or under any other agreement shall not operate to limit or relieve any person from any liability imposed by Minnesota Statutes, sections 80C.01 or 80C.22. However, the foregoing shall not bar a general release by franchisee of all claims in the event of a voluntary settlement of a bona fide dispute or a mutual termination between the parties.

**EXHIBIT A**

**FRANCHISE AGREEMENT AND ALL EXHIBITS**

# CARTRIDGE WORLD
# FRANCHISE AGREEMENT

_____
Franchisee

_____


_____
Location

_____
Date of Agreement

| SECTION | PAGE |
|---|---|
| 1. INTRODUCTION, DEFINITIONS, AND PRELIMINARY AGREEMENTS | 1 |
| 1.1 Introduction | 1 |
| 1.2 Definitions | 3 |
| 2. AWARD OF FRANCHISE | 7 |
| 2.1 Award of Franchise; Term, Your Basic Commitment | 7 |
| 2.2 Territory | 7 |
| 3. DEVELOPMENT AND OPENING OF YOUR CARTRIDGE WORLD STORE | 8 |
| 3.1 Site Selection | 8 |
| 3.2 Lease of Premises | 8 |
| 3.3 CARTRIDGE WORLD Store Design Standards | 9 |
| 3.4 Development for Your CARTRIDGE WORLD STORE | 9 |
| 3.5 Equipment, Furniture, Fixtures and Signs | 9 |
| 3.6 CARTRIDGE WORLD Store Opening | 9 |
| 3.7 Grand Opening Program – Marketing | 9 |
| 3.8 Relocation of CARTRIDGE WORLD Store Premises | 9 |
| 4. COMPUTER HARDWARE AND SOFTWARE SYSTEMS | 9 |
| 5. TRAINING AND GUIDANCE | 10 |
| 5.1 Training | 10 |
| 5.2 Guidance and Assistance | 10 |
| 5.3 Manuals | 11 |
| 6. MARKS | 11 |
| 6.1 Goodwill and Ownership of Marks | 11 |
| 6.2 Limitations and Use of Marks | 11 |
| 6.3 Notification of Infringements and Claims | 11 |
| 6.4 Discontinuance of Use of Marks | 11 |
| 7. RELATIONSHIP OF PARTIES; INDEMNIFICATION | 12 |
| 7.1 Independent Contractor | 12 |
| 7.2 No Liability for Acts of Other Party | 12 |
| 7.3 Taxes | 12 |
| 7.4 Responsibility, Indemnity, etc. | 12 |
| 7.5 Disclosure | 13 |
| 8. CONFIDENTIAL INFORMATION; EXCLUSIVE RELATIONSHIP | 13 |
| 8.1 Confidential Information – Non-Disclosure and Non-Use | 13 |
| 8.2 Exclusive Relationship, Restrictions on Similar Businesses During Franchise Term and After Transfer, Termination, Expiration, Repurchase, etc. | 13 |
| 9. FEES | 15 |
| 9.1 Initial Franchise Fee, Releases, etc. | 15 |
| 9.2 Royalty – Percentage, Minimum, Payment Dates | 16 |
| 9.3 Electronic Funds Transfer | 16 |
| 9.4 Interest and Late Fees on Late Payments and/or Reports/Connections Costs | 16 |
| 9.5 Application of Payments, Set-Offs, etc. | 17 |
| 9.6 Inflation Adjustments/Currency Requirements | 17 |
| 9.7 Mandatory Convention Attendance, Possible Fee | 17 |

**SECTION**                                                                                              **PAGE**

10.   YOUR CARTRIDGE WORLD STORE — IMAGE AND OPERATION                                                     17
    10.1     Application of Payments, Set-Offs, etc.                                                        17
    10.2     Designated Equipment, Products, Services and/or Suppliers                                      17
    10.3     Purchasing Cooperative                                                                         18
    10.4     Compliance with Laws and Ethical Business Practices                                            18
    10.5     Management and Personnel of Your CARTRIDGE WORLD Store, Training                               19
    10.6     Insurance                                                                                      19
    10.7     Program Participation                                                                          20
    10.8     Continued Payment of Royalties, etc., During Closure                                           20
    10.9     Customer Satisfaction, Quality Controls, etc.                                                  20
    10.10    Franchisee Advisory Council and Selection                                                      20

11.   MARKETING                                                                                            20
    11.1     National Marketing Fund                                                                        20
    11.2     Your Participation in the Marketing Fund                                                       23
    11.3     Your Local Store Marketing Activities                                                          23
    11.4     Regional Franchisee Marketing Group(s) ("FMG")                                                 23

12.   STORE RECORDS AND REPORTING                                                                         24
    12.1     Bookkeeping, Accounting and Records, Cash Register,
             Computer and Other Systems                                                                     24
    12.2     Reports, Financial Statements and Tax Returns                                                  24

13.   INSPECTIONS AND AUDITS                                                                               24
    13.1     Our Inspections, etc.                                                                          24
    13.2     Audit                                                                                          24
    13.3     Gross Volume Understatements                                                                   25

14.   TRANSFER                                                                                             25
    14.1     Transfers by Us                                                                                26
    14.2     Transfers by You                                                                               26
    14.3     Conditions for Approval of Any Transfer                                                        26
    14.4     Additional Conditions for Transfer to a Business Entity                                        27
    14.5     Death or Disability of Franchisee                                                              28
    14.6     Effect of Consent to Transfer                                                                  28
    14.7     Our Right-of-First Refusal                                                                     29
    14.8     Our Right to Repurchase                                                                        29

15.   SUCCESSOR FRANCHISE                                                                                  31
    15.1     Your Rights                                                                                    31
    15.2     Notice of Election                                                                             31
    15.3     Conditions to the Award of a Successor                                                         31

16.1  TERMINATION OF THE FRANCHISE                                                                         32
    16.1     Defaults with No Right to Cure                                                                 32
    16.2     Defaults with Right to Cure                                                                    33
    16.3     Repeated Defaults                                                                              34
    16.4     Cross-Defaults                                                                                 34
    16.5     Failure to Meet Performance Standards                                                          34
    16.6     Non-Exclusive Remedies                                                                         36
    16.7     No Equity on Termination, etc.                                                                 36
    16.8     Extended Cure Period                                                                           36

| **SECTION** | | **PAGE** |
|---|---|---|
| 16.9 | Management of the Store After Issuance of Notice of Default | 36 |
| 16.10 | Our Right to Discontinue Supplying Items Upon Default | 37 |
| 16.11 | Termination, Expiration, or Repurchase of Our Master Franchise Agreement | 37 |
| **17.** | **RIGHTS AND OBLIGATIONS ON TRANSFER, REPURCHASE, TERMINATION AND/OR EXPIRATION OF THE FRANCHISE** | 37 |
| 17.1 | Payments of All Amounts Owed, etc. | 37 |
| 17.2 | Intellectual Property, Confidential Information, Trade Dress, etc. | 37 |
| 17.3 | Telephone and Other Directory Listings, Internet Sites | 38 |
| 17.4 | Continuing Obligations | 38 |
| **18.** | **GRANT OF SECURITY INTEREST** | 39 |
| **19.** | **DISPUTE AVOIDANCE AND RESOLUTION** | 39 |
| 19.1 | MEDIATION AND MANDATORY BINDING ARBITRATION, WAIVER OF RIGHT TO TRIAL IN COURT, etc. | 39 |
| 19.2 | Venue | 42 |
| 19.3 | Terms Applicable to All Proceedings | 42 |
| 19.4 | Limitations on Damages and/or Remedies | 42 |
| 19.5 | Prior Notice of Claims by You | 43 |
| 19.6 | Periods in Which to Make Claims | 43 |
| 19.7 | Survival of Obligations | 43 |
| 19.8 | Costs and Attorneys Fees | 44 |
| 19.9 | Binding Effect, Modification | 44 |
| 19.10 | Our Exercise of "Business Judgment" and/or Meaning of "Sole Discretion"; Express Agreement | 44 |
| 19.11 | Construction, etc. | 45 |
| 19.12 | Non-Retention of Funds | 45 |
| 19.13 | Severability; Substitution of Valid Provisions | 45 |
| 19.14 | Waivers; Cumulative Rights | 45 |
| 19.15 | Choice of Laws | 45 |
| 19.16 | Application of Agreement to Parties and Others; Joint and Several Liability | 46 |
| **20.** | **NOTICES AND PAYMENTS** | 46 |
| **21.** | **ACKNOWLEDGMENTS, AND REPRESENTATIONS, ENTIRE AGREEMENT, NO FIDUCIARY RELATIONSHIP, ETC.** | 46 |
| EXHIBIT 1: | OWNER'S GUARANTY AND ASSUMPTION OF CORPORATE FRANCHISEE'S OBLIGATIONS | 50 |
| EXHIBIT 1.2: | CURRENT FORM OF RELEASING LANGUAGE | 52 |
| EXHIBIT 2.2: | TERRITORY | 54 |
| EXHIBIT 3.2: | COLLATERAL ASSIGNMENT OF LEASE | 57 |
| EXHIBIT 8.1: | APPROVED EMPLOYEE CONFIDENTIALITY AGREEMENT | 60 |

Franchise Agreement Number: _____

**CARTRIDGE WORLD**
**Unit Franchise Agreement**

Date of this Agreement: _____

Expiration Date: _____

Franchisor: **Wildwood Franchising, Inc, a California Corporation**

Franchisee: _____

In a number of places in this Franchise Agreement, you're asked to initial certain items to show that they've been fully discussed with you, and read, understood and agreed to by you. Initialing those areas doesn't lessen the importance of other areas or mean that they are not fully enforceable. Please initial below and at all other points indicated.

Your Initials: _____ / _____

1. **INTRODUCTION, DEFINITIONS, AND PRELIMINARY AGREEMENTS.**

   1.1 **Introduction.**

   A. In this Agreement, the Franchisor's Master Franchisor, Cartridge World North America LLC, is referred to as "the Master Franchisor" or "CWNA". CWNA's Managing Member, Cartridge World, Inc., is referred to as "CW, Inc.". Cartridge World Pty Ltd, CW Inc.'s Australian parent company and an Affiliate of CWNA, is referred to as "CW International". The Franchisee is referred to as "you," "your," or the "Franchisee".

   B. CW International has developed methods of operating Cartridge World® Stores at a retail level which provide products and services related to refilling of printer (and other) cartridges, including refilling of inkjet cartridges; remanufacturing of laser cartridges; sales of toner, computer hardware (including printers) and software, and ancillary products and services. We refer to these businesses as "Traditional CARTRIDGE WORLD Stores."

   C. CW International has made a strategic decision to use franchising to create a brand identity and maximize market penetration for the CARTRIDGE WORLD brand in the United States, and to achieve and maintain a competitive edge for that brand in relevant marketplaces. CARTRIDGE WORLD Stores Franchise Businesses use certain proprietary knowledge, procedures, formats, systems, forms, printed materials, applications, specifications, standards and techniques authorized or developed by CW International (all of which are part of the " CARTRIDGE WORLD System").

   D. CW International also has developed a system for the promotion of, and provision of, assistance to CARTRIDGE WORLD Store Franchise Businesses on a regional basis to enhance the CARTRIDGE WORLD System. Distinguishing characteristics of the Cartridge World System include (but are not necessarily limited to) certain trade marks and logos and other forms of commercial identity, training of Unit Franchisees and Master Franchisees, marketing concepts, the Manuals, distinctive color schemes and Trade Dress, and the Confidential Information. CW International has granted CWNA the exclusive right to grant Master Franchises in the United States for the award of Traditional CARTRIDGE WORLD

Store Franchises using the CARTRIDGE WORLD System. We are a Master Franchisee, and CWNA has granted us the exclusive right in a defined geographic area to award single unit Traditional CARTRIDGE WORLD Store Franchises using the CARTRIDGE WORLD System. Although CW International, CWNA and CW Inc. each is an intended beneficiary of this Agreement and may sue to enforce it, neither CW International, CWNA nor CW Inc. is a party to it, and none is bound by it in any way. All obligations and rights under this Agreement are directly between you and us.

E. To simplify this Agreement and make it easier to read and understand, we have defined certain terms used in this Agreement in Section 1.2, below. When you see a capitalized word, or if you don't understand the meaning of a particular pronoun reference, look at Section 1.2 to see whether the term has been defined. Capitalized words that are not defined in Section 1.2 are defined in the section where they first appear.

F. You applied for a franchise to own and operate a traditional CARTRIDGE WORLD Store and your application has been approved by us in reliance on the information you gave us.

G. Your CARTRIDGE WORLD franchise is a licensing arrangement, awarded under specific terms and conditions. You must comply fully with this Agreement and the Manuals in order to use the CARTRIDGE WORLD Marks, System and other Intellectual Property.

H. You agree that it is critical to you, us, CWNA, CW International and each Franchisee for the System to be flexible to respond to commercial opportunities and challenges. An inability to change the System could adversely affect all CARTRIDGE WORLD franchisees. You, therefore, agree and anticipate that the Manual and the System may be changed by us and/or CWNA and/or CW International, from time-to-time in our/their Business Judgment. You agree to comply with the Manuals and the System as they are changed by us/them.

I. Every detail of your CARTRIDGE WORLD Franchise Business is important — not only to you, but to us and to all CARTRIDGE WORLD Franchisees — to increase and maintain the value of the Marks and the businesses associated with them. Therefore, during the term of this Agreement, you must at all times develop, maintain and operate your CARTRIDGE WORLD Business in accordance with each CARTRIDGE WORLD System Standard, as modified and supplemented by us and/or CWNA and/or CW International from time to time in our/their Business Judgment.

J. You understand and agree that your investment in a Cartridge World® Franchise involves special risks, including, but not limited to, the following: Cartridge World® is a new brand in the United States, with little, if any, recognition or established good will among potential customers. Any positive name recognition and good will to be established will be the result, in large measure, of you and other Franchisees providing quality business services and faithfully following the Manuals and System. The Traditional Cartridge World Store business model is new to the United States and has not been proven in the United States, although it has been used in other countries. Substantial competition to the Cartridge World concept may exist in the United States, with certain competitors having established units and/or channels of distribution. Competition includes, among others, internet suppliers, office supply stores, mail order, "brick and mortar" outlets and other channels of distribution. The Traditional Cartridge World Store business is subject to frequent changes in the business environment, including technological developments, some of which might impact you negatively. All of these and other factors make your investment speculative.

K. Without your commitment to the System and to fulfill each of the obligations detailed in this Agreement, we would not form this franchise relationship with you.

### 1.2    Definitions.

**"Affiliate"** - Any person or entity which controls, is controlled by or is under common control with another person or entity; as to the Franchisee, any owner of any interest in the Franchisee, any employee or agent of the Franchisee, and/or independent contractor performing functions for, or on behalf of, the Franchisee, and any entity controlled by any of the foregoing.

**"Agreement"** - This Franchise Agreement.

**"Attorneys' Fees"** - Includes, without limitation, legal fees, whether incurred in preparation of the filing of any written demand or claim, action, hearing, arbitration, or other proceeding to enforce the obligations of this Agreement, or during any such proceeding, plus all costs incurred in connection therewith.

**"Brand"** - The CARTRIDGE WORLD® brand, as applied to various goods and/or services as authorized by us from time-to-time.

**"Business Entity"** - Includes a corporation, partnership, joint venture, limited liability company, limited partnership, or other form of business recognized in any jurisdiction.

**"Business Judgment"** - Means that we and/or the Related Companies are allowed to exercise our/their judgment however we/they consider to be appropriate in our/their sole and absolute discretion, without any limitation. You and we agree that when in this Agreement we describe instances in which we/they may exercise Business Judgment, we must and do have the unrestricted right to make decisions and/or take (or refrain from taking) actions. We have this right even if a particular decision/action may have negative consequences for you, a particular franchisee or group of franchisees. You understand and agree that the exercise of Business Judgment is critical to our role as a Franchisor of the System and to our goals for its continuing improvement. This is a defined term for the purposes of this Agreement and is not intended to incorporate principles related to the application of the business judgment rule in a corporate law context.

**"Confidential Information"** - As defined in Section 8.1.

**"Customary Representations, Warranties and Agreements"** - Includes commitments generally made by a transferor in connection with a transfer of a business and/or related assets, including but not limited to: representations as to ownership, condition and title to stock and/or assets, liens and encumbrances relating to the stock and/or assets, validity of contracts, and liabilities, contingent or otherwise, relating to the business/assets/entity to be acquired; full indemnification obligations and non-competition covenants by the transferor and each Affiliate, substantially similar to those required in Sections 7.4 and 8.2 B of this Agreement; the delivery at closing of instruments transferring good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us in our Business Judgment), and demonstrating that all sales, transfer and/or similar taxes are to be paid by the transferor through escrow if we so require; the transfer at closing of all licenses and permits which may be assigned or transferred.

**"Designated Equipment"** - Equipment that meets our requirements and which you must obtain and use in the operation of your CARTRIDGE WORLD Store.

**"Fair Market Value"** - A price determined in a manner consistent with reasonable depreciation of any leasehold improvements, as applicable, and the items purchased. Fair Market Value does not include any factor or increment for any goodwill or for the Marks or any trademark, service mark or other commercial symbol used in connection with the operation of your CARTRIDGE WORLD Store. If you and we are unable to agree on the price of any assets, then the Fair Market Value will be determined by an independent appraiser selected by you and us. If you and we are unable to agree on an appraiser, you

and we will each select one appraiser, who together will select a third appraiser. The Fair Market Value will be deemed to be the average of the three (3) independent appraisals.

**"Franchise"** - The right to operate a single Traditional CARTRIDGE WORLD Store at the Premises under the terms of this Agreement.

**"Franchise Advisory Council" or "FAC"** - The advisory group selected (or which may be selected) in accordance with this Agreement, which shall provide Input as provided in this Agreement and as we may request from time to time.

**"Franchised Business"** - The business operations authorized to be conducted by, at or in connection with your CARTRIDGE WORLD Store under this Agreement

**"Franchisor-Related Persons/Entities"** — Franchisor, Cartridge World North America, LLC, Cartridge World Pty Ltd., LLC, Cartridge World, Inc., the Marketing Fund, the FAC and each and all of the following, whether past, current and/or future: each and all company(ies) and/or person(s) acting through, in concert with us and/or any of the foregoing, and/or as Affiliates of ours and/or of any of the foregoing; each and all of the partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees of us and/or any of the foregoing; and each and all of the predecessors, successors and/or assigns of us and/or any of the foregoing.

**"General Release"** - A general release, in the then-current form prescribed by us at the time such release is to be delivered, of any and all claims, liabilities and/or obligations, of any nature whatsoever, including existing as of, and/or arising before, the date of any such release, however arising, known or unknown, whether against us and/or any or all of the Franchisor-Related Persons/Entities, and whether by you, any owner of you (if you are or become a Business Entity), any person/entity claiming on the basis of an alleged right of yours, and/or any Affiliate of any of the foregoing. A copy of our general releasing language as currently used by us (which is subject to change) is attached as Exhibit 1.2 and is approved by you.

**"Good Standing"** - You are in "Good Standing" if you (and each of your owners and Affiliates) are not in default of any obligation to us and/or any of the Franchisor-Related Persons/Entities, whether arising under this Agreement or any other agreement between you (and each of your owners and Affiliates) and us (and/or any of the Franchisor-Related Persons/Entities), the Manuals or other System requirements (collectively, the "Obligations"); provided that you are not in Good Standing if you have been in default of any Obligations and such defaults are incurable by nature and/or part of a series of repeated defaults as defined in this Agreement, whether or not cured.

**"Gross Profit"** - Gross Profit is Gross Volume less the actual cost direct product cost (before deducting all overhead costs, including without limitation rent, payroll, insurance, taxes, and all other Store operating expenses) that you incurred and paid for in connection with the products/services which are sold and/or distributed by your Traditional CARTRIDGE WORLD Store.

**"Gross Volume"** - Gross Volume includes all charges and/or revenues which are, or could be, received or earned by you (and/or any Affiliate):

    A)    by, at or in connection with your CARTRIDGE WORLD Store;

    B)    relating to the kinds of goods or services available now or in the future through a CARTRIDGE WORLD Store and/or distributed in association with the Marks or the CARTRIDGE WORLD System;

    C)    relating to the operation of any Similar Business;

    D)    with respect to, any tenants and/or subtenants of yours on the Premises (including rent and other lease payments); and/or

    E)    with respect to any co-branding activities.

All sales and/or billings, whether collected or not, will be included in Gross Volume, with no deduction for credit card or other charges. Gross Volume does <u>not</u> include sales tax, value added and similar taxes collected and paid when due to the appropriate taxing authority or actual customer refunds, adjustments and credits.

"**Immediate Family**" - With respect to any person, "immediate family" includes that person's spouse and/or domestic partner and each of their respective parents, guardians, grandparents, siblings, children, grandchildren, aunts, uncles, cousins, nieces and/or nephews.

"**Input**" - Advice and suggestions regarding specified matters. When we receive Input from the FAC or any other franchisee group we will retain the ultimate decision-making authority and responsibility for all matters for which Input is sought. FAC (or any other franchisee group) Input, votes or other collective actions will not be binding on us unless we have otherwise agreed in writing. FAC (or any other franchisee group) approval or consent will not be required as a pre-condition to any decision and/or action we may take.

"**Intellectual Property**" - Includes, regardless of the form or medium involved, i) all CARTRIDGE WORLD Software, including the data and information processed or stored thereby; ii) the Manuals and all other directives, policies or information we and/or a Related Company(ies) issue from time to time; iii) all Customer relationships and information; iv) the Marks; v) all Confidential Information and trade secrets; and vi) all other proprietary, copyrightable and/or trade secret information and materials developed, acquired, licensed or used by us and/or a Related Company(ies) in our operation of the System.

"**Limited Release**" - A release by us (in the form prescribed by us at the time such release is to be delivered) of any and all known claims, liabilities and/or obligations, of any nature whatsoever, including those existing as of, and/or arising before, the date of any such release, against you, your affiliates and/or your owners, if you are a Business Entity; except that any such claims will be preserved by us if we disclose them to you in writing.

"**Manuals**" - Specifications, standards, policies and procedures prescribed by us and published to you in any media (including electronic) and which are to be followed in the operation of your CARTRIDGE WORLD Store as they may be changed or eliminated by us in our Business Judgment.

"**Marketing Fund**" - The fund established and defined under Section 11.1.

"**Marks**" - The trademarks, service marks and other commercial symbols now and/or in the future owned by (or licensed to) us to identify the services and/or products offered by CARTRIDGE WORLD Stores, including (but not limited to) "CARTRIDGE WORLD®", the Trade Dress and other logos and identifiers designated by us from time-to-time.

"**PUA**" or "**Per Unit Average**" - The average Gross Volume for all CARTRIDGE WORLD Stores in the United States during the most recent six (6) month period before the measuring date.

"**Post Termination Provisions**" - Those promises contained in this Agreement that survive its expiration, Transfer, Repurchase, or Termination for any reason, including without limitation the confidentiality, non-competition, indemnification, and dispute resolution and other provisions contained in Articles 19, 20 and 21.

"**Premises**" - The facility in which you will operate a single Traditional CARTRIDGE WORLD Store.

"**Products**" and "**Services**" - Goods, products and services designated by us from time-to-time for use, sale or otherwise to be provided (and/or used) at and/or from your Traditional CARTRIDGE WORLD Store and/or in association with the Marks.

"**Related Companies**" - CWNA, CW Inc. and CW International are each a Related Company. We are independently owned and operated and are not an Affiliate of the Related Companies.

"**Repurchase**" - Repurchase includes (but is not limited to) any acquisition by us (and/or any of the Franchisor-Related Persons/Entities) of your rights in and/or to any of the following: i) this Agreement; ii) the Franchise; iii) the ownership of the Franchisee; iv) your CARTRIDGE WORLD Store; or v) any lease or assets associated with any of the foregoing.

"**Similar Business**" - Any enterprise that offers, is otherwise involved in, or deals with any goods, products and/or services, which are substantially similar to those goods, Products and/or Services now or in the future authorized by us to be offered at or from CARTRIDGE WORLD Stores (including any such enterprise and/or entity awarding franchises or licenses to operate or be involved with any such business). Our receipt of any royalties with respect to any Similar Business is not an approval of your involvement with any Similar Business.

"**Special Accounts**" - Classes of special customers (which may include national accounts, other large businesses, government agencies, and/or otherwise) as designated by us from time-to-time in our Business Judgment.

"**System**" - The distinctive format and method of doing business developed and used for the operation of a CARTRIDGE WORLD Store, and subject to change by us and/or a Related Company(ies) at any time in our/their Business Judgment.

"**System Standards**" - Standards prescribed by us and/or a Related Company(ies) in our/their Business Judgment from time-to-time, in the Manuals or elsewhere, for the operation, marketing and otherwise of CARTRIDGE WORLD Stores.

"**Terminate**" or "**Termination**" - "Terminate" or "Termination" when used in this Agreement means the Termination or cancellation of your rights and our obligations under this Agreement for any reason before the initial term expires. All of our rights are not cancelled on Termination since you have certain obligations that survive the ending of the Agreement in any manner, such as, but not limited to certain promises regarding non competition, confidentiality and indemnity. Both of us are bound by the dispute resolution provisions (Article 19) this Agreement, even after the Agreement is ended for any reason.

"**Territory**" - The geographic area described in Exhibit 2.2.

"**Trade Dress**" - The CARTRIDGE WORLD Store design and image authorized by us and subject to change by us and/or a Related Company(ies) at any time and in our/their Business Judgment.

"**Traditional CARTRIDGE WORLD Store**" - A "Traditional CARTRIDGE WORLD Store" means a full, standard size, "brick and mortar" retail facility located in a free-standing building or a shopping center accessible to the general public and using the Marks and CARTRIDGE WORLD® System.

"**Transfer**" - Defined in Section 14.2.

"**Us**," "**We**," "**Our**" or "**Franchisor**" — *(INSERT NAME OF FRANCHISOR)*, a _____ corporation.

"**CARTRIDGE WORLD Store**" - The Traditional CARTRIDGE WORLD Store you are franchised to operate by this Agreement.

"**You**," "**Your**," or "**Franchisee**" - The parties signing this Agreement as Franchisee. (If there is more than one Franchisee, each is jointly and severally obligated under this Agreement and all other

agreements with us and/ or Franchisor-Related Persons/Entities). The term "you" is applicable to one or more persons or a Business Entity, as the case may be.

2.    **AWARD OF FRANCHISE.**

   2.1    **Award of Franchise; Term, Your Basic Commitment.**

   A.   We're pleased to award you a franchise to operate a single Traditional CARTRIDGE WO®RLD Store at a single location to be approved by us, and to use the Marks and the CARTRIDGE WORLD® System in the operation of that Traditional CARTRIDGE WORLD Store. If this Agreement is awarded in connection with a new franchise, the franchise is awarded for a term of ten (10) years, commencing on the Date of this Agreement and ending on the Expiration Date noted on the first page of this Agreement; but if the lease or sublease for the Premises is terminated or expires before the end of such franchise term (and no substitute location has been consented to by us in writing and occupied by you before the termination/expiration of such lease/sublease), we may Terminate this Agreement as of the termination/expiration of such lease/sublease.

   B.   If this Agreement is awarded in connection with your acquisition of an existing franchised Traditional CARTRIDGE WORLD Store, then the term of this Agreement will end on the expiration date of the franchise agreement granted to the party from whom you acquired the franchise, subject to earlier Termination upon termination/expiration of the relevant lease/sublease as described in Section 2.1 A., above. The Expiration Date is noted on the first page of this Agreement.

   C.   If this Agreement is awarded in connection with the grant of a successor franchise, then the term of this Agreement will be governed by the successor provisions of the franchise agreement under which you operated during the initial term (which is now expired). The Expiration Date is noted on the first page of this Agreement.

   D.   The Franchise awarded to you by this Agreement is to operate only a single Traditional CARTRIDGE WORLD® Store and to use the Marks and the System only for purposes of conducting a business in accordance with the provisions of this Agreement, the Manuals and other communications from us. All of the business of the CARTRIDGE WORLD Store must be conducted from the Premises, although you and we understand that certain of the Products and Services may be delivered away from the Premises, such as at a customer's site. You are authorized to use the Marks only in connection with the operation of the Franchise Business at single location, the Premises. You must not conduct any activities from the Premises other than the operation of your Traditional CARTRIDGE WORLD® Store without our prior written consent. You will not engage in any other business or activity that may conflict with your obligations under this Agreement or reduce the Gross Volume of your CARTRIDGE WORLD® Store.

   2.2    **Territory.**  Your rights relating to any Territory are exactly (and only) as <u>expressly</u> set forth in Exhibit 2.2.

---

> I have read Sec. 2.1, 2.2, AND Exhibit 2.2 in their entirety understand them, and agree with them.
>
> Your Initials: _____ / _____

---

3.    **DEVELOPMENT AND OPENING OF YOUR CARTRIDGE WORLD STORE.**

**3.1    Site Selection.**

A.    You must have a site acceptable to us, receive the opening notice from us described in Section 3.6, below, and do everything necessary for your CARTRIDGE WORLD Store to open for business within six (6) months from the date of this Agreement. You must not operate a CARTRIDGE WORLD Store, use any of the Marks from or at any location, or make any commitments about a site until you have our written site acceptance. We won't unreasonably withhold our acceptance. Acceptance by us of any location is not a recommendation, approval or endorsement of such site. We make no representations or warranties as to the success of any site or as to any other matter of any kind relating to the site.

B.    If you are unable to acquire a site within the time provided in 3.1 A, above, then we may Terminate this Agreement.

C.    All matters related in any way to your site are your sole responsibility, regardless of any assistance we may choose to provide. You are responsible for obtaining any architectural and engineering services required for your facility and for ensuring its compliance with local law. Neither we, nor any Franchisor-Related Persons/Entity, nor any other person or company associated with us will have any liability for any site-related matter. You agree not to make any claims against us and/or any of the Franchisor-related Persons/Entities with regard to such matters.

**3.2    Lease of Premises.**

A.    You agree to submit any lease and all site-related documents to us for our review prior to their execution by you. You shall use commercially reasonable efforts to arrange for the inclusion of provisions in Lease Addendum or other appropriate site-related documents which:

1)    Obligate the lessor to provide us on request with sales and other operations information related to your CARTRIDGE WORLD Store;

2)    Permit you to operate your CARTRIDGE WORLD Store in accordance this Agreement and the Manuals;

3)    Provide that the Premises will be used only for the operation of a CARTRIDGE WORLD Store, and prohibit you from assigning or modifying any of your lease rights, or extending the term without our prior written consent;

4)    Require the lessor to concurrently provide us with a copy of any written notices (whether of default or otherwise) to you under the lease and give us the right to cure any default if we so choose.

5)    Provide us with a right to take assignment and possession of your CARTRIDGE WORLD Store, without the lessor's consent or any additional consideration. If we exercise this right, we will not have any liability for any obligations incurred prior to our occupancy. You agree to take whatever actions are necessary to accomplish such assignment and will, when you sign this Agreement, also sign the Collateral Assignment of Lease attached as Exhibit 3.2. If you lose your lease rights to the Premises in connection with any bankruptcy, the lessor will, on our request, enter into a new lease with us on essentially the same terms as the terminated lease;

6)    Provide that the lessor consents to the use of the Marks, Trade Dress and other aspects of the System, as modified from time-to-time, and give us the right to enter the premises during normal business hours for purposes of inspection, to take steps to protect the Marks and Trade Dress and/or prevent/cure any default.

You won't execute a lease or sublease, or any modification or amendment, without our prior written consent, which we may grant, condition or withhold in our Business Judgment as we deem appropriate. You'll deliver a copy of the signed lease or sublease to us within five (5) days after it's signed.

3.3 **CARTRIDGE WORLD Store Design Standards.** You agree to comply with any standards, specifications and other requirements (the "CARTRIDGE WORLD Store Design Standards") that we furnish you for design, decoration, layout, equipment, furniture, fixtures, signs and other items for your CARTRIDGE WORLD Store. Any changes from plans provided by us must be submitted to us for our consent, which may be provided in our Business Judgment. Your compliance with the standards does not release you from your obligation to ensure that your CARTRIDGE WORLD Store is designed and constructed in compliance with all federal, state, and local laws, including without limitation the Americans with Disabilities Act. You agree to execute and deliver to us an ADA Certification in the form attached to this Agreement as Exhibit 3.3., before you open your CARTRIDGE WORLD Store, to confirm and certify that your CARTRIDGE WORLD Store and any proposed renovations comply with the ADA.

3.4 **Development for Your CARTRIDGE WORLD Store.** You must select and employ a licensed contractor reasonably acceptable to by us. You are solely responsible for the selection and work of any contractor selected and/or employed by you, even if referred by us.

3.5 **Equipment, Furniture, Fixtures and Signs.** You'll use only Designated Equipment and suppliers approved by us in the development and operation of your CARTRIDGE WORLD Store as we may require. We and/or our Affiliates and/or Related Companies may be such approved suppliers.

3.6 **CARTRIDGE WORLD Store Opening.** You will open your CARTRIDGE WORLD Store for business immediately upon our notice to you that: i) all of your pre-opening obligations have been fulfilled; ii) pre-opening training has been completed; iii) all amounts due us (and/or any Affiliate) have been paid; and iv) copies of all insurance policies (and payment of premiums), leases/subleases and other required documents have been received.

3.7 **Grand Opening Program - Marketing.** You agree to spend at least Five Thousand Dollars ($5,000) on a grand opening marketing program. We'll furnish advice and guidance to you with respect to such program that you agree to follow. You must conduct and complete your grand opening marketing program within six (6) months of the date of this Agreement.

3.8 **Relocation of CARTRIDGE WORLD Store Premises.** Any relocation requires our written consent, will be at your sole expense and will require that you (and each Affiliate and owner of yours) sign a General Release. If your CARTRIDGE WORLD Store is damaged, condemned or otherwise rendered unusable, or if, in your and our judgment, there is a change in the character of the location of your CARTRIDGE WORLD Store sufficiently detrimental to its business potential to warrant its relocation, you agree to relocate your CARTRIDGE WORLD Store.

4. **COMPUTER HARDWARE AND SOFTWARE SYSTEMS.**

A. You must purchase, use, maintain and update at your expense the software, computer and other systems (including point-of-sale and back-office systems) meeting our specifications, as we may modify them. If required by us, you agree to maintain your systems on-line to allow us access to system data and information. You agree to comply with our then-current Terms of Use and Privacy Policies and any other requirements regarding all computer and other systems, including Internet usage. Supplier or and/or licensor charges for use, maintenance, support and/or updates of and to the required systems are payable by you upon receipt.

B. Neither we nor any of the Franchisor-Related Persons/Entities will have any liability and/or obligation (and neither you, nor any Affiliate of yours, will make any claims) about any failures, errors or

any other occurrences relating to any computer or system hardware or software without an express written warranty from us, even if recommended or specified by us.

5. **TRAINING AND GUIDANCE.**

    5.1    **Training.**

    A. You must complete our initial training program before operating your CARTRIDGE WORLD Store. The initial Franchise Fee covers an initial training program for a single attendee, and includes coach airfare (to and from Australia) and accommodations (during the scheduled training period) for <u>one (1)</u> person (travel and accommodations for more than one person must be paid by you.) Living and other expenses are your sole responsibility. We can choose to eliminate or shorten training for persons previously trained or with comparable experience.

    B. The initial training program will be conducted at CW International headquarters in Australia (or such other location as we may designate in our Business Judgment) and held at a time and for such period, as we specify in our Business Judgment. You will be responsible for training each of your managers to our then-current standards. We may require in our Business Judgment that each of your Traditional Cartridge World Store managers attend and complete our initial training program before beginning operation. We will use reasonable efforts to accommodate attendance by managers and other staff members at initial training programs upon thirty (30) days advance notice. You'll be responsible for all tuition fees, airfare, travel, wages, living, incidental and other expenses for your managers and any other personnel attending the initial training program and any other voluntary or mandatory training programs, seminars or meetings, unless otherwise agreed to by us in writing.

    C. If we, in our Business Judgment, determine that you have not successfully completed (or are not making satisfactory progress in your initial training we may either require that a substitute manager complete the training or terminate this Agreement. If we elect to Terminate, then we will refund to you the <u>lesser</u> of:

        1)    one-half (1/2) of the initial franchise fee that you have paid to us; or

        2)    the initial franchise fee, (less any training-related costs, commissions and/or any other expenses paid by us and/or a Related Company (both internal costs and outside expenses) and related to your Franchise); but only if you and your Affiliates return the Manuals and sign a General Release and a document acceptable to us that preserves the Post Termination Provisions of this Agreement, as well as any other documents we may reasonably require.

    D. You and your manager must attend additional and/or refresher training programs, including national and regional conferences, conventions and meetings, as we may reasonably require to correct, improve and/or enhance your operations, the System and its members. In addition, we can require successful completion of training by all of your supervisory personnel. Other than the initial training program, meetings designated as mandatory by us will be held in the North America at a location selected by us. Optional meetings may be at locations inside or outside of the North America, as selected by us in our Business Judgment. We may elect to charge a reasonable fee for all training.

    5.2    **Guidance and Assistance.** We will provide guidance in the operation of your CARTRIDGE WORLD Store. This guidance can be furnished in whatever manner we consider appropriate in our Business Judgment, including electronically, in writing or telephonically, through training programs and/or on-site consultations and/or through representatives of ours and/or Related Companies, among other methods. We will provide at your request on-site consultations at your CARTRIDGE WORLD Store, based on notice, availability of personnel and your payment of reasonable travel, food, incidental and lodging expenses. No consulting fee will be charged. If we believe in our Business Judgment that your operations warrant it, we can require that a manager or other person

designated by us be placed in your CARTRIDGE WORLD Store to supervise its day-to-day operations until operations meet System standards. If we choose to do so, you must reimburse us according to the requirements of Section 16.9.

5.3 **Manuals.** During the term of the Franchise, we will <u>loan</u> you (or allow you electronic or other access to) one copy of the Manuals. You will continuously comply, at your sole expense, with all provisions of, and additions/deletions/changes to, the Manuals. Any such additions/deletions/changes will take precedence over all prior communications. Mandatory specifications, standards and operating procedures prescribed from time-to-time by us in the Manuals, or otherwise communicated to you electronically or otherwise, are a part of this Agreement. In the event of a dispute, the master Manuals maintained at our office and/or a Related Company's headquarters will control.

6.   **MARKS.**

6.1 **Goodwill and Ownership of Marks.** You have a non-exclusive right to use the Marks and only as expressly authorized by us under this Agreement. CW International has all rights in and to the Marks. All goodwill belongs exclusively to CW International and/or Related Companies, and you will not obtain any goodwill in the Marks as a result of this Agreement, your operation of the Franchise or for any other reason. Any unauthorized use of the Marks is a breach of this Agreement and an infringement of proprietary rights. You agree that if you breach any obligation regarding the Marks, we/Related Companies would have no adequate remedy at law and that we/Related Companies will be entitled to equitable relief. You won't oppose, or engage in any acts or omissions inconsistent with, our rights in and to the Marks. This Agreement applies to all trademarks, service marks and other commercial symbols that we may authorize you to use throughout its term. You acknowledge that while CW International may have made application for registrations of certain of the Cartridge World Marks in the United States, registration of the Cartridge World Marks in these countries has not been finalized as of the date of this Agreement. Although CW International intends to continue-to diligently prosecute such registrations, neither we, nor CW International, nor any Related Company can make any assurance as to the outcome of its application(s) or the current or future status of the Cartridge World Marks in the such countries. If we do not have a federal registration for any of the Marks, then (with respect to any such Mark) we do not have certain presumptive legal rights granted by a registration.

6.2 **Limitations and Use of Marks.** You will use the Marks as the sole identification for your CARTRIDGE WORLD Store. You will not use any Mark, or modified version or derivative of a Mark, as part of any business or trade name. Prior to adoption and/or use, any proposed corporate and/or trade name must be approved by us in our Business Judgment. You'll give such trademark and other notices (including notices of independent ownership) as we direct and will, at your expense, obtain fictitious or assumed name registrations as may be required under law. You will display the Marks as required by us and will not use the Marks so as to negatively affect their goodwill. You won't use any Mark in connection with the performance or sale of any unauthorized services or products or at any location or in any other manner not expressly authorized in writing by us.

6.3 **Notification of Infringements and Claims.** You'll take such actions as we consider important in our Business Judgment to protect the Marks. You will not take any action that jeopardizes our or any Related Company's interests in, or the validity or enforceability of, the Marks. You agree to immediately notify us of any apparent or actual infringement of, or of any challenge to your use of, the Marks. You will not communicate with any third party with respect to such a claim (except for Related Companies and their designees). We will take such action as we deem appropriate in our Business Judgment. CW International (and/or its designees) have the exclusive right to control any settlement, litigation or proceeding arising out of or related to any such matters.

6.4 **Discontinuance of Use of Marks.** You agree to comply at your expense with any directions from us and/or any Related Company to discontinue, modify, substitute or add Marks. We cannot and do not make any guaranty that a modification, discontinuance or otherwise may not be

required for any reason. In such event, we will have no liability or obligation to you. You agree to make no claim in connection with any modification, discontinuance or other action, and/or with any dispute regarding the Marks against us and/or any Related Company. There is always a possibility that there might be one or more businesses using a name and/or marks similar to the Marks and with superior rights.

## 7. RELATIONSHIP OF THE PARTIES; INDEMNIFICATION.

**7.1** **Independent Contractor.** You will always identify yourself to all persons and in all dealings of your CARTRIDGE WORLD Store as an independent owner under a CARTRIDGE WORLD franchise, clearly indicating that your Franchise Business is separate and distinct from our business and that of any Related Company. You will include notices of independent ownership on such forms, business cards, stationery, advertising, signs and other materials as we require from time-to-time. Subject to the requirements of this Agreement and the Manuals, you'll have complete operational control of your business, including the right to hire and fire each employee.

**7.2** **No Liability for Acts of Other Party.** You will not represent that your and our relationship is other than that of independent Franchisor and Franchisee. Neither you nor we will have any liability under any acts, omissions, agreements or representations made by the other that are not expressly authorized in writing. This Agreement does not create a fiduciary relationship between you and us and/or any Related Company.

**7.3** **Taxes.** Payment of all taxes related to your Franchised Business is your sole responsibility. Neither we/nor any Related Company have any liability for any taxes on the sales made and/or business conducted by you (except for any taxes we are required by law to collect from you with respect to purchases from us.)

**7.4** **Responsibility, Indemnity, etc.**

A. You will indemnify and hold us and all of the Franchisor-Related Persons/Entities harmless from all fines, suits, proceedings, claims, demands, actions, losses, damages, costs, fees (including attorney's fees and related expenses) and/or any other liability of any kind or nature, however arising, growing out of or otherwise connected with the operation of your CARTRIDGE WORLD Store and/or related to any act, error and/or omission of yours (even if there is a claim that a Franchisor-Related Person/Entity was negligent) (including, but not limited to, your ownership and/or management of your CARTRIDGE WORLD Store and/or any transfer of any interest in this Agreement or your CARTRIDGE WORLD Store). We and/or a Related Company will have the right to control all litigation, and defend and/or settle any claim, against and/or including us and/or the Franchisor-Related Persons/Entities, or affecting our and/or their interests, in such manner as we/Related Companies deem appropriate in our/their respective Business Judgment, without affecting our/their rights under this indemnity.

B. Any goods and/or services provided by us, the Franchisor-Related Persons/Entities and/or any "approved" person/company/referral are provided without any warranties, express or implied, THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE BEING EXPRESSLY DISCLAIMED, absent a specific written warranty expressly provided in connection with a particular item or service.

---

I have read Sec. 7.4, understand it, and agree with it.

Your Initials: _____ / _____

---

**7.5** **Disclosure.** You permit us to disclose, in offering circulars required by law and other places, any information relating to your CARTRIDGE WORLD Store, including your name, any address and/or phone number(s), revenues, expenses, results of operations and/or other information. Any disclosure by us shall be for reasonable our business purposes.

## 8. CONFIDENTIAL INFORMATION; EXCLUSIVE RELATIONSHIP.

### 8.1 Confidential Information – Non-Disclosure and Non-Use.

A. "Confidential Information" includes all information relating to the operation of a CARTRIDGE WORLD Store or the System, including, among other things, all current and future: i) Manuals, training, techniques, processes, policies, procedures, systems, data and know how regarding the development, marketing, operation and franchising of CARTRIDGE WORLD Stores; ii) specifications and information about Products and Services and iii) all information regarding customers and suppliers, including any statistical and/or financial information and all lists; iv) methods of refilling printer cartridges; v) our engineered jigs. Specifically, and without limitation, we own and control all domain names and URLs ("Uniform Resource Locator") relating to any and all CARTRIDGE WORLD Stores, as well as all information, lists and data related to past, present and future customers of your CARTRIDGE WORLD Store. Your only interest in any of this Confidential Information is the right to use it pursuant to this Agreement. You have the burden of proof and of going forward in any dispute between you and us involving the proprietary or confidential nature of any information.

B. Both during and after the term of this Agreement, you agree i) to use the Confidential Information only for the operation of your CARTRIDGE WORLD Store under a CARTRIDGE WORLD Franchise Agreement; ii) to maintain the confidentiality of the Confidential Information; iii) not to make or distribute, or permit to be made or distributed, any unauthorized copies of any portion of the Confidential Information; and iii) to implement all prescribed procedures for prevention of unauthorized use or disclosure of the Confidential Information.

C. You agree to disclose to us all ideas, techniques, methods and processes relating to a CARTRIDGE WORLD Store which are conceived or developed by you and/or your employees. We shall have the perpetual right to use, and to authorize others to use, such ideas, etc., without payment to you. You agree to sign (and cause your employees and contractors to sign) such documents as we may reasonably require in order to implement this clause.

D. You'll cause each of your employees, agents, principals and Affiliates to sign a form of confidentiality agreement approved by us and will provide us copies of the same upon request. A currently approved form of such agreement is attached as Exhibit 8.1.

### 8.2 Exclusive Relationship, Restrictions on Similar Businesses During Franchise Term and After Transfer, Termination, Expiration, Repurchase, etc.

A) In Term Restrictions: During the term of this Agreement and any successor franchise, neither you, nor any Affiliate of yours, nor any shareholder, member or partner of yours (if you are or become a business entity), nor any Immediate Family member of any of the foregoing, will:

    1) have any direct or indirect interest anywhere in any Similar Business, or in any entity awarding franchises or licenses or establishing joint ventures or other business enterprises for the operation of Similar Businesses; or

    2) perform any services anywhere as an employee, agent, representative or in any capacity of any kind for any Similar Business, or for any entity awarding franchises or licenses or establishing joint ventures to operate Similar Businesses; or

3) employ or try to employ any employee of ours, of a Franchisor-Related Person/Entity or of any other CARTRIDGE WORLD franchisee or Master Franchisee, without providing notice to the respective employer and obtaining their prior written consent. If you violate Section 8.2 A.3 during or after the term of this Agreement, then our remedies will include (but not be limited to) payment to us by you of $5,000, such amount having been mutually agreed on by you and us in view of the extreme difficulty in accurately determining the damages suffered as a result of such breach.

B. Post Term Restrictions: For two (2) years after the later of the following terminating events: i) any transfer, Repurchase and/or Termination of this Agreement; ii) the expiration of this Agreement (if a successor franchise or renewal term is not granted); and/or iii) the date on which you stop operating your final CARTRIDGE WORLD Store or using the Marks and/or System, all of the persons and entities named in such Section 8.2, A, above:

1) shall not accept or solicit any person, firm or company that has been a CARTRIDGE WORLD Customer during the period twelve months prior to termination, nor try to divert any such Customers from any CARTRIDGE WORLD Store or CARTRIDGE WORLD enterprise of any kind (including any operations owned by any Franchisor-Related Persons/Entity and/or other Master Franchisees); and

2) shall be subject to all of the restrictions stated in Section 8.2 A, above, with respect to Similar Businesses located, and/or services to be performed, in the Territory and in the marketing area of any CARTRIDGE WORLD Store ("Marketing Area"). For the purposes of this Agreement, a Marketing Area for a Traditional Cartridge World Store is the territory defined by such Store's franchise agreement (including any Stores owned/operated by us). For a Store that does not have a designated Territory (other than its Premises address), Marketing Area is defined as the geographic area within a _____ mile radius of such Store. However, the two (2) year period following such terminating event shall be extended for an additional one-(1) year if, during the first two years a CARTRIDGE WORLD Store is located in a portion of your former CARTRIDGE WORLD Store Marketing Area. You and we intend to provide any such newly established CARTRIDGE WORLD Store a reasonable period of time in which to launch its operations in a new market without unfairly being competitively disadvantaged by having a party familiar with and experienced in the CARTRIDGE WORLD System operating in the same Market Area.

3) You are responsible for learning whether or not a particular location is within a CARTRIDGE WORLD Store Marketing Area by providing us a written request for such information. Any and all determinations that we make regarding the Marketing Area will be final and binding on you.

4) You and we have expressly bargained and agreed that it is your obligation under this Agreement to ensure the compliance of each of the persons identified in Section 8.2 A., with the restrictions described in this Section 8.2. The foregoing notwithstanding, we shall use reasonable judgment in evaluating whether or not the conduct of an Immediate Family member warrants our exercising any rights under this provision, considering your actual relationship to such member and his/her activities, among other factors. The restrictions of this Section do not apply to the ownership of shares of a Similar Business (of a class of securities listed on a stock exchange or traded on the over-the-counter market) which represent less than three percent (3%) of the number of shares of that class issued and outstanding.

5) You and we share a mutual interest in ensuring compliance with the limitations on competition described in this Section 8.2. A CARTRIDGE WORLD franchisee's non-compliance with these restrictions would damage you, us and other CARTRIDGE WORLD Franchisees and unfairly limit reasonable expansion alternatives open to us and CARTRIDGE WORLD system members. You acknowledge and agree that such protections can enhance the value of the CARTRIDGE WORLD System to you as a franchisee, represent a reasonable balancing of your and our respective interests and

have been expressly bargained for. You confirm that you possess valuable skills unrelated to the franchised business and have the ability to be self-supporting and employed regardless of the competitive restrictions described in this Section 8.2.

6) If you violate any of the foregoing restrictions, our remedies will include (but not be limited to) the right to obtain equitable relief and to receive all profits generated in connection with the operation of any Similar Business until the date you cease to violate such restrictions. All competitive restrictions will be extended for the length of time that any breach of the Post Termination Obligations is ongoing. If any of the restrictions of this Section are determined to be unenforceable to an extent because of excessive duration, geographic scope, business coverage or otherwise, they will be reduced to the level that provides the greatest protection to us and the CARTRIDGE WORLD System, but which is still enforceable, notwithstanding any choice-of-law or other provisions in this Agreement to the contrary.

7) If the above restrictions of this Section are wholly unenforceable then we may choose to have you pay a fee of one-half (1/2) of the royalties and marketing contributions which would be payable if the competing activity was conducted on behalf of a franchised CARTRIDGE WORLD Store for two years after the terminating event. This fee has been selected by you and us because of the difficulty of predicting actual damages, among other reasons.

> **I have read Sec. 8.1 and 8.2, understand them, and agree with them.**
>
> **Your Initials:** _____ / _____

9.    FEES.

    9.1    Initial Franchise Fee, Releases, etc.

A. An initial franchise fee of _____ Thousand Dollars ($_____) is fully earned and payable to us on signing of this Agreement. The fee is entirely nonrefundable, with the limited exceptions noted elsewhere in this Agreement.

B. The language of the General Release attached as Exhibit 1.2 is incorporated in and effective upon the signing of this Agreement, excepting only those claims solely related to the offer and sale of <u>this</u> Franchise where such releases are expressly prohibited by applicable law.

C. As a condition to the occurrence of any of the following events (the "Events"), you and/or any affiliate/owner of yours will sign a General Release, excepting only (where such releases are expressly prohibited by applicable law) those claims solely related to the offer and sale of the new Franchise:

      (i)     the awarding of any future, additional or other franchise;
      (ii)    the renewal of this franchise and/or awarding of a successor franchise;
      (iii)   any assignment or transfer (as defined in this Agreement) by you and/or any affiliate/owner of you; and/or
      (iv)   any other event described in this Agreement as being conditioned in whole or in part upon such a General Release (as defined in Article 1.2, above.)

We will provide you with a Limited Release (as defined in Article 1.2, above) upon the occurrence of i) or ii) and in any such instances as may be described elsewhere in this Agreement. If you or we fail to request or obtain from the other a General Release(s) or Limited Release, as applicable, at the occurrence of any of the foregoing Events, then the occurrence of the Event itself shall constitute the grant of such General Release and Limited Release.

You and we have agreed on these provisions considering that: (1) the releases to be provided in the future will be effective as of future dates only, (2) the release requirement generally is triggered by a discretionary choice made by you to receive various future benefits (e.g. an award of an additional, successor, assignment franchise, etc.), (3) you providing a release to us (and we informing you of possible known claims by us) is a practical business strategy if you and/or we propose to change, extend, expand or otherwise modify our relationship at a future date. You and we agree that setting mutual expectations for the receipt of such future releases and assenting to grant them now is more productive than being surprised by such requirements at a later point in our relationship.

### 9.2 Royalty - Percentage and Minimum, Payment Dates.

A. You agree to pay us in each royalty period the greater of: i) the minimum continuing royalty amount or ii) royalties which are calculated as follows with respect to the two business segments identified below:

(a) with respect to computer hardware (including printers) and/or software sales, six percent (6%) of Gross Profit received or earned by you during the preceding royalty period, and

(b) with respect to all other Products and/or Services sales (including but not limited to inks, ink cartridges and related printer consumables), an additional six percent (6%) of Gross Volume received or earned by you during the preceding royalty period.

The current minimum monthly continuing royalty amount is $500.00 and is subject to the inflation adjustment formula described in Section 9.6, below. Minimum and/or percentage royalties are to be paid by the tenth day after each royalty period. Royalty payments are due commencing with the royalty period in which you begin CARTRIDGE WORLD Store operations or _____ months after the effective date of this Agreement, whichever is earlier. The current royalty period is a calendar month, but the time period may be changed by us in our Business Judgment. You will use your best efforts to maximize Gross Volume. Minimum royalty payments of $500.00 per month will not be assessed during the first six months of operation.

B. We can require that various Products and/or Services only be supplied by us, a Franchisor-Related Person/Entity and/or a designee of ours. You understand and agree that we and/or our Franchisor-Related Person/Entity may derive additional revenues/profits as a result of your purchases of such Products/Services.

### 9.3 Electronic Funds Transfer. 
You must participate in our then-current electronic funds transfer and reporting program(s). All royalties owed and any other amounts designated by us must be received or credited to our account by pre-authorized bank debit by end of business on the tenth (10th) day after a royalty period. You authorize us to debit your account by an amount equal to the minimum continuing royalty if a royalty payment is not received when due, and to collect the balance of any amounts owed in accordance with this Agreement. Any such non-payment or late payment of the actual amount due is a breach of this Agreement.

### 9.4 Interest and Late Fees on Late Payments and/or Reports/Collections Costs. 
All amounts you owe us and/or our Affiliates bear interest at the highest applicable legal rate for open account business credit, but not to exceed one and one-half percent (1.5%) per month. Additionally, we may require you to pay an administrative late fee of Two Hundred Dollars ($200.00) for each late report and/or late payment. The foregoing amount is subject to inflation adjustment under Section 9.6, but will not exceed any applicable legal restrictions. If we experience repeated late payments by you, then we may require you to pay all amounts due us by cashier's check. You are responsible for all reasonable costs of collection incurred by us in connection with any late payments, including legal costs and attorneys' fees.

**9.5** **Application of Payments, Set-Offs etc.** As to you and/or any Affiliate of yours, we can:

A) apply any payments received to _any_ past due, current, future or other indebtedness of any kind in our Business Judgment, no matter how payment is designated by you, except that Marketing Fund contributions may only be credited to the Marketing Fund;

B) set off, from any amounts that may be owed by us, any amount owed to us or any marketing fund; and

C) retain any amounts received for your account (and/or that of any Affiliate of yours), whether rebates from suppliers or otherwise, as a payment against any amounts owed to us.

We can exercise any of the foregoing rights in connection with amounts owed to or from us and/or any Franchisor-Related Person/Entity.

**9.6** **Inflation Adjustments/Currency Requirements** Amounts specified as being subject to inflation adjustment may be adjusted by us annually in our Business Judgment in proportion to the changes in the Consumer Price Index (U.S. Average, all items) maintained by the U.S. Department of Labor (or any successor index that we designate) as compared to the previous year. We will notify you of any such percentage adjustment. All amounts specified in this Agreement are in U.S. Dollars.

**9.7** **Mandatory Convention Attendance, Possible Fee.** You are required to attend all meetings designated by us as mandatory (including without limitation the CARTRIDGE WORLD annual convention), unless otherwise excused by us. One management-level individual shall attend on behalf of each of your CARTRIDGE WORLD Stores. You may be required by us to pay a fee at the time of the event to offset the cost of a convention or other program. You are responsible for all other costs of attendance.

**10.** **YOUR CARTRIDGE WORLD STORE — IMAGE AND OPERATION.**

**10.1** **System Compliance, Regular Upgrading.**

A. You agree to operate your CARTRIDGE WORLD Store in full compliance with the then-current CARTRIDGE WORLD System and the Manuals. You agree to promptly comply at your expense with all then current requirements, standards and operating procedures relating to every aspect of a CARTRIDGE WORLD Store and its operations (including without limitation use of specified equipment, Products and Services, computer hardware and software; supplier programs and operating systems; signs, logos, designs and advertising/marketing materials and forms; website designs and formats).

B. You will maintain your CARTRIDGE WORLD Store at your expense according to all CARTRIDGE WORLD standards for new stores and promptly undertake all changes as are required by us from time-to-time in our Business Judgment. If you fail to do so, we may do so on your behalf. You agree to reimburse us within 10 days of our delivery of an account statement. You will not make any alterations to your CARTRIDGE WORLD Store or its appearance as originally approved by us without our prior written approval.

C. You agree that you and your employees will wear then current CARTRIDGE WORLD career apparel at your sole expense.

**10.2** **Designated Equipment, Products, Services and/or Suppliers.**

A. Your CARTRIDGE WORLD Store will purchase, use and offer such Designated Equipment, Products and Services, as are specified by us and/or a Related Company from time to time. We may designate a single or multiple suppliers for any given item or service and may concentrate purchases with

one or more suppliers in our Business Judgment. Such suppliers may include, and may be limited to, us and/or companies affiliated with and/or related to us. You understand that we currently have a Related Company(ies) that derive(s) substantial revenues from the sale of Products to Master Franchisees and Cartridge World Store Franchisees, including but not limited to, inks, ink cartridges and related printer consumables, and expect these and/or other sales of Products/Services by us, Affiliates and Related Company(ies) to continue in the future. We also may develop new products and processes which you may be required to use/implement in your operations, such as a residue filtering system currently under development by CW International. We or an Affiliate or Related Company(ies) may be designated by us/Related Company(ies) in our/their Business Judgment as an exclusive supplier for any such Products/Services. An exclusive supplier may be designated to help ensure that such Products are of a uniform, high quality and are uniformly available in all Traditional Cartridge World Stores. You and we agree that the predictability of high quality Products, Product performance and similar factors are of key importance to our target consumers, to building a positive image and reputation for the Cartridge World Brand and Franchise system, and to individual Store and System growth. We/Related Companies may delete, substitute, modify or add to the Products/Services/suppliers in our/their Business Judgment.

B. Designation of a supplier may be conditioned on factors established by us/Related Companies in our/their Business Judgment, including without limitation performance relating to frequency of delivery, standards of service, and payment or other consideration to us or parties designated by us/them. We/Related Companies may approve, or revoke or deny approval, of particular items or suppliers in our/their Business Judgment.

C. You can request the approval of an item, service or supplier by notifying us in writing and submitting such information and/or materials we may request. We may require you to pre-pay any reasonable charges connected with our review and evaluation of any proposal. We'll notify you of our decision within a reasonable time. You may only purchase items, services, and/or supplies from a supplier if we have approved the supplier in writing and have not later revoked our approval.

D. You will not make any claims against us/Related Companies with respect to any supplier and/or related products/services (and/or our designation of, or our relationship with, any supplier/products/services). Claims with respect to any supplier-related and/or similar matters shall be made only against the supplier in question. You will provide us with written notice prior to taking any action in connection with such a claim. We will use diligent efforts to assist you in resolving any disputes with suppliers approved and/or designated by us.

10.3    **Purchasing Cooperative.** We may require that you join and make required purchases/leases through the CARTRIDGE WORLD® purchasing cooperative or other entity designated by us. Such entity may adopt its own bylaws, rules, regulations and procedures, subject to our consent in our Business Judgment. We can require each such entity to submit monthly and annual financial statements, and can require that the annual financial statements be audited, all at the expense of such cooperative. Your failure to timely pay amounts due to, or comply with the bylaws, rules, regulations and procedures of such cooperative is a breach of this Agreement. We may offset against amounts we owe to you the amount of your unpaid cooperative obligations.

10.4    **Compliance with Laws and Ethical Business Practices.**

A. You'll operate your CARTRIDGE WORLD Store in full compliance with all applicable laws, ordinances and regulations. If there is ever a conflict between the requirements imposed under this Agreement and your obligation to comply with applicable laws, ordinances, and regulations, you shall immediately: (1) comply with the applicable law, ordinance, and/or regulation; and (2) give us written notice explaining the nature and extent of the conflict.

B. We make no representations or assurances as to what (if any) licenses, permits, authorizations or otherwise may be required in connection with your CARTRIDGE WORLD Store. It is your sole

responsibility to identify and obtain all authorizations necessary to your operation. You maintain high standards of honesty, integrity, fair dealing and ethical conduct in your business activities. You'll notify us in writing within five (5) days of the commencement of any proceeding and/or of the issuance of any governmental order or action impacting you and/or your CARTRIDGE WORLD Store.

C.   You agree to comply and/or assist us in our compliance efforts, as applicable, with any and all laws, regulations, Executive Orders or otherwise relating to anti terrorist activities, including without limitation the U.S. Patriot Act, Executive Order 13224, and related U.S. Treasury and/or other regulations. In connection with such compliance efforts, you agree not to enter into any prohibited transactions and to properly perform any currency reporting and other activities relating to your Franchise Business as may be required by us or by law. You confirm that you are not listed in the Annex to Executive Order 13224 and agree not to hire any person so listed or have any dealing with a person so listed (the Annex is available at http://www.treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html).You are solely responsible for ascertaining what actions must be taken by you to comply with all such laws, orders and/or regulations, and specifically acknowledge and agree that your indemnification responsibilities as provided in Section 7.04 pertain to your obligations hereunder.

### 10.5   Management and Personnel of Your CARTRIDGE WORLD Store, Training.

A.   Your CARTRIDGE WORLD Store must be personally managed on a full-time basis by a person who has successfully completed mandatory training and met then-current standards. We strongly recommend on-site management by you.

B.   You are solely responsible for the hiring and management of your CARTRIDGE WORLD Store employees, for the terms of their employment and for ensuring their compliance with any training or other employment related requirements established by us from time to time in our Business Judgment.

C.   We have the right to deal with the manager regarding routine operations and reporting requirements. You will ensure that our records for your CARTRIDGE WORLD Store managers/supervisors are kept current.

### 10.6   Insurance.

A.   You'll maintain in force policies of insurance issued by carriers approved by us covering various risks, as specified in writing by us from time-to-time. We may specify the types and amounts of coverage required under such policies and require different and/or additional kinds of insurance at any time, including excess liability insurance. Each insurance policy must: i) name us and our Affiliates and Related Companies as additional named insured; ii) contain a waiver of all subrogation rights against us, our Affiliates and any successors and assigns; iii) and provide thirty (30) days' prior written notice to us of any material modifications, cancellation, or expiration of such policies.

B.   If you fail to maintain required insurance coverage, we will have the right (but not the obligation) to obtain such insurance coverage on your behalf. You will pay us on demand any costs and premiums incurred by us.

C.   Current insurance requirements include the following and are subject to change by us: (i) comprehensive general liability insurance against claims for bodily and personal injury, death and property damage caused by, or occurring in conjunction with, your CARTRIDGE WORLD Store; (ii) all risk property and casualty insurance for the replacement value of your CARTRIDGE WORLD Store and all associated items; and (iii) business interruption insurance providing for continued payment of all amounts due us and/or any Affiliate of ours under this Agreement.

**10.7    Program Participation.**  We may condition your participation in any program, or your receipt of any CARTRIDGE WORLD System benefits, on your being in compliance with, and not in default of any term of, this Agreement.

**10.8    Continued Payment of Royalties, etc. During Closure.**  You will immediately notify us of any closure of your CARTRIDGE WORLD Store for any reason and submit a plan for re-opening. All financial obligations of yours to us or to any Franchisor Related Person/Entity (including royalties) will remain in effect during such closure period. Any such closure not authorized and/or excused by us shall be a default of this Agreement, entitling us to all remedies available hereunder, at law and in equity.

**10.9    Customer Satisfaction, Quality Controls, etc.**  We may institute various programs for auditing customer satisfaction and/or other quality control measures. We may require you to pay for such program costs. You agree to request your customers to participate in any surveys performed by or on behalf of us, using forms prescribed by us from time to time.

**10.10    Franchisee Advisory Council and Selection.**  We and/or Related Companies may elect in our/their Business Judgment to form a "Franchisee Advisory Council" or "FAC," to provide input to us. The FAC will consist of Franchisees in Good Standing, each of whom shall represent the interests of the Traditional CARTRIDGE WORLD Stores in their distinct geographical region (the "Region"). FAC members will be elected for a term or terms by a majority of the Traditional CARTRIDGE WORLD Stores situated in their respective Region. The geographical area of each Region will be established by us and/or Related Companies, as applicable, in our/their Business Judgment, with due consideration given to achieving a representative group of Stores for each Region. The number of Regions and their respective boundaries will be subject to adjustment from time to time to reflect growth and Store population changes, among other appropriate factors. Each Store, both franchisee and Franchisor/Related Company-owned, will be entitled to one vote per Store. We, and/or Related Companies, as applicable, will always have the right to appoint one representative to participate in all FAC meetings and any other FAC activities, but such representative will be a non-voting participant. The FAC may adopt its own bylaws, rules, regulations and procedures, subject to our and/or Related Companies, as applicable, consent in our/their Business Judgment. While we/they are not required to do so except in those specific instances stated in this Agreement, if we/Related Companies submit any matters for approval to an FAC and approval is granted, the approval will be binding on you.

## 11.    MARKETING.

### 11.1    National Marketing Fund.

A.    CWNA plans to establish (or has established) in its Business Judgment an advertising, publicity and marketing fund (the "National Marketing Fund" or "Marketing Fund") to promote CARTRIDGE WORLD Stores and the Brand. You agree to make a marketing fund contribution calculated as follows with respect to the two business segments identified below:

(a)    with respect to computer hardware (including printers) and/or software sales, an amount not to exceed four percent (4%) of Gross Profit received or earned by you during the preceding royalty period,

plus

(b)    with respect to all other Products and Services sales (including but not limited to inks, cartridges and computer compatibles), an additional amount not to exceed four percent (4%) of "Gross Volume" received or earned by you during the preceding royalty period;

The percentage contributions shall be established by CWNA in its Business Judgment, subject to the maximum limitations described above. Such percentage marketing contributions will be calculated and

payable at the same time and in the same manner as percentage and minimum royalties, including any electronic funds transfer requirements. Such contributions shall be payable to CWNA, or as otherwise instructed by CWNA. CWNA may, on a temporary or permanent basis, delegate management of all or part of the Marketing Fund to us and/or other Master Franchisees and/or Related Companies, including but not limited to contribution collection activities. In such an event, all rights of, and benefits to, CWNA with respect to the Marketing Fund, whether arising under the provisions of this Agreement or otherwise, shall also accrue to us and/or such other entities. If CWNA has delegated or delegates any such management to us, it will have no obligations to you [and you will not make any claims against CWNA or any Related Company] with respect to such management activities and/or any related matter. To the extent of any such delegation, all such obligations will be ours alone.

B. CWNA shall have sole discretion over all matters relating to the Marketing Fund, operational, marketing or any other matter (consistent with its purposes and the provisions of this Agreement). The Marketing Fund may be used for (among other things) product development; signage; creation, production and distribution of marketing, advertising, public relations and other materials in any medium, including the internet; administration expenses; brand/image campaigns; media; national, regional and other marketing programs; activities to promote current and/or future CARTRIDGE WORLD Stores and the Brand; agency and consulting services; research, any expenses approved by us and associated with FAC or other franchisee advisory groups. A brief statement regarding the availability of CARTRIDGE WORLD franchises may be included in advertising and other items produced using the Marketing Fund.

C. CWNA, we and/or any Franchisor Related Persons/Entities can provide goods, services, materials, etc. (including administrative services and/or "in-house advertising agency" services) and be compensated and/or reimbursed for the same by the Marketing Fund, provided that any such compensation must be reasonable in amount. CWNA can arrange for goods, services, materials, etc. (including administrative services) to be provided by independent persons/companies and all related costs, fees, etc. will be paid by the Marketing Fund. While CWNA is not required to do so, if an FAC has been formed and any matters are submitted by CWNA for approval to the FAC and approval is granted by a majority of the members, the approval will be binding on you.

D. The Marketing Fund will be accounted for separately and may be used to pay all administrative and other costs of the Marketing Fund related to its activities and purposes and/or as authorized by the relevant Franchise Agreements. All taxes of any kind incurred in connection with or related to the Marketing Fund, its activities, contributions to the Marketing Fund and/or any other Fund aspect, whether imposed on CWNA, us, a Related Company, the Marketing Fund or any other related party, will be the sole responsibility of the Marketing Fund. CWNA will prepare financial statements for the Marketing Fund annually, which will be furnished to you upon written request. Such statements may be audited and any related accounting/auditing costs will be paid by the Marketing Fund. Funds in the Marketing Fund must be expended, prior to termination of the Marketing Fund, only for the purposes authorized by the relevant Franchise Agreement(s.) No profit, gain or other benefit will directly accrue to CWNA from the Marketing Fund. All interest earned on monies contributed to, or held in, the Marketing Fund will be remitted to the Marketing Fund and will be subject to the restrictions of the relevant Franchise Agreement(s.) In making expenditures, the Marketing Fund will first spend any contributions made by any supplier; second, any earnings on assets held by the Marketing Fund; third, any contributions made by CWNA; and finally any contributions made by Franchisees.

E. Financial management of the Marketing Fund will be CWNA's sole responsibility. CWNA may in its Business Judgment:

1) compensate ourselves and/or any Franchisor Related Person/Entity for salaries, administrative costs, overhead and other expenses incurred in Marketing Fund related programs/activities, including but not limited to production, research, insurance, and collection expenses, as well as any legal expense related to the activities and purposes of the Marketing Fund (consistent with the provisions of this Agreement);

2) charge the Marketing Fund for attorney's fees and other costs related in any way to claims against us and/or any of the Franchisor-Related Persons/Entities regarding the Marketing Fund However, CWNA shall be required to reimburse the Marketing Fund for any attorneys' fees and/or costs paid by the Marketing Fund in connection with any action in which CWNA is finally found to have acted unlawfully or to be guilty of wrongdoing with respect to the Marketing Fund;

3) spend in any fiscal year an amount greater or less than the aggregate contributions to the Marketing Fund in that year, and the Marketing Fund may borrow from CWNA or other lenders to cover deficits of the Marketing Fund or cause the Marketing Fund to invest any surplus;

4) collect for remission to the Marketing Fund any advertising or promotional amounts offered by any supplier based upon franchisee purchases. Any such contributions, whether or not made with respect to purchases by you, will not count toward your required Fund contributions;

5) pay the advertising, marketing, public relations and related costs involved in any co-branding, dual franchising or other such multi-sponsor programs;

6) revise marketing and other programs, and/or make expenditures from the Marketing Fund, to take account of cultural and other differences (and/or CWNA may delegate management of a portion of the Marketing Fund in connection therewith);

7) defer, waive and/or compromise claims for current/future contributions to, and/or claims against or with respect to, the Marketing Fund and fund the same with the Marketing Fund;

8) take legal or other action against any franchisee in default of their obligations to the Marketing Fund;

9) merge the Marketing Fund with any marketing fund otherwise established for CARTRIDGE WORLD Stores for use as described in this Section 11.1, so long as the restrictions of the relevant Franchise Agreement(s) continue to apply to contributions made by Franchisees under such arrangements;

10) maintain Marketing Fund assets in one or more accounts designated as "trust accounts" for purposes of protecting such assets from claims of third-party creditors, (but such action shall not be deemed to create any "trust," "fiduciary relationship" or similar special arrangement);

11) incorporate the Marketing Fund or operate it through an entity separate from CWNA, which is subject to all rights and duties of CWNA's relating to the Marketing Fund;

12) take such other actions in connection with the Fund as CWNA consider to be appropriate and as are consistent with the provisions of this Section 11.1.

F. You acknowledge and agree that we have no obligation to ensure that expenditures by the Marketing Fund are or will be proportionate or equivalent to contributions to the Marketing Fund by CARTRIDGE WORLD Stores operating in any geographic area, or that any CARTRIDGE WORLD Store will benefit directly, indirectly or in proportion to its contribution to the Marketing Fund; provided that contributions from Traditional Cartridge World Stores in the United States will be used in accordance with this Agreement for the primary benefit of Traditional Cartridge World Stores in the United States. We have no obligation to cause other CARTRIDGE WORLD Stores to contribute to the Marketing Fund or engage in local marketing, and we may permit a franchisee to make direct advertising expenditures in place of contributions to the Marketing Fund. You understand that some CARTRIDGE WORLD Franchisees may have Marketing Fund obligations that are different from yours, if any. However, all CARTRIDGE WORLD Stores owned by CWNA and/or us will make contributions to the Marketing Fund as if they were subject to the then-current form of Franchise Agreement.

G. Neither CWNA nor we (nor any of the Franchisor-Related Persons/Entities, including the FAC) will be liable for any act or omission in connection with the Marketing Fund which is consistent with this Agreement. You and we expressly agree that none of the relationships with you in connection with the Marketing Fund are in the nature of a "trust," "fiduciary" or similar special arrangement.

H. Subject to the express requirements of this Agreement that your contributions will only be spent as authorized herein, you agree that CWNA and/or us and/or any Related Company may deny access to any and all programs and/or materials created by, and benefits of, the Marketing Fund to you and to any

Franchisees who are in default in any obligations to the Marketing Fund and/or otherwise in default under this Agreement.

**11.2** <u>**Your Participation in the Marketing Fund.**</u> You agree to participate in all Marketing Fund programs. You have the right to set your own prices, except that we may specify maximum prices for goods or services to the greatest degree permitted by law. You will fully honor all coupons, price reduction and other promotions/programs as directed by us. The Marketing Fund may furnish you with marketing, advertising and promotional materials; however, we may require that you pay the cost of producing, shipping and handling for such materials.

**11.3** <u>**Your Local Store Marketing Activities**</u>.

A. You must spend Four Hundred Dollars ($400.00) each calendar month for local advertising and promotion of your CARTRIDGE WORLD Store, subject to inflation adjustment as set forth in Section 9.6 and to the additional Grand Opening requirements provided in Section 3.7, above. You'll submit, upon our request, verification of your expenditures in a form prescribed by us in our Business Judgment. Appropriate local advertising expenditures may include, but are not limited to, classified telephone directory listings and advertising. The value of discounts, coupon redemptions and/or products or services given without charge shall not considered to meet your local advertising obligation under this Section.

B. Your advertising will be in good taste and conform to ethical and legal standards. We may require that samples of all advertising and promotional materials for any media, including the Internet, be submitted to us for our review and approval prior to use. You agree not to use any materials or programs disapproved by us/any Related Company at any time in our/their Business Judgment. We can require that a brief statement regarding the availability of CARTRIDGE WORLD franchises be included in advertising used by you and/or that brochures regarding purchase of CARTRIDGE WORLD franchises be displayed in your CARTRIDGE WORLD Store.

C. All, if any, use of the Internet, World Wide Web or other electronic media by you in connection with your CARTRIDGE WORLD Store will be as specified by us/any Related Company in our/their Business Judgment from time-to-time, whether in the Manuals or otherwise. Among other things, such use may be required to be only through us/any Related Company, using a designated Internet/Intranet Service Provider (which can be us or an Affiliate), and that all pages be accessed through a designated site and/or meet specifications. CW International and CWNA plan to implement an internet/intranet system to enhance communications by and among them, us and Franchisees and to permit the efficient/economic delivery of a variety of information, such as Manuals, System bulletins, marketing materials, financial data, reporting information, technical instructions, etc. You agree to participate in any such intranet/internet activities as required from time to time and to maintain the necessary hardware, software, High-Speed Internet Service (Cable, DSL) (based on availability) or dial-up modem and other items as required by us to enable you to do so on an ongoing basis at your expense. You agree to pay by credit card, bank autodraft, or other method required by us, an Internet/Intranet Service Fee in an amount not to exceed $100.00 per month, to support such System programs. We can collect such fee in advance on an annual or other basis, and such Fee is subject to annual adjustment based on the formula provided in Section 9. 6, above.

**11.4** <u>**Regional Franchisee Marketing Group(s) ("FMG")**</u>. We/any Related Company may elect in our/their Business Judgment to form regional associations of CARTRIDGE WORLD franchisees to conduct various marketing related activities on a cooperative basis (an "FMG"). If an FMG is formed covering your area, then you must join and actively participate. You may be required to contribute such amounts as are determined from time-to-time by the FMG. Contributions will be established on a per Store basis. The FMG may adopt its own bylaws, rules, regulations and procedures, subject to our consent in our Business Judgment. Any failure to timely pay amounts due to, or to comply with the bylaws, rules, regulations and procedures of the FMG, shall be a breach of this Agreement. We may

offset against amounts we/any Related Company owe to you the amount of your unpaid FMG obligations. While neither we nor /any Related Company are required to do so, if we/they submit any matters for approval to the FMG and approval is granted, the approval will be binding on you.

## 12. STORE RECORDS AND REPORTING.

**12.1 Bookkeeping, Accounting and Records, Cash Register, Computer and Other Systems.** You must obtain and maintain at your sole expense accounting, sales, reporting and records retention systems conforming to any requirements prescribed by us from time-to-time, including any such electronic systems with on line access for us. Such systems may include, but are not limited to, electronic cash register, computer and point-of-sale systems, and software programs, and may have components only available from us, a Franchisor Related Person/Entity and/or designated suppliers. We reserve the right to use in our Business Judgment, and to have full access to, all cash register, computer and any other systems, and the information and data they contain. We may charge a reasonable fee for the license, modification, maintenance or support of software or any other goods and/or services that we furnish to you in connection with any of the systems.

**12.2 Reports, Financial Statements and Tax Returns.**

A. You will provide to us such information regarding the sales and operation of your CARTRIDGE WORLD Store, and in such form and format, as we/Related Companies specify from time-to-time in their Business Judgment. Such information may be obtained through a variety of methods, including among them direct on line access, facsimile transmissions and written copies. Current information requirements include, but are not limited to, the following, and are subject to change by us/Related Companies:

1) Sales and operations reports for each royalty period, which are due at the same time as the corresponding royalty payment; and

2) within forty-five (45) days after the end of each fiscal year, an unaudited fiscal year-end balance sheet and income statement for your CARTRIDGE WORLD Store, prepared in accordance with generally accepted accounting principles, and verified and signed by you;

3) retention of all records of or relating to your CARTRIDGE WORLD Store, including all income, sales and other tax returns, for the term of this Agreement and one year thereafter.

B. You agree to provide such other data, information and supporting records for your CARTRIDGE WORLD Store as we/Related Companies reasonably may request from time to time, including without limitation copies of your CARTRIDGE WORLD Store's state sales tax returns and those portions of your income tax returns relating to your CARTRIDGE WORLD Store. We reserve the right to require you to provide us at your expense with an annual audited financial statement prepared by a certified public accountant upon a reasonable belief by us that such statements are required to help ensure reporting accuracy.

## 13. INSPECTIONS AND AUDITS.

**13.1 Our Inspections, etc.** We and/or our agents and/or Related Companies will have the right, at any time during business hours, and without prior notice to you, to: i) inspect your CARTRIDGE WORLD Store and related activities and items and record the same; ii) remove samples for testing and analysis; iii) interview personnel; iv) interview customers; and v) conduct inventories. You'll cooperate fully in connection with such matters. We may require you or an individual designated by us to meet at our headquarters or other location designated by us, for the purpose of discussing and reviewing your CARTRIDGE WORLD Store's operations, financial performance and other matters.

**13.2 Audit.** We and/or our agents and/or Related Companies will have the right at any time during business hours, and without prior notice to you, to inspect and/or audit business records relating in any way to your CARTRIDGE WORLD Store and the books and records of any person(s), corporation or

partnership which holds, or does business with, the Franchise. Such business records may include, but are not limited to, bookkeeping and accounting records, sales and income tax records and returns, cash register tapes, invoices, and deposit receipts. Our right to audit includes the right to access all cash registers, computers and other equipment by electronic means. You'll cooperate fully with such an audit.

**13.3  Gross Volume Understatements.** If any inspection or audit discloses an understatement of Gross Volume, you will pay to us the royalties and marketing contributions due on the understated amount, plus interest, from the date originally due until the date of payment. We may require you to reimburse us for the cost of the inspection or audit, including, without limitation, the charges of any independent accountants, and related travel and per diem charges for our and their employees, if:

A) any inspection or audit is necessary because of your failure to timely furnish required information/reports; or

B) Gross Volume is understated for any period by more than two percent (2%).

In addition to all other remedies and rights of ours hereunder or under applicable law, we may Terminate this Agreement if:

A) Gross Volume is understated for any period by more than five percent (5%); or

B) any understatement is determined by us to be intentional.

## 14.  TRANSFER.

### 14.1  Transfers by Us.

A.  This Agreement, and any or all of our rights and/or obligations under it, are fully transferable by us in our Business Judgment, in whole or in part, without your consent, provided that any such transferee shall appear at the time of the transfer to have financial resources reasonably appropriate to fulfill its obligations under this Agreement. For the purposes of this Section 14.1, we shall be entitled to rely upon financial statements provided to us by the transferee. If we transfer this Agreement, only the transferee will have obligations to you. Our obligations (and those of any of the Franchisor-Related Persons/Entities) will be extinguished. You specifically acknowledge and agree that we and/or any Franchisor Related Entity/Person may: be sold and/or we and/or any Franchisor Related Entity/Person may sell any or all intellectual property and/or other assets (including the Marks); go public; engage in a private or other placement of some or all our/their securities; merge, acquire other entities and/or assets (competitive or not); be acquired by a competitive or other entity; and/or undertake any refinancing, leveraged buy-out and/or other transaction.

B.  On any repurchase, Termination or expiration of the Master Franchise Agreement between us and CWNA, or notice by CWNA to you of our having committed a default or of CWNA's election to receive direct payment, you will (1) pay to CWNA or its nominee all amounts owed or to be owing, and submit all reports due or to become due, under this (and/or any other) Agreement and (2) allow to be assigned to CWNA (or its nominee) this Franchise Agreement and any other Franchise or other agreement between us and you (or any affiliate of yours). You hereby award to CWNA a power of attorney authorizing CWNA to execute any and all such assignments.

C.  You agree that neither we nor any Franchisor Related Person/Entity will have any liability to you resulting from our entering into any transactions permitted hereunder. We also may, on a permanent or temporary basis, delegate any or all of our duties to another company to perform. In such event, you will look only to such other company for the performance of such duties.

**14.2** **Transfers by You.**

A.  The rights and duties created by this Agreement are personal to you (or your owners, if the Franchisee is a Business Entity).  We have awarded the Franchise relying on the individual integrity, ability, experience and financial resources of you or such owners.  Therefore, neither this Agreement, the Franchise, the Franchisee nor your CARTRIDGE WORLD Store (or any interest in, or the assets of, any of them) may be transferred without our prior written approval.  Any transfer or attempted transfer without our approval is null and void.

B.  The term "transfer" includes (but is not limited to) any voluntary or involuntary assignment, sale, gift, pledge or any grant of any security or other interest (whether partial or whole, or direct or indirect), by you (or your owners, if the Franchisee is a Business Entity).  A transfer also includes the following events: i) any transfer of ownership of capital stock or any partnership or similar interest; ii) any merger, consolidation or issuance of additional securities representing an ownership interest in the Franchisee; iii) any sale of voting stock of the Franchisee or of any security convertible to voting stock; iv) any transfer in a corporate or partnership dissolution, divorce, insolvency proceeding or otherwise by operation of law; v) any transfer of any interest in any revenues, profits, or assets of your CARTRIDGE WORLD Store and which is not in the ordinary course of business; or vi) any transfer to a business entity and/or a trust or similar entity.  A transfer of ownership, possession or control of your CARTRIDGE WORLD Store, or of its assets, may only be made with a transfer of the Franchise.  Any transfer in the event of death or disability will be governed by Section 14.5, below.

**14.3** **Conditions for Approval of Any Transfer.**

A.  All of the following conditions must be met prior to, or concurrently with, the effective date of any transfer.  We may waive any condition in our sole and absolute discretion.

1)  You must be in compliance with this Agreement, the Manuals, all other agreements between you and us (including any of our respective Affiliates), and all leases/subleases with any party, and the transferee must expressly assume all obligations under all such agreements; and

2)  The transferee and its owners must meet our then current requirements for new franchisees, including but not limited to business experience, aptitude and financial resources; and

3)  You must meet all payment and reporting obligations under the Franchise Agreement and any other agreements between you and us (and any of our respective Affiliates/Related Companies).  Promissory notes shall be accelerated and paid in full; and

4)  All obligations to third parties in connection with your CARTRIDGE WORLD Store must be satisfied or assumed by the transferee; and

5)  Your CARTRIDGE WORLD Store and its operations must have been brought into full compliance with the Manuals and specifications and standards then-applicable for new CARTRIDGE WORLD Stores; and

6)  At our option, the transferee must successfully complete, or agree to complete, our training program for new franchisees; transferee is responsible for all travel and training costs; and

7)  The transferee must, at our option, i) agree to be bound by all the terms and conditions of this Agreement for the remainder of the term, or ii) execute our then current form of franchise agreement and ancillary documents (including guarantees) as are then customarily used by us in the grant of franchises; the term of such new franchise agreement shall, at our option, be either for the balance of the term of this Agreement or for the full term generally awarded to new franchisees as of the time of the transfer; and

8)      The transfer must be completed in compliance with the terms of any applicable leases and other agreements and with all applicable laws, including but not limited to licensing and operations-related laws and/or laws governing franchise sales; and

9)      You or the transferee must pay us with your application for a transfer a non-refundable transfer fee of Ten Thousand Dollars ($10,000.00), subject to inflation adjustment as provided in Section 9.6, above, but only if such proposed transfer involves a change in ownership or control of fifty percent (50%) or more.

10)      You and each of your owners and/or Affiliates, and the transferee (and each owner and/or Affiliate of the transferee), must sign a General Release; and

11)      Any grant of a security or similar interest in connection with a transfer (which grant may or may not be permitted by us in our Business Judgment), will be subordinated to our rights and the rights of any Franchisor Related Person/Entity under the Franchise Agreement or any other agreement; provided that we may refuse to allow you or anyone else to grant or receive a pledge, mortgage, lien or any security or similar interest in and/or to the Franchise or the Franchised Business (or any of its assets) if, after having expended commercially reasonable efforts in discussions with lenders or other applicable parties, we are unable in our Business Judgment to obtain appropriate protections for our rights under this Agreement and/or for CARTRIDGE WORLD System interests; and

12)      You will agree with the transferee not to compete after the transfer in accordance with restrictions acceptable to us and substantially similar to those described in Section 8.2 B, above, to the maximum extent permitted by law.  We shall be named a third party beneficiary of such agreement; and

13)      We may (but are not required to) withhold or condition our consent to any transfer in our Business Judgment, particularly if we believe that the terms of transfer jeopardize the economic viability of the franchise or based on other circumstances of the transfer, and/or if we would not normally directly award a franchise in such a situation.

B.  You agree that we may (but are not required to) discuss with you and/or the proposed transferee all matters related to any transfer and/or proposed transfer at any time which we consider to be appropriate in our Business Judgment without liability (including our opinion of the terms of sale, performance of your franchise, etc.).  You expressly consent to any such discussions by us.

C.  Neither you nor any transferee shall rely on us to assist in the evaluation of the terms of any proposed transfer.  You acknowledge and agree that an approval of a proposed transfer shall not be deemed to be an approval of the terms, nor any indication as to any likelihood of success or economic viability.

14.4     Additional Conditions for Transfer to a Business Entity.

A.  We will consent to a transfer from you to a Business Entity owned by you and formed for the sole purpose of operating the CARTRIDGE WORLD Store if the conditions described in 14.3, above, and the following conditions are met.  Such a transfer will not relieve you of your obligations under this Agreement.  You will remain jointly and severally liable to us for your and the Business Entity's obligations.

1)      The Business Entity's stock certificates (and/or other applicable evidences of ownership and all documents of formation/governance) must recite that any ownership interest in the Business Entity is restricted by the terms of this Agreement; and

2) You must have (and continue to maintain) management control and ownership of at least fifty-one percent (51%) of the Business Entity and personally manage its affairs; and

3) The individual Franchisee (or, if the Franchisee is a partnership, at least one of the partners) must be and remain the chief executive officer, chief operating officer or chief financial officer and meet our then-current training requirements. If the Franchisee is or becomes a corporation, LLC, partnership or other business entity, the chief executive officer, chief operating officer or chief financial officer of such entity must always meet all of our then-current training and other standards; and

4) The transferee must enter into an approved form of assignment in which the Business Entity assumes all of the Franchisee's obligations under this Agreement and any other agreements with us and/or a Franchisor Related Person/Entity, and any other documents we may require as provided in 14.3 A. (7), above; and

5) All current and future owners of the Business Entity must agree in writing to comply with this Agreement and any other agreements with us and/or any Franchisor Related Persons/Entities. We may at our option and in our Business Judgment require any and all owners to jointly and severally guarantee (in a written form approved by us) any such obligations of the Business Entity under any such agreements. The current approved form of Owner's Guarantee is attached as Exhibit 1 to this Agreement; and

6) No public offerings of debt or equity ownership in the transferee entity may be conducted, and no shares of any type issued without obtaining our prior written consent; and

7) We may require that each of the present and/or future shareholders, directors, and/or officers execute confidentiality and non-competition agreements with terms substantially similar to those described in Sections 8.1 and 8.2, respectively; and

8) In any event, we may withhold or condition our consent to any transfer as we deem appropriate in our Business Judgment, based on the circumstances of the transfer or otherwise.

14.5 **Death or Disability of Franchisee.**

A. If the Franchisee, or if the owner of the Franchisee with a controlling interest, dies or is permanently disabled, then his or her interest in this Agreement, the Franchise and/or the Franchisee shall be transferred to a third party subject to all of the provisions of this Article 14. A "permanent disability" occurs if you are not able to personally, actively participate in the management of your CARTRIDGE WORLD Store for (6) consecutive months. Any transfer under this Section shall be completed within six (6) months from the date of death or permanent disability. If no transfer occurs, the Franchise will automatically terminate at the end of such period, unless a written extension is granted by us in our Business Judgment.

B. We can (but are not required to) operate the Franchised Business on your behalf and at your expense in the event of your death, disability or absence. We can pay ourselves a reasonable amount for our management services and other costs. We will use reasonable efforts and business judgment in managing the business, but will in all cases be indemnified by you (and/or your estate) against any costs and/or liabilities related in any way to our management and the operation of the Franchised Business. We are expressly authorized by you to manage in good faith and on terms that we consider appropriate in our Business Judgment, including payment of any past, current and/or future obligations to us or to any other creditor out of assets and/or revenues of the Franchised Business.

14.6 **Effect of Consent to Transfer.** Our consent to a transfer is not a waiver of any claims we may have against you, and you are not relieved of any obligations to us or any Franchisor Related Persons/Entities (including any defaults by any transferee) unless you have an express written release

signed by us. If you, your owners and your Affiliates comply with all of the requirements of this Article 14, including providing us with a General Release, then we may provide you in our Business Judgment with a Limited Release. Your obligations under the Post Termination Provisions will survive any transfer of this Agreement whether or not such a Limited Release is given. Any dispute regarding any proposed or completed transfer will be resolved through the dispute resolution provisions of this Agreement. Neither we nor any Franchisor Related Persons/Entities will have any liability to you or any proposed or actual transferee in connection with our examination and/or possible consent or withholding of consent involving any transfer or proposed transfer, or our exercise of any right of ours, which is consistent with this Agreement. You agree to indemnify and hold us harmless from any liability to you, the proposed transferee or otherwise.

### 14.7 Our Right-of-First-Refusal.

A. We have a right of first refusal regarding any proposed transfer subject to this Agreement. With each proposed transfer, you will provide us with a true and complete copy of the offer received by you (and any ancillary agreements), and the conditions to transfer described in Sections 14.3 and 14.4, as applicable, will be met. The offer and the price and terms of purchase must apply only to an interest in this Agreement, the Franchise, your CARTRIDGE WORLD Store or the Franchisee. Any value attributable to the goodwill of the Marks, CARTRIDGE WORLD System elements, Confidential Information or any other assets, tangible or intangible, related to the CARTRIDGE WORLD brand and System will be excluded from the purchase price.

B. We will give you written notice of our decision to exercise our right of first refusal within thirty (30) days from the date of our receipt of the offer and ancillary documents. If any of the assets to be purchased do not meet the standards we then apply to new CARTRIDGE WORLD Stores, or if you are in default, we can require that the store be brought into compliance and any defaults cured before the 30 day period begins. We may substitute cash for any form of payment proposed in such offer and will have a reasonable period of time in which to prepare for the close of the transaction (generally 60 days). We'll be entitled to purchase any interest subject to all Customary Representations, Warranties and Agreements. We can require that the closing of the sale be through an escrow. You and we will comply with any applicable bulk sales and/or similar laws, and you will maintain all insurance policies until the date of closing. We will have the right to set off against any amount of money payable by us all amounts due from you and/or your Affiliates to us and/or our Affiliates and/or Related Companies. We will also have the right, in our Business Judgment, to pay any amount otherwise payable to you directly to your creditors in satisfaction of your obligations. If you violate any of your obligations that expressly or by their nature survive this Agreement, we will not be obligated to pay any amount otherwise due or payable to you thereafter. In connection with such purchase, you and each transferor (and your respective Affiliates) will sign a General Release, and we will sign a Limited Release.

C. If we do not exercise our right-of-first-refusal, you or your owner may complete the sale to such purchaser on the exact terms of such offer, subject to the conditions of this Article 14. If there is a material change in the terms of the sale, we will have an additional right-of-first-refusal on the same terms and conditions as are applicable to the initial right-of-first-refusal. Our rights under this or any other Section are fully assignable.

### 14.8 Our Right to Repurchase

A. We have a right, but not an obligation, to Repurchase your Franchise, your Franchise Business and any or all of the assets of your Franchised Business that we choose. This right may be exercised by us in our Business Judgment by giving you written notice at any time during the term of this Agreement and on or within 120 days of Termination/expiration thereof.

B. The Repurchase price for the Franchise shall be calculated as follows:

1) if the reacquisition occurs during the initial term, the initial Franchise fee paid by you shall be multiplied by a fraction, the numerator of which is the number of full months remaining of your initial term and the denominator of which is the number of full months in the total Initial Term; or

2) if the reacquisition occurs during a successor term, the amount paid by you for the successor Franchise multiplied by a fraction, the numerator of which is the number of full months remaining of such renewal term or successor Franchise and the denominator of which is the number of full months in the total term of the Franchise under which you are then operating.

The repurchase price will include compensation only for the term of the then current Franchise Agreement, not for any successor terms.

C. The repurchase price for the Franchised Business and/or any Franchise assets shall be based upon assets to be purchased. We may elect to purchase all of the assets, or only those assets that we choose in our Business Judgment. If you and we are unable to agree on the purchase price, the Fair Market Value will be determined as defined in Article 1.2, above. All sales, transfer and/or similar taxes are to be paid by you. In no event will the purchase price include:

1) any goodwill or other monetary factor for the Marks, Cartridge World System elements, Confidential Information or any other assets, tangible or intangible, related to the Cartridge World Brand and System; and/or

2) any assets excluded from the purchase by us in our Business Judgment; and/or

3) leasehold improvements not owned by you and/or purchased by us.

Pending the closing of such a purchase, we will have the right to appoint a manager to maintain the operation of your Franchise. You will forever indemnify and hold us harmless against all obligations incurred in connection with the business prior to purchase. You'll furnish us with a complete list of accounts unpaid by you within ten (10) days of our notice of intent to exercise this option. We may (but are not required to) pay these unpaid bills directly to the parties owed and deduct them from the purchase price in lieu of paying such portion of the purchase price directly to you.

The Post Term restrictions described in Section 8.02 B, above, and elsewhere in this Agreement will be continuing obligations of yours. We shall receive all Customary Representations and Warranties from you, your owners and your Affiliates in connection with any such purchases. We can require that the closing of the sale be through an escrow. You and we will comply with any applicable bulk sales and/or similar laws, and you will maintain all insurance policies until the date of closing. We will also have the right, in our Business Judgment, to pay any amount otherwise payable to you directly to your creditors in satisfaction of your obligations. If you violate any of your obligations that expressly or by their nature survive this Agreement, we will not be obligated to pay any amount otherwise due or payable to you thereafter.

D. Any purchase price to be paid under this Section 14.8 will be paid, at our sole option, either in cash at closing, or under an unsecured, interest free promissory note, as follows: Twenty Percent (20%) at closing, Twenty Percent (20%) no later than 90 days after closing, Twenty Percent (20%) no later than 180 days after closing, Twenty Percent (20%) at the first anniversary date of the closing, and the final Twenty Percent (20%) at the second anniversary date of the closing. We can offset against the purchase price, and any installments thereof, any amounts owed by you (or any Affiliates) to us (or any Franchisor Related Persons/Entities). In connection with our exercise of any rights under this Section 14.8, you (and each owner/Affiliate) will execute a General Release. We will provide you with a Limited Release, unless you are in default under this Agreement.

E.   We will not assume any liabilities, debts or obligations of yours in connection with any such Transfer, repurchase or payment, and you will indemnify us and each of the Franchisor-Related Persons/Entities from any and all claims arising out of any such Transfer, repurchase or payment. Notwithstanding the foregoing sentence, costs paid or incurred in connection with the transaction, including but not limited to, all appraisal fees and closing costs, shall be shared equally between you and us, but excluding attorneys' fees paid or payable to the respective attorneys for the parties.  You and we will comply with all applicable laws in connection with any such repurchase transfer and payment and you will cooperate with us in complying with all such requirements.

F.   This Agreement shall Terminate upon the date the above-described Repurchase becomes effective, subject to any surviving obligations described in this Agreement (unless earlier Terminated as a result of a default by you or by expiration of the Agreement).  If you fail to complete or to continue to comply with any surviving obligation(s), we will not be obligated to pay that portion of the Repurchase price otherwise due or payable following such failure, in addition to any other remedies to which we are otherwise entitled.

## 15.   SUCCESSOR FRANCHISE.

### 15.1   Your Rights.

A.   If you are awarded this Agreement for the initial term of your franchise, then this Agreement Terminates at the expiration of the initial term.  At that time, subject to the provisions of this Article 15, you will be eligible to be awarded a successor franchise.   The successor Franchise Agreement may differ materially from this one in financial and other ways and terms.  The successor term will be a single ten (10) year period, without any further term; but if the lease or sublease for the Premises is terminated or expires before the end of such successor term (and no substitute location has been consented to by us in writing and occupied by you before the termination/expiration of such lease/sublease), we may Terminate the successor agreement as of the termination/expiration of such lease/sublease.  You have no right to an additional successor term if this Agreement is being awarded to you as a successor franchise agreement.

### 15.2   Notice of Election.

A.   You must give us written notice of election to obtain the successor franchise not less than six (6) months, but not more than twelve (12) months, before the expiration of the initial term of this Agreement. Within ninety (90) days after our receipt of the notice, we will give to you in writing:

1)   any reasons which could cause us to not award the successor franchise, including any deficiencies requiring correction; and

2)   our then-current requirements relating to the image, appearance, decoration, furnishing, equipping, stocking and programs for a CARTRIDGE WORLD Store (collectively, the "specifications and standards then-applicable for new CARTRIDGE WORLD Stores and with the Manuals").

B.   If you are subject to a Correction Process under Section 16.5 when i) you provide us with notice of your intent to obtain a successor franchise, or ii) the successor franchise would be awarded, then we may choose in our Business Judgment to defer the award of any successor until you have successfully complied with the applicable CARTRIDGE WORLD System Standards and Financial Standards.

### 15.3   Conditions to the Award of a Successor.  Any award of the successor franchise must meet all of the following conditions, together with the then current standards applicable to successor franchisees, each of which are agreed to be reasonable:

A.   You (and each Affiliate of yours) must be in Good Standing;

B.   Your CARTRIDGE WORLD Store and its operations must fully comply with all specifications and standards then-applicable for new CARTRIDGE WORLD Stores and with the Manuals by the expiration of this Agreement;

C.   You must present evidence satisfactory to us that you have the right to remain in possession of your CARTRIDGE WORLD Store for the duration of the successor franchise. If you are unable to maintain possession of your CARTRIDGE WORLD Store, or in our judgment your CARTRIDGE WORLD Store should be relocated, you must have obtained our consent to and secured substitute premises by the Expiration Date of this Agreement. Such premises must comply with all specifications and standards then-applicable for new CARTRIDGE WORLD Stores and with the Manuals;

D.   You (and each Affiliate of yours) must have paid all amounts owed to us and any Franchisor Related Persons/Entities;

E.   You must have executed our then-current form of Franchise Agreement and related documents then customarily used by us (with appropriate modifications to reflect the fact that the Franchise Agreement to be awarded relates to a single successor franchise as contemplated by this Agreement). You will not be required to pay the then-current initial franchise fee, and we will not be required to provide you any site location, initial training or other "start-up" services in connection with the award of any successor franchise;

F.   You must have complied with our then-current qualification and training requirements. We may require your personnel to successfully complete any retraining program(s), at such times and location(s) as we then specify. There will be no charge for any retraining program(s), but you will be responsible for all travel, meals, lodging and other expenses of your personnel;

G.   You (and each owner and/or Affiliate of yours) must have executed a General Release, except for any claims exclusively related to the successor franchise (where expressly so required by applicable law). If you, your owners and your Affiliates comply with all of the requirements of this Article 15, including providing us with a General Release, then we will provide you with a Limited Release; and

H.   You must have paid us a successor fee equal to ten percent (10%) of our then-current initial franchise fee for a first franchise (but not less than $5,000.00, which minimum amount is subject to adjustment according to the inflation formula described in Section 9.6). The fee must be received from you at the time of your election and is non-refundable unless we do not grant a successor agreement to you.

Failure by you and/or your owners to timely complete all of the foregoing requirements will be deemed an election by you not to obtain the successor franchise.

16.   **TERMINATION OF THE FRANCHISE.**

16.1   **Defaults with No Right to Cure.** This Agreement will automatically Terminate upon delivery of our written notice of Termination to you in compliance with Article 20 (without further action by us and without opportunity to cure) if you (or any of your owners):

A.   fail to timely meet the site selection, development, opening and other requirements provided in Sections 3.1A and 3.6, above or failure to successfully complete training to our satisfaction as required in Section 5.1 above; or

B.   abandon or fail to operate your CARTRIDGE WORLD Store for more than seven (7) consecutive calendar days, or lose the right to possession of the premises and does not relocate your CARTRIDGE WORLD Store in accordance with this Agreement; or

C.   make any material misrepresentation or omission in your application for the Franchise, including (but not limited to) failure to disclose any prior litigation or criminal convictions (other than minor traffic offenses); or

D.   are judged bankrupt, become insolvent, make an assignment for the benefit of creditors, are unable to pay his or her debts as they become due, or a petition under any bankruptcy law is filed by or against you or any of your owners or a receiver or other custodian is appointed for a substantial part of the assets of your CARTRIDGE WORLD Store; or

E.   are convicted of, or plead no contest to, a felony, or to any crime or offense that is likely to adversely affect the reputation of the Franchisee or any owner, your CARTRIDGE WORLD Store, us or the goodwill associated with the Marks; or

F.   engage in any misconduct which unfavorably affects the reputation of the Franchisee or any owner, your CARTRIDGE WORLD Store, us, a Related Company or the goodwill associated with the Marks (including, but not limited to, child abuse, health or safety hazards, drug or alcohol problems, or permitting unlawful activities at your Store); or

G.   make, or attempt to make, an unauthorized "transfer" as defined in this Agreement or surrender control without our prior written approval; or

H.   make an unauthorized use of the Marks or any unauthorized copy, use or disclosure of any Confidential Information; or

I.   violate any of the In Term or Post Term Restrictions against competition provided in Section 8.2, above (or any other person identified therein commits such a violation); or

J.   commit any act or omission of fraud or misrepresentation, whether with respect to us, any of the Franchisor-Related Persons/Entities and/or any third party, including (but not limited to) any misrepresentation of Gross Volume; or

K.   have five or more material customer complaints with respect to your CARTRIDGE WORLD Store in any 12 month period, whether or not resolved; or

L.   fail to permit or cooperate with us or our designee in any audit or inspection or fail to retain (or to produce on request) any records required to be maintained by you;

16.2   **Defaults with Right to Cure.**  This Agreement will automatically Terminate on delivery of our written notice of Termination to you in compliance with Article 20 (without further action by us and without further opportunity to cure beyond that set forth in this Section):

A.   10 Day Cure  If within ten (10) calendar days after delivery of our written notice to you, you (or any of your owners) do not cure any:

    1)   failure to maintain required insurance;
    2)   failure to correct any condition that, in our reasonable judgment, might pose a danger to public health and/or safety;
    3)   failure to report accurately Gross Volume or fail to submit any other report due under this Agreement or any lease/sublease in accurate and complete form and when required;
    4)   failure to make payments of any amounts due us, any Franchisor-Related Person/Entity, any designee of ours and/or any supplier/creditor of yours and do not correct such failure(s);

5)    failure to comply with any of the dispute resolution provisions of this Agreement, including (but not limited to) failure to pay/deposit any amounts or otherwise and/or unexcused failure to appear or respond to any dispute resolution proceedings.

With respect to items A.1 and/or A.2 above, we may require you to immediately cease all operations until such defaults are fully cured.

B.  <u>30 Day Cure</u>   If within thirty (30) calendar days after delivery of our written notice to you, you (or any of your owners) do not cure any:

1)    default under the lease or sublease for your CARTRIDGE WORLD Store within the applicable cure period set forth in the lease or sublease (if such applicable cure period is less than 30 days, then such applicable cure period shall apply, notwithstanding any cure period provided in this Article);

2)    delinquency in your obligations to taxing authorities, landlords, equipment lessors, suppliers or others;

3)    failure to comply with any other provision of this Agreement, any other agreement with us and/or any Affiliate of ours and/or any Related Company, or any specification, standard or operating procedure or rule prescribed by us in the Manuals or by other writing which does not provide for a shorter notice period.

If any such default under this Section 16.2 B cannot reasonably be corrected within such thirty (30) day period, then you must undertake diligent efforts within such thirty (30) day period to come into full compliance. You must furnish, at our request, proof acceptable to us of such efforts and the date full compliance will be achieved. In any event, all such defaults must be fully cured within ninety (90) days after delivery of the initial written notice to you of Termination.

16.3    <u>Repeated Defaults</u>.  This Agreement will automatically Terminate upon delivery of our written notice of Termination to you in compliance with Article 20 (without further action by us and without opportunity to cure) if you or any Affiliate has committed two or more applicable defaults within any twelve (12) consecutive months, or three or more applicable defaults within any twenty-four (24) consecutive months. An "applicable default" is a single breach of any obligation under this Agreement and/or the Manuals, or under any other agreement with us and/or any of our Affiliates/Related Companies, whether or not such default is cured, or is the same as or similar to a prior event of default.

16.4    <u>Cross-Defaults</u>.  Any default by you (or any owner or Affiliate of yours) under this Agreement may be regarded by us as a default under any other agreement between us (or any Franchisor Related Persons/Entities) and you (or any owner or Affiliate of yours). Any such default under any other agreement or any other obligation between us (or any Franchisor Related Persons/Entities) and you (or any owner or Affiliate of yours) may be regarded as a default under this Agreement. Any default by you (or any owner or Affiliate of yours) under any lease, sublease, loan agreement, or security interest related to the Franchise Business may be regarded as a default under this Agreement, regardless of whether or not any such agreements are between you (or any owner or Affiliate of yours) and us (or any Franchisor Related Persons/Entities).

16.5    <u>Failure to Meet Performance Standards</u>.

A.  You and we have a shared interest in your CARTRIDGE WORLD Store not performing below CARTRIDGE WORLD System Standards, or failing to achieve an appropriate level of Gross Volume. You acknowledge that neither you nor we would have entered into this franchise relationship if you and we did not agree that your maintenance of CARTRIDGE WORLD System Standards or Gross Volume at agreed upon levels is vital to our relationship. "Performance Standards" includes both CARTRIDGE WORLD System Standards and Gross Volume requirements as described below. We have developed a

remedial process, which is described below in Section 16.5 F, that may be used by us in our discretion to help a Store improve its performance. While we are not required to do so, the process may be implemented by us if a System Standards Score in a scored category is lower than the average System Standards Score or if Gross Volume for the applicable measurement period does not equal the then-current Financial Standard.

B. <u>CARTRIDGE WORLD System Standards</u>. Your CARTRIDGE WORLD Store may be evaluated for compliance with CARTRIDGE WORLD System Standards using various methods (including, but not limited to, inspections, field service visits, customer comments/surveys and secret shopper reports). Any evaluation will be based on the methodology and scoring system then in use throughout the CARTRIDGE WORLD Store network (including any Stores owned by us or a Related Company) Your CARTRIDGE WORLD Store will be assigned System Standards Scores for categories being scored at that time. Your scores will be compared with the average score in each such category achieved by all CARTRIDGE WORLD Stores in the United States (including those owned and/or operated by us and/or our Affiliates), or such other geographic area as we reasonably believe to be appropriate for evaluation score purposes.

C. <u>CARTRIDGE WORLD Financial Standards</u>. We may compare your Gross Volume with the then-current "Financial Standard". Any comparisons will be made on a six (6) month basis. [For example, if the first comparison was on June 30, the next comparison would be on December 31, etc.] The Financial Standard will be determined as follows:

| Period Open (measured from the earlier of actual opening date or the date by which the Store is required to be open) | Financial Standards (adjusted every 6 mos.) |
|---|---|
| Less than One Year | 50% of PUA* |
| One Year or More, But Less Than Two Years | 65% of PUA* |
| Two Years or More | 75% of PUA* |

*"PUA" or "Per Unit Average" – The average Gross Volume for all CARTRIDGE WORLD Stores in the United States during the most recent six (6) month period before the measuring date.

D. Changes to elements of the Financial or System Standards may be made with six months written advance notice to you. Such revisions may include, but are not limited to, changes in PUA percentages, measurement periods or geographical areas.

E. <u>Correction Process</u>

1) If we notify you of your failure to meet the then-current average System Standards Score in a scored category and/or the applicable Financial Standard, then you will have six (6) months from our delivery of written notice to meet all applicable Financial and System Standards.

2) We will reasonably cooperate with and assist you in your efforts to meet your performance objectives. You may experience certain costs, such as travel, meals, lodging and any other related expenses, associated with extra on site consultation, retraining programs or other activities

F. If at the end of such six (6) month correction period your CARTRIDGE WORLD Store does not meet the average CARTRIDGE WORLD System Standards score for any category and/or the then applicable Financial Standards, then we may elect to Terminate this Agreement. You will have one

hundred twenty (120) days after the end of such Six (6) Month Correction Period to complete a sale of your franchise to a third party if:

1)   You provide us written notice of your desire to sell your franchise within 10 days of the expiration of such six (6) month correction period along with a General Release signed by you and each of your owners and Affiliates; and

2)   Any such transfer meets all requirements of this Agreement, including those provided in Article 14.3, above.

G. If you do not provide us the notice described in 16.5 F.1, above, or complete an authorized sale within the 120 day period provided in 16.5 F, above, then we may elect to Terminate this Agreement immediately upon delivery of written notice to you in accordance with Article 20, below.

H.   Nothing in this Section is intended to limit or diminish in any way any rights or remedies provided us under this or any other agreement, at law or in equity.   The fact that any correction process may be ongoing shall not prevent us from exercising any such rights and/or remedies, including any right to Terminate this Agreement for another default under this or any other agreement.

**16.6     Non Exclusive Remedies.**  Whenever we have a right to Terminate this Agreement, we (and any Franchisor Related Person/Entity) will have all remedies allowed at law and in equity.  No right or remedy which we may have (including Termination) is exclusive of any other right or remedy, and we may pursue any rights and/or remedies available.  In every instance in which we have the right to Terminate this Agreement under this Article 16, we may elect in our Business Judgment to cancel any and/or all of your territorial or similar rights (including, but not limited to, any rights-of-first-refusal), whether arising under this Agreement or in any other manner or document.

**16.7     No Equity on Termination, etc.**  Your rights regarding the Franchise are controlled by the provisions of this Agreement.   You will have no equity or any other continuing interest in the Franchise, any goodwill associated with it, or any right to compensation or refunds at the expiration and/or Termination of the term of the Franchise.

**16.8     Extended Cure Period.**  Notwithstanding anything to the contrary in this Agreement, we reserve the right to grant to you in our Business Judgment an extended cure period for any breach.  You acknowledge that our decision to grant such an extended cure period shall not operate as a waiver of any of our rights and that we may choose to condition such any such an extension upon the signing of a General Release by you, each owner and Affiliates of yours.

**16.9     Management of the Store After Issuance of Notice of Default.**

A.   If we issue a notice of default, we will have the right (but not the obligation) to manage your CARTRIDGE WORLD Store until you have cured all defaults.  All revenues received by the CARTRIDGE WORLD Store while we (or our designee) are managing it will be kept in a separate fund.    All CARTRIDGE WORLD Store expenses, including compensation, travel and living expenses for our appointed manager, may be paid out of such fund.  We shall be paid Five Hundred Dollars ($500.00)/day as a management fee (subject to adjustment as provided in Section 9.6).  If such fund is insufficient to pay CARTRIDGE WORLD Store expenses, we shall notify you. You shall, within five (5) business days, deposit such amounts as shall be required by us to attain a reasonable fund balance.

B.   Operation of the CARTRIDGE WORLD Store by us during any such period shall be on your behalf; provided that we shall only have a duty to use reasonable efforts and shall not be liable to any creditor of yours or for any debts, losses or obligations incurred by the CARTRIDGE WORLD Store. This Section 16.9 shall not limit our right to Terminate this Agreement as herein provided or affect any of our indemnity or other rights under this Agreement.

**16.10   Our Right To Discontinue Supplying Items Upon Default.** We and any Franchisor Related Persons/Entities have the right, in addition to all other rights and remedies, to require upon the issuance of a default that you pay C.O.D (i.e., cash on delivery) or by certified check for any goods/services related to the operation of your Franchise Business.  We and any Franchisor Related Persons/Entities also have the right to stop selling and/or providing any goods and/or services to you until you have cured all defaults.

**16.11   Termination, Expiration, or Repurchase of Our Master Franchise Agreement.** On any Repurchase, Termination or expiration of the Master Franchise Agreement between us and CWNA, CWNA may terminate any or all Unit Franchise Agreements if it elects not to continue to regularly award Franchises and maintain a Franchise program for Cartridge World Stores in your state/country/Territory. CWNA may make a good faith determination that continued franchising (on a national, regional or other basis) is not appropriate for reasons that relate to its economic or other interests (a "General Market Withdrawal").  You agree that if any statute or court decision requires "good cause" (or any similar standard) for non-renewal or termination, such a good faith determination by CWNA will be considered to be good cause.  A General Market Withdrawal will be deemed to have occurred if CWNA makes a general public announcement of its withdrawal and provides written notice to all franchisees within the area in which the withdrawal is to be effective (although CWNA may award (or permit the award of) renewal or Successor Franchises where an older form of Master/Unit Franchise Agreement or otherwise requires it to do so, or continue to service existing Franchisees under outstanding agreements).

**17.   RIGHTS AND OBLIGATIONS ON TRANSFER, REPURCHASE, TERMINATION AND/OR EXPIRATION OF THE FRANCHISE.**

**17.1   Payments of All Amounts Owed, etc.**   You must pay all royalties, marketing contributions and all amounts of any kind owed to us and/or any Franchisor Related Persons/Entities within ten (10) days after the Repurchase, Termination or expiration of the Franchise, or from a later date when the amounts due can be determined.

**17.2   Intellectual Property, Confidential Information, Trade Dress, etc.** After any Transfer, Repurchase, Termination or expiration of the Franchise:

A.   You agree to immediately and permanently discontinue your CARTRIDGE WORLD business and any use of the Intellectual Property and/or the Confidential Information, as defined in Article 1.2, and will not use any similar or derivative marks, or materials, or colorable imitations of any of the Intellectual Property in any medium or manner or for any purpose;

B.   You will return to us or (at our option) destroy all software, Manuals, forms, materials, signage and any other items containing any Intellectual Property or Marks, or otherwise identifying or relating to a CARTRIDGE WORLD Store (to the extent they have not been assigned in connection with an authorized Transfer or a Repurchase);

C.   You will take such actions as may be required to cancel all fictitious or assumed name or equivalent registrations relating to your use of any Mark which have not been assigned in connection with an authorized Transfer or a Repurchase;

D.   You will remove from the Premises any distinctive signage, physical and/or structural features associated with the Trade Dress of CARTRIDGE WORLD Stores (and remodel, repaint, or otherwise alter the appearance of the Premises), so that the Premises are clearly distinguished from other CARTRIDGE WORLD Stores and do not create any public confusion (to the extent they have not been assigned in connection with an authorized Transfer or a Repurchase);

E.   You agree not to identify yourself, or any business you may operate or in which you may become involved, or to advertise or promote yourself in any manner, as a present or former CARTRIDGE WORLD franchisee;

F.   You will furnish to us within thirty (30) days satisfactory evidence of your compliance with the obligations described in this Section 17.2 and in Section 17.3, below.  If you operate any business using any of the Intellectual Property, Marks, Confidential Information or any aspect of the System, our remedies will include (but will not be limited to) recovery of the greater of i) all profits earned by you in the operation of such business, or ii) all royalties, advertising contributions and other amounts which would have been due if this Agreement remained in effect with you.

### 17.3    Telephone and Other Directory Listings, Internet Sites.

A.   You understand and agree that we own all telephone numbers, domain names, Internet addresses/sites and/or other communications services links (collectively, the "Numbers"), and any related directory listings/advertising, used in connection with the operation of your CARTRIDGE WORLD Store.  We may in our Business Judgment require you to sign an assignment of such Numbers prior to training or at another time.  After any Termination, Repurchase and/or expiration of the Franchise, you will promptly transfer, call-forward, discontinue or otherwise deal with the Numbers and any related directory listings/advertising as we direct.  You agree to sign any documents and/or pay any amounts required by a telephone/communication services provider as a condition to our dealing with the Numbers and any related directory advertising/listings.  By signing this Agreement, you irrevocably appoint us your attorney in fact to take any such actions regarding the Numbers and any related directory listings/advertising if you do not do so yourself within ten (10) days after the Termination, Repurchase or expiration of this Franchise.  Such companies may accept this Agreement as conclusive evidence of our exclusive rights in such Numbers and related directory listings, web pages and advertising/marketing.

B.   If we choose at any time to be direct billed by a provider for any account for the Numbers and/or directory listings/advertising, you agree to pay us all amounts due such providers within ten (10) days of our written notice to you.  If you fail on two or more occasions to pay any such amounts to us when due, then we may require you to maintain a deposit with us in an amount reasonably determined by us based upon usage history and other relevant factors.

### 17.4    Continuing Obligations.

A.   All obligations and rights which expressly or by their nature survive the Transfer, Repurchase, expiration or Termination of this Agreement will continue in full force and effect until they are satisfied or by their nature expire (including but not limited to indemnity, non-competition and confidentiality rights and obligations; obligations to pay and the provisions of Articles 19 and 21).  These obligations continue notwithstanding any rejection of this Agreement in a bankruptcy proceeding or otherwise.

B.   If this Agreement is Terminated because of a default of yours, you will not be released or discharged from your obligations, including payment of all amounts then due and other amounts which would have become due under this Agreement if you had continued in operation as a CARTRIDGE WORLD Franchise for the full term.  Our remedies will include (but are not limited to) the right to collect the present value of these amounts and to receive the benefit of our bargain with you, as well as to accelerate the balances of any promissory notes owed and to receive any other unpaid amounts owed to us or any Affiliates of ours.  You and we agree that it would be commercially unreasonable and damaging to the integrity of the CARTRIDGE WORLD system if a CARTRIDGE WORLD Franchisee could default and then escape the financial consequences of his contractual commitment to meet payment obligations for the term of the Agreement.  You (and each of your owners/Affiliates) agree to sign a General Release if we choose in our Business Judgment to waive our rights to collect any amounts that would have become due if you had continued in operation as a CARTRIDGE WORLD Franchisee.  This option of ours may be exercised at any time.

I have read Sec. 17.1–17.4, understand them, and agree with them.

Your Initials: _____ / _____

## 18. GRANT OF SECURITY INTEREST.

For valuable consideration, as security for the payment of all amounts owing or to be owed by you (and/or any Affiliate of yours) to us (and/or any Affiliate/Related Company of ours) under this Agreement or any other agreements, and your performance of all obligations thereunder, you hereby grant to us a security interest in all proceeds of your CARTRIDGE WORLD Store and in all of the assets, including equipment, furniture, fixtures and signs, used by, at or in connection with, your CARTRIDGE WORLD Store and its related business and (the "Collateral").  You will not remove the Collateral or any portion thereof without our prior written consent.  You represent and warrant that the security interest granted is prior to all other security interests in the Collateral except for (a) bona fide purchase money security interests and (b) the security interest granted to a third party in connection with your original financing for your CARTRIDGE WORLD Store, if any.  In connection with any request for our approval of a security interest, we will make commercially reasonable efforts to accommodate reasonable lender's requirements, including the subordination of our interests to the lender's and/or lessor's, as applicable, in our Business Judgment, bearing in mind the interests of the borrower, lender, ourselves and the System.  On the occurrence of any event entitling us to Terminate this Agreement or any other agreement between the parties, or if we reasonably determine that we are not assured that your (and/or any Affiliates') obligations will be timely and fully paid and/or performed, we will have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which your CARTRIDGE WORLD Store is located, including, without limitation, the right to take possession of the Collateral.  You will execute and deliver to us financing statements and/or such other documents as we reasonably deem necessary to perfect our interest in the Collateral within ten (10) days of your receipt of such documents from us.

I have read Art. 18, understand it, and agree with it.

Your Initials: _____ / _____

## 19. DISPUTE AVOIDANCE AND RESOLUTION.

For the purposes of this Article 19, "you" shall be deemed to include your owners, Affiliates and their respective employees, and "we" shall be deemed to include "Franchisor Related Persons/Entities."

19.1 **MEDIATION AND MANDATORY BINDING ARBITRATION, WAIVER OF RIGHT TO TRIAL IN COURT, etc.**  You and we believe that it is important to resolve any disputes amicably, quickly, cost effectively and professionally and to return to business as soon as possible.  You and we have agreed that the provisions of this Article 19 support these mutual objectives and, therefore, agree as follows:

A. Claim Process:  Any litigation, claim, dispute, suit, action, controversy, or proceeding ("Claim") between or involving you and us on whatever theory and/or facts based, and whether or not arising out of this Agreement, will be processed in the following manner, except as expressly provided below at Section 19.1 H.

1) First, discussed in a face-to-face meeting held within 30 days after either you or we give written notice to the other proposing such a meeting.

2) <u>Second</u>, if not resolved, submitted to non-binding mediation for a minimum of eight hours before i) Franchise Arbitration and Mediation, Inc. ("FAM") or its successor (or an organization designated by FAM or its successor), or ii) any other mediation organization approved by all parties, or iii) by Judicial Arbitration and Mediation Service (JAMS) or its successor (or an organization designated by JAMS or its successor), if FAM cannot conduct such mediation and the parties cannot agree on a mediation organization. Any mediation/arbitration (and any appeal of arbitration) will be conducted by a mediator/arbitrator experienced in franchising. Any party may be represented by counsel and may, with permission of the mediator, bring persons appropriate to the proceeding. If both you and we do not want to participate in mediation, then you and we may proceed to arbitration as provided below.

3) <u>Third</u>, <u>submitted to and finally resolved by binding arbitration</u> before and in accordance with the arbitration rules of FAM or its successor (or an organization designated by FAM or its successor); provided that if such arbitration is unable to be heard by any such organizations, then the arbitration will be conducted before and in accordance with the arbitration rules of JAMS or its successor (or an organization designated by JAMS or its successor). All arbitrators shall be experienced in franchising. On election by any party, arbitration and/or any other remedy allowed by this Agreement may proceed forward at the same time as mediation. Judgment on any preliminary or final arbitration award will be final and binding, and may be entered in any court having jurisdiction (subject to the opportunity for appeal as contemplated below).

4) <u>Fourth</u>, a final award by an arbitrator (there will be no appeal of interim awards or other interim relief), may be appealed within thirty (30) days of such final award. Appeals will be conducted before a three (3) arbitrator panel appointed by the same organization as conducted the arbitration, each member of which shall be experienced in franchising. The arbitration panel will not conduct any trial de novo or other fact-finding function. Such panel's decision may be entered in any court having jurisdiction and will be binding, final and non-appealable.

B.  <u>Confidentiality</u>: The parties to any meeting/mediation/arbitration will sign confidentiality agreements, excepting only public disclosures and filings as are required by law.

C.  <u>Location and Attendees</u>: Any mediation/arbitration (and any appeal) will be conducted exclusively at a location at or near our headquarters (which location may change at any time as a result of our possibly moving our headquarters in the future and which may be a substantial distance from your location), and be attended by you and us, and/or designees authorized to make binding commitments on each of our respective behalf.

D.  <u>Arbitration Authority</u>: Arbitrators in any proceeding under this Article 19 shall apply all applicable law, and a failure to apply the applicable law in accord with Section 19.16 shall be deemed an act in excess of authority. The arbitrator shall decide any questions relating in any way to the parties' agreement (or claimed agreement) to arbitrate, including but not limited to applicability, subject matter, timeliness, scope, remedies, claimed unconscionability and any alleged fraud in the inducement. The arbitrator may issue summary orders disposing of all or part of a claim and provide for temporary restraining orders, preliminary injunctions, injunctions, attachments, claim and delivery proceedings, temporary protective orders, receiverships and/or interim/final relief. Each party consents to the enforcement of such orders, injunctions, etc. by any court having jurisdiction. The subpoena powers of the arbitrator with respect to witnesses to appear at the arbitration proceeding shall not be subject to any geographical limitation.

E.  <u>Discovery</u>: The disputants shall have the same discovery rights as are available in civil actions under the state law selected in Section 19.16.

F.  <u>Compulsory Counter-claims</u>: Each participant must submit or file any claim that would constitute a compulsory counter-Claim (as defined by the applicable rule under the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such Claim that is not

submitted or filed in such proceeding will be forever barred. In no event may offers and/or other communications made in connection with, or related in any way to, mediation, possible settlement or other resolution of a dispute be admitted into evidence or otherwise used in any arbitration or other proceeding, and any arbitration award in violation of this provision shall be vacated by the arbitration appeal panel (described above) and/or any court having jurisdiction.

G. Fees and Costs: The fees and expenses of the mediator(s), arbitrator(s), mediation organization and/or arbitration organization shall be shared equally by the parties and the parties will bear their own costs, including attorneys fees, except in the following instances:

1) the party who seeks a mediation, arbitration and/or court proceeding shall deposit $10,000 (subject to inflation adjustment) with the applicable organization (and/or with the court) to cover the costs and fees charged (or to be charged) by such organization. Such deposit shall be factored into the appropriate allocation of costs as described in this Subsection 19.1 G;

2) any party to a Claim who requests that the arbitrator issue a written award specifying the facts found and the law applied will bear the arbitrator's fees and charges incurred in connection therewith; and

3) any party who seeks an appeal shall deposit $10,000 (subject to inflation adjustment) with the applicable organization to cover the costs and fees charged (or to be charged) by such organization in connection with an appeal. Such deposit shall be factored into the appropriate allocation of costs as described in this Subsection 19.1 G. If such party does not prevail on appeal, such party shall be solely responsible for all cost and fees of the appeal (but not for the non-appealing party's attorneys' fees). This provision is inapplicable to matters resolved by settlement agreement.

Failure to pay/deposit any amounts in connection with any dispute resolution procedures shall be a default under this Agreement.

H. Disputes Not Subject to the Mediation/Arbitration Process: Claims or disputes relating primarily to the validity of the Marks and/or any Intellectual Property licensed to you may be subjected to court proceedings or to the Process outlined in 19.1 A, above, at our sole election. Claims relating to a disputant's rights to possession of any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) may be subjected at the claiming party's election to court proceedings or to the Process outlined in 19.1 A, above. An action to compel a party's compliance with 19.1 A 1, above, may only be subjected to court proceedings consistent with Section 19.2, below.

I. Your and Our Intentions: You and we mutually agree (and have expressly had a meeting of the minds) that, notwithstanding any contrary provisions of state, or other law, and/or any statements in our Offering Circular required by a state as a condition to registration or for some other purpose,:

1) all issues relating to arbitration and/or the enforcement of arbitration-related provisions of this Agreement will be decided by the arbitrator (including all Claims that any terms were procured by fraud or similar means) and governed only by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration and exclusive of state statutes and/or common law;

2) all provisions of this Agreement (including, but not limited to, Articles 19 and/or 21) shall be fully enforced, including (but not limited to) those relating to arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, shortened periods in which to bring Claims;

3) you and we intend to rely on federal preemption under the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and, as a result, the provisions of this Agreement will be enforced only according to its terms;

4) **you and we each knowingly waive all rights to a court trial** understanding that arbitration may be less formal than a court or jury trial, may use different rules of procedure and evidence and that appeal is generally less available, but still strongly preferring mediation and/or arbitration as provided in this Agreement; and

5) the terms of this Agreement (including but not limited to this Article 19) shall control with respect to any matters of choice of law.

**19.2** **Venue.** Without in any way limiting or otherwise affecting your and our obligations under Section 19.1, above, you and we agree that any litigation will be held in the United States District Court encompassing our then-current headquarters (the "Proper Federal Court") Proceedings will be held only in the Proper Federal Court, subject to the following exceptions:

A. if a basis for federal jurisdiction does not exist, then any such proceeding shall be brought exclusively before a court in the most immediate state judicial district encompassing our then-current headquarters and having subject matter jurisdiction (the "Proper State Court");

B. proceedings to remove or transfer a matter to the Proper Federal Court and/or to compel arbitration as contemplated by this Agreement may be brought in the court where the applicable action is pending and/or the Proper State or Federal Court; and

C. any action to obtain possession of any real and/or personal property (including any action in unlawful detainer, ejectment or otherwise) may be brought in any court of competent jurisdiction and/or the Proper State or Federal Court.

**19.3** **Terms Applicable to All Proceedings.** With respect to any arbitration, litigation or other proceeding of any kind, you and we:

A. knowingly waive all rights to trial by jury;

B. knowingly waive any right to make any claims of any kind for, and/or to recover, punitive, exemplary, multiple, pain-and-suffering, mental distress, incidental, consequential, special, lost income and/or profits (except as expressly provided in 19.4 A, below) and/or similar damages under any theory whatsoever, as such claims are generally speculative and subject to abuse;

C. will pursue any such proceeding on an individual basis only, and not on a class-wide or multiple plaintiff basis.

**19.4** **Limitations on Damages and/or Remedies.**

A. Damages. We shall be entitled to recover the present value of all payments which normally would have been owed by you if the franchise had continued in existence for its full term, together with any past due payments owed to us and/or any Affiliate (in addition to any other remedies available to us in accordance with this Agreement and applicable law). However, your maximum liability, and that of any and all Affiliates of yours, will be limited to $100,000 total, for any claim, whenever brought, subject to inflation adjustment; provided that there shall be no such limitation on indemnity obligations. Our maximum liability, and that of any and all of the Franchisor-Related Persons/Entities, will be limited to $100,000 total, for any and all claims, whenever brought, subject to inflation adjustment. The terms of this paragraph are subject to the provisions of Section 19.6, below.

B. Your Remedy for Wrongful Termination. Nothing in this Agreement shall be construed as limiting your right to seek recourse in the manner set forth in Section 19.1 for an allegedly wrongful termination by us of your rights under this Agreement. Remedies available to you in the event of a finding of wrongful

termination of this Agreement by us are exclusively limited to reinstatement as a franchisee and to an award of actual damages subject to the limitations described in 19.4 A, above.

C. <u>Exclusive Remedy Regarding Our Consent Actions</u>. Your sole remedy for any Claim involving our withholding or delaying of any consent or approval is for the arbitrator to order such consent. Unless otherwise expressly provided in this Agreement, approvals and consents by us may be granted/withheld in our Business Judgment.

D. <u>Actions to Compel a Meeting</u>. The sole remedy for any Claim to compel a meeting pursuant to Section 19.1 A. 1 shall be an order requiring that such meeting take place, and no such Claim may be brought once a mediation or arbitration proceeding has commenced.

19.5 <u>Prior Notice of Claims by You</u>. You and we agree that before you take any legal or other action against us, <u>you will first give us written notice and thirty (30) days to cure such alleged act or omission</u>. If such alleged act or omission cannot reasonably be corrected within such thirty (30) day period and we are diligently continuing efforts to cure, then we shall have ninety (90) calendar days after such written notice is received to cure such alleged act or omission; provided that a) any dispute regarding our withholding consent with respect to a proposed transfer by you, or any other dispute in which delay may cause you significant harm or loss, may be immediately processed as provided in Section 19.1, above; and b) any claim for equitable relief with respect to a dispute under Subsection 19.1 (H) shall not be subject to this Section 19.5.

19.6 <u>Periods In Which to Make Claims</u>.

A. You must comply with the provisions of Section 19.5, above, or be barred from bringing any action or proceeding against us and/or any Affiliates of ours. Also, no arbitration, action or suit (whether by way of Claim, counter-claim, cross-complaint and raised as an affirmative defense, offset or otherwise) by either you or us will be permitted against the other, whether for damages, rescission, injunctive or any other legal and/or equitable relief, in respect of any alleged breach of this Agreement, or any other Claim of any type, unless such party commences such arbitration proceeding, action or suit before the expiration of the <u>later</u> of:

1) One (1) year after the date on which the state of facts giving rise to the cause of action comes to the attention of, or should reasonably have come to the attention of, such party; or

2) One (1) year after the initial occurrence of any act or omission giving rise to the cause of action; but

3) In no event shall any Claim be brought later than eighteen months after the event or occurrence giving rise to the Claim, whenever discovered.

If any federal, state or other law provides for a shorter limitation period than is described in this Subsection 19.6 A, then such shorter period will govern.

B. The limitations set forth in this Section 19.6 will <u>not</u> apply to Claims arising from or related to confidentiality, non-competition and/or indemnification obligations under this Agreement, and/or protection of the Marks.

19.7 <u>Survival of Obligations</u>.

A. Each provision of this Article 19, together with the provisions of Article 21, will be deemed to be self-executing and continue in full force and effect subsequent to and notwithstanding the expiration, Termination, rescission, or finding of unenforceability of this Agreement (or any part of it) for any reason; will survive and will govern any Claim for rescission; and will apply to and govern any Claim against, or with respect to, the Marketing Fund. Notwithstanding any bankruptcy or other proceeding, you and we

wish to have the dispute avoidance and resolution provisions of this Agreement strictly enforced according to their terms.

B. Non-competition, confidentiality, protection of the Marks and indemnity/hold harmless obligations provided in this Agreement shall survive the expiration and/or Termination of this Agreement according to their terms. To the maximum extent permitted by law, the effect of any statute of limitations which would, by lapse of time, limit such duties is hereby waived by you and us.

19.8 **Costs and Attorneys' Fees.** Except as expressly provided regarding recovery of attorneys' fees as part of indemnification rights hereunder, or in this Section 19.8, or as otherwise expressly provided in this Agreement, the parties will each bear their own costs of enforcement and/or defense (including but not limited to attorney's fees) in any claim or dispute between you and us, including those matters resolved pursuant to a settlement agreement between the parties. However, if any such case is summarily disposed of in an arbitration or litigation proceeding for lack of merit (such as by summary judgment or award, judgment on the pleadings, judgment n.o.v., non-suit, motion to dismiss, directed verdict or similar disposition in arbitration or court), the party bringing such case shall pay for the other party's costs of enforcement and/or defense (including but not limited to attorney's fees.)

19.9 **Binding Effect, Modification.** This Agreement is binding on the parties hereto and their respective executors, administrators, heirs, assigns, and successors in interest, and will not be modified or supplemented except by means of a written agreement signed by both you and our President or one of our Vice Presidents. However, you and we understand and agree that changes to the Manuals made in accordance with this Agreement are binding and do not require any acceptance by you, written or otherwise, to be effective and enforceable. No other officer, field representative, salesperson or other person has the right or authority modify this Agreement, or to make any representations or agreements on our behalf, and any such modifications, representations and/or agreements shall not be binding.

19.10 **Our Exercise of "Business Judgment" and/or Meaning of "Sole Discretion"; Express Agreement.**

A. When we use the phrases "sole and absolute discretion", "sole discretion" and/or "Business Judgment", whether in this Agreement or another context, you and we agree that we have the wholly unrestricted right to make decisions and/or take (or refrain from taking) actions. We shall use our judgment in exercising such discretion based on our assessment of the interests we consider appropriate and will not be required to consider your individual interests or the interests of any other particular franchisee(s). You, we and all other franchisees have a collective interest in working within a franchise system with the flexibility to adjust to business conditions, including but not limited to the competitive environment, new regulatory developments and emerging business opportunities. Therefore, you and we agree that the ultimate decision-making responsibility for the CARTRIDGE WORLD System must be vested in us. No franchisee or other party (including any third party acting as an arbitrator or trier of fact) is entitled to substitute its judgment for ours, so long as we act in compliance with all legal requirements. We shall have no liability for the exercise of our discretion in accordance with the provisions of this Agreement.

B. You and we shall execute this Agreement in the belief that it is the basis for a long-term business relationship and should be enforced according to its express provisions. Neither you nor we have any expectation that the rights and obligations described herein will be defined or determined to be other than as expressly written. Therefore, you and we expressly agree to waive any "implied covenant of good faith and fair dealing," or any similar doctrine or rule of interpretation in any construction of this Agreement. If this mutual waiver is unenforceable for any reason, you and we agree that upon the imposition of any "implied covenant of good faith and fair dealing," or any similar doctrine or rule of interpretation, whether by court decision, arbitrator or otherwise, then such imposition will be against our agreement and meeting of the minds on this subject and the party against whom such law or covenant is applied shall have the right to Terminate this Agreement immediately and without liability by providing written notice to the other.

C. The provisions of this Section 19.10 may be pleaded as a defense to any applicable claim for breach.

### 19.11  Construction, etc.

A. Section and Article headings are for convenience only and do not define, limit, or construe such provisions.

B. References to a "controlling interest" are to a shareholder, membership or partnership interest, as applicable, which enables the holder(s) of such interest to determine the outcome of a decision making process for the applicable entity.

C. This Agreement will be executed in multiple copies, each of which will be deemed an original.

D. Each of us have carefully reviewed and thought about each provision of this Agreement. Therefore, you and we agree that it should be deemed to have been drafted equally and that no presumptions or inferences concerning terms or interpretation will result because we initially prepared this Agreement.

**19.12  Non-Retention of Funds.**  You do not have the right to offset or withhold payments of any kind owed or to be owed to us against amounts purportedly due you from us as a result of any dispute of any nature or otherwise, except as authorized by an arbitration award in your favor.

**19.13  Severability; Substitution of Valid Provisions.**  Each provision of this Agreement, and any portion of any provision, is severable (including, but not limited to, any provision related to dispute resolution). Each party reserves the right to challenge any law, rule or judicial or other construction which would have the effect of varying or rendering ineffective any provision of this Agreement. To the extent that any provision of this Agreement, or any specification, standard or operating procedure prescribed by us, is invalid or unenforceable, you and we agree that such provisions will be enforced to the fullest extent permissible under governing law. This Agreement will be deemed automatically modified to comply with governing law if such law requires: i) a greater time period for notice of the Termination of, or refusal to renew, this Agreement; or ii) the taking of some other action not described in this Agreement. Such modifications to this Agreement shall be effective only in such jurisdiction. You and we agree that we may modify any invalid or unenforceable provision to the extent required to be valid and enforceable, and you and we will be bound by the modified provisions. You and we agree that the unenforceability of any provision of this Agreement will not affect the remainder of this Agreement. If any limitation on your and/or our rights (including, but not limited to, any limitation on damages, waiver of jury trial, shortened period in which to make any claim or otherwise) is held unenforceable with respect to one party, then such limitation will not apply to the other party.

**19.14  Waivers; Cumulative rights.**  Subject to the provisions of Section 19.6, no waiver by either party of any breach, default or unfulfilled condition under this or any other agreement between the parties shall be deemed a waiver of any subsequent or other breach, default or unfulfilled condition. No waiver shall be effective unless in writing and signed by an authorized representative of the signing party. The rights and remedies provided in this Agreement are cumulative. Except as expressly provided in this Agreement, no party will be prohibited from exercising any rights or remedies provided under this Agreement or permitted under law or equity.

**19.15  Choice of Laws.**  You and we agree on the practical business importance of certainty as to the law applicable to your and our relationship and its possible effect on the development and competitive position of the System. Therefore, you and we also agree that, except with respect to the applicability of the Federal Arbitration Act, 9 U.S.C. § 1 et seq. and the effect of federal pre-emption of state law by such Act, and except to the extent governed by the United States Trademark Act and other

federal laws and as otherwise expressly provided in this Agreement, this Agreement and all other matters, including, but not limited to respective rights and obligations, concerning you and us, will be governed by, and construed and enforced in accordance with, the laws of California.

You and we agree that this provision shall be enforced without regard to the laws of such state relating to conflicts of laws or choice of law; except that the provisions of any law of that state regarding franchises (including, without limitation, registration, disclosure, and/or relationship laws) shall not apply unless such state's jurisdictional, definitional and other requirements are met independently of, and without reference to, this Section.

19.16   **Application of Agreement to Parties and Others; Joint and Several Liability.**

A.   The rights and obligations of this Agreement run directly between you and us and are not intended to create any third-party beneficiary or similar rights or obligations unless specifically expressed in this Agreement; except that the protections which apply to us relating to indemnification and/or releases shall also apply to any past, current and/or future Franchisor-Related Persons/Entities as if they were expressly named beneficiaries thereof.

B.   We have the right to elect in our Business Judgment to not enforce (or to selectively enforce) any provision of this or any Agreement, standard or policy, whether with respect to you and/or any other franchisee or other person, in a lawful manner without liability.

C.   If two or more persons are at any time the Franchisee or the Franchisee owners, all of their obligations and liabilities under this or any other agreement with us and/or any Franchisor-Related Persons/Entities will be joint and several.

> **I have read Sec. 19.1–19.16, understand them, and agree with them.**
>
> Your Initials: _____ / _____

## 20.   NOTICES AND PAYMENTS.

All written notices and reports to be delivered by the provisions of this Agreement or of the Manuals will be deemed so delivered when delivered by hand, immediately on transmission by facsimile transmission or other electronic system, including e-mail or any similar means, one (1) business day after being placed in the hands of a commercial courier service for overnight delivery, or three (3) business days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to us at CARTRIDGE WORLD Master Franchise, _____ (or our then-current headquarters), to the attention of the President, and to you, at your CARTRIDGE WORLD Store. Until your CARTRIDGE WORLD Store has opened for business, we may send you notices at any address appearing in your application for a franchise or in our records. Any required payment or report not actually received by us during regular business hours on the date due will be deemed delinquent. Notice to any one Franchisee, or owner of the Franchise, shall be deemed effective as to all Franchisees under this Agreement and all owners of the Franchise(s). Any party may change its address for receipt of notices by providing prior written notice of such change to the other party.

## 21.   ACKNOWLEDGMENTS AND REPRESENTATIONS, ENTIRE AGREEMENT, NO FIDUCIARY RELATIONSHIP, ETC.

A.   You and we agree that your and our relationship is not a fiduciary or similar special relationship, but rather is an ordinary commercial relationship between independent business people with arms length dealings.

B. You acknowledge that you (and each of your owners, if you are a business entity) have had the opportunity and been advised by us to have this Agreement and all other documents reviewed by your own attorney, and that you've read, understood, had an opportunity to discuss and agreed to each provision of this Agreement. You agree that you've been under no compulsion to sign this Agreement.

C. You and we expressly acknowledge and agree that the provisions of Article 19, above, [whether relating to arbitration, mediation, waiver of jury trial, venue, limitations on damages, prohibition against multiple plaintiff-class actions, shortened statutes of limitation, and/or otherwise] may require you to travel to a distant location to resolve a dispute, expend additional funds, and/or raise challenges for you and/or us in prosecution of claims/actions. You and we view these provisions in the context of a diverse franchise system with both large and small, sophisticated and unsophisticated participants, and that requires uniformity and predictability. As such, you and we knowingly accept such provisions and limitations as justified by business necessities and representative of a reasonable balancing of your and our interests, and those of the System as a whole, and not as unfair or burdensome.

D. You and we agree that this Agreement contains the final, complete and exclusive expression of the terms of your and our agreement (along with concurrently signed writings, such as but not limited to personal guarantees, Statement of Prospective Franchisee, addenda, exhibits, releases and any other related documents {collectively, the Related Documents}) and supersedes all other agreements and/or representations of any kind or nature. Any understandings, agreements, representations, or otherwise (whether oral or written) which are not fully expressed in this Agreement and the Related Documents are expressly disclaimed by you and us, including but not limited to any promises, options, rights-of-first refusal, guarantees, and/or warranties of any nature (excepting only the written representations made by you in connection with your application for this franchise). Neither you nor we believe it to be fair or reasonable for the other party to have to deal with allegations about understandings, representations, etc. not fully expressed in writing in this Agreement.

E. You specifically acknowledge that you have not received or relied on (nor have we or anyone else provided) any statements, promises or representations that you will succeed in the franchised business or at any location; achieve any particular sales, income or other levels of performance; earn any particular amount, including any amount in excess of your initial franchise fee or other payments to us; or receive any rights, goods, or services not expressly set forth in this Agreement.

F. You represent, warrant and agree that no contingency, prior requirement, or otherwise (including but not limited to obtaining financing) exists with respect to you fully performing any or all of your obligations under this Agreement. You further represent to us, as an inducement to our entering into this franchise relationship, that you have made no misrepresentations or material omissions in obtaining the Franchise.

Your Initials: _____ / _____

G. You acknowledge that you have not received or relied on (nor have we or anyone else provided, except as may have been contained in the Uniform Franchise Offering Circular received by you):

1) any sales, income or other projections of any kind or nature; or

2) any statements, representations, charts, calculations or other materials which stated or suggested any level or range of sales, income, profits or cash flow; or

3) any representations as to any profits you may realize in the operations of the Franchised Business or any working capital or other funds necessary to reach any 'break-even' or any other financial level.

If any such information, promises, representations and/or warranties have been provided to you, they are unauthorized and inherently unreliable. You agree to advise us of the delivery of any such information. You must not rely upon any such information, nor shall we be bound by it. We do not, nor do we attempt to, predict, forecast or project future performance, revenues or profits of any you or any franchisee. We are unable to reliably predict the performance of an CARTRIDGE WORLD Store even operated by us, and certainly cannot predict results for your CARTRIDGE WORLD Store.

Your Initials: _____ / _____

H. You acknowledge and agree that the success of the business venture contemplated to be undertaken by you is speculative and will be dependent on your personal efforts, and success is not guaranteed. You acknowledge and represent that you have entered into this Agreement and made an investment only after making an independent investigation of the opportunity, including having received a list with your Uniform Franchise Offering Circular of others currently operating, or who have operated, our franchises.

I. You acknowledge that you (and each of your owners) has received, fully read and understood, and all questions have been answered regarding, i) a copy of our Uniform Franchise Offering Circular with all exhibits at least ten (10) business days prior to signing any binding documents or paying any sums (whichever occurred first), and ii) a copy of this Agreement and all other agreements complete and in form ready to sign at least five (5) business days prior signing any binding documents or paying any sums (whichever occurred first).

Your Initials: _____ / _____

J. You understand, acknowledge and agree that (1) we may have offered franchises in the past, may currently be offering franchises and/or may offer franchises in the future, on economic and/or other terms, conditions and provisions which may significantly differ from those offered by this Agreement and any related documents and (2) there may be instances where we have varied, or will vary, the terms on which we offer franchises, the charges we (and/or our Affiliates/Related Companies) make or otherwise deal with our Franchisees to suit the circumstances of a particular transaction, the particular circumstances of that Franchisee or otherwise, in each case in our Business Judgment.

Your Initials: _____ / _____

K. You understand that we are relying on you to bring forward in writing at this time any matters inconsistent with the representations contained in this Article 21. You agree that if any of the statements or matters set forth in this Article 21 are not true, correct and complete that you will make a written statement regarding such next to your signature below so that we may address and resolve any such issue(s) at this time.

Your Initials: _____ / _____

L. You acknowledge and agree that the officers, directors, employees, and agents of the Franchisor and Related Companies act only in a representative capacity and not in an individual capacity, and that no other persons and/or entities other than the Franchisor has or will have any duties or obligations to you.

Your Initials: _____ / _____

IN WITNESS WHEREOF, you and we have executed and delivered this Agreement in _____ counterparts on the day and year first above written.

THIS AGREEMENT WILL NOT BECOME EFFECTIVE UNLESS AND UNTIL SIGNED BY THE PRESIDENT OR A VICE PRESIDENT OF FRANCHISOR. NO FIELD REPRESENTATIVE OR OTHER PERSON IS AUTHORIZED TO EXECUTE THIS AGREEMENT FOR FRANCHISOR.

FRANCHISOR:

**Wildwood Franchising, Inc.**
a California corporation

By: _____

Title: President

FRANCHISEE (Individual)

_____          _____
Signature                                                    Signature

_____          _____
Printed Name                                               Printed Name

FRANCHISEE (Corp., LLC or Partnership)

_____
Legal Name of Franchisee Entity

a_____     _____
Jurisdiction of Formation           Corporation, LLC or Partnership

By: _____
       Name

_____
       Signature

Title: _____

Exhibit 1

## OWNER'S GUARANTY AND ASSUMPTION OF CORPORATE FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, the execution by Wildwood Franchising, Inc. a California corporation, ("the Franchisor") of the franchise agreement (the "Franchise Agreement") between Franchisor and _____, a(n) _____ corporation (the "Corporate Franchisee"), each of the undersigned hereby personally and unconditionally, jointly and severally:

(1) guarantees to Franchisor, its Affiliates, the Franchisor-Related Persons/Entities (as defined in the Franchise Agreement) and each of their respective successors and assigns, for the term of the Franchise Agreement and thereafter as provided in the Franchise Agreement, that the undersigned will be personally bound by, and punctually pay and perform, each and every agreement and obligation set forth in the Franchise Agreement;

(2) agrees to be personally bound by, and personally liable for, the breach of, each and every provision in the Franchise Agreement;

(3) agrees to be personally bound by, and personally liable for, each obligation of the Entity Franchisee to Franchisor, its affiliates and/or any Franchisor Related Persons/Entities, and

(4) agrees that neither Franchisor, its Affiliates, and/or any Franchisor-Related Persons/Entities need to bring suit first against any of the undersigned in order to enforce the provisions of this Owner's Guaranty and Assumption of Franchisee's Obligations (the "Guaranty"), and each may enforce this guarantee against any or all of the undersigned as it chooses in its sole and absolute discretion.

Each of the undersigned waives presentment, demand, notice of dishonor, protest, nonpayment and all other notices whatsoever, including without limitation: notice of acceptance hereof; notice of all contracts and commitments; notice of the existence or creation of any liabilities under this Guaranty and/or otherwise and of the amount and terms thereof; and notice of all defaults, disputes or controversies between Entity Franchisee and Franchisor, and the settlement, compromise or adjustment thereof.

Further, each of the undersigned consents and agrees that:

(1) his or her direct and immediate liability under this Guaranty will be joint and several and shall not be relieved or diminished by any release or compromise of any liability of any of the other undersigned or of any party or parties primarily or secondarily liable under the Agreement, this Guaranty and/or otherwise;

(2) such liability will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time-to-time grant to the Entity Franchisee and/or to any other person, including without limitation the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable ;

(3) the liabilities and obligations of the undersigned, whether under this Guaranty or otherwise, will not be diminished or otherwise affected by the termination, rescission, expiration, renewal or modification of the Franchise Agreement;

(4) he or she will comply with the Post Termination Provisions of the Franchise Agreement, as that term is defined in the Franchise Agreement; and

(5) the provisions of Articles 19 and 21 the Franchise Agreement are incorporated in and will apply to this Guaranty as if fully set forth herein and shall apply to any dispute involving the Franchisor and any of the undersigned; provided that in all events the undersigned agrees to pay all expenses paid or incurred by Franchisor in enforcing the provisions of this Guaranty against the undersigned and in collecting or attempting to collect any amounts due hereunder, including reasonable attorneys' fees.

In connection with the execution of this Guaranty and with the Franchisor permitting the Franchise Agreement to be awarded to the Entity Franchisee in lieu of the undersigned, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the undersigned hereby grants a General Release of any and all claims, liabilities and/or obligations, of any nature whatsoever, however arising, <u>known or unknown,</u> against the Franchisor and/or any or all of the Franchisor-Related Persons/Entities.

Terms not defined in this Guaranty shall have the same meanings as in the Franchise Agreement.

IN WITNESS WHEREOF, each of the undersigned has here unto affixed his or her signature on the same date as the Franchise Agreement was executed.

GUARANTOR(S)                             PERCENTAGE OF OWNERSHIP
OF CORPORATE FRANCHISEE

_____          _____%

_____          _____%

_____          _____%

_____          _____%

Corporate Franchisee:

_____, a _____ (specify jurisdiction of formation) _____
(specify corporation, LLC, LLP or otherwise).

By _____

Its _____

Franchise Agreement Number: _____

**Exhibit 1.2**

**Current Form of
CARTRIDGE WORLD® Releasing Language
(subject to change)**

Release-General Provisions.  The Franchisee(s), jointly and severally, hereby release and forever discharge each and all of the Franchisor-Related Persons/Entities (as defined below) of and from any and all causes of action, in law or in equity, suits, debts, liens, defaults under contracts, leases, agreements or promises, liabilities, claims, demands, damages, losses, costs or expenses, of any nature whatsoever, howsoever arising, **known or unknown**, fixed or contingent, past or present, that the Franchisee(s) (or any of them) now has or may hereafter have against all or any of the Franchisor-Related Persons/Entities by reason of any matter, cause or thing whatsoever from the beginning of time to the date hereof (the "Claims"), it being the mutual intention of the parties that this release be unqualifiedly general in scope and effect and that any Claims against any of the Franchisor-Related Persons/Entities are hereby forever canceled and forgiven.

THE FRANCHISEE(S) ACKNOWLEDGE THAT THEY ARE FAMILIAR WITH THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

THE FRANCHISEE(S), BEING AWARE OF THIS CODE SECTION, HEREBY EXPRESSLY WAIVE ALL OF THEIR RIGHTS THEREUNDER AS WELL AS UNDER ANY OTHER STATUTES OR COMMON LAW PRINCIPLES OF SIMILAR EFFECT OF ANY APPLICABLE JURISDICTION, INCLUDING, WITHOUT LIMITATION, CALIFORNIA AND/OR [JURISDICTIONS OF FRANCHISEE(S)' RESIDENCE AND LOCATION OF FRANCHISED UNITS].

The Franchisee(s) expressly assume the risk of any mistake of fact or fact of which they may be unaware or that the true facts may be other than any facts now known or believed to exist by Franchisee(s), and it is the Franchisee(s) intention to forever settle, adjust and compromise any and all present and/or future disputes with respect to all matters from the beginning of time to the date of this document finally and forever and without regard to who may or may not have been correct in their understanding of the facts, law or otherwise.  All releases given by the Franchisee(s) are intended to constitute a full, complete, unconditional and immediate substitution for any and all rights, claims, demands and causes of action whatsoever which exist, or might have existed, on the date of this document. The Franchisee(s) represent and warrant that they have made such independent investigation of the facts, law and otherwise pertaining to all matters discussed, referred to or released in or by this document as the Franchisee(s), in the Franchisee(s) independent judgment, believe necessary or appropriate. The Franchisee(s) have not relied on any statement, promise, representation or otherwise, whether of fact, law or otherwise, or lack of disclosure of any fact, law or otherwise, by the Franchisor-Related Persons/Entities or anyone else, not expressly set forth herein, in executing this document and/or the related releases.

Franchisee(s) Initials: _____

No Assignment or Transfer of Interest.  The Franchisee(s) represent and warrant that there has been, and there will be, no assignment or other transfer of any interest in any Claims that the Franchisee(s) may have against any or all of the Franchisor-Related Persons/Entities, all Claims having been fully and finally extinguished, and the Franchisee(s) agree to forever indemnify and hold the

Franchisor-Related Persons/Entities harmless from any liability, claims, demands, damages, losses, costs, expenses or attorneys' fees incurred by any of the Franchisor-Related Persons/Entities as a result of any person asserting any interest in any of the Claims and/or any voluntary, involuntary or other assignment or transfer, or any rights or claims under any assignment, transfer or otherwise. It is the intention of the parties that this indemnity does not require payment by any of the Franchisor-Related Persons/Entities as a condition precedent to recovery against the Franchisee(s) under this indemnity.

Franchisee(s) Initials: _____

Attorneys Fees. If the Franchisee(s), or anyone acting for, or on behalf of, the Franchisee(s) or claiming to have received, by assignment or otherwise, any interest in any of the Claims; commence, join in, or in any manner seek relief through any suit (or otherwise) arising out of, based upon or relating to any of the Claims released hereunder or in any manner asserts against all or any of the Franchisor-Related Persons/Entities any of the Claims released hereunder, the Franchisee(s) agree to pay all attorneys' fees and other costs incurred by any of the Franchisor-Related Persons/Entities in defending or otherwise responding to said suit or assertion directly to the Franchisor-Related Persons/Entities incurring such costs.

Franchisee(s) Initials: _____

"Franchisor-Related Persons/Entities." Us, Cartridge World North America, LLC, Cartridge World, Inc., Cartridge World Pty Ltd., and each Affiliate of any of the foregoing, each Cartridge World® marketing and/or advertising fund and each and all of the following, whether past, current and/or future: Each and all entities and/or persons acting through or in concert with any of the foregoing; each and all of the partners, shareholders, officers, directors, agents, attorneys, accountants, and/or employees of any of the foregoing, as well as each and all of the successors and/or assigns of any of the foregoing.

Franchisee(s) Initials: _____

Date of Releases, Joint and Several Liability. The releases granted hereunder shall be deemed effective as of the date hereof. The liabilities and obligations of each of the Franchisee(s) (and any other person/entity providing releases to the Franchisor-Related Persons/Entities) shall be joint and several.

Franchisee(s) Initials: _____

**Exhibit 2.2**

**Territory**

The "Territory" is as follows:

_____

_____

_____

_____

Note:   Boundary lines include only the area within the boundary line and extend only to the middle of the boundary demarcation (for example, only to the middle of a street or highway.)  You have no rights under this Agreement or otherwise with respect to a facility on the other side of the boundary line, street or highway or otherwise, and no matter how close to such boundary a facility may be, regardless of the distance from, impact on, or vicinity of, your CARTRIDGE WORLD Store or the number of CARTRIDGE WORLD Stores, other outlets or otherwise in any area or market.  Your rights are limited as set forth in the Franchise Agreement.

A.   Subject to our rights and your obligations as set forth throughout this Agreement, we will not enter into a Franchise Agreement licensing a Traditional CARTRIDGE WORLD Store, or open a Franchisor-owned Traditional CARTRIDGE WORLD Store, inside the area (the "Territory") described on this Exhibit "2.2" for a period of twenty four months from the Date of this Agreement (the "Start up Period").  After the Start up Period expires and throughout the balance of the initial term of this Agreement we will not license a Traditional CARTRIDGE WORLD Store, or open a Franchisor-owned Traditional CARTRIDGE WORLD Store, inside the Territory without first providing you with a right of first refusal, subject to all of the terms and conditions described in Exhibit 2.2 D below.  Regardless of the foregoing, if you are awarded this Franchise as a successor Franchise Agreement or as a transferee of an existing Franchise, then the right of first refusal described in Exhibit 2.2 D below, shall apply from the Date of this Agreement and there shall be no Start up Period for the purposes of your Agreement.

Your rights in the Territory are exactly (and only) as expressly set forth in this Exhibit 2.2.  Except for limited rights with respect to the location of a Traditional CARTRIDGE WORLD Store within the Territory and subject to any applicable right of first refusal provisions as stated in Exhibit 2.2 D below, you have no right to exclude, control or impose conditions on the location of present or future CARTRIDGE WORLD (or any other brand) units or distribution channels of any type, franchised or CARTRIDGE WORLD-owned, regardless of their location or proximity to the Premises.  This Franchise applies only to the establishment and operation of a Traditional Cartridge World Store at a single site (and the offer/sale of certain Products and Services, as specified by us from time-to-time)  The Franchise does not grant you any rights with respect to other and/or related businesses, products and/or services, in which we or any Franchisor Related Persons/Entities may be involved, now or in the future.

B.   We and Franchisor-Related Persons/Entities expressly reserve all other rights, including among them the rights to:

1)      own and/or operate ourselves, and/or authorize others to own and/or operate:

a)    any kind of business in the Territory selling to customers located anywhere, whether or not using the CARTRIDGE WORLD Marks and System, i) except for a Traditional CARTRIDGE WORLD Store during a Start up Period (if you are not a successor or transfer franchisee) and ii) subject to any applicable right of first refusal as described in Exhibit 2.2 D, below; and

b)    any kind of business outside of the Territory selling to customers located anywhere, including without limitation, Traditional CARTRIDGE WORLD Stores, whether or not using the CARTRIDGE WORLD Marks and System;

2)    develop or become associated with other concepts (including dual branding and/or other franchise systems), whether or not using the CARTRIDGE WORLD System and/or the Marks, and award franchises under such other concepts for locations anywhere and/or operate units/channels of distribution (including, for example, the telephone, catalog, direct mail or fax, email, and the Internet) owned by us and/or any Affiliate/Related Company under such other concepts for locations anywhere, selling to customers located anywhere;

3)    acquire, be acquired by, merge, affiliate with or engage in any transaction with other businesses (whether competitive or not), with units located anywhere and selling to customers located anywhere. Such transactions may include (but are not limited to) arrangements involving competing outlets and brand conversions (to or from the CARTRIDGE WORLD Marks and System). Such transactions are expressly permitted under this Agreement, and you agree to participate at your expense in any such conversion as instructed by us.

C.  You understand that a "Traditional CARTRIDGE WORLD Store" is defined in Section 1.2 of the Franchise Agreement, above. The term does not include non-traditional CARTRIDGE WORLD Stores or other distribution opportunities. A non-traditional CARTRIDGE WORLD Store concept may include (but is not limited to) limited square footage outlets like an "express" unit or a kiosk; units housed within other retail facilities, such as a department store; internet sites and/or direct mail operations.

D.  We and Franchisor-Related Persons/Entities also expressly reserve the rights to market and sell CARTRIDGE WORLD Brand (or any other brand) products and services (whether or not competitive) to customers located anywhere (including within the Territory) using any channel of distribution located anywhere, subject only to the following conditions. If any such distribution opportunity involves the location of a Traditional Cartridge World Store (after the expiration of any applicable Start up Period) or any other "brick and mortar" unit for the distribution of competitive products/services under the Cartridge World Brand inside the Territory (a "Brick and Mortar Distribution Opportunity") the following terms and conditions will apply:

1.  We will provide you with a right of first refusal under terms and conditions specified by us in our Business Judgment, for any Brick and Mortar Distribution Opportunity in the Territory, subject to the process described in Exhibit 2.2 D, below, and to your being in Good Standing and meeting our then current financial, operational and other business standards for the award of such Brick and Mortar Distribution Opportunities to Franchisees. Such standards may be modified by us from time to time in our Business Judgment.

2.  A right of first refusal regarding a Brick and Mortar Distribution Opportunity will be processed as follows: We will provide you written notice of a Brick and Mortar Distribution Opportunity expected to be physically located in your Territory. You will have fifteen (15) days in which to advise us in writing (and pay any initial fees) that you wish to participate in the Brick and Mortar Distribution Opportunity. If you do not notify us within such period, then we may pursue such Brick and Mortar Distribution Opportunity and/or grant any other person/entity the right to participate in such Brick and Mortar Distribution Opportunity without any liability to you. If you timely notify us in writing that you do wish to participate in the Brick and Mortar Distribution Opportunity, then we may condition your participation on compliance with such

terms and conditions as we consider appropriate to the particular Brick and Mortar Distribution Opportunity in our Business Judgment. Such conditions may include, but are not limited to: your execution of such agreements and related documents as are then generally used by us in connection with the award of the applicable Brick and Mortar Distribution Opportunity; payment of all initial fees and any other applicable fees; meeting any eligibility requirements as are then generally applied by us to candidates for a Brick and Mortar Distribution Opportunity; and the execution by you (and any Affiliate and owner of yours) of a General Release, as defined in Section 1.02, above. When you provide us with such General Release, excepting only (where such releases are expressly prohibited by applicable law) those claims solely related to the offer and sale of the new Brick and Mortar Distribution Opportunity, we will give to you a Limited Release, as defined in Section 1.02, above. If you do not meet the conditions applicable to the award of the Brick and Mortar Distribution Opportunity and/or any opening requirements that may be included in any Brick and Mortar Distribution Opportunity agreements, then we  and/or any Related Company may pursue such Brick and Mortar Distribution Opportunity and/or grant any other person/entity the right to participate in it, without any liability to you.

E.   Our current policy is to allow you to accept orders from any customer located anywhere and to market to customers located anywhere, but we can change this policy in our Business Judgment. We have the right to place geographic or other restrictions upon such activities, among other things. You agree to comply with any policy changes.

F.   Your use of the Internet, World Wide Web, and other electronic or other means of marketing and distribution of goods and/or services can be restricted by us in our Business Judgment. You will not market or sell through such venue(s) or any channel of distribution other than your Traditional CARTRIDGE WORLD Store without our written permission, which we can grant, condition or deny in our Business Judgment. You agree not to deal with Special Account(s), as we may specify from time to time.

G.We may choose in our Business Judgment to offer/provide Products and/or Services through the Internet, World Wide Web and/or other similar venues (no matter where the Customer is located). Your use of the Internet, World Wide Web, and other electronic or other means of marketing and distribution (including by mail) of Unit Franchises, goods and/or services can be restricted by us in our Business Judgment. You will not market or sell through such venue(s) without our written permission, which we can grant, condition or deny in our Business Judgment. You agree not to deal with Special Account(s), as we may specify from time to time.

FRANCHISOR:

**Wildwood Franchising, Inc.**

A California Corporation

By: _____
          Signature

Title:  President

FRANCHISEE:

_____
Signature

_____
Printed Name

_____
Signature

_____
Printed Name

**Exhibit 3.2**

**CARTRIDGE WORLD**
**COLLATERAL ASSIGNMENT OF LEASE**

THIS COLLATERAL ASSIGNMENT OF LEASE (this "Assignment") is entered into as of _____, 20___, between _____ ("Franchisee") and Wildwood Franchising, Inc., a California corporation ("Franchisor.")

Subject to the provisions hereof, the Franchisee, to secure its obligations to the Franchisor under the franchise agreement between the Franchisor and the Franchisee for the operation of an "Cartridge World Unit Franchise" business, dated _____, 20___ (the "Franchise Agreement") and under every agreement between the Franchisee and the Franchisor, hereby assigns, transfers and sets over unto Franchisor [and/or such person(s)/entity(ies) as Franchisor may from time-to-time designate] all of Franchisee's right, title and interest, whether as tenant or otherwise, in, to and under that certain lease (the "Lease"), a copy is attached to this Assignment, dated _____, 20___, between Franchisee and _____ ("Landlord"), respecting that property commonly known as _____ _____ (the "Premises"). The Franchisor shall have no liabilities or obligations of any kind arising from, or in connection with, this Assignment, the Lease or otherwise (including, but not limited to, any obligation to pay rent and/or other amounts) **until and unless** the Franchisor, in its Business Judgment, takes possession of the Premises pursuant to the terms hereof **and** expressly (and in writing) assumes the rights and obligations of Franchisee under the Lease. The Franchisor is only responsible for those obligations accruing after the date of such assumption.

The Franchisee agrees to indemnify and hold harmless the Franchisor from and against all claims and demands of any type, kind or nature made by the Landlord or any third party that arise out of or are in any manner connected with the Franchisee's use and occupancy of the Premises subject to the Lease.

The Franchisee represents and warrants to the Franchisor that the Franchisee has full power and authority to assign the Lease and its interest in the Lease.

**The Franchisor will not take possession of the Premises until and unless the Franchisee defaults (and/or until there is a termination, cancellation, rescission or expiration of the Franchisee's rights)** under the Lease, any sublease, the Franchise Agreement or other agreement between the Franchisee and the Franchisor (or any affiliate). In such event, the Franchisor (or its designee) shall have the right, and is hereby empowered, (but has no obligation) to take possession of the Premises, expel Franchisee therefrom. Franchisee shall then have no further right, title or interest in or under the Lease or to the Premises, all such rights thereby passing to the Franchisor or its designee, in each case without the Landlord's further consent. The Franchisee agrees to do all acts necessary or appropriate to accomplish such assignment on the Franchisor's request. The Franchisee will reimburse the Franchisor for the costs and expenses incurred in connection with any such retaking, including, without limitation, the payment of any back rent and other payments due under the Lease (whether such payments are made by a separate agreement with the Landlord or otherwise), attorney's fees and expenses of litigation incurred in enforcing this Assignment, costs incurred in reletting the Premises and costs incurred for putting the Premises in good working order and repair.

Franchisee agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Franchisor. Throughout the term of the

**LANDLORD APPROVAL:**

The undersigned Landlord hereby consents to and approves of the above-described Collateral Assignment of Lease by the Franchisee to the Franchisor and further agrees that immediately upon notice to the Landlord, the Franchisor shall have the right to succeed the Franchisee as the tenant under the Lease without further action or consent by any of the parties hereto; provided, however, nothing in the Assignment or in the consent and approval by the Landlord to the Assignment shall affect any other rights of the Landlord under the Lease.

LANDLORD                                              FRANCHISOR

_____          _____

By: _____          By: _____

Its _____          Its _____

**Exhibit 8.1**

Approved Employee Confidentiality Agreement
**(Subject to change by us)**

(You are responsible for ensuring that the terms of the agreement used by you comply with local laws)

## EMPLOYEE CONFIDENTIALITY AND OTHER EMPLOYMENT UNDERSTANDINGS

In consideration of my employment and as inducement for disclosure by _____
_____ *[franchisee entity or individual name]*, doing business as a CARTRIDGE WORLD licensee (the "Company"), for the continuation of such employment, and for the salary or wages which I have received and will receive during the period of such employment, I hereby agree that during my employment with the Company and for any post-term periods specified in this Agreement:

1) That my employment by the Company will be in accordance with the policies, rules and regulations of the Company, as the same now exist, or as they may be established or modified from time to time.

2) That the Company has developed and/or acquired certain designs, techniques, know-how, marketing concepts and information (including customer, supplier and product lists), operating procedures and technical information relating to refilling of printer (and other) cartridges, including refilling of inkjet cartridges; remanufacturing of laser cartridges; sales of toner, computer hardware (including printers) and software, and ancillary products, services and techniques and other related applications which are not generally known in the industry or to the public and which the Company deems its confidential and proprietary property (hereinafter referred to as "Confidential Information"):

3) That by virtue of my employment by the Company, I will or may have access to customer, supplier and product lists, technical processes and know how, specifications, manuals, notes, reports, memoranda, data, equipment and/or secured areas (in written, audio, magnetic and/or electronic format), which are disclosing the Company's Confidential Information.

4) With reference to the Company's Confidential Information, I further agree as follows:

    a.    That the Confidential Information is a valuable trade secret of the Company (as licensed by the Franchisor, CWNA and related companies), and I will not use the Confidential Information other than within the course and scope of my employment responsibilities and functions.

    b.    That I will not release or divulge any Confidential Information unless expressly authorized to do so in writing by a superior or an officer of the Company; provided, however, that during the period of my employment, I will be permitted to release or divulge the same, or any portion thereof, to persons employed or otherwise closely associated with the Company, but only to the extent that I know such persons have a need to know the same within the course and scope of their employment by or close association with the Company (for example, attorney and/or accountants retained by the Company).

    c.    That any and all publications/copies/disclosures of the Company's Confidential Information in any form, which may be given to me or to which I may be granted access, are and will at all times remain, the exclusive property of the Company; that the Confidential Information is being given to me in trust and confidence; and that I will accept the same subject to such trust.

    d.    That during the period of my employment by the Company, I will take all reasonable steps to safeguard and maintain the secrecy and confidentiality of the Confidential Information in my possession or control, including by way of illustration and not limitation (i) securing the Confidential Information in

locked or otherwise secured files; and (ii) refraining from making copies or reproductions of the Confidential Information, or any portions thereof, unless necessary for the carrying out of my employment responsibilities, or if expressly authorized to do so by a superior or an officer of the Company.

e.    That upon the termination of my employment by the Company, I will immediately return to the Company, any and all Confidential Information and all copies thereof, which may have been entrusted to me or which I may have generated or copied, as well as physical property of the Company, including books, tapes, equipment, and the like, whether proprietary or not, which I may have in my possession or control.

f.    That my obligations hereunder with respect to the Company's Confidential Information will continue beyond the period of my employment until the Confidential Information, or any portion thereof, becomes, other than by my act or omission, generally available or known to the public and the industry.

5)    That all inventions, discoveries, developments, improvements, innovations, and writings, whether or not eligible for patent and/or copyright protection (hereinafter collectively referred to as "Innovations" or "Inventions" as may be appropriate), conceived or made by me either solely or in concert with others, during the period of my employment by the Company (including, but not limited to, any period prior to the date of this Agreement) whether or not made or conceived during working hours, which (a) relate in any manner to the existing or contemplated business, or the development of activities of the Company, or (b) are suggested by or result from my work for the Company, or (c) result from my use of the Company's time, materials, or facilities, will be the sole and exclusive property of the Company. Any Inventions made by me, or disclosed by me to a third party, or described in a patent application of mine, within nine (9) months following the period of my employment by the Company will be presumed to have been conceived or made by me during the period of my employment with the Company, unless I can prove they were conceived and made by me following the period of such employment.

6)    That I will promptly make a full disclosure to the Company, and hold in trust for the sole right and benefit of the Company, any and all Inventions which I may solely or jointly conceive, write, develop, reduce to practice; cause to be conceived, written, developed, or reduced to practice, during the period of time I am employed by the Company, and thereafter in accordance with Paragraph 5) above.

7)    That I hereby assign and agree to assign to the Company, all of my right, title and interest in and to all my Inventions, if any, which belong to the Company by virtue of Paragraph 5) above, and agree, during and subsequent to my employment, to execute and deliver to the Company, ownership, title and exclusive rights therein, all without charge, but at the Company's expense.

8)    That I hereby assign and agree to assign to the Company all of my right, title and interest in and to any and all United States and foreign patents and copyrights covering my Inventions, if any, which belong to the Company by virtue of Paragraph 5) above, and all reissues, registrations and renewals thereof. I further agree, during and subsequent to my employment, to aid (i) in the prosecution of any United States or foreign applications for Letters Patent or the registration of copyrights covering such inventions and (ii) in the enforcement of any such patents or copyrights. In this connection, I will, at the Company's request and expense, execute, acknowledge and deliver any and all documents and oaths, and take such further action considered necessary by the Company for the foregoing purposes, without charge, but at the Company's expense.

9)    That in the event the Company is unable, for any reason whatsoever, to secure my signature to any lawful and necessary documents required to assign, apply for, or prosecute any United States or foreign applications for Letters Patent or the registration of copyrights in and to my Inventions which belong to the Company by virtue of Paragraph 5) above, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and in my behalf and stead to execute and file any such assignments and applications, and to do all other

lawfully permitted acts to further the prosecution and issuance of Letters Patent thereon and/or registrations of copyrights with the same legal force and effect as if executed by me.

10) That my compensation as an employee of the Company will cover any Inventions which I may conceive or make hereunder, and I will not be entitled to any additional compensation therefore.

11) That I represent to the Company that I have no right, title or interest in or to any invention which has been made, conceived or reduced to practice by me (solely or jointly with others) prior to my employment by the Company.

12) That my services and the Company's Confidential Information which may be entrusted to me are unique, and that, if I breach this Agreement, the Company may not be adequately compensated by damages. Therefore, if I violate the terms of this Agreement, either during or after my employment, the Company will be entitled, in addition to all other remedies available to it, to equitable relief by injunction or otherwise, thereby enjoining or restraining me, and those persons acting in concert with me, from the continuation of any breaches hereof. The right to equitable relief granted to the Company in the foregoing sentence will not preclude the Company from seeking actual money damages from me or any other party in the event of a breach or threatened breach of this Agreement.

13) That during my employment by the Company, and for one (1) year after termination of such employment, I will not; 1) directly or indirectly, or in concert with others, employ or attempt to employ or solicit for any employment competitive with the Company, any of the Company's employees, 2) conduct, operate, consult, advise or in any manner be associated, directly or indirectly, with any business or operation substantially similar to or competitive with that conducted by the Company within the Company's territory (as defined by Company's franchise agreement). Such restriction includes the furnishing and/or use of the Confidential Information to any person and/or entity, whether gratuitously, on a consulting basis, as an owner, shareholder, partner, employee or associate. It is my responsibility to be certain that I ask for and understand the limits of that territory.

14) That nothing contained in this Agreement will be construed to prevent me from engaging in a lawful profession, trade or business after my employment with the Company. This Agreement will be construed only as one which prohibits me from engaging in practices unfair to the Company, and which are in violation of the confidence and trust reposed in me by the Company with respect to its Confidential Information.

15) That I will be subject to the following dispute resolution provisions:

a.   Any litigation, claim, dispute, action or proceeding ("claim") arising out of or relating to this Agreement or any alleged breach of any provision hereof, will be submitted to and finally resolved by binding arbitration before and in accordance with the arbitration rules of Franchise Arbitration and Mediation, Inc. ("FAM") or its successor (or an organization designated by FAM or its successor), or ii) any other mediation organization approved by all parties, or iii) by Judicial Arbitration and Mediation Service (JAMS) or its successor (or an organization designated by JAMS or its successor).

b.   Any mediation/arbitration (and any appeal of arbitration) will be conducted at the Company's then-current principal offices (or Franchisor's then-current headquarters if enforcement is sought by Franchisor), and by a mediator/arbitrator experienced in franchising. Except as expressly provided below, the parties to any mediation or arbitration will bear their own costs, including attorney's fees. The fees and expenses of the mediator(s), arbitrator(s), mediation or arbitration organization will be shared equally by the parties to the dispute. Each participant must submit or file any claim which would constitute a compulsory counterclaim (as defined by the applicable rule under the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates. Any such claim, which is not submitted or filed in such proceeding, will be forever barred.

c.   Judgment on any preliminary or final arbitration award (subject to the opportunity for appeal as contemplated above) may be entered in any court having jurisdiction and will be binding, final and non-appealable.

d.   The parties each knowingly waive all rights to trial by a court or jury, understanding that arbitration may be less formal than a court or jury trial, may use different rules of procedure and evidence and that appeal is generally less available, still strongly preferring, and having mutually selected, mediation and/or arbitration as provided in this Agreement to resolve any disputes, the parties having had an express meeting of the minds on each these matters.  The Company intends to, and I expressly agree that the Company may, fully enforce each of the provisions of this Agreement, including those relating to arbitration, waiver of jury trial, limitation of damages, venue, choice of laws, or otherwise, having had an express meeting of the minds regarding each of such matters.

e.   Notwithstanding any provision of this Agreement or otherwise relating to which state or other laws this Agreement will be governed by, any provisions of state, or other law to the contrary, the Company and I mutually intend and agree that (1) all issues relating to arbitrability and/or the enforcement of the agreement to arbitrate contained herein will be (i) decided by the arbitrator and (ii) governed exclusively by the Federal Arbitration Act (9 U.S.C. § 1 et seq.) and the federal common law of arbitration and (2) the Company and I mutually intend and agree (and have expressly had a meeting of the minds) to fully enforce all of the provisions of this Agreement and all other documents signed by the Company and me, including (but not limited to) all venue, choice-of-laws, mediation/arbitration provisions and other dispute avoidance and resolution provisions and to rely on federal preemption under the Federal Arbitration Act (9 U.S.C. § 1 et seq.).

f.   No party will be required to post a bond in order to obtain any injunctive or other equitable relief. Any claim will be conducted and resolved on an individual basis only and not on a class-wide, multiple plaintiff or similar basis.

g.   These dispute resolution provisions apply to any claims/arbitration between the parties, and/or by any owner and/or affiliate thereof, or which could be brought in their behalf or by any successor.

16) That upon the termination of my employment, the Company may notify anyone thereafter employing me of the existence and provisions of this Agreement.

17) I understand that my employment is at will unless a fixed term is specified herein or in another writing, executed by me and the Company, which governs my employment.

18) That I have no existing agreements with, obligations to, or interest in any other party that keep me from complying with my obligations under this Agreement, or which may give rise to a conflict of interest, except those identified on the attached list executed by me and the Company.  If no list is attached, I agree that there are no such agreements, obligations or interests on my part.  In addition, I agree to disclose in writing to my superior any future agreements, obligations and/or interests which may preclude or conflict with my obligations hereunder.

19) That I will not use on behalf of, or divulge to, the Company, or its agents or employees, during my employment by the Company, confidential or trade secret information acquired during any prior employment of mine or from any other source outside of the Company, provided, of course, that I know or should know of its nature as confidential or a trade secret.

20) That I understand and confirm that I have no authority whatsoever to make any commitment or enter into any arrangement or contract on behalf of the Company unless authorized by an officer of the Company in writing.

21) That the Company and I agree that this Agreement supersedes any prior oral agreement and/or written agreement executed by and between us relating generally to the subject matter of this Agreement; and we further agree that this Agreement can be waived only by a writing, signed by me and by an officer of the Company.

22) That the Company and I agree that this Agreement will be effective as of the date of the commencement of my employment with the Company.

23) That the Company and I agree that, if it is determined that any provision of this Agreement is illegal or unenforceable, such provision will be enforced to the fullest extent permissible under governing law and such determination will solely affect such provision and not impair the remaining provisions of this Agreement. The time period of the competitive restrictions described in this Agreement (confidentiality, no-compete and non-disclosure) will be extended by the length of time during which I am in breach of any such provision of this Agreement.

24) That the Company and I agree that this Agreement will be construed, and the validity, performance and enforcement hereof will be governed by the laws of the State in which the Company's franchised premises which employed me, is located.

25) That a waiver by the Company of any breach of this Agreement on my part will not operate as or be construed as a waiver of any subsequent breach hereof.

26) That this Agreement will inure to the benefit of and be enforceable by the Company and its Franchisor, and any successors and assigns of the foregoing, and that it will be binding upon me, my executors, administrators, legatees, distributees, heirs and other successors in interest.

27) That I have read the foregoing provisions; that I understand that this Agreement defines the terms and conditions under which the Company is willing to employ or continue to employ me; that I am executing this Agreement and agreeing to abide by its provisions voluntarily; and that the Company has given me a copy of this Agreement for my future reference so as to avoid any possible oversights or misunderstandings regarding its provisions.

Dated _____, 20____ at _____, _____
                                                                    [City]                              [State]

_____
(the "Company")                                              EMPLOYEE:

By:_____          _____

Its: _____           [Employee's signature]

                                                                  _____
                                                                  [Employee's name]

## ADDENDUM TO
## FRANCHISE AGREEMENT
## AS REQUIRED BY THE STATE OF MINNESOTA

In recognition of the requirements of the Minnesota Franchise Act and the rules and regulations promulgated thereunder, the parties to the attached Wildwood Franchising, Inc. Franchise Agreement (the "Agreement") agree as follows:

1.      With respect to franchises governed by Minnesota law, Franchisor will comply with Minn. Stat. Sec. 80C.14, Subds. 3 and 4 which require, except in certain specified cases, that a franchisee be given 90 days notice of termination (with 60 days to cure) and 180 days notice for non-renewal of the Agreement.

2.      Section 16.11 of the Franchise Agreement is deleted.

3.      Article 19, including Section 19.3 A., is hereby revised to provide that no jury trial waiver shall be effective as to any claims that are litigated rather than submitted to arbitration.

4.      Section 19.15 shall be revised by adding the following as the last sentence thereof: Pursuant to Minn. Rule Sec. 2860.4400J, this Section 19.5 shall not in any way abrogate or reduce any rights of the franchisee as provided for in Minnesota Statutes, Chapter 80C.

5.      Section 19.2 shall be revised by adding the following as the last sentence thereof: With respect to franchises governed by Minnesota law, the foregoing provisions shall not be applicable to the extent prohibited by Minn. Stat. Sec. 80C.21 and Minn. Rule 2860.4400J.

6.      Section 19.4 is revised to provide that any limitation of claims is subject to and will comply with Minn. Stat. § 80C.17 Subd. 5

7.      With respect to the franchises governed by Minnesota law, Franchisor will comply with requirements imposed by Minnesota Statutes section 80C.12, subdivisions 1(g) concerning protection of a franchisee's right to use the trademarks or indemnify franchisee in connection with claims regarding the use of the trademarks.

8.      With respect to franchises governed by Minnesota law, any release franchisee is required to provide by the provisions of the Agreement or under Exhibit 1.2 attached to the Agreement or under any other agreement shall not operate to limit or relieve any person from any liability imposed by Minnesota Statutes, sections 80C.01 or 80C.22.  However, the foregoing shall not bar a general release by franchisee of all claims in the event of a voluntary settlement of a bona fide dispute or a mutual termination between the parties.

Dated this _____ day of _____, 20___.

FRANCHISOR:

**Wildwood Franchising, Inc.**
a California corporation

By: _____

Title: President

#189848 v1 - 040122 oc mn-pea v1 [21962]

FRANCHISEE (Individual)

_____       _____
Signature                                                      Signature


_____       _____
Printed Name                                                Printed Name


FRANCHISEE (Corp., LLC or Partnership)

_____
Legal Name of Franchisee Entity


a_____  _____
Jurisdiction of Formation            Corporation, LLC or Partnership


By: _____
        Name

_____
        Signature

Title:_____

#189848 v1 - 040122 oc mn-pea v1 [21962]

**EXHIBIT B**

**FINANCIAL STATEMENTS**

# CARTRIDGE WORLD NORTH AMERICA, LLC

## FINANCIAL STATEMENTS

## DECEMBER 31, 2002

# CARTRIDGE WORLD NORTH AMERICA, LLC

## TABLE OF CONTENTS

Independent auditors' report     Page 2

Balance sheet – December 31, 2002     Exhibit A

Statement of income and accumulated deficit for the period ended December 31, 2002     Exhibit B

Statement of members' deficit     Exhibit C

Statement of cash flows for the period ended December 31, 2002     Exhibit D
Pages 1 - 2

Notes to financial statements – December 31, 2002     Exhibit E
Pages 1 - 2



RINA

ROONEY IDA NOLT AHERN

ACCOUNTANCY CORPORATION

*180 Grand Avenue*
*Suite 200*
*Oakland*
*CA 94612-3741*

*(510) 893-6908*
*fax (510) 834-1522*
*1-800-RINA-CPA*
*www.rina.com*

*Member of MGI*

## Independent Auditors' Report

The Members
Cartridge World North America, LLC

We have audited the accompanying balance sheet of Cartridge World North America, LLC (a California limited liability company) as of December 31, 2002 and the related statements of income, members' deficit, and cash flows for the period from June 21, 2002 (Inception) to December 31, 2002. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Cartridge World North America, LLC as of December 31, 2002 and the results of its operations and its cash flows for the period then ended in conformity with accounting principles generally accepted in the United States of America.

*Rooney, Ida Nolt & Ahern*

Certified Public Accountants

Oakland, California
January 31, 2003

*Oakland*

*Roseville*

*Walnut Creek*

*Fremont*

*San Francisco*

# CARTRIDGE WORLD NORTH AMERICA, LLC

## BALANCE SHEET – DECEMBER 31, 2002

### ASSETS

| | | |
|---|---:|---:|
| **CURRENT ASSETS:** | | |
| Cash | | $ 1,428 |
| Inventory | | 17,902 |
| Prepaid expenses | | 3,075 |
| TOTAL CURRENT ASSETS | | 22,405 |
| **PROPERTY AND EQUIPMENT:** | | |
| Equipment | $ 47,027 | |
| Leasehold improvements | 12,158 | |
| Office equipment | 21,545 | |
| Totals | 80,730 | |
| Less accumulated depreciation | (4,509) | 76,221 |
| **OTHER ASSETS:** | | |
| Security deposit | | 6,825 |
| TOTAL ASSETS | | $ 105,451 |

### LIABILITIES AND MEMBERS' DEFICIT

| | | |
|---|---:|---:|
| **CURRENT LIABILITIES** | | |
| Note payable | | $ 66,118 |
| Accounts payable | | 45,041 |
| Income taxes payable | | 800 |
| TOTAL LIABILITIES (all current) | | 111,959 |
| MEMBERS' DEFICIT (Exhibit C) | | (6,508) |
| TOTAL LIABILITIES AND MEMBERS' DEFICIT | | $ 105,451 |

See accompanying notes to the financial statements.

# CARTRIDGE WORLD NORTH AMERICA, LLC

## STATEMENT OF INCOME

### PERIOD ENDED DECEMBER 31, 2002

| | | |
|---|---|---:|
| REVENUE | $ | 50,000 |
| OPERATING EXPENSES | | 284,500 |
| LOSS FROM OPERATIONS | | (234,500) |
| PROVISION FOR INCOME TAXES | | 800 |
| NET LOSS | $ | (235,300) |

See accompanying notes to the financial statements.

EXHIBIT C

# CARTRIDGE WORLD NORTH AMERICA, LLC

## STATEMENT OF MEMBERS' DEFICIT

### PERIOD ENDED DECEMBER 31, 2002

| | | |
|---|---|---:|
| Capital contributed | $ | 228,792 |
| Net loss for the period | | (235,300) |
| **TOTAL MEMBERS' DEFICIT** | $ | (6,508) |

See accompanying notes to the financial statements.

# CARTRIDGE WORLD NORTH AMERICA, LLC

## STATEMENT OF CASH FLOWS

### PERIOD ENDED DECEMBER 31, 2002

| | | | |
|---|---:|---:|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss (Exhibit B) | | | $ (235,300) |
| Adjustments to reconcile net loss to net | | | |
| cash provided by operating activities: | | | |
| Depreciation | $ 4,509 | | |
| Expenses paid direct by members | 64,162 | | 68,671 |
| Increase in: | | | |
| Inventory | (17,902) | | |
| Prepaid expense | (3,075) | | (20,977) |
| Increase in: | | | |
| Accounts payable | 45,041 | | |
| Income taxes payable | 800 | | 45,841 |
| | | | |
| NET CASH USED BY OPERATING ACTIVITIES | | | (141,765) |
| | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | |
| Purchase of equipment | | (48,710) | |
| | | | |
| NET CASH USED BY INVESTING ACTIVITIES | | | (48,710) |
| | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Capital contributions | | 125,785 | |
| Proceeds from note payable | | 66,118 | |
| | | | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | | | 191,903 |
| | | | |
| INCREASE IN CASH | | | 1,428 |
| | | | |
| CASH, beginning of period | | | 0 |
| | | | |
| CASH, end of period | | | $ 1,428 |

# CARTRIDGE WORLD NORTH AMERICA, LLC

## STATEMENT OF CASH FLOWS

### FOR THE PERIOD ENDED DECEMBER 31, 2002

SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:
Cash paid during the period for:

| | | |
|---|---|---|
| Income taxes | $ | 0 |
| Interest | $ | 0 |

SUPPLEMENTAL DISCLOSURE OF NON-CASH TRANSACTIONS:

| | | |
|---|---|---|
| Sale of a franchise agreement in exchange for consulting fees | $ | 50,000 |

The following amounts were paid for directly by the members:

| | | |
|---|---|---|
| Rent deposit | $ | 6,825 |
| Operating expenses | | 64,162 |
| Purchase of office equipment and tennant improvements | | 32,020 |
| | $ | 103,007 |

# CARTRIDGE WORLD NORTH AMERICA, LLC

## NOTES TO FINANCIAL STATEMENTS - DECEMBER 31, 2002

**Note 1. NATURE OF ACTIVITIES AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:**

**Nature of activities:**

The Company holds the master franchise agreement to sell territorial master franchises for Cartridge World Pty. Ltd of Australia in North America. The agreement with Cartridge World Pty Ltd. for the use of the name and trademark "Cartridge World" is a perpetual, royalty-free, nontransferable license. In addition to selling territorial master franchises the Company will provide toner cartridge refills to the individual franchises.

**Inventory:**

Inventory is stated at the lower of cost (first-in-first-out method) and market.

**Depreciation:**

The Company computes depreciation on its property and equipment using the straight-line method of accounting over a period of five years.

**Advertising:**

The Company expenses advertising costs as the advertisements are published. Advertising expense for the period ended December 31, 2002 was approximately $24,000.

**Income taxes:**

The Company has been organized as a Limited Liability Company ("LLC"). As such, the Company pays no federal income taxes but is taxed at the state level using the statutory rates in effect for an LLC. Additionally, the members are individually taxed on their proportionate share of the Company's taxable income.

**Note 2. NATURE OF ESTIMATES:**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Note 3. RELATED PARTY TRANSACTIONS:**

The member incurred expenses on behalf of the Company and settled these amounts direct with the third party vendors. These transactions total $103,007 and have been treated as capital contributions.

One of the members advanced $66,118 to the Company as a short-term loan. The balance bears interest at 5% per annum and is to be repaid in February 2003.

The members' have a financial interest in several other Cartridge World entities worldwide. During the period, the Company purchased inventory for $17,902 from a Cartridge World entity based in Germany and equipment for $39,450 from a Canadian entity.

# CARTRIDGE WORLD NORTH AMERICA, LLC

## NOTES TO FINANCIAL STATEMENTS - DECEMBER 31, 2002

**Note 4. COMMITMENTS:**

The Company is liable under long-term lease commitments for the following annual rentals on its facility:

| Years Ending December 31, | |
|---|---|
| 2003 | $ 54,600 |
| 2004 | 54,600 |
| 2004 | 27,300 |
| Total | $136,500 |

Rental expense for the period ended December 31, 2002 was approximately $32,000.

**Note 5. SUBSEQUENT EVENTS:**

Subsequent to the year end the Company sold the master franchises for Florida and central Texas.

# WILDWOOD FRANCHISING, INC.

## (*A California S Corporation*)

## FINANCIAL STATEMENTS

## DECEMBER 31, 2002

# WILDWOOD FRANCHISING, INC.

## TABLE OF CONTENTS

Independent auditors' report .......... Page 2

Balance sheet - December 31, 2002 .......... Exhibit A

Statement of income and accumulated deficit for the year
ended December 31, 2002 .......... Exhibit B

Statement of cash flows for the year ended December 31, 2002 .......... Exhibit C

Notes to financial statements - December 31, 2002 .......... Exhibit D



RINA
ROONEY IDA NOLT AHERN

ACCOUNTANCY CORPORATION

180 Grand Avenue
Suite 200
Oakland
CA 94612-3741

(510) 893-6908
fax (510) 834-1522
1-800-RINA-CPA
www.rina.com

Member of Midsnell
International

**Independent Auditors' Report**

The Board of Directors
Wildwood Franchising, Inc.

We have audited the accompanying balance sheet of Wildwood Franchising, Inc. (a California corporation) as of December 31, 2002 and the related statements of income and accumulated deficit and cash flows for the period from December 6, 2002 (Inception) to December 31, 2002. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Wildwood Franchising, Inc. as of December 31, 2002 and the results of its operations and its cash flows for the period then ended in conformity with accounting principles generally accepted in the United States of America.

*Rooney. Ida. Nols , Ahn*

Certified Public Accountants

Oakland, California
January 2, 2003

Oakland

Sacramento

Walnut Creek

Fremont

San Francisco

# WILDWOOD FRANCHISING, INC.

## BALANCE SHEET – DECEMBER 31, 2002

### ASSETS

| | | | |
|---|---|---|---|
| **CURRENT:** | | | |
| Cash | $ | 5,000 | |
| Prepaid expense | | 368 | |
| | | | |
| TOTAL CURRENT ASSETS | | $ | 5,368 |
| | | | |
| **OTHER:** | | | |
| Master franchise agreement | | | 50,000 |
| | | | |
| TOTAL ASSETS | | $ | 55,368 |

### LIABILITIES AND STOCKHOLDER'S EQUITY

| | | | |
|---|---|---|---|
| **CURRENT:** | | | |
| Stockholder advances | $ | 7,384 | |
| | | | |
| TOTAL LIABILITIES (all current) | | $ | 7,384 |
| | | | |
| **STOCKHOLDER'S EQUITY:** | | | |
| Capital stock: no par value, 10,000 shares authorized, | | | |
| 1,000 shares issued and outstanding | | 50,000 | |
| Accumulated deficit | | (2,016) | |
| | | | 47,984 |
| | | | |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | | $ | 55,368 |

See accompanying notes to the financial statements.

**EXHIBIT**

# WILDWOOD FRANCHISING, INC.

## STATEMENT OF INCOME AND ACCUMULATED DEFICIT

### FROM DECEMBER 6, 2002 (INCEPTION) TO DECEMBER 31, 2002

| | | |
|---|---|---|
| REVENUE | $ | 0 |
| OPERATING EXPENSES: | | |
| Organization costs | | 2,016 |
| LOSS FROM OPERATIONS | | (2,016) |
| PROVISION FOR INCOME TAXES | | 0 |
| NET LOSS AND ACCUMULATED DEFICIT | $ | (2,016) |

See accompanying notes to the financial statements.

# WILDWOOD FRANCHISING, INC.

## STATEMENT OF CASH FLOWS

### FOR THE PERIOD FROM DECEMBER 6, 2002 (INCEPTION) TO DECEMBER 31, 2002

| | | | |
|---|---|---:|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | |
| Net loss (Exhibit B) | | | $ (2,016) |
| Adjustments to reconcile net loss to net | | | |
| cash provided by operating activities: | | | |
| Expenses paid by the stockholder | $ | 2,383 | |
| Increase in: | | | |
| Prepaid expense | | (368) | 2,016 |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | | | 0 |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | 0 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | |
| Advances from stockholder | | 5,000 | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | | | 5,000 |
| NET INCREASE IN CASH | | | 5,000 |
| CASH, beginning of period | | | 0 |
| CASH, end of period | | | $ 5,000 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | | |
| Cash paid during the period for: | | | |
| Income taxes | | $ | 0 |
| Interest | | $ | 0 |

SUPPLEMENTAL DISCLOSURE OF NON-CASH TRANSACTIONS:
During the period, the Company issued 1,000 shares of common stock in
exchange for a master franchise agreement valued at $50,000.

During the period, the sole stockholder paid expenses in the amount of
$2,383 on behalf of the Company.

See accompanying notes to the financial statements.

# WILDWOOD FRANCHISING, INC.

## NOTES TO FINANCIAL STATEMENTS - DECEMBER 31, 2002

**Note 1. NATURE OF ACTIVITIES AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:**

Nature of activities:

The Company holds the master franchise agreement to sell franchises for Cartridge World, provider of toner cartridge refill services, within a defined territory in Northern California.

Amortization:

The Company computes amortization on the master franchise agreement using the straight-line method of accounting over a fifteen-year life.

S Corporation election:

The Company elected to have its income taxed directly to the stockholders. Accordingly, provision for income taxes, except for minimum state income taxes, has not been made.

**Note 2. NATURE OF ESTIMATES:**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Note 3. RELATED PARTY TRANSACTIONS:**

The 100% stockholder incurred expenses on behalf of the Company prior to incorporation and advanced the funds to establish the corporate bank account. These transactions total $7,384 and will be repaid as soon as the funds are available.

On incorporation of the Company the stockholder contributed the master franchise agreement, valued at $50,000, in exchange for 1,000 shares of common stock.

## WILDWOOD FRANCHISING, INC.

### (A California S Corporation)

### FINANCIAL STATEMENTS

### FEBRUARY 28, 2003

# WILDWOOD FRANCHISING, INC.

## TABLE OF CONTENTS

Accountants' compilation report     Page 2

Balance sheet - February 28, 2003     Exhibit A

Statement of income and accumulated deficit for the two months
    ended February 28, 2003     Exhibit B

Statement of cash flows for the two months ended February 28, 2003     Exhibit C

Notes to financial statements – February 28, 2003     Exhibit D

# RINA
## ROONEY IDA NOLT AHERN

ACCOUNTANCY CORPORATION

180 Grand Avenue
Suite 330
Oakland
CA 94612-3711

(510) 893-0008
fax (510) 834-1522
1-800-RINA-CPA
www.rina.com

Member of MGI

Oakland

Roseville

Walnut Creek

Fremont

San Francisco

The Board of Directors
Wildwood Franchising, Inc.

We have compiled the accompanying balance sheet of Wildwood Franchising, Inc. (a California corporation) as of February 28, 2003, and the related statement of income and accumulated deficit and cash flows for the two months then ended, in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of financial statements information that is the representation of management. We have not audited or reviewed the financial statements and, accordingly, do not express an opinion or any other form of assurance on them.

*Rooney, Ida, Nolt, Ahern*

Certified Public Accountants

Oakland, California
March 3, 2003

-2-

EXHIBIT A

## WILDWOOD FRANCHISING, INC.

### BALANCE SHEET – FEBRUARY 28, 2003

#### ASSETS

CURRENT:

| | | |
|---|---|---|
| Cash | $ 19,205 | |
| Prepaid expense | 368 | |
| TOTAL CURRENT ASSETS | | $ 19,573 |

OTHER:

| | |
|---|---|
| Master franchise agreement, net of accumulated amortization of $555 | 49,445 |
| TOTAL ASSETS | $ 69,018 |

#### LIABILITIES AND STOCKHOLDER'S EQUITY

CURRENT:

| | | |
|---|---|---|
| Income taxes payable | $ 800 | |
| Stockholder advances | 7,384 | |
| TOTAL LIABILITIES (all current) | | $ 8,184 |

STOCKHOLDER'S EQUITY:

| | | |
|---|---|---|
| Capital stock: no par value, 10,000 shares authorized, | | |
| 1,000 shares issued and outstanding | 50,000 | |
| Additional paid in capital | 20,000 | |
| Accumulated deficit | (9,166) | 60,834 |
| TOTAL LIABILITIES AND STOCKHOLDER'S EQUITY | | $ 69,018 |

See accompanying accountants' compilation report and notes to financial statements.

## WILDWOOD FRANCHISING, INC.

### STATEMENT OF INCOME AND ACCUMULATED DEFICIT

#### JANUARY 1, 2003 TO FEBRUARY 28, 2003

| | |
|---|---:|
| REVENUE | $ 0 |
| | |
| OPERATING EXPENSES: | |
| Professional fees | 3,000 |
| Licenses | 729 |
| Organization costs | 1,970 |
| Other costs | 96 |
| Amortization | 555 |
| TOTAL OPERATING EXPENSES | 6,350 |
| | |
| LOSS FROM OPERATIONS | (6,350) |
| | |
| PROVISION FOR INCOME TAXES | 800 |
| | |
| NET LOSS | (7,150) |
| | |
| ACCUMULATED DEFICIT, beginning of period | (2,016) |
| | |
| ACCUMULATED DEFICIT, end of period | $ (9,166) |

See accompanying accountants' compilation report and notes to financial statements.

**EXHIBIT C**

# WILDWOOD FRANCHISING, INC.

## STATEMENT OF CASH FLOWS

### JANUARY 1, 2003 TO FEBRUARY 28, 2003

| | | |
|---|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss (Exhibit B) | $ | (7,150) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Amortization | | 555 |
| Increase in taxes payable | | 800 |
| NET CASH USED BY OPERATING ACTIVITIES | | (5,795) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | 0 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Additional paid in capital | $ 20,000 | |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | | 20,000 |
| NET INCREASE IN CASH | | 14,205 |
| CASH, beginning of period | | 5,000 |
| CASH, end of period | $ | 19,205 |
| **SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:** | | |
| Cash paid during the period for: | | |
| Income taxes | $ | 0 |
| Interest | $ | 0 |

See accompanying accountants' compilation report and notes to financial statements.

EXHIBIT D

## WILDWOOD FRANCHISING, INC.

### NOTES TO FINANCIAL STATEMENTS - FEBRUARY 28, 2003

**Note 1. NATURE OF ACTIVITIES AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:**

Nature of activities:

The Company holds the master franchise agreement to sell franchises for Cartridge World, a provider of toner cartridge refill services, within a defined territory in Northern California.

Amortization:

The Company computes amortization on the master franchise agreement using the straight-line method of accounting over a fifteen-year life.

S Corporation election:

The Company elected to have its income taxed directly to the stockholders. Accordingly, provision for income taxes, except for minimum state income taxes, has not been made.

**Note 2. NATURE OF ESTIMATES:**

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

**Note 3. RELATED PARTY TRANSACTIONS:**

The 100% stockholder incurred expenses on behalf of the Company prior to incorporation and advanced the funds to establish the corporate bank account. These transactions total $7,384 and will be repaid as soon as the funds are available.

During the two months ended February 28, 2003, the stockholder contributed $20,000 to the Company which has been recorded as additional paid in capital.

See accompanying accountants' compilation report.

**EXHIBIT C**

**STATE ADMINISTRATORS
AND
AGENTS FOR SERVICE OF PROCESS**

# STATE ADMINISTRATORS

**California:**
Department of Corporations
1390 Market Street, 8th Floor
San Francisco, CA 94102-5303

320 West 4th Street., Suite 750
Los Angeles, CA 90013-1105

1515 K Street, Suite 200
Sacramento, CA 95814-4052

**Connecticut:**
State of Connecticut
Department of Banking
260 Constitution Plaza
Hartford, CT 06103

**Florida:**
Florida Department of Agriculture
Division of Agriculture and Consumer Services
Division of Consumer Services
Mayo Building, Second Floor
Tallahassee, FL 32399-0800

**Hawaii:**
Department of Commerce and
  Consumer Affairs
Business Registration Division
1010 Richards Street
Honolulu, HI 96810

**Illinois:**
Office of the Attorney General
500 South Second Street
Springfield, IL 62706

**Indiana:**
Indiana Securities Division
302 West Washington Street, Room E-111
Indianapolis, IN 46204

**Kentucky:**
Consumer Protection Division
Office of the Attorney General
1024 Capital Center Drive
P.O. Box 2000
Frankfort, KY 40602-2000

**Maryland:**
Office of the Attorney General
Division of Securities
200 Saint Paul Place
Baltimore, MD 21202-2020

**Michigan:**
Consumer Protection Division
Antitrust and Franchise Unit
Michigan Department of Attorney General
670 Law Building
Lansing, MI 48913

**Minnesota:**
Minnesota Department of Commerce
133 East Seventh Street
St. Paul, MN 55101

**Nebraska:**
Department of Banking and Finance
1200 North Street, Suite 311
P.O. Box 95006
Lincoln, NE 68509

**New York:**
New York State Department of Law
Bureau of Investor Protection and Securities
120 Broadway, 23rd Floor
New York, NY 10271

**North Dakota:**
Office of Securities Commissioner
600 East Boulevard, 5th Floor
Bismarck, ND 58505

**Rhode Island:**
Division of Securities
Suite 232
233 Richmond Street
Providence, RI 02903

**South Dakota:**
Department of Commerce and Regulation
Division of Securities
118 West Capital Avenue
Pierre, SD 57501-2017

**Texas:**
Secretary of State
Statutory Documents Section
1019 Brazos Street
Austin, TX 78701

**Utah:**
Division of Consumer Protection
Utah Department of Commerce
160 East 300 South
P.O. Box 45804
Salt Lake City, UT 84145-0804

**Virginia:**
State Corporation Commission
Division of Securities and
Retail Franchising
1300 East Main Street, 9th Floor
Richmond, VA 23219

**Washington:**
Department of Financial Institutions
Securities Division
150 Israel Road, S.W.
Tumwater, WA 98501

**Wisconsin:**
State of Wisconsin
Department of Financial Institutions
Division of Securities
345 West Washington Avenue, 4th Floor
Madison, WI 53703

# AGENTS FOR SERVICE OF PROCESS

**California:**
California Commissioner of Corporations
Department of Corporations
1390 Market Street
San Francisco, California 94102

**Florida:**
C T Corporation System
8751 West Broward Boulevard
Plantation, Florida 33324

**Hawaii:**
Director of Commerce and Consumer Affairs
Business Registration Division
P.O. Box 40
Honolulu, Hawaii 96813

**Illinois:**
Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706

**Indiana:**
Secretary of State
201 State House
200 West Washington Street
Indianapolis, Indiana 46204

**Maryland:**
The Securities Commissioner
200 Saint Paul Place
Baltimore, Maryland 21202-2020

**Michigan:**
Department of Attorney General's Office
Consumer Protection Division
670 Law Building
Lansing, Michigan 48913

**Minnesota:**
Commissioner of Commerce
133 E. Seventh St.
St. Paul, MN 55101

**Nebraska:**
CT Corporation System
206 South 13th Street, Suite 1500
Lincoln, Nebraska 68508

**New York:**
Secretary of State
41 State Street
Albany, New York 12231

**North Dakota:**
Commissioner of Securities
600 East Blvd., Fifth Floor
Bismarck, North Dakota 58505

**Rhode Island:**
Director of Business Regulation
Division of Securities
233 Richmond St., Suite 232
Providence, Rhode Island 02903-4232

**South Dakota:**
Director
Securities Division
c/o 118 West Capitol
Pierre, South Dakota 57501-5070

**Texas:**
C T Corporation System
350 North Saint Paul Street
Dallas, Texas 75201

**Virginia:**
Clerk of the State Corporation Commission
1300 East Main Street, 1st Floor
Richmond, Virginia 23219

**Washington:**
Director
Department of Financial Institutions
Securities Division
150 Israel Road SW
Tumwater, Washington 98501

**Wisconsin:**
Administrator
Department of Financial Institutions
Division of Securities
345 West Washington Avenue, 4th Floor
Madison, Wisconsin 53703

**EXHIBIT D**

**LIST OF CURRENT AND FORMER FRANCHISEES,
MASTER FRANCHISEES, AND PILOT OPERATIONS**

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

## AUSTRALIA

| Location | State | Address | | Phone | Franchisee | Email |
|---|---|---|---|---|---|---|
| Adelaide (CBD) | SA | 224 Franklin Street | 5000 | 08 8410 7600 | Brett & Lesh Tucker | cartridgeworldcbd@senet.com.au |
| Adelaide Head Office | SA | 39 Charles Street | 5070 | 08 8233 9800 | Bryan Stokes & Paul Wheeler | info@cartridgeworld.com.au |
| Alice Springs | NT | Shop 4 / 52 Elder Street | 870 | 08 8953 8700 | Paul Christie & Claire Donnelly | bigbelly@aol.com |
| Altona | Vic | Shop 11, Harrington Square, Maidstone Street | 3018 | 03 9398 5200 | Marie & Rodney Cain | altona@cartridgeworld.arach.net.au |
| Ascot Vale | Vic | 225 Union Rd | 3072 | 03 9375 4059 | James & Raelene McCool | cwascot@ihug.com.au |
| Ashgrove | Qld | 137-139 Waterworks Road | 4060 | 03 3366 5111 | Jim & Helen Graham | cartridgeworld@powerup.com.au |
| Ashmore | Qld | Shop 31a Ashmore Plaza Cotlew Street | 4214 | 07 5597 3337 | Mark & Leisa Delany | cartridgeworld@hotmail.com |
| Ballarat | Vic | 1213a Sturt Street | 3350 | 03 5338 8630 | Ian & Kim Dridan | cartridgeworld.ballarat@bigpond.com |
| Ballina | NSW | 15 Kerr Street | 2478 | 02 6686 6538 | Joe & Denise Young | ballina@cartridgeworldnsw.com.au |
| Balcatta | WA | Unit 1 / 5 Ledgar Road | 6021 | 08 9240 4079 | Jo Venter | cartridgeworld@arach.net.au |
| Bankstown | NSW | 4 / 268 Canterbury Rd Revesby | 2212 | 02 9771 1644 | Dean & Sally Broughton | bankstown@cartridgeworldnsw.com.au |
| Bayswater | Vic | 713 Mountain Highway | 3163 | 03 9729 1910 | Milton Talbot | cwbayswater@ihug.com.au |
| Beachside | Vic | 242 Nepean Highway Edithvale | 3156 | 03 9772 7030 | Michael Newbond | cwbeachside@unfa.com.au |
| Beenleigh | Qld | Shop 4 / 62 George Street | 4207 | 07 3807 4688 | Carol & Ron Haigh | beenleigh@cartridgeworld.com.au |
| Belconnen | ACT | 52 Weedon Close | 2617 | 02 6253 3922 | Noel Kitt & Glen Loberger | belconnen@cartridgeworld.com.au |
| Bendigo | Vic | 300a High Street | 3550 | 03 5444 4984 | Peter & Jan Cashen | cartridgeworld@impulse.net.au |
| Blacktown | NSW | Suite 3 / 2A Newton Road | 2148 | 02 9676 4511 | Paul & Donna Borg | blacktown@cartridgeworldnsw.com.au |
| Box Hill (Blackburn South) | Vic | Shop 11 / 96 Canterbury Road | 3130 | 03 9894 0678 | Don Murray | boxhill@cartridgeworld.com.au |
| Brunswick | Vic | 32 Lygon Street, Brunswick East | 3057 | 03 9380 1866 | Keith Ashton | brunswick@cartridgeworld.com.au |
| Bull Creek | WA | Shop 6a Parry Place Shopping Centre Parry Avenue | 6149 | 08 9313 6655 | Joe Venter | cartridgeworld@arach.net.au |
| Bunbury | WA | Shop 7 / Highway Court 119 Beach Road | 6230 | 08 9791 3138 | Douglas Gordon | huncart@bigpond.com |
| Bundaberg | Qld | Shop 4 Royal Arcade Barolin Sreet (PO Box 4062) | 4670 | 07 4152 2290 | David & Julie Anderson | cwbundaberg@hotmail.com |
| Burnie | Tas | 239 Bass Highway Cooee | 7320 | 03 6431 6867 | Bryan Stokes & Paul Wheeler | burnie@cartridgeworld.com.au |
| Burwood | NSW | Shop 1 / 10 Railway Parade | 2133 | 02 9744 7488 | Pascal & Cathy Funari | burwood@cartridgeworldnsw.com.au |
| Caboolture | NSW | 42 King Street | 4510 | 07 5499 3319 | Norman Gehrmann | cworld@caboolture.net.au |
| Cairns | Qld | 383 Mulgrave Road | 4870 | 07 4033 5233 | Mark & Jan Scarr | cairns@cartridgeworld.com.au |
| Camden | NSW | Shop 6, Capital Arcade, 81 Argyle Street | 2570 | 02 4655 6766 | Gary & Rita Rix | camden@cartridgeworldnsw.com.au |
| Campbelltown | NSW | Shop 4 / 9 Patrick Street | 2560 | 02 4620 5057 | Gary & Rita Rix | campbelltown@cartridgeworldnsw.com.au |
| Capalaba | Qld | 90 Old Cleveland Road (PO Box 1352) | 4157 | 07 3823 5600 | Mark Weir | capalaba@cartridgeworld.com.au |
| Carina | Qld | 858 Old Cleveland Road | 4154 | 07 3843 6900 | David & Sandi Connolly | carina@cartridgeworld.com.au |
| Carlisle (Welshpool) | WA | 98 Oats Street | 6101 | 08 9472 6315 | Peter Davies | peterda@ozemail.com.au |
| Castle Hill | NSW | Suite 2 / 31 Terminus Street, Castle Hill | 2154 | 02 9659 5366 | David Campbell | castlehill@cartridgeworldnsw.com.au |
| Central West - Bathurst | NSW | 10 / 82 George Street | 2795 | 02 6334 4405 | David Halpin | centralwest@cartridgeworldnsw.com.au |
| Charlestown (Newcastle) | NSW | Shop 2 / 116 Pacific Highway | 2290 | 02 4946 2800 | Brent Fox | newcastle@cartridgeworldnsw.com.au |
| Charmhide | Qld | Shop 2 / 744 Gympie Road | 4032 | 07 3359 2277 | Bob Dann | cwcharm@ozemail.com.au |
| Coffs Harbour | NSW | 95 Grafton Street | 2450 | 02 6652 6526 | Mick & Karen Stevens | coffsharbour@cartridgeworldnsw.com.au |
| Coolum | Qld | Shop 3 / 17-21 Birtwill Street Coolum Beach | 4573 | 07 5446 1255 | Joshua Brown | cwcoolum@hotmail.com |
| Cottesloe | WA | 10 Station Street | 6011 | 08 9385 2285 | John & Julie Goldie | cottesloe@cartridgeworld.com.au |
| Cranbourne | VIC | 8 High Street, Cranbourne | 3977 | 03 5995 1811 | Ian Sherrefs | cartridgeworldfrankston@bigpond.com.au |
| Croydon | Vic | 66A Maroondah Highway | 3136 | 03 9724 9844 | Stephen Lawrence | croydon@cartridgeworld.com.au |
| Currimundi | Qld | Unit 2 / 700 Nicklin Way | 4551 | 07 5493 2632 | John & Rosalie Anderson | cartridgeworld@bigpond.com |
| Currumbin | Qld | Unit 4/58-58 Currumbin Creek Road | 4223 | 07 55256200 | Mark & Leisa Delany | cartridgeworld@bigpond.com |
| Dandenong | Vic | 158c Princes Highway | 3175 | 03 9791 1510 | Lynne & Craig Hancock | cwdand@ihug.com.au |
| Darwin | NT | 50 Stuart Highway | 0800 | 08 6981 1288 | Buff & Anne | darwincartridge@austarnet.com.au |
| Dee Why | NSW | Shop 1 / 16 Fisher Road | 2099 | 02 9982 6700 | Chris & Maurice Canty | deewhy@cartridgeworldnsw.com.au |
| Dubbo | NSW | 30 Talbragar Street | 2830 | 02 6884 8644 | Lynn Crump | dubbo@cartridgeworldnsw.com.au |
| Echuca | Vic | 260 Anstruther Street | 3564 | 03 5482 1234 | Peter Rymer | cwechuca@bigpond.net.au |
| Elsternwick | Vic | 440 Glenhuntly Road | 3185 | 03 9533 0860 | Richard & Margaret Gosch | rgosch@bigpond.com |
| Essendon | Vic | 479b Keilor Road Niddrie | 3042 | 03 9374 4977 | Lawrence & Brenda Cutajar | cartridg@ihug.com.au |
| Fairfield (Smithfield) | NSW | 697b The Horsley Drive Smithfield | 2164 | 02 9729 4777 | Tony Romano, Nick & Rocco Leonello | fairfield@cartridgeworldnsw.com.au |
| Frankston | Vic | 12f Beach Street | 3199 | 03 9783 3288 | Ian Sherrefs | cartridgeworldfrankston@bigpond.com.au |
| Fremantle | WA | 333 Carrington Street | 6163 | 08 9314 3499 | Paul Masson & Graham Dixon | sales@cartridgeworld.net.au |
| Gawler | SA | Shop 4 / 71 Murray Street | 5118 | 08 8523 5441 | Paul Smith | cwgawler@chariot.net.au |
| Geelong | Vic | 264 Moorabool Street | 3220 | 03 5221 4444 | John & Gerrard Flynn | cworld@bigpond.com |
| Gladstone | Qld | 7 Dawson Road | 4680 | 07 4976 9999 | Alastair Frew | gladstone@cartridgeworld.com.au |
| Goolwa (Fleurieu) | SA | Shop 40 Ocean Street | 5211 | 08 8552 1555 | Shane & Emily Porteous | fleurieu@cartridgeworld.com.au |

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| Gosford | NSW | 89 Victoria Road East Gosford | 2250 | 02 4322 3597 | Col Moran | gosford@cartridgeworldnsw.com.au |
| Greenacres | SA | Shop 10 Greenacres Shopping Centre | 5086 | 08 8261 2222 | Ian John Thamm | cartridgeworld1@blabutton.com.au |
| Greensborough | Vic | Shop 6 / 60 Main Road | 3088 | 03 9432 0511 | Nick & Kathy Aspridis | greensborough@cartridgeworld.com.au |
| Greenslopes | Qld | 629 Logan Road | 4120 | 07 3397 0566 | Mark & Annetta Yaxley | cwgreenslopes@dart.net.au |
| Greenway | ACT | 7 Reed Street Tuggeranong Square | 2900 | 02 6293 1018 | Noel Kitt & Glen Loberger | greenway@cartridgeworldact.com.au |
| Griffith | NSW | 117a Banna Ave | 2680 | 02 6964 7222 | Peter & Lucy Taylor | griffith@cartridgeworld.com.au |
| Gympie | Qld | 194 Mary Street | 4570 | 07 5482 3811 | Kent Hutton | cw-gympie@spiderweb.com.au |
| Hampton | Vic | Shop 3 / 427 Hampton Street | 3188 | 03 9521 8022 | Dominic & Michelle D'Abate | cwhamp@hug.com.au |
| Hervey Bay | Qld | Shop 1 / 5 Torquay Rd Pialba | 4655 | 07 4124 4786 | David Smith | herveybay@cartridgeworld.com.au |
| Hobart | Tas | 131 Bathurst Street | 7000 | 03 6231 0114 | Clyde Jackson & Michael Giachin | cwhobeart@hotmail.com |
| Hornsby | NSW | Shop 2 / 20 George Street | 2250 | 02 9476 0895 | Janusz & Michael Jakubek | hornsby@cartridgeworldnsw.com.au |
| Horsham | Vic | 2 Firebrace Street | 3400 | 03 5382 1200 | Stephen Chamberlain & Peter Cashen | horsham@cartridgeworld.com.au |
| Hove | SA | 4 / 339 Brighton Road | 5048 | 08 8377 2288 | Brian James Tregilgas | tregilgas@internode.on.net |
| Hurstville | NSW | Shop 62 / 14 Woodville Street | 2220 | 02 9586 1117 | Garry Flaxman | hurstville@cartridgeworldnsw.com.au |
| Indooroopilly | Qld | Shop 6 / 15 Westminster Road | 4068 | 07 3878 1771 | Jim & Helen Graham | indooroopilly@cartridgeworld.com.au |
| Ipswich | Qld | Cnr Brisbane & East Streets | 4305 | 07 3282 8866 | Annette Yaxley | ipswich@cartridgeworld.com.au |
| Joondalup | WA | Shop 3 / 80 Grand Boulevard | 6027 | 08 9301 6633 | Jo Venter | joondalup@cartridgeworld.com.au |
| Kalgoorlie | WA | Shop 1 / 72 Maritana Street | 6430 | 08 9022 2700 | Noel Flemming & Carolyne Grillo | kalgoorlie@cartridgeworld.net.au |
| Kerretha | WA | Unit 5 2644 Balmoral Road | 6714 | 08 9144 2855 | Louise Miller | karratha@cartridgeworld.com.au |
| Killarney Vale | NSW | Shop 3 / 132 Wyong Road | 2261 | 02 4334 1855 | Brent Fox | killarneyvale@cartridgeworldnsw.com.au |
| Kingaroy | Qld | 1 / 197 Haly Street | 4610 | 07 4162 1305 | Terry La Franchi | kingaroy@cartridgeworld.com.au |
| Labrador (Southport) | Qld | Shop 4 Labrador Park Shopping Centre 100 Brisbane Road | 4215 | 07 5537 6344 | Mark & Leisa Delany | cartridgeworld@hotmail.com |
| Lilydale | Vic | 242 Main Street | 3140 | 03 9735 9994 | Stephen Lawrence | lilydale@cartridgeworld.com.au |
| Lithgow | NSW | 341A Main Street (Western Newsagancy) | 2790 | 02 6352 3364 | Brett Egan | lithgow@cartridgeworldnsw.com.au |
| Lismore | NSW | Shop 1 / 75 Conway Street | 2480 | 02 6622 0622 | David Helpin | lismore@cartridgeworldnsw.com.au |
| Liverpool (Moorebank) | NSW | Unit 3 / 1 Field Close Moorebank | 2170 | 02 9822 6500 | Eddie Rennick | liverpool@cartridgeworldnsw.com.au |
| Mackay | Qld | 134 Wood Street | 4740 | 07 4951 2688 | Rodney & Mary-Anne Spark | cartworld@mrbean.net.au |
| Malaga | WA | Shop 7 / 1904 Beach Road | 6090 | 08 9248 1766 | Mark & Gillian Holland | cartridgeworldmalaga@smartchat.net.au |
| Mandurah | WA | 3 / 41 Pinjarra Road | 6210 | 08 9535 9333 | Gerald Merven | gerald@iinet.net.au |
| Maryborough | Qld | 150 Adelaide Street | 4650 | 07 4122 4440 | David Smith | maryborough@cartridgeworld.com.au |
| Maroochydore | Qld | 12 - 16 First Avenue | 4558 | 07 5479 1544 | Jon Kirkwood & Kathy Norton | cartridgeworld@austemat.com.au |
| Melrose Park | SA | 1101 South Road | 5039 | 08 8357 5477 | Jamie Stokes, Craig Harvey | cwmelpk@senet.com.au |
| Merrylands | NSW | Shop 1 / 246-250 Pitt Street | 2160 | 02 9760 2777 | Tony Romano, Nick & Rocco Leonello | merrylands@cartridgeworldnsw.com.au |
| Midland | WA | 302 Great Eastern Highway | 6056 | 08 9250 8822 | Gunter & Sonia Steffens | cartridgeworldmidland@bigpond.com |
| Mildura | Vic | Shop 1 / 78 Lime Avenue | 3500 | 03 5023 1777 | Mark Cavallo | cartridgeworld@ncable.com.au |
| Miranda (Sutherland) | NSW | Shop 2 / 629 Kingsway | 2228 | 02 9531 2383 | Ray Hargreaves & Judith Hargreaves | miranda@cartridgeworldnsw.com.au |
| Mitcham | Vic | 499 Whitehorse Road | 3132 | 03 9874 0201 | Stephen & Deborah Foster | mitcham@cartridgeworld.com.au |
| Mona Vale | NSW | Shop 16 / 20 Bungan Street | 2103 | 02 9997 2496 | Chris & Maurice Canty | monavale@cartridgeworldnsw.com.au |
| Moonah | Tas | 50A Main Road | 7009 | 03 6228 0022 | Robert & Jan Smith | cartridgemoon@bigbusnet.com.au |
| Morphett Vale | SA | 2/368 Main South Road | 5162 | 08 8326 8299 | John Horgan | jhorgs@ihug.com.au |
| Murray Bridge | SA | Shop 10 Seventh Street | 5253 | 08 8531 3599 | Mary & Don McLean | murraybridge@cartridgeworld.com.au |
| Nambour | Qld | 122 Currie Street | 4560 | 07 5476 4644 | Rex & Fiona Hallyburton | cworldnambour@powerup.com.au |
| NSW Master Franchisee | NSW | 118 Macquarie Street Parramatta | 2150 | 02 9633 0577 | David Campbell | david@cartridgeworldnsw.com.au |
| Newcastle | NSW | Shop 11 / 810 Hunter Street | 2300 | 02 4969 7272 | Brent Fox | newcastle@cartridgeworldnsw.com.au |
| North Sydney | NSW | 114 Glover Street Mosman | 2088 | 02 9909 1633 | Kerry & Pauline Bignell | northsydney@cartridgeworldnsw.com.au |
| Norwood | SA | 52 Payneham Road Stepney | 5067 | 08 8363 3944 | Bryan Stokes & Paul Wheeler | norman@senet.com.au |
| Noosa | Qld | 2 / 28 Sunshine Beach Road | 4567 | 07 5455 4450 | Joshua Brown | cwcoolum@hotmail.com |
| Oakleigh | Vic | Shop 3 / 10A Atherton Road | 3166 | 03 9569 0088 | Michael Giachin & Clyde Jackson | cwoakleigh@hotmail.com |
| Orange | NSW | 223 Peisley Street | 2800 | 02 6361 6077 | David Helpin | orange@cartridgeworldnsw.com.au |
| Oxley | Qld | 1114 Oxley Road | 4075 | 07 3379 6050 | Allen Vaughn | cartridgeworld@mbox.com.au |
| Pakenham | VIC | Shop 6 / 125-127 Main Street | 3810 | 03 5941 13331 | Mark Douglas | cartridgeworldpakenham@yahoo.com |
| Paddington | Qld | Shop 3 / 244 Given Terrace | 4064 | 07 3368 3577 | Ric & Gail & Kieran Frawley | cwpad@ihug.com.au |
| Parramatta | NSW | 118 Maquarie Street | 2150 | 02 9635 8880 | Ivan Phillips | parramatta@cartridgeworldnsw.com.au |
| Penrith | NSW | Shop 4 Surveyor House 2 Castlereagh Street | 2750 | 02 4721 4001 | David & Adam Colantonio | penrith@cartridgeworldnsw.com.au |
| Port Adelaide | SA | 240 St Vincent Street | 5015 | 08 8240 4330 | Ian John Thamm | cartridgeworld1@blabutton.com.au |
| Port Lincoln | SA | 6 Bligh Street | 5606 | 08 8683 1233 | Paul Park | cwpllincoln@ozemail.com.au |
| Port Pirie | SA | 8 Main Road | 5540 | 08 8633 0176 | Warren Lane | cartridgeworld@centralonline.com.au |

#189536 CWI Master and Unit Franchisees 12/31/03

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| Prospect | SA | 75 Prospect Road | 6082 | 08 8342 3233 | Stephen & Jeanette Caputo | cartridgeworld@senet.com.au |
| Qld Master Franchisee | Qld | 1 / 5 Torquay Avenue Pialba | 4655 | 07 41247699 | David Smith | qld@cartridgeworld.com.au |
| Redcliffe (Margate) | Qld | 277a Oxley Avenue | 4019 | 07 3283 3516 | Les & Bev Falke | carbine1@bigpond.com |
| Reservoir | Vic | 259 Broadway | 3073 | 03 9462 5592 | Raffaele & Tracy Mercuri | cwreservoir@ihug.com.au |
| Richmond | SA | 284 Marion Road Netley | 5037 | 08 8351 4900 | Michael & Kim Moss | cartrich@tpc.net.au |
| Robina (Burleigh) | Qld | Shop 22 Christine Corner  221 Christine Avenue | 4226 | 07 5535 6600 | Mark & Leisa Delany | cartridgeworld@hotmail.com |
| Rockhampton | Qld | Shop 3 / 61 High Street North Rockhampton | 4701 | 07 4928 2000 | Alastair Frew | rockhampton@cartridgeworld.com.au |
| Rockingham | WA | Shop 5 / 97 Dixon Road | 6168 | 08 9529 4011 | Steve Loader | cwrham@eftel.com.au |
| Runcorn | QLD | 258 Warrigal Road | 4113 | 07 3219 7500 | Allen Vaughn | cartridgeworld@mbox.com.au |
| Ryde | NSW | Shop 3 / 1043 Victoria Road West Ryde | 2114 | 02 9804 0666 | Robert & Ricky Zanera | ryde@cartridgeworldnsw.com.au |
| Salisbury | SA | Shop 64 / 74 Park Terrace | 5108 | 08 8285 6033 | Phil Robinson | cwsali@ihug.com.au |
| SA/NT/TAS/WA Master Franchisee | SA | 30 Admella Street Hope Valley | 5090 | 08 8264 6263 | John Flues | ksyjohn@ozemail.com.au |
| Shellharbour | NSW | Unit 1 / 9 Industrial Road Oak Flat | 2529 | 02 4256 3010 | Andrew & Joanne Doughton | shellharbour@cartridgeworldnsw.com.au |
| Shepparton | Vic | 2 Fryers Street | 3630 | 03 5821 3611 | Phil Leversha | cartridgeworld@origin.net.au |
| Silverwater (Lidcombe) | NSW | Shop 2 / 42-44 Railway Street Lidcombe | 2141 | 02 9649 2515 | Arunan Selvaratnam | cartridgeworld@hotmail.com |
| Slacks Creek | Qld | Shop 15 / 390 Kingston Road | 4127 | 07 3299 1166 | Ross & Judith Williams | slackscreek@cartridgeworld.com.au |
| St Marys | NSW | Shop 2 / 249 Queen Street | 2760 | 02 9833 7666 | David & Adam Colantonio | stmarys@cartridgeworldnsw.com.au |
| South Melbourne | Vic | 216 Clarendon Street | 3205 | 03 9686 0313 | Bruce Higgs & Gary Peacock | southmelbourne@cartridgeworld.com.au |
| Strathpine | QLD | 3 / 500 Gyple Road | 4500 | 07 3881 2446 | Ken Smith | strathpine@cartridgeworld.com.au |
| Sunbury | VIC | Shop 5 / Old Bakery Walk | 3429 | 03 9744 4815 | Joe Cavello | sunbury@cartridgeworld.com.au |
| Tamworth | NSW | 466 Peel Street | 2340 | 02 6766 4544 | Jack & Karen Newell | tamworth@cartridgeworld.com.au |
| Taree | NSW | 26 Pulteney Street | 2430 | 02 6552 1022 | Howard Dixon & Bill Pedmore | taree@cartridgeworld.com.au |
| Toowoomba (Darling Downs) | Qld | 698 Ruthven Street | 4350 | 07 4638 8444 | David & Julie Anderson | cwtoowoomba@hotmail.com |
| Townsville | Qld | 269 / 271 Charter Towers Road | 4810 | 07 4728 3333 | Alastair Frew | townsville@cartridgeworld.com.au |
| Traralgon | Vic | 23 Post Office Place | 3844 | 03 5176 5660 | Colin Turner | gippsland@cartridgeworld.com.au |
| Tweed Heads | NSW | Shop 8 / 2-8 Blundell Boulevarde South Tweed Heads | 2486 | 07 5524 3001 | Joe & Denise Young | tweed@cartridgeworldnsw.com.au |
| Ultimo | NSW | 765 Harris Street | 2007 | 02 9211 1414 | Enazat & Yunos Hassib | sydneycbd@cartridgeworldnsw.com.au |
| Unley | SA | Shop 4 / 92-94 Unley Road | 5061 | 08 8271 3955 | Steve Wray | refill@ihug.com.au |
| Victoria Master Franchisee | Vic | 2 Olivia Court Gisborne | 3437 | 03 5428 8042 | Allan Russell | vic@cartridgeworld.com.au |
| Wangaretta | VIC | Shop 2 / 24 Faithful Street | 3677 | 03 5722 9800 | Graeme & Leeann Lincoln | lincoln@bigpond.com |
| Warragul | Vic | 60 Queen Street | 3820 | 03 5623 1113 | Colin Turner | cwgipps@dcsi.net.au |
| Warrnambool | Vic | 6 Norfolk Plaza | 3220 | 03 5562 7655 | Jackie Russell | cwwbool@hotkey.net.au |
| Wagga Wagga | NSW | 45A Baylis Street | 2650 | 02 6971 7350 | Michael Stout | wagga@cartridgeworldnsw.com.au |
| Wembley (Osborne Park) | WA | 186a Harborne Street | 6014 | 08 9387 3333 | Mick Brisley | cartridgeworld@my.we |
| Werribee | Vic | Shop 2 / 32 Synnot Street | 3030 | 03 9749 6844 | Jeff & Glenda Kruse | cwwerrib@ihug.com.au |
| West End | Qld | 65 Vulture Street | 4101 | 07 3844 1552 | Robert Bouchet | robbouchet@bigpond.com.au |
| Whitsunday | Qld | Shop 8 / Cannonvale Markets 157 Shute Harbour Road | 4802 | 07 4948 2788 | Rodney & Mary-Anne Spark | cartworld@mrbean.net.au |
| Whyalla | SA | Lincoln Highway (Adj to Sundowner Hotel) | 5608 | 08 8644 3035 | Paul King & Tyrell Camplin | cartridgeworld@kingcc.com.au |
| Wodonga | Vic | 154 High Street | 3690 | 02 6056 5314 | Graeme & Leeann Lincoln | lincoln@bigpond.com |
| Wollongong | NSW | Shop 2 / 322  Crown Street | 2500 | 02 4228 4001 | Wayne Cady & Christine Dixon | thegong@cartridgeworldnsw.com.au |
| Woy Woy | NSW | 35 / 39 Colonial Mews Blackwall Road | 2256 | 02 4342 7384 | Col Moran | woywoy@cartridgeworldnsw.com.au |

| | | CANADA | | | | |
|---|---|---|---|---|---|---|
| Canada Master Franchisee | CAN | 474-800-15355-24th Avenue Surrey BC | U4A 2H9 | 3603195519 | David Niles | cwr@telus.net /cwcd@telus.net |
| Tomken | ON | 925 Rathburn Rd Unit B4B-2 Mississauga | L4W 4C3 | 905 696 0167 | Tony Cannataro | tcannataro@cartridgeworld.ca |
| Bristol | ON | Sandalwood Plaza Unit 14-B 40 Bristol Road East Mississauga | L4Z 3K8 | 905-502-7822 | Jyoti and Ratan Swami | rlswami@cartridgeworld.ca |
| Scarborough | ON | 1981 Kennady Road, Unit 2 Scarborough | M1P 5A2 | 416 412 FILL (3455) | Naltram & Karan Singh | naltram@cartridgeworld.ca, karan@cartridgeworld.ca |
| Surrey BC (Fleetwood) | BC | Fleetwood Square 8888-152A Street Surrey BC | V3R 0V7 | 604-588-8815 | Barry Kroeker | kroeker@cartridgeworld.ca |
| White Rock | BC | 12-3189 King George Highway Surrey BC | V4P 1B8 | 604 538-5598 | Mike Kitchen | whiterock@cartridgeworld.ca |

| | | CENTRAL & EASTERN EUROPE | | | | |
|---|---|---|---|---|---|---|
| Hoza | EU | Hoza 29 / 31 Warszawa, Poland | 00-521 | 48 22 622 3841 | Jarema Breza (Mike Chambers, Alden Hoyle) | jbreza@cartridgeworld.pl |
| Jana Pawla II | EU | Al. Jana Pawla II 34, Warszawa, Poland | 01-141 | 48 22 620 6390 | Jarema Breza | jbreza@cartridgeworld.pl |
| Ken | EU | 96 Lok U13 | 02-777 | 48 22 641 17 56 | Komisji Edukacji Narodowej | cwken@cartridgeworld.pl |
| Limi | EU | Limi 1 Tallinn, Estonia | 10821 | (372) 611 6960 | William H. Cronanberg III | limi@cartridgeworld.ee |
| Lodz | EU | Nawrot 26 Lodz, Poland | 90-055 | 48 42 674 35 20 | Powel Trzeblatowski | ptzeblatowski@cartridgeworld.pl |
| Pronski | EU | Pronski 6 Tallin Estonia | 10124 | 372 6533 233 | Jannus Aule | cwpronski@cartridgeworld.ee |

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| Riga | LV | K Valdemara Street 57/59 | LV 1010 | 371 724 3259 | Aleksander Hoperskii & Aleksandra Shuklin | ahoperskis@cartridgeworld.lv |
| Sas | EU | Sas 10/12 Budapest, Hungary | H-1051 | 36 1 450 3311 | Laszlo Gall | lgall@777westel.hu |
| Targowa | EU | Targowa 27 Warszawa | 03-728 | 48 22 618 08 01 | Jaremia Breza | jbreza@cartridgeworld.pl |
| Central & Eastern Europe Master Franchisee | EU | Hoza 29 / 31 Warszawa, Poland | 00-521 | 48 22 622 3841 | Aldan Hoyle | ahoyle@cartridgeworld.org |

| CYPRUS | | | | | | |
|---|---|---|---|---|---|---|
| England Master Franchisee (Harrogate) | UK | Unit 6C Hornbeam Park Oval Hornbeam Park Harrogate North Yorkshire | HG2 8RB | 44 1423 878 520 | David Parkinson | david@cartridgeworld.org |
| Limmasol | CY | 31 Aylas Phylaxeos | 3731 | 25 360 370 | Duncan Glover | cwcyprus@cartridgeworld.org |
| Nicosia | UK | 34A Nikis Avenue Nicosia Cyprus | | 00 357 777 785 | Duncan Glover & Alan Ainsworth | cwnicosia@cartridgeworld.org |

| ENGLAND | | | | | | |
|---|---|---|---|---|---|---|
| Allerton | UK | 358 Smithdown Road Allerton Liverpool | L15 5AN | 44 151 733 1133 | David & Elaine Illidge | cwallerton@cartridgeworld.org |
| Altrincham | UK | 26 Regent Road Altrincham Cheshire | WA14 1RP | 44 1619 295 003 | Joanne McNamara | cwaltrincham@cartridgeworld.org |
| Amersham | UK | 3 Grimsdells Corner Sycamore Road Amersham Buckinghamshire | HP6 5DZ | 44 1494 434 373 | Ewart & Fiona Holloway | cwamersham@cartridgeworld.org |
| Andover | UK | 6 Bridge Street Andover Hampshire | SP10 1BH | 44 800 183 7744 | Mark & Lesley-Ann Simmonds | cwandover@cartridgeworld.org |
| Ashford | UK | 19 Woodthorpe Road Ashford Middlesex | TW15 2RP | 44 1784 420 101 | Ray Smith, Graham Owen & Angela Owen | cwashford@cartridgeworld.org |
| Aylesbury | UK | 32 Parton Road Aylesbury Buckinghamshire | HP20 1NG | 44 1296 434 666 | David & Norma Hulse-Mark Spolander | cwaylesbury@cartridgeworld.org |
| Banbury | UK | 12 South Bar Street Banbury | OX16 9AA | 44 1295 279 777 | John Stanley | cwbanbury@cartridgeworld.org |
| Basildon | UK | 63 High Street Pitsea Basildon Essex | SS13 3BB | 44 1268 555 533 | Mary Drake | cwbasildon@cartridgeworld.org |
| Bearwood | UK | 616 Bearwood Road Bearwood Birmingham | B66 4BW | 44 121 429 9990 | Paramjit Singh | cwbearwood@cartridgeworld.org |
| Birkenhead | UK | 722 Borough Road Tranmere Birkenhead | CH42 9JE | 44 151 608 5522 | Ross McCormick | cwbirkenhead@cartridgeworld.org |
| Bishopston | UK | 53 Gloucester Road Bishopston Bristol | BS7 8AD | 44 117 924 8888 | Daniel Whelan | cwbishopston@cartridgeworld.org |
| Blackburn | UK | 44 Bank Top Blackburn Lancashire | BB2 1TB | 44 1254 695 059 | Lynne Hartley | cwblackburn@cartridgeworld.org |
| Bradford | UK | 103 Manningham Lane Bradford West Yorkshire | BD1 3BN | 44 1274 306 786 | Alexander Procyk | cwbradford@cartridgeworld.org |
| Braintree | UK | 3 Rayne Road Braintree Essex | CM7 2QA | 44 1376 321 123 | Ray Watson | cwbraintree@cartridgeworld.org |
| Bramhall | UK | 218 Moss Lane Bramhall Cheshire | SK7 1BD | 44 161 439 1900 | Tom & Susan Kelly | cwbramhall@cartridgeworld.org |
| Bridlington | UK | 23 Prospect Street Bridlington | YO15 2AE | 44 1262 601 111 | Denzil Davies | cwbridlington@cartridgeworld.org |
| Brighton | UK | 71 London Road | BN1 4JE | 44 1273 207 732 | Stephen Mulrine | cwbrighton@cartridgeworld.org |
| Bromborough | UK | 902 New Chester Road (A41) Bromborough | CH62 8AU | 44 151 343 0999 | Ross McCormick | cwbromborough@cartridgeworld.org |
| Burton-upon-Trent | UK | 8/9 Derby Street Burton-upon-Trent Staffordshire | DE14 2LA | 44 1283 743 715 | Chris Walker | cwburtonupontrent@cartridgeworld.org |
| Bury | UK | 107 Rochdale Road Bury | BL9 7BA | 44 161 762 0077 | | cwbury@cartridgeworld.org |
| Burnley | UK | 212 Colne Road Burnley Lancashire | BB10 1QY | 44 1282 685 009 | Peter Gaynor | pgaynor118@aol.com |
| Carlisle | UK | Unit 3 Port Road Carlisle Cumbria | CA2 7AJ | 44 1228 599 591 | John & Elaine Hope | cwcarlisle@cartridgeworld.org |
| Chatham | UK | 11 Watling Street Chatham Kent | ME5 7EP | 44 1634 581 010 | Colin Harms | cwchatham@cartridgeworld.org |
| Chelmsford | UK | 243 Broomfield Road Chelmsford Essex | CM1 4DP | 44 1245 284 992 | Keith Tata & Suzi Fielding | cwchelmsford@cartridgeworld.org |
| Chester | UK | 53 Boughton Street | CH3 5AF | 44 1244 321 655 | Alan & Rose McCubbine | cwchester@cartridgeworld.org |
| Chorley | UK | 81 Water Street Chorley Lancashire | PR7 1EX | 44 1257 277 277 | Howard Jones | cwchorley@cartridgeworld.org |
| Christchurch | UK | 1164 Christchurch Road Bournemouth | BH7 6DY | 44 1202 305 222 | Dan Brown (Manager) | cwchristchurch@cartridgeworld.org |
| Cleveleys | UK | 22 Rossall Road Thornton Cleveleys | FY5 1DX | 44 1253 852 453 | Keith Houghton | cwcleveleys@cartridgeworld.org |
| Clifton | UK | 74 Clifton Road Clifton Green York | YO30 6AW | 44 1904 733 999 | Ashley & Helen Cooper | cwclifton@cartridgeworld.org |
| Colchester | UK | 7 Century House North Station Road Colchester | CO1 1RE | 44 1206 505 568 | Richard Giles | cwcolchester@cartridgeworld.org |
| Crewe | UK | 149 Nantwich Road Crewe Cheshire | CW2 6DF | 44 1270 255 588 | Alan McCubbine | cwcrewe@cartridgeworld.org |
| Croydon | UK | 194 Brighton Road South Croydon Surrey | CR2 6AF | 44 20 8686 9696 | Keith & Eileen McMahon | cwcroydon@cartridgeworld.org |
| Darlington | UK | 321 North Road Darlington Co Durham | DL1 3BL | 44 1325 467 698 | Chris Gould | cwdarlington@cartridgeworld.org |
| Derby | UK | 813 Osmaston Road Derby | DE24 9BG | 44 1332 298 400 | Stuart Brook | cwderby@cartridgeworld.org |
| Dewsbury | UK | 9 Broadway House Foundry Street Dewsbury | WF13 1QQ | 44 1924 430 633 | John Hirst | cwdewsbury@cartridgeworld.org |
| Doncaster | UK | 40 Duke Street Doncaster | DN1 3EA | 44 1302 325 511 | Kris Marsden (Manager) | cwdoncaster@cartridgeworld.org |
| Dudley | UK | 68 Wellington Road Dudley | DY1 1RE | 44 1384 456 999 | Manoj Patel | cwdudley@cartridgeworld.org |
| Dunstable | UK | 135 High Street Dunstable Bedfordshire | LU6 1JN | 44 1582 520 620 | David & Karen Ratcliffe | cwdunstable@cartridgeworld.org |
| Durham | UK | 94 Claypath Durham City | DH1 1RG | 44 1913 639 494 | Wendy Sloan | cwdurham@cartridgeworld.org |
| Ealing | UK | 20 Queen's Parade Hanger Lane Ealing London | W5 3HU | | Gerard Cohen | cwealing@cartridgeworld.org |
| Earlsdon | UK | 43 Earlsdon Street Earlsdon Coventry West Midlands | CV5 6EP | 44 2476 717 872 | Vicky Chappell & Gary Hubbard | cwearlsdon@cartridgeworld.org |
| East Grinstead | UK | 51 Railway Approach East Grinstead West Sussex | RH19 1BT | 44 1342 301 515 | Joe & Natalie Vennard | cweastgrinstead@cartridgeworld.org |

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| East Finchley | UK | 127 East End Road East Finchley London | N2 0SZ | 44 208 883 2933 | Kapil Yagnik | cweastfinchley@cartridgeworld.org |
| Eastleigh | UK | 52 Market Street Eastleigh | SO50 5RB | 442380 650 606 | Terry Axton | cweastleigh@cartridgeworld.org |
| East London | UK | 458 Romford Road Forest Gate London | E7 8DF | 44 2084 702 189 | Imtiaz Patel & Zulfi Khan | cweastlondon@cartridgeworld.org |
| Ecclesall | UK | 997 Ecclesall Road Sheffield | S11 8TN | 44 114 266 0666 | Andy Leech | cwecclesall@cartridgeworld.org |
| Eltham | UK | 42 Eltham High Street Eltham | SE9 1BT | 44 208 859 2111 | Michael Smith | cweltham@cartridgeworld.org |
| Enfield | UK | 495 Southbury Road Enfield | EN3 4JW | 44 20 8443 3311 | Tony Plunkett | cwenfield@cartridgeworld.org |
| England Master Franchisee (Harrogate) | UK | Unit NSC Hornbeam Park Oval Hornbeam Park Harrogate North Yorkshire | HG2 8RB | 44 1423 878 520 | David Parkinson | david@cartridgeworld.org |
| Exeter | UK | 61 Cowick Street Exeter | EX4 1AP | 44 1392 684 664 | Craig Collins | cwexeter@cartridgeworld.org |
| Folkestone | UK | 7 Shellons Street Folkestone Kent | CT20 1BW | 44 1303 247 474 | Mike Kimpton | cwfolkestone@cartridgeworld.org |
| Fareham | UK | 186b West Street Fareham Hampshire | PO16 0HP | 44 1329 220 555 | Tony & Michael Hansford | cwfareham@cartridgeworld.org |
| Fleet | UK | 110-116 Fleet Road Fleet Hampshire | GU51 4PA | 44 1252 815 577 | George & Andrew Nagalewski | cwfleet@cartridgeworld.org |
| Gloucester | UK | 10 London Road Gloucester | GL1 3NE | 44 1452 413 413 | Terry Jeffery | cwgloucaster@cartridgeworld.org |
| Gosforth | UK | 161-163 High Street Gosforth Newcastle | NE3 1HE | 44 1912 461 090 | Martin Bell | cwgosforth@cartridgeworld.org |
| Gravesham | UK | 67 Sun Lane Gravesend Kent | DH12 5HQ | 44 1474 532 021 | Bill & Amanda Gritt | cwgravesham@cartridgeworld.org |
| Grimsby | UK | 19 Hainton Avenue Grimsby | DN32 9BB | 44 1472 359 100 | Simon Brook | cwgrimsby@cartridgeworld.org |
| Halifax | UK | 246 King Cross Road Halifax | HX1 3JP | 44 1422 303 208 | Christopher Wightman | cwhalifax@cartridgeworld.org |
| Harrogate | UK | 46 Kings Road Harrogate North Yorkshire | HG1 5JW | 44 1423 701 704 | David Parkinson | cwkingsroad@cartridgeworld.org |
| Hartlepool | UK | 255 York Road Hartlepool Cleveland | TS26 9AD | 44 1429 891 688 | Melony Lister | cwhartlepool@cartridgeworld.org |
| Hastings | UK | 111 Sedlescombe Road North St Leonards-on-Sea | TN37 7EJ | 44 1424 428 345 | Kevin J McKenna | cwhastings@cartridgeworld.org |
| Haywards Heath | UK | 138 South Road Haywards Heath West Sussex | RH16 4LT | 44 1444 451 900 | Mark Springall & Gordon MacKay | cwharwardsheath@cartridgeworld.org |
| Headingley | UK | 50 Otley Road Headingley Leeds | LS6 2AL | 44 113 274 6060 | Stuart & Janet Cook | cwheadinglay@cartridgeworld.org |
| Hereford | UK | 1 Bastion Mews Union Street Hereford | HR1 2BT | 44 1432 27 22 33 | Nick Fellows | cwhereford@cartridgeworld.org |
| Hornsey | UK | 370 Hornsey Road London | N19 4HT | 44 20 7281 7600 | Omar Ben Khadra | cwhornsey@cartridgeworld.org |
| Horsforth | UK | 100 New Road Side Horsforth Leeds | LS16 4QB | 44 1135 588 900 | Tony Marsh & Hester Bradfield | cwhorsforth@cartridgeworld.org |
| Huddersfield | UK | 29 John William Street | HD1 1BL | 44 1484 300 988 | Nicholas Peel | cwhuddersfield@cartridgeworld.org |
| Hull | UK | 34 Cottingham Road Hull | HU6 7AR | 44 1482 492 701 | John Clough | cwhull@cartridgeworld.org |
| Hull Road | UK | 16 Hull Road York | YO10 3JL | | Ashley & Helen Cooper | cwhullroad@cartridgeworld.org |
| Hyde | UK | 42 Manchester Road Hyde Cheshire | SK14 2BD | 44 161 303 3000 | Kevin Maddox | cwhyde@cartridgeworld.org |
| Ilford | UK | 15 Woodford Avenue Gants Hill Ilford Essex | IG2 6UF | 44 20 8551 2277 | John Servis & David Selby | cwilford@cartridgeworld.org |
| Isle of Wight | UK | 98 High Street Newport Isle of Wight | PO30 1BQ | 44 1983 53 23 23 | John L Shield | cwisleofwight@cartridgeworld.org |
| Jesmond | UK | 49 St Georges Terrace Jesmond Newcastle-upon-Tyne | NE2 2SX | 44 600 18 33 800 | Martin Bell | cwjesmond@cartridgeworld.org |
| Keighley | UK | 22 Cavendish Street Keighley West Yorkshire | BD21 3RB | 44 1535 692 265 | Nigel Harding | cwkeighley@cartridgeworld.org |
| Kendal | UK | 79 Highgate Kendal Cumbria | LA9 4ED | 44 1539 721 999 | Grahame Lambert & David Clarke | cwkendal@cartridgeworld.org |
| Kettering | UK | 12B Horsemarket Kettering Northamptonshire | NN16 0DQ | 44 1536 412 627 | John Howlett | cwkettering@cartridgeworld.org |
| Kidderminster | UK | 24 Worcester Street Kidderminster | DY10 1EG | 44 1562 744 100 | Paul & Russ Kalsall | cwkidderminster@cartridgeworld.org |
| Kings Heath | UK | 53 The Parade High Street Kings Heath Birmingham | B14 7BH | 44 121 444 0077 | Maba Yasin | cwkingsheath@cartridgeworld.org |
| Leamington Spa | UK | 8 Clarendon Avenue Leamington Spa Warwickshire England | CV32 5PZ | 44 1926 888 131 | Michael & Karrie Crowley | cwleamingtonspa@cartridgeworld.org |
| Leicester | UK | 54 Narborough Road Leicester | LE3 0BR | 44 116 254 3225 | Peter Butler | cwleicester@cartridgeworld.org |
| Leigh | UK | 47 Chapel Street Leigh Lancashire | WN7 2PB | 44 1942 604 030 | Colin Winstanley | cwleigh@cartridgeworld.org |
| Leigh-on-Sea | UK | 1575 London Road Leigh-on-Sea Essex | SS9 2SG | 44 1702 477 449 | Tony & Pat Greenan | cwleighonsea@cartridgeworld.org |
| Lincoln | UK | 405 High Street Lincoln | LN5 7TE | 44 1552 560 156 | Terry Howes | cwlincoln@cartridgeworld.org |
| Luton | UK | Crystal House New Bedford Road Luton | LU1 1HS | 44 1582 420 490 | David & Karen Ratcliffe | cwluton@cartridgeworld.org |
| Macclesfield | UK | 20A Park Green Macclesfield Cheshire | SK11 7NA | 44 1625 500 125 | Steve Woodbridge & Kathleen Gee & Steve Gee | cwmacclesfield@cartridgeworld.org |
| Meadow Lane | UK | 352 Meadow Lane Nottingham | NG2 3GL | 44 1159 868 999 | Pauline Doherty | cwmeadowlane@cartridgeworld.org |
| Middlesbrough | UK | 40 Borough Road Middlesbrough Cleveland | TS1 5DW | 44 1642 230 026 | Chris Gould | cwmiddlesbrough@cartridgeworld.org |
| Newbury | UK | 4 Bartholomew Street Newbury | RG1 45LL | 44 1635 529 544 | Mark & Lesley-Ann Simmonds | cwnewbury@cartridgeworld.org |
| New Malden | UK | 370 Malden Road Worcester Park Surrey | KT4 7NW | 44 2083 3306 103 | John McKeown | cwnewmalden@cartridgeworld.org |
| New Milton | UK | 3 Osbourne House Station Road New Milton | BH25 6HY | 44 01425 616 123 | David Darling | cwnewmilton@cartridgeworld.org |
| Newton Abbot | UK | 165 Queen Street Newton Abbot | TQ12 2BS | 44 1626 365 222 | Brooke Osborn (Manager) | cwnewtonabbot@cartridgeworld.org |
| Northampton | UK | 341 Wellingborough Road Northampton | NN1 4ER | 44 1604 230 333 | Tony Osborne | cwnorthampton@cartridgeworld.org |
| North Finchley | UK | 861 High Road North Finchley London | N12 8PT | | Su-Chuan Paget | cwnorthfinchley@cartridgeworld.org |
| Northwood | UK | 64 The Broadway Joel Street Northwood Hills Middlesex | HA6 1PA | 44 1923 835 248 | Bharat Parmar | cwnorthwood@cartridgeworld.org |
| Northwich | UK | 78 Witton Street Northwich Cheshire | CW9 5AE | 44 106 354 554 | A Miller, S Gee, K Gee & S Woodbridge | cwnorthwich@cartridgeworld.org |
| Norwich | UK | 119 Unthank Road Norwich | NR2 2PE | 44 1603 662 700 | Craig Moss & Brad Moss | cwnorwich@cartridgeworld.org |
| Oldham | UK | 39 King Street Oldham | OL8 1DP | 44 1616 284 181 | Damain Gallacher & James Knowles | cwoldham@cartridgeworld.org |

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| Ormskirk | UK | 56 Church Street Ormskirk Lancashire | L39 3AW | 44 1695 580 020 | Pete & Michael Walsh | cwormskirk@cartridgeworld.org |
| Oxford | UK | 106 London Road Headington Oxford Oxon | OX9 9AJ | 44 1865 764 454 | Jonathan Barton | cwoxford@cartridgeworld.org |
| Oxley | UK | 506 Stafford Road Oxley Wolverhampton | WV10 6AN | 44 1902 788 240 | Richard Williams | cwoxley@cartridgeworld.org |
| Paignton | UK | 252 Torquay Road Preston Paignton Devon | TQ3 2EZ | 44 1803 551 212 | Paul Slimm | cwpaignton@cartridgeworld.org |
| Parkstone | UK | 185 Bournemouth Road Parkstone Poole Dorset | BH14 9HU | 44 1202 385 000 | David Darling & Simon Denby & Derek Wynne | cwparkstone@cartridgeworld.org |
| Peterborough | UK | 971 Lincoln Road Walton Peterborough | PE4 6AF | 44 1733 570 600 | Neil Summers | cwpeterborough@cartridgeworld.org |
| Petersfield | UK | 30 Lavant Street Petersfield Hampshire | GU32 3EF | 44 1730 710 101 | John Deacon | cwpetersfield@cartridgeworld.org |
| Plymouth | UK | 42 Mutley Plain Plymouth | PL4 6LE | 44 1752 515 151 | Craig Collins & Tracey Chase | cwplymouth@cartridgeworld.org |
| Portsmouth | UK | 48A Keyes Court Albert Road Hampshire | PO5 2SJ | 44 2392 340 060 | Jason & Emma Doran | cwportsmouth@cartridgeworld.org |
| Potters Bar | UK | 24 Barnet Road Potters Bar Hertfordshire | EN6 2QS | 44 1707 642 500 | Mark Babb | cwpottersbar@cartridgeworld.org |
| Preston | UK | 49 Watson Lane Ashton-on-Ribble Preston Lancashire | PR2 2NL | 44 1772 724 465 | David & Diane Gwynne | cwpreston@cartridgeworld.org |
| Pudsey | UK | 82-84 Lowtown Pudsey West Yorkshire | LS28 1AA | 44 113 256 0256 | Alex Procyk | cwpudsey@cartridgeworld.org |
| Rawtenstall | UK | 14 Bury Road Queens Square Rawtenstall Rossendale Lancashire | BB4 6AA | 44 1706 216 687 | Darren & Nyreen Turner | cwrawtenstall@cartridgeworld.org |
| Ripon | UK | 70 North Street Ripon | HG4 1EN | 44 1765 607 743 | Dave Clement (Manager) | cwripon@cartridgeworld.org |
| Rochdale | UK | 147 Yorkshire Street Rochdale Lancashire | OL12 0DR | 44 1706 640 037 | Damian Gallacher | cwrochdale@cartridgeworld.org |
| Rotherham | UK | 259 Wickersley Road Rotherham | S60 4JS | 44 1709 540 656 | Ashley Smith | cwrotherham@cartridgeworld.org |
| Rickmansworth | UK | 186 New Road Coxley Green Rickmansworth Hertfordshire | WD3 3HD | 44 1923 770 072 | Paul & Jana Spalding | cwrickmansworth@cartridgeworld.org |
| Rugby | UK | 4 St Matthews Street Rugby Warwickshire | CV21 3BY | 44 1788 550 575 | Andrew Hunt | cwrugby@cartridgeworld.org |
| Sale | UK | 70 Marsland Road Sale Manchester | M33 3HG | 44 161 973 8448 | Brad McBride | cwsale@cartridgeworld.org |
| Salisbury | UK | 3 Catherine Street Salisbury Wiltshire | SP1 2DF | TBA | Mark & Lesley Ann Simmonds | cwsalisbury@cartridgeworld.org |
| Scarborough | UK | 38-40 Seamer Road Corner Scarborough | YO12 5 BA | 44 1723 377 066 | Andrew & Jayne Colbeck | cwscarborough@cartridgeworld.org |
| Sedgley Park | UK | 44 Bury New Road Sedgley Park Prestwich Manchester | M25 0JU | 44 161 798 5482 | Paul Mason & Gary Kirkby | cwsedgleypark@cartridgeworld.org |
| Sherwood | UK | 519 Mansfield Road Sherwood Nottinghamshire England | NG5 2JL | 44 1159 622 999 | Steve Raw & Mick Weaver | cwsherwood@cartridgeworld.org |
| Shirley | UK | 389 Shirley Road Shirley Southampton | SO15 3JD | 44 2380 343 229 | Terry & Margaret Axton | cwshirley@cartridgeworld.org |
| Slough | UK | 18 High Street Slough Berkshire | SL1 1EQ | 44 1753 575 759 | Narinder Bason | cwslough@cartridgeworld.org |
| Solihull | UK | 1494 Stratford Road Hall Green Birmingham | B28 9ET | 44 121 733 2707 | David Heath | cwsolihull@cartridgeworld.org |
| Southend | UK | 159 Wood Grange Drive Southend-on-Sea Essex | SS1 2SF | 44 1702 600 720 | Robert & Debbie Wells | cwsouthend@cartridgeworld.org |
| Southport | UK | 45 Tulketh Street Southport Merseyside | PR8 1AN | 44 1704 512 280 | Clive Aitken | cwsouthport@cartridgeworld.org |
| Sheldon | UK | Sheldon Chambers 2241 Coventry Road Sheldon Birmingham | B26 3NW | 44 121 743 4555 | Neil Pooler | cwsheldon@cartridgeworld.org |
| Shrewsbury | UK | 15 Conway Drive Monkmoor Shrewsbury Shropshire | SY2 5AU | 44 1743 365 252 | Paul Munro | cwshrewsbury@cartridgeworld.org |
| Stafford | UK | Unit B Madford Retail Park Foregate Street Stafford | ST16 2PA | 44 1785 254 559 | Yik Man & Jenny Shui | cwstafford@cartridgeworld.org |
| St Albans | UK | 159 Hatfield Road St Albans Hertfordshire | AL1 4LB | 44 1727 866 332 | Mariko Ozaki-Owen | cwstalbans@cartridgeworld.org |
| St Helens | UK | 57 Duke Street St Helens | WA10 2JF | 44 1744 200 66 | Jim Mulvaney | cwsthelens@cartridgeworld.org |
| Stockport | UK | 37 Great Portwood Street Stockport Cheshire | SK1 2DW | 44 161 477 9888 | Alan Richings | cwstockport@cartridgeworld.org |
| Stoke-on-Trent | UK | 49 George Street Newcastle-under-Lyme Staffordshire | ST5 1JU | 44 1782 855 947 | Carl Evans | cwstokeontrent@cartridgeworld.org |
| Sunderland | UK | 21 North Bridge Street Sunderland Tyne & Wear | SR5 1AB | 44 1915 142 135 | Martin Bell | cwsunderland@cartridgeworld.org |
| Swindon | UK | 11 Farington Road Swindon Wiltshire | SN1 5AR | 44 1793 714 100 | Jonathan Barton | cwswindon@cartridgeworld.org |
| Tadcaster Road | UK | 90 Tadcaster Road York | YO19 5LJ | 44 1904 700 200 | Ashley & Helen Cooper | cwtadcasterroad@cartridgeworld.org |
| Taunton | UK | 4 East Reach Taunton Someset | TA1 3EN | 44 1823 321 300 | Steve & Carol Pike | cwtaunton@cartridgeworld.org |
| Team Valley | UK | E Zone Building Team Valley Trading Estate Kingsway Gateshead | NE11 0EG | 44 191 482 7815 | Martin Bell | cwteamvalley@cartridgeworld.org |
| Telford | UK | 30 Haygate Road Wellington Shropshire | TF1 1QA | 44 1952 244 542 | Allan Clayton | cwtelford@cartridgeworld.org |
| Totterdown | UK | 184 Wells Road Totterdown Bristol | BS4 2AL | 44 117 971 9306 | Mark Buxton & Andy Hawkins | cwtotterdown@cartridgeworld.org |
| Truro | UK | The Leats Pydar Street Truro Cornwall | TR1 2AS | 44 1872 22 21 21 | Brian & Jennie Coombe | cwtruro@cartridgeworld.org |
| Urmston | UK | 40 Flixton Road Urmston Manchester | M41 5AA | 44 1617 468 060 | Chris Falade | cwurmston@cartridgeworld.org |
| Vauxhall | UK | 334 Kennington Lane Vauxhall London | SE11 5HY | 44 207 582 8605 | Olusola Odelaye | cwvauxhall@cartridgeworld.org |
| Wakefield | UK | 117 Kirkgate Wakefield | WF1 1JG | 44 1924 378 951 | Peter Wells & Phil Trickey | cwwakefield@cartridgeworld.org |
| Walsall | UK | 28 Stafford Street Walsall West Midlands | WS2 8DG | 44 1922 621 222 | Richard Williams & Richard Ison | cwwalsall@cartridgeworld.org |
| Waltham Cross | UK | Unit 2 Regent Gate 83 High Street Waltham Cross Hertfordshire | EN8 7AF | 44 1992 760 333 | Mark & Mandy Babb | cwwalthamcross@cartridgeworld.org |
| Walton | UK | 2 Walton Vale Liverpool | L9 2BU | 44 151 524 3001 | Gordon & Christine Hughes | cwwalton@cartridgeworld.org |
| Wembley | UK | 37 Court Parade Wembley | HA0 3HS | 44 208 904 1551 | Gideon Sidi & Norman Mazure | cwwembley@cartridgeworld.org |
| West Bromwich | UK | 47 Bull Street West Bromwich | B70 6EU | 44121 580 4222 | Chen Singh & Sen Dhillow | cwwestbromwich@cartridgeworld.org |
| Whitley Bay | UK | 234 Whitley Road Whitley Bay Tyne & Wear | NE26 2TA | 44 0191 252 0020 | Martin Bell | cwwhitleybay@cartridgeworld.org |
| Widnes | UK | 152 Widnes Road Widnes | WA8 6BA | | Alan Lee | cwwidnes@cartridgeworld.org |
| Wigan | UK | 695-697 Ormskirk Road Pemberton Wigan | WN5 8AQ | 44 1942 213 000 | Jim Mulvaney | cwwigan@cartridgeworld.org |
| Winchester | UK | 106 Battery Hill Winchester Hampshire | SO22 4BH | 44 1982 865 988 | Sharron & Gary Maltby | cwwinchester@cartridgeworld.org |

CWI
Master Franchisees
and
Unit Franchisees
As of December 1, 2003

| Winton | UK | 776 Wimborne Road Bournemouth Dorset | BH9 2DX | 44 1202 386 666 | Russell Trent | cwwinton@cartridgeworld.org |
| Withington | UK | 540 Wilmslow Road Withington Manchester | M20 4BY | 44 161 434 8000 | Lynn & Ray Beecham | cwwithington@cartridgeworld.org |
| Woking | UK | 4 Guilford Road Woking Surrey | GU22 7PX | 44 1483 747 000 | Nigel & Susan Burrow | cwwoking@cartridgeworld.org |
| Worcester | UK | 49/51 Barbourne Road Worcester | WR1 1SA | 44 1905 24 974 | Michael Horkan | cwworcester@cartridgeworld.org |

| FRANCE | | | | | | |
|---|---|---|---|---|---|---|
| France Master Franchisee (Harrogate) | FR | Unit 3C Hornbeam Park Oval Hornbeam Park Harrogate North Yorkshire | HG2 8RB | 44 1423 878 520 | David Parkinson | david@cartridgeworld.org |
| Boulogne | FR | 3, rue Thiers Croisement route de la Reine et Avenue Victor Hugo | 92100 | 01 46 25 14 10 | Guy De Marolles | guy.de-marolles@wanadoo.fr |
| Grenoble | FR | 118 Cour Jean Jaures | 38000 | 04 76 46 35 58 | Nicolas Brechignac | cwgrenoble@cartridgeworld.org |
| Lille | FR | 142, rue Nationale Lille | 59000 | 03.28.523.532 | Ludovic Delammaecker | cwlille@cartridgeworld.fr |

| GERMANY | | | | | | |
|---|---|---|---|---|---|---|
| German Master Franchisee | DE | Marburger Strasse 44 | | 49 641 797 9831 | Thomas Werle | thomas.werle@cartridgeworld.de |
| Berlin | DE | Lietzenburger Str. 49-50, 10789 Berlin | 10789 | 44 4930 8891 4568 | Shai Benzman & Alex Kos | cwberlin1@cartridgeworld.de |
| Glassen | DE | Marburger Strasse 44 | | 49 641 797 9831 | Thomas Werle | thomas.werle@cartridgeworld.de |
| Goerlitz | DE | Jakobstrasse 6, D02826 Goerlitz | D02826 | 00493581 76 47 11 | Frank Brendler | cwgoerlitz@cartridgeworld.de |
| Jena | DE | Grietgasse 18, 07743 Jena | 7743 | 0049 3641 479377 | Siegfried Henze | cwjena@cartridgeworld.de |
| German Master Franchisee | DE | 12 Ormiston Terrace, Corstorphine, Edinburgh | EH127SJ | 44 13133.44260 | Bruce Stuart | cwcorstorphine@cartridgeworld.org |

| IRELAND | | | | | | |
|---|---|---|---|---|---|---|
| Bangor | UK | Springhill Shopping Centre Killeen Road Bangor County Down | BT19 1ND | 44 2891 272 450 | Bryan Marshall | cwbangor@cartridgeworld.org |
| Belfast | UK | 543 Lisburn Road Belfast County Antrim | BT9 7GQ | 44 2890 681 254 | John & Peter Hendron | cwbelfast@cartridgeworld.org |
| Belfast East | UK | 113 Cregagh Road Belfast County Antrim | BT6 8PZ | 44 2890 739 421 | Roger Lomas | cwbelfasteast@cartridgeworld.org |
| Cork | IE | 10/11 Parnell Place, Cork | | | Tony Holmes & Carmel Holmes | cwcork@cartridgeworld.org |
| Dandalk | IE | 10 Crowe Street, Dandalk Co. Louth | | (042) 93 20150 | James McAnerney | cwdundalk@cartridgeworld.org |
| Dublin | IE | 76 Navan Road, Dublin | 7 | 00353 1 88 23 600 | Mark Walder & Mark Tracey | cwdublin7@cartridgeworld.org |
| Ireland Master Franchisee | IE | Unit 14, Town Park Centre Tuam Road, Galway | | (091) 767 957 | Gerry Smyth | cwireland@eircom.net |
| Galway | IE | Town Park Centre Tuam Road, Galway | | (091) 767 957 | Gerry Smyth | cwgalway@cartridgeworld.org |
| Letterkenny | IE | Pearse Road, Letterkenny, Co. Donegal | | 00353 74 916 8868 | Michael Cowburn | cwdonegal@cartridgeworld.org |
| Limerick | IE | 28 Catharine Street, Limerick | | (061) 405 405 | Tony Jones | cwlimerick@cartridgeworld.org |
| Lisburn | UK | 82 Antrim Street Lisburn | BT28 1AU | 44 2892 604 090 | Peter Hendron | cwlisburn@cartridgeworld.org |

| MALAYSIA | | | | | | |
|---|---|---|---|---|---|---|
| Malaysian Master Franchisee | MY | 15 Jalan 28/70a Desa Sri 50480 Hartamas | | 60 323 000 619 | Shareen Yew | shayew@pc.jaring.my |
| Kuala Lumpar | MY | 15 Jalan 28/70a Desa Sri 50480 Hartamas | | 60 323 000 619 | Shareen Yew | shayew@pc.jaring.my |

| NEW ZEALAND | | | | | | |
|---|---|---|---|---|---|---|
| Botany Downs | North | Unit J / 301 Botany Road Auckland | | 64 9 272 2460 | Jan & Paul Wilkinson | cartridgeworld@bigfoot.com |
| Christchurch (City Central) | South | 198 St Asaph Street City Central | | 64 3 365 7739 | Terry & Raylene Helm | terry@cartridgeworld.co.nz |
| Dunedin | South | 50 Filluel Street | | 64 3 477 4058 | Graeme & Maxine Cochrane | |
| Hamilton | North | 313b Barton Street Hamilton | | 64 7 958 1637 | Josh & Sian Grant | hamilton@cartridgeworld.co.nz |
| Hastings | North | Corner Aubyn & Hastings Street Hastings | | 64 6 873 6169 | Mark Beel | hastings@cartridgeworld.co.nz |
| Henderson | North | 16 Railside Avenue (West Henderson) PO Box 121174 | | 64 9 836 7246 | Steve Clare | cartridge_world@hotmail.com |
| Kilbirnie | North | Shop 12 Kilbirnie Plaza Kilbirnie Wellington | | 64 4 387 2980 | Tony & Debra Clennick | kilbirnie@cartridgeworld.co.nz |
| Lower Hutt | North | 47 Dudley Street Lower Hutt Wellington | | 64 4 569 7872 | Bill & Helen Swann | lowerhutt@cartridgeworld.co.nz |
| Manukau | North | 9-15 Sharkey Street | | 64 9 262 3836 | Josh & Sian Grant | manukau@cartridgeworld.co.nz |
| Mount Eden | North | 380 Dominion Road (PO Box 560058) Mt Eden Auckland | 1003 | 64 9 638 6944 | Ted & Fran Northcott | cartridgeworldmteden@xtra.co.nz |
| Napier | North | 198 Hastings Street | | 64 9 832 8600 | Mark Beel | |
| Nelson | South | 14b Vagabond Street | | 64 3 5469 650 | Jan & John Cramond | jjcramond@xtra.co.nz |
| New Lynn | North | 3077 Great North Road | | 64 9 826 1022 | Jens & Sonia Anderson | newlynn@cartridgeworld.co.nz |
| New Plymouth | North | 172 Devon Street East | | T +64 6 757 4360 | Bryan Kettle | |
| New Zealand Master Franchisee | North | Craignuek 2RD Roxburgh Central Otago | | 64 3 446 8000 | Geoff Smith | smithgeoff@xtra.co.nz |

CWI
Master Franchisees
· and
Unit Franchisees
As of December 1, 2003

| | | | | | | |
|---|---|---|---|---|---|---|
| Northland | North | 89 Cameron Street Whangarei | | 64 9 430 0211 | Jann & Brent Leaming | |
| Northshore | North | 15 / 80 Paul Matthews Road Cnr Upper Harbor Highway Albany | | 64 9 415 3334 | Richard Bunting | northshore@cartridgeworld.co.nz |
| Papakura | North | 117 Great South Road Papakura Auckland | | 64 9 298 8309 | Don Straker | cwpsk@xtra.co.nz |
| Papanui | South | 482 Papanui Road | | 64 4 352 6419 | Jason Wild | papanui@cartridgeworld.co.nz |
| Porirua | North | 7 Hartham Place South (next to Urgent Pharmacy) | | 64 4 238 1576 | Dee Fisher & Tom Glastonbury | porirua@cartridgeworld.co.nz |
| Remuera | North | 648 Remeura Road Remuera Auckland | | 64 9 524 8282 | Geoff Keble | cworld@yahoo.co.nz |
| Riccarton | South | 100 Riccarton Road | | 64 3 348 1046 | Phil Wild & Daslee Southon | phil@cartridgeworld.co.nz |
| Takapuna | North | 4 / 445 Lake Road | | 44 9 486 0215 | John Fairburn | takapuna@cartridgeworld.co.nz |
| Tauranga | North | 84 Willow Street | | 64 7 577 6110 | Peter East | |
| Upper Hutt | North | 79 Main Street Upper Hutt Wellington | | 64 4 528 0822 | Andrew Henderson | upperhutt@cartridgeworld.co.nz |
| Wellington Central | North | Level 1 Grand Arcade 16 Wills Street Wellington | | 64 473 9592 | Bill & Helen Swann | wgtn.store@cartridgeworld.co.nz |
| | | **SCOTLAND** | | | | |
| Aberdeen | UK | 198 Rosemount Place Aberdeen | AB25 2XQ | 44 1224 633 111 | Ricardo & Christina Ferreyra | cwaberdeen@cartridgeworld.org |
| Ayr | UK | 55 Alloway Street Ayr Ayrshire | KA7 1SP | 44 1292 880 669 | Kevin Rosie & David Neil | cwayr@cartridgeworld.org |
| Bathgate | UK | 8 George Place Bathgate West Lothian | EH48 1NP | 44 1506 636 633 | Douglas Pilkington | cwbathgate@cartridgeworld.org |
| Coatbridge | UK | Unit AA Quadrant Shopping Centre Coatbridge North Lanarkshire | ML5 3EG | 44 1236 710 422 | Jerome Oliver & Jo Parker | cwcoatbridge@cartridgeworld.org |
| Corstorphine (Edinburgh) | UK | 12 Ormiston Terrace Corstorphine Edinburgh Scotland | EH12 6SJ | 44 1313 344 290 | Bruce Stuart, Ben Stokes, Marco (the German) | cwcorstorphine@cartridgeworld.org |
| Dalry (Edinburgh) | UK | 54 Dalry Road Edinburgh | EH11 2BA | 44 1313 471 654 | Kieran Panico | cwedinburghdalry@cartridgeworld.org |
| East Kilbride | UK | 7 Hunter Street East Kilbride Glasgow | G74 4LZ | 44 1355 271 984 | Chris Franchitti | cwek@cartridgeworld.org |
| Falkirk | UK | 112 Grahams Road Falkirk Stirling | FT2 7BZ | 44 1324 624 262 | Douglas Broadfoot | cwfalkirk@cartridgeworld.org |
| Glasgow West | UK | 13 Byres Road Partick Glasgow | G11 5RD | 44 1415 761 224 | Fraser MacInnes | cwglasgowwest@cartridgeworld.org |
| Jersey | UK | 16 The Parade, St Helier, Jersey, Channel Islands | JE2 3QP | 0044 1534 734 600 | Martin & Jill Riddock | cwjersey@cartridgeworld.org |
| Kirkcaldy | UK | 3 Whytescauseway, Kirkcaldy, Fife | KY1 1XF | 44 1592 263 093 | Laurie Anderson | cwkirkcaldy@cartridgeworld.org |
| Paisley | UK | 49 Causeyside Street Paisley Renfrewshire | PA1 1YN | 44 1418 873 231 | Asif Akhtar | cwpaisley@cartridgeworld.org |
| Scotland Master Franchisee | UK | 12 Ormiston Terrace Corstorphine Edinburgh | | 44 1313 344 290 | Bruce Stuart | cwscotland@cartridgeworld.net |
| Shawlands | UK | 235 Kilmarnock Road Shawlands Glasgow West | G41 3JF | 44 141 649 6603 | David Neil & Chris Franchitti | cwshawlands@cartridgeworld.org |
| Tayside | UK | 161 Perth Road Dundee Tayside | DD2 1AR | 44 1382 525 298 | Peter McDowall | cwtayside@cartridgeworld.org |
| | | **SINGAPORE** | | | | |
| Singapore Master Franchisee | SG | 304 Orchard Road Lucky Plaza #01 - 41 | 238863 | 65 6 7335 040 | Dominick Tan Kok Hool | dominick@cartridgeworld.com.sg |
| Shenton Way - Singapore | SG | 5 Shenton Way UIC Building # B1 - 07 | 068808 | 65 6323 2998 | Dominick Tan Kok Hool & Karen Yeap | dominick@cartridgeworld.com.sg |
| | | **SPAIN** | | | | |
| Spain Master Franchisee | ES | Edificio Parquesol Local 5 Marbella, Malaga | 29600 | 900) 901 810 | Mark Penney | mark@cartridgeworld.com |
| Marbella | ES | Edificio Parquesol Ramon y Cajal, Local 5 Marbella, Malaga | 29600 | (900) 901 810 | Mark Penney | info@cartridgeworldmarbella.es |
| | | **WALES** | | | | |
| Cardiff | UK | 49 Whitchurch Road Cardiff | CF14 3JP | 44 2920 650 573 | David Dowse | cwcardiff@cartridgeworld.org |
| Newport | UK | 114 Chepstow Road Newport South Wales | NP19 8EF | 44 1633 262 640 | Michael & David Cleaver | cwnewport@cartridgeworld.org |
| Wales Master Franchisee (Harrogate) | UK | Unit I3C Hornbeam Park Oval Hornbeam Park Harrogate North Yorkshire | HG2 8RB | 44 1423 878 823 | David Parkinson | cardiff@cartridgeworld.org |
| Swansea | UK | 2 Walter Road Swansea West Glamorgan | SA1 5NE | 44 1792 472 727 | Matthew Tams (Manager) | cwswansea@cartridgeworld.org |
| Cwmbran | UK | 107 The Highway New Inn Pontypool Wales | NP4 0PJ | 44 1495 767 760 | Steve Helton | cwcwmbran@cartridgeworld.org |

**EXHIBIT E**

**OPERATIONS MANUAL TABLE OF CONTENTS**

# Table of Contents

RECEIPT, TERMS & COPYRIGHT .................................................................................1

WELCOME TO CARTRIDGE WORLD ............................................................................2

LOCATION OF CARTRIDGE WORLD OUTLETS ..........................................................3

HISTORY OF CARTRIDGE WORLD...............................................................................4

THE FRANCHISE SYSTEM AND ITS HISTORY.............................................................5

ORGANIZATION CHART ...............................................................................................7

CARTRIDGE WORLD PHILOSOPHY FOR CONDUCTING BUSINESS ..........................8

CARTRIDGE WORLD ROLE AND RESPONSIBILITIES .................................................9

    Our Responsibilities .............................................................................................9

    Your Role and Responsibilities .........................................................................10

    Specific Responsibilities ...................................................................................10

    Group Loyalty....................................................................................................11

YOUR FIELD CONSULTANT .......................................................................................12

FRANCHISE MEETINGS ..............................................................................................13

THE FRANCHISE AGREEMENT ...................................................................................14

    Termination of Franchise ..................................................................................14

YOUR OPERATIONS MANUAL....................................................................................15

    How To Use your Manual ..................................................................................15

    Purpose ..............................................................................................................15

    Secrecy And Confidentiality .............................................................................15

        *Secrecy*............................................................................................................*16*

        *Confidentiality* ................................................................................................*16*

    Return.................................................................................................................16

    Revisions............................................................................................................16

    Suggestions ........................................................................................................17

    Loss Of Manual..................................................................................................17

# Table of Contents

RECORDING & REPORTING ................................................................................................1

GENERAL BOOKKEEPING ................................................................................................2

    What is Bookkeeping? ................................................................................................2

    The Importance of Bookkeeping ................................................................................2

    Financial Control ................................................................................................3

    Types Of Records You Must Keep ................................................................................5

THE RECEIPTS JOURNAL ................................................................................................9

    What is a Receipts Journal? ................................................................................9

        *Using the Receipts Journal* ................................................................................9
        *Example of Receipts Journal* ................................................................................11

THE PAYMENTS JOURNAL ................................................................................................12

    What Is A Payments Journal? ................................................................................12

        *Using the Payments Journal* ................................................................................12
        *Example of Payments Journal* ................................................................................14

THE PETTY CASH SYSTEM ................................................................................................15

    The Bank Statement ................................................................................................18

    Example Of A Bank Statement ................................................................................20

THE CASH FLOW BUDGET ................................................................................................21

    Example of Cash Flow Worksheet ................................................................................27

ANNUAL REPORTS ................................................................................................30

INSURANCE POLICIES ................................................................................................31

    Minimum Requirements ................................................................................................31

TELEPHONE ................................................................................................32

AUDITS ................................................................................................33

OFFICE ORGANIZATION ................................................................................................34

    Incoming/Outgoing Mail ................................................................................................34

    Franchisor Correspondence ................................................................................................35

Filing ......................................................................................................36

Banking Procedures ...............................................................................37

FRANCHISE REPORTING & PAYMENTS..............................................................38

Monthly Report Form .............................................................................38

Annual Financial Report..........................................................................39

Franchise Service Fees ............................................................................40

Advertising Fee .....................................................................................41

Stock & Supplies Payments ......................................................................42

## Table of Contents

CUSTOMER SALES & SERVICE ............................................................................................. 1

Telephone Enquiries ...................................................................................................... 1

Serving the Customer ................................................................................................ 2
Our Method of Selling ............................................................................................... 3
Selling the Benefits ................................................................................................... 4
Good Business Manners ............................................................................................ 5
The Ten Commandments Of Good Business ............................................................. 8
Handling The Busy Period ......................................................................................... 9
Customer Complaints ............................................................................................... 10
Different Types Of Customers ................................................................................. 11

Cartridge World – Continuous Improvement Matrix ............................................... 12

# Table of Contents

COMPLYING WITH NATIONAL AND LOCAL REGULATIONS ...............................................1

    Business Name Registration ....................................................................................1

FRANCHISE LICENCE DISPLAY .................................................................................2

EXTERNAL DESIGN AND SIGNAGE.............................................................................3

CARTRIDGE WORLD COLOURS..................................................................................4

CORPORATE IDENTITY .............................................................................................5

    Name & Trademark ..............................................................................................5

    Your Use Of Trademark (Logo)...............................................................................6

    Signs ................................................................................................................6

    Originals Available For Printer ...............................................................................6

    Corporate Stationery, Business Cards, Graphic Standards.............................................7

    Improper Use and Infringements..............................................................................9

CORPORATE UNIFORMS ...........................................................................................8

    Uniform Deductibility ..........................................................................................9

    Ordering Process ................................................................................................9

# Table of Contents

INTRODUCTION .............................................................................................................. 1

    **What is Occupational Health & Safety** ........................................................... 1

        *Occupational Health & Safety Policy* ............................................................ 2

OBLIGATIONS ................................................................................................................ 3

    **Emergency Procedures** ................................................................................... 3

POLICY ........................................................................................................................... 3

        *Fire Exits* ........................................................................................................ 4

        *Your Work Area* ............................................................................................ 4

        *Waste Disposal* ............................................................................................. 5

        *Drugs & Smoking* .......................................................................................... 5

        *Harassment* ................................................................................................... 6

        *Manual Handling* .......................................................................................... 6

        *Armed Hold-Up Procedures* ......................................................................... 7

        *Accident Prevention* ...................................................................................... 8

# Table of Contents

DAILY PROCEDURES ...................................................................................1

WEEKLY PROCEDURES ...............................................................................1

MONTHLY PROCEDURES .............................................................................1

HOURS OF BUSINESS ..................................................................................2

UPDATING OF NEW PRODUCTS.....................................................................3

STOCK & SUPPLY CHECK............................................................................4

FREIGHT....................................................................................................4

CREDIT INVOICES ......................................................................................5

    How to Make A Credit Invoice ...........................................................5

PAYMENT OF ACCOUNTS – (CREDITORS) ......................................................6

CASH & SECURITY......................................................................................7

    Cash Receipts .................................................................................7

    Petty Cash .....................................................................................7

    Cash Variances................................................................................7

    Credit Cards ...................................................................................8

    Cash Protection ..............................................................................8

    Cash Theft .....................................................................................8

PREMISES & EQUIPMENT MAINTENANCE .......................................................9

SALE OF YOUR CARTRIDGE WORLD FRANCHISE ...........................................10

FRANCHISEE DISPUTE RESOLUTION ............................................................11

GENERAL COMMUNICATION ......................................................................12

Confidential Operations Manual
Copyright ©

# Table of Contents

ADVERTISING ........................................................................................................... 1

GRAND OPENING – NEW FRANCHISE ............................................................... 2

PRESS RELEASES ................................................................................................... 3

ADVERTISING OPERATIONS .............................................................................. 4

STANDARDS ............................................................................................................. 6

NEWSPAPERS .......................................................................................................... 7

TELEVISION ADVERTISING ............................................................................... 8

RADIO ....................................................................................................................... 9

YELLOW PAGES ..................................................................................................... 10

BROCHURES/DIRECT MAIL ................................................................................ 11

SPONSORSHIPS ...................................................................................................... 12

ASSESSMENT OF EFFECTIVENESS .................................................................. 13

KNOWLEDGE OF THE COMPETITION ............................................................ 14

MAINTAINING PUBLIC AWARENESS .............................................................. 15

LOCAL ADVERTISING & PROMOTION ............................................................ 16

IDENTIFYING AND MARKETING TO NICHE MARKETS ............................... 17

SELLING TO SCHOOLS AND GOVERNMENT AGENCIES ............................. 19

PARTNERING WITH COMPLEMENTARY BUSINESSES ................................ 21

ALIGNING WITH SERVICE COMPANIES, INSTRUCTORS AND RETAILERS ..... 22

LOCAL TRADE AND BUSINESS SHOWS .......................................................... 23

FREE PUBLICITY ................................................................................................... 24

**Personnel & Staff Management**

# Table of Contents

MANAGEMENT STYLE ........................................................................................ 1

    Your Employees & Recruitment ................................................................ 1

    Employee Profile ........................................................................................ 2

    Steps in Selecting Personnel ..................................................................... 3

    Organizing Time ........................................................................................ 4

    Motivating Employees ............................................................................... 5

    Staff And Training ..................................................................................... 6

    Minimum Training Requirements ............................................................. 7

    Ongoing Training ...................................................................................... 7

    Standard Application Form ...................................................................... 8

    Conditions Of Hire .................................................................................. 8

    Staff Pay ................................................................................................... 9

    Application For Leave .............................................................................. 10

        *Vacation Leave* ................................................................................. *10*

        *Sick Leave* ........................................................................................ *10*

    Cartridge World Application For Leave Form ........................................ 11

    Termination .............................................................................................. 12

    Employee Appearance & Personal Presentation .................................... 13

    Smoking .................................................................................................... 14

    Alcohol &/Or Drugs ................................................................................ 14

EMPLOYEE OPERATING PROCEDURE ............................................................... 15

    Introduction ............................................................................................. 15

    Hours Of Employment ............................................................................. 15

    Serving The Customer ............................................................................. 15

    Smile ........................................................................................................ 16

    Greeting ................................................................................................... 16

**Look And Listen** ................................................................................................ **16**

*Acknowledgment - Customer Leaving* .......................................................... *16*

**Suggestive Selling** ............................................................................................ **17**

**Cleaning Vehicle** .............................................................................................. **17**

**Casual, Part Time, Employees** ........................................................................ **18**

**Suggestions** ....................................................................................................... **18**

**Media** ................................................................................................................. **18**

**Cash Receipts** .................................................................................................... **19**

*Giving Change* .............................................................................................. *19*

Retail Law

# Table of Contents

Introduction ................................................................................. 2

Speaking to the Media ............................................................... 4

Speaking to Government Authorities ...................................... 4

Invitation to Buy ........................................................................ 5

Restriction of Purchases ........................................................... 6

Product Recalls and Withdrawals .......................................... 6

Country of Origin ....................................................................... 7

Price Reduction Claims ............................................................. 9

Product Liability ........................................................................ 10

"Bait and Switch" Advertising ................................................ 11

**EXHIBIT F**

**STATEMENT OF PROSPECTIVE FRANCHISEE**

# Cartridge World
# STATEMENT OF PROSPECTIVE FRANCHISEE

## [<u>Note:</u> Dates and Answers Must Be Completed in the Prospective Franchisee's <u>Own</u> Handwriting.]

Since the Prospective Franchisee (also called "me," "our," "us," "we" and/or "I" in this document) and Wildwood Franchising, Inc. (also called the "Franchisor," "you" or "your") both have an interest in making sure that no misunderstandings exist between them, and to verify that no violations of law might have occurred, and understanding that the Franchisor is relying on the statements I/we make in this document, I/we assure the Franchisor as follows:

**A.** <u>The following dates and information are true and correct</u>:

1. _____, 20____    The date of my/our first face-to-face meeting with any person to discuss the possible purchase of a CARTRIDGE **Initials** _____    WORLD ® Franchise.

2. _____, 20____    The date on which I/we received a Uniform Franchise Offering Circular about a CARTRIDGE WORLD® **Initials** _____    Franchise.

3. _____, 20____    The date when I/we received a fully completed copy (other than signatures) of the Franchise Agreement and all other **Initials** _____    documents I/we later signed.

4. _____, 20____    The earliest date on which I/we signed the Franchise Agreement or <u>any</u> other binding document (not including **Initials** _____    any Letter or other Acknowledgment of Receipt.)

5. _____, 20____    The earliest date on which I/we delivered cash, check or other consideration to the Franchisor, or any other person **Initials** _____    or company.

**B.** <u>Representations and Other Matters</u>:

1. No oral, written, visual or other promises, agreements, commitments, representations, understandings, "side deals," options, rights-of-first-refusal or otherwise of any type, including, <u>but not limited to</u>, any which expanded upon or were inconsistent with the Offering Circular, the Franchise Agreement or any other written documents, have been made to or with me/us with respect to <u>any</u> matter (including, <u>but not limited to</u>, advertising, marketing, site location and/or development, operational, marketing or administrative assistance, exclusive rights or exclusive or protected territory or otherwise) nor have I/we relied in any way on any such, except as expressly set forth in the Franchise Agreement, Area Development Agreement or a written Addendum thereto signed by the Prospective Franchisee and the President of the Franchisor, except as follows:

_____

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____

2.    No oral, written, visual or other claim, guarantee or representation (including, but not limited to, charts, tables, spreadsheets or mathematical calculations to demonstrate actual or possible results based on a combination of variables, such as multiples of price and quantity to reflect gross sales, or otherwise), which stated or suggested any specific level or range of actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained), from franchised or non-franchised units, was made to me/us by any person or entity, nor have I/we relied in any way on any such, except for information (if any) expressly set forth in Item 19 of the Franchisor's Offering Circular (or an exhibit referred to therein), except as follows:

_____

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____

3.    No contingency, prerequisite, reservation or otherwise exists with respect to any matter (including, but not limited to, the Prospective Franchisee obtaining any financing, the Prospective Franchisee's selection, purchase, lease or otherwise of a location, any operational matters or otherwise) or the Prospective Franchisee fully performing any of the Prospective Franchisee's obligations, nor is the Prospective Franchisee relying on the Franchisor or any other entity to provide or arrange financing of any type, nor have I/we relied in any way on any such, except as expressly set forth in the Franchise Agreement, Area Development Agreement or a written Addendum thereto signed by the Prospective Franchisee and the President of the Franchisor, except as follows:

_____

(If none, the Prospective Franchisee should write NONE in his/her/their own handwriting.)

**Prospective Franchisee's Initials:** _____

4.    The individuals signing for the "Prospective Franchisee" constitute all of the executive officers, partners, shareholders, investors and/or principals of the Prospective Franchisee and each of such individuals has received the Uniform Franchise Offering Circular and all exhibits and carefully read, discussed, understands and agrees to the Franchise Agreement, Area Development Agreement, each written Addendum and any Personal Guarantees.

**Prospective Franchisee's Initials:** _____

5.    I/we have had an opportunity to consult with an independent professional advisor, such as an attorney or accountant, prior to signing any binding documents or paying any sums, and the Franchisor has strongly recommended that I/we obtain such independent professional advice. I/we have also been strongly advised by the Franchisor to discuss my/our proposed purchase of, or investment in, a CARTRIDGE WORLD® Franchise with existing CARTRIDGE WORLD® Franchisees prior to signing any binding documents or paying any sums and I/we have been supplied with a list of existing CARTRIDGE WORLD® Franchisees.

**Prospective Franchisee's Initials:** _____

6.    I confirm that I have discussed my/our proposed purchase of, or investment in, a CARTRIDGE WORLD® Franchise with the following existing CARTRIDGE WORLD® Franchisees on the dates listed below:

| Name of CARTRIDGE WORLD Franchisee | Date | Name of CARTRIDGE WORLD Franchisee | Date |
|---|---|---|---|
| 1. _____ | ____ | 2. _____ | ____ |
| 3. _____ | ____ | 4. _____ | ____ |
| 5. _____ | ____ | 6. _____ | ____ |

7. I/we understand that: entry into any business venture necessarily involves some unavoidable risk of loss or failure, while the purchase of a franchise may improve my/our chances for success, <u>the purchase of an CARTRIDGE WORLD® franchise (or any other) franchise is a speculative investment, investment beyond that outlined in the Offering Circular may be required to succeed, there exists no guaranty against possible loss or failure in this or any other business and the most important factors in the success of CARTRIDGE WORLD® Franchise, including the one to be operated by me/us, are my/our personal business, marketing, sales, management, judgment and other skills.</u>

**Prospective Franchisee's Initials:** _____

    <u>If there are any matters inconsistent with the statements in this document, or if anyone has suggested that I sign this document without all of its statements being true, correct and complete, I/we will (a) **immediately** inform the Franchisor's attorney (805-547-0697) and the Franchisor's Chief Operating Officer (_____) and (b) make a written statement regarding such next to my signature below so that the Franchisor may address and resolve any such issue(s) at this time and before either party goes forward.</u>

    I/we understand and agree that the Franchisor does not furnish or endorse, or authorize its salespersons or others to furnish or endorse, any oral, written or other information concerning actual or potential sales, costs, income, expenses, profits, cash flow, tax effects or otherwise (or from which such items might be ascertained), from franchised or non-franchised units, that such information (if any) not expressly set forth in Item 19 of the Franchisor's Offering Circular (or an exhibit referred to therein) is <u>not reliable and that I/we have not relied on it, that no such results can be assured or estimated and that actual results will vary from unit to unit and may vary significantly.</u>

**Prospective Franchisee's Initials:** _____

    I/we understand and agree to all of the foregoing and represent and warrant that all of the above statements are true, correct and complete.

Date: _____

**PROSPECTIVE FRANCHISEE (Individual)**


_____
Signature


_____
Printed Name


_____

Signature

_____
Printed Name

**PROSPECTIVE FRANCHISEE (Corp., LLC or Partnership) - Must be accompanied by appropriate personal guarantee(s)**

_____
Legal Name of Entity

_____   _____
Jurisdiction of Formation      Corporation, LLC or Partnership

By: _____
      Name

_____
      Signature

Title: _____

## <u>PRINCIPALS</u>

_____     _____

_____     _____

All of the above is true, correct and complete to the best of my knowledge:

_____
Franchise Marketing Representative

Reviewed by: _____

_____  _____
President of Franchisor       Franchise Agreement Number

## RECEIPT OF FRANCHISE RELATED DOCUMENTS

      The undersigned, personally and/or as an officer or partner of the proposed franchisee, does hereby acknowledge receipt of the following documents, in form of execution:

[    ]        Franchise Agreement with Minnesota Addendum

(Proposed franchisee must initial the box adjacent to the applicable document)

      I further acknowledge my understanding that it is my responsibility, individually and/or as an officer of partner of the proposed franchisee, to review all such documents, so that I am fully familiar with the transaction contemplated thereby prior to the execution thereof.

Date: _____

      THE LAW REQUIRES THAT WE PROVIDE YOU WITH THE FRANCHISE-RELATED DOCUMENTS NOTED ABOVE AT LEAST FIVE (5) BUSINESS DAYS PRIOR TO THE DATE THEY ARE TO BE EXECUTED.  PLEASE DO NOT SIGN OR RETURN THESE DOCUMENTS UNTIL FIVE (5) BUSINESS DAYS HAVE ELAPSED FROM THE DATE OF THIS RECEIPT.


_____,

                    individually and/or as an officer or partner of

                _____

                (_____, corporation)

                (_____, partnership)

ITEM 23
RECEIPT

THIS OFFERING CIRCULAR SUMMARIZES PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.

IF THE SUBFRANCHISOR OFFERS YOU A UNIT FRANCHISE, THE SUBFRANCHISOR MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIER OF :
(1)    THE FIRST PERSONAL MEETING TO DISCUSS THE FRANCHISE; OR
(2)    TEN BUSINESS DAYS BEFORE SIGNING OF A BINDING AGREEMENT; OR
(3)    TEN BUSINESS DAYS BEFORE ANY PAYMENT TO THE SUBFRANCHISOR.

YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN ANY FRANCHISE AGREEMENT.

IF THE SUBFRANCHISOR DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND YOUR STATE AGENCY.

The Subfranchsior authorizes the Commissioner of Commerce, Minnesota Department of Commerce, 85 7th Place East, Suite 500, St. Paul, Minnesota 55101 to receive service of process for the Subfranchisor.

I have received a Uniform Franchise Offering Circular dated: January 28, 2004.

This Offering Circular included the following addenda and exhibits:

Minnesota Addendum to Offering Circular
Exhibit A - Franchise Agreement with Minnesota Addendum
Exhibit B - Financial Statements
Exhibit C - State Administrators and Agents for Service of Process
Exhibit D - List of Current and Former Franchisees, Master Franchisees, And Pilot Operations
Exhibit E - Operations Manual Table of Contents
Exhibit F - Statement of Prospective Franchisee
Exhibit G - Receipts

Date _____         Franchisee Signature _____

Print Name _____

Received Personally and on behalf of:
_____

## ITEM 23
## RECEIPT

THIS OFFERING CIRCULAR SUMMARIZES PROVISIONS OF THE FRANCHISE AGREEMENT AND OTHER INFORMATION IN PLAIN LANGUAGE. READ THIS OFFERING CIRCULAR AND ALL AGREEMENTS CAREFULLY.

IF THE SUBFRANCHISOR OFFERS YOU A UNIT FRANCHISE, THE SUBFRANCHISOR MUST PROVIDE THIS OFFERING CIRCULAR TO YOU BY THE EARLIER OF :
(1)     THE FIRST PERSONAL MEETING TO DISCUSS THE FRANCHISE; OR
(2)     TEN BUSINESS DAYS BEFORE SIGNING OF A BINDING AGREEMENT; OR
(3)     TEN BUSINESS DAYS BEFORE ANY PAYMENT TO THE SUBFRANCHISOR.

YOU MUST ALSO RECEIVE A FRANCHISE AGREEMENT CONTAINING ALL MATERIAL TERMS AT LEAST FIVE BUSINESS DAYS BEFORE YOU SIGN ANY FRANCHISE AGREEMENT.

IF THE SUBFRANCHISOR DOES NOT DELIVER THIS OFFERING CIRCULAR ON TIME OR IF IT CONTAINS A FALSE OR MISLEADING STATEMENT, OR A MATERIAL OMISSION, A VIOLATION OF FEDERAL AND STATE LAW MAY HAVE OCCURRED AND SHOULD BE REPORTED TO THE FEDERAL TRADE COMMISSION, WASHINGTON, D.C. 20580 AND YOUR STATE AGENCY.

The Subfranchsior authorizes the Commissioner of Commerce, Minnesota Department of Commerce, 85 7th Place East, Suite 500, St. Paul, Minnesota 55101 to receive service of process for the Subfranchisor.

I have received a Uniform Franchise Offering Circular dated: January 28, 2004.

This Offering Circular included the following addenda and exhibits:

Minnesota Addendum to Offering Circular
Exhibit A - Franchise Agreement with Minnesota Addendum
Exhibit B - Financial Statements
Exhibit C - State Administrators and Agents for Service of Process
Exhibit D - List of Current and Former Franchisees, Master Franchisees, And Pilot Operations
Exhibit E - Operations Manual Table of Contents
Exhibit F - Statement of Prospective Franchisee
Exhibit G - Receipts

Date _____          Franchisee Signature _____

Print Name _____

Received Personally and on behalf of:

_____